HARRIGAN and others, Respondents, vs. GILCHRIST and
others, Appellants. [Eight appeals.]

*December 11, 1903—June 10, 1904.*

APPEAL. (1, 2) *Service of notice: "Adverse party:" Insolvent cor-*
*poration.* (3, 4) *Several appeals in one notice: Undertakings.*
(5, 7) *Security for costs: Validity of statutes: Constitutional*
*law.* (6, 8) *Jurisdiction of appellate court: Defective appeal:*
*Allowing omissions to be supplied.* (9, 10) *Denying motion to*
*dismiss after defect cured: Terms.* (66) *Findings of fact, when*
*disturbed: Evidence: Fraud.* (117) *Taxation of costs: Several*
*appeals: Who are prevailing parties.*
JURISDICTION: EQUITY. (6) *Of appellate court: Defective appeal.*
(11) *Of subject matter: When may be challenged.* (12, 14–16)
*Want of power, or abuse thereof: Results.* (13) *Circuit courts:*
*Constitutional jurisdiction: Extent.* (17) *Action, at law or*
*in equity? Question not jurisdictional, but one of practice.*
(18, 59) *Error, when jurisdictional.* (19–21, 57, 58) *Equity ju-*
*risdiction: Extent: Principles not precedents: Complicated sub-*
*ject matter.* (25) *Same: Enforcement of trusts.*
CONSTITUTIONAL LAW. (5, 7) *Statutes requiring security for costs:*
*Validity.* (52, 53) *Trial by jury: Extent of right: Statutory ac-*
*tions.*
CORPORATIONS: INSOLVENCY: RECEIVERS: WINDING-UP ACTION: TRUSTS
AND TRUSTEES. (22–24) *Property as trust fund for creditors:*
*Parties defendant in winding-up action: Receiver as trustee:*
*Constructive trustees of property obtained by fraud.* (25) *Ex-*
*clusive jurisdiction of equity.* (26, 27) *Sequestration: Statu-*
*tory remedy: Policy of courts.* (28) *Creditors' action not de-*
*pendent on statute.* (29) *Relations between creditors and re-*
*ceiver: Respective spheres of action.* (30–33) *Destroying iden-*
*tity of subject of trust: Accounting by trustee: Liability at law*
*or in equity? Tort.* (34–38) *Receivers, when and by whom*
*compelled to account: Procedure: Contempt proceeding not ex-*
*clusive: When not to be made defendants as trustees.* (39, 40)
*Fraudulent transferee as defendant: Discovery.* (41) *Dissolu-*
*tion of corporation: Power of courts: Administering property.*
(42–44) *Remedies of creditors as to trust fund: Legal title: Re-*
*ceiver not essential.* (45) *Code substitute for creditors' bill.*
(46, 47) *Amended or supplemental complaint: New matters:*
*Broadening the action: Parties.* (50) *Form of judgment.* (51)
*Joint liability of constructive trustees.* (54, 55, 60) *Receiver*
*collusively appointed, when treated as mere agent for co-wrong-*

doers: *Parties defendant: Accounting.*  (56–59) *Pleading in winding-up suit: Matters included.*  (61) *Condition precedent: Return of execution unsatisfied.*  (62) *Parties: Rearrangement after suit commenced.*  (63) *Supplemental complaint: Delay in asking leave to file.*  (64, 65) *Consolidation of actions.*  (67–69) *Receiver conserving equities at his own expense: Lien: Speculating with subject of trust.*  (70, 71) *Judicial advice: Oral evidence: Misstatements to court.*  (72, 112) *Relief granted although fraud not proven.*  (66b) *Degree of proof necessary.*  (73) *Survival of action: Accounting.*  (74–78) *Conserving hypothecated assets, etc.: Rights of secured creditors: Sharing in distribution: Exhausting security.*  (79–81) *Completing unfinished contracts: Directions by court.*  (82, 83) *Imperfect mortgages: Intention to pledge: Equity: Priority.*  (84–86) *Purchase of trust property by trustee voidable: Recovery of damages by* cestui que trust.  (91, 99) *Advisory orders may be* ex parte.  (92) *Creditor's expenses in prosecuting suit, when allowed.*  (93, 94) *Interests of secured creditors when not adverse to receiver: Attorneys acting for both.*  (95, 97, 98) *Attorneys for receivers: Allowances: Itemized accounts.*  (96) *Allowance for receiver's services.*  (100) *Receiver's responsibility for mistakes of judgment.*  (101–103, 106) *Receiver's accounts: Time and manner of examination: Reference not governed by statute or rules: May be closed summarily:* Ex parte *settlement an indiscretion.*  (113, 114) *Attorneys when bound by allowance: Reducing allowance: Recovery of excess paid: Interest.*  (115, 116) *Expense of settling accounts: Allowance: Judgment for costs against creditors, when payable from trust fund.*

PLEADING AND PRACTICE.  (5, 7) *Security for costs: Validity of requirement.*  (48) *Scope of the Code.*  (49, 56) *Misjoinder of causes of action: Waiver.*  (50) *Judgment: Form.*  (52, 53) *Trial by jury: Extent of right: Statutory actions.*  (61) *Demurrer* ore tenus.  (63) *Supplemental complaint: Delay in asking leave to file.*  (64, 65) *Consolidation of actions.*  (73) *Survival of actions.*  (89) *Reliance on judge's announced opinion: Subsequent contrary decision: Re-opening case.*  (104) *Recitals of fact in order presumed true.*  (105) *Preparation of findings by attorneys.*  (107, 108) *Judges: Reviewing decisions of predecessors: Setting aside orders improvidently granted.*  (109, 110, 113, 114) *Recovery of moneys paid on orders afterwards set aside: Interest.*  (111, 112) *Suit on one cause of action, recovery on another: Equity.*

EVIDENCE.  (66b) *Fraud: Degree of proof necessary.*  (87) *Statements of agent as against principal.*  (90) *Undisputed testimony of interested party.*

MORTGAGES. (82, 83) *Imperfect attempt: Intention to pledge: Equity: Rights of other creditors: Priority.*
SALES. (88) *Of electric lighting plant: Contracts and supplies impliedly included.*

## I.

A creditors' action was commenced as to an insolvent corporation, a receiver appointed, and the usual sequestration proceedings had. Subsequently, the complaint being deemed defective, a supplementary action was commenced, and like proceedings were had therein as before, the receiver's acts under the first appointment being affirmed. Thereafter all proceedings were had as in the two actions till after the passing of the receiver's final account and the distribution of the assets. Then, upon a showing made by creditors that such actions, though commenced ostensibly in their interests, were, in fact, commenced and carried on throughout pursuant to a conspiracy between the officers of the corporation and others to misappropriate the corporate assets, their agent being imposed upon the court as receiver and judicial approval of his acts obtained by fraud, and that it was desired to have the causes so combined and reorganized as to call upon the wrongdoers to account therein for their misdeeds,—no judgment having been rendered interfering with the proposed course,—a formal order was made consolidating the actions and vacating so far as necessary the administrative orders, particularly those passing the receiver's account and distributing the assets. The moving creditors and all similarly situated and wishing to join with them were made plaintiffs, and those theretofore in such position defendants, joining with them the alleged wrongdoers. The order permitted the filing of a supplemental complaint tendering such issues as might be deemed necessary to the administration of the trust. Such a complaint was filed and served and issues joined thereon by all defendants as to all the material allegations thereof, and a trial was had resulting in a judgment for plaintiffs, relief being granted according to the liabilities respectively adjudged against the defendants. Thereupon eight notices of appeal were served, each notice being by two or more defendants to the effect that the persons named therein "severally and separately" appealed, one undertaking for $250 being given with each notice. No notice of appeal was served upon the insolvent. The clerk of the trial court certified the record to this court, and for two years thereafter respondents' counsel treated the appeals as regular, stipulations being made with appellants' counsel providing for continuances, among other

things, with terms in some cases imposed upon appellants', which were submitted to. At the fourth term of the court after such filing of the record, and when the appeals were about to be heard upon the merits, respondents' counsel moved for a dismissal thereof because, while each appellant appealed separately from others, he did not give a separate undertaking. Appellants' counsel seasonably thereafter made due applications to the trial court under sec. 3052, Stats. 1898, for leave to perfect the appeals, which were granted and an undertaking filed accordingly for $250 as to each appellant. A supplemental return having been made showing such facts and bringing up such undertakings, and the motions to dismiss them having been heard,—*Held:*

1. The term "adverse party" in sec. 3049, Stats. 1898, relating to the service of notice of appeal to this court, does not mean merely the opposite party on the record. It does not extend beyond parties having some substantial interest in sustaining the decision challenged by the appeal. p. 207.

2. In an action to reach the property applicable to the payment of the indebtedness of an insolvent corporation, a judgment having been rendered against parties charged with wrongfully appropriating such property or some part thereof, it being conceded that the corporate indebtedness greatly exceeds the corporate assets, and the corporation having for all business purposes ceased to exist, though yet having a legal entity, it is not an adverse party within the meaning of the appeal statutes, in a controversy upon appeal between the creditors and the judgment debtors. p. 210.

3. If several parties join in one notice of appeal, stating that they severally and separately appeal, the effect is the same as if there were as many notices of appeal as appellants; and to make the notice effective as to any appellant an undertaking in the sum of $250 under the statute is requisite to each. p. 210.

4. An undertaking in form to answer in the sum of $250 for the defaults of several defendants constitutes one obligation. p. 211.

5. Reasonable regulations imposing costs and requiring security for costs as incidents of judicial proceedings to redress wrongs or protect rights, do not violate the bill of rights entitling every person to "obtain justice freely and without being obliged to purchase it." p. 214.

6. The giving in good faith of a proper notice of appeal, and the recognition thereof by the proper officer by returning the record to this court, confers jurisdiction here, to allow any defect in the appeal to be cured within the time limited by statute for

taking the same; and if the only defect is in failing to serve the statutory undertaking for $250, it being filed for the use of the respondent, it confers jurisdiction upon this court to hear the appeal without the error being cured, counsel for respondent not seasonably objecting. p. 212.

7. Statutory regulations of the right to a review upon appeal or otherwise, as regards costs and security for costs, cannot be condemned as class legislation merely because it is more burdensome for some persons than for others to comply therewith. p. 220.

8. If the omission to give a proper undertaking to perfect an appeal happens through mistake or accident, it is proper for the trial court to allow such omission to be cured; and if the omission is not attributable to either mistake or accident, so called, but is excusable in any view of the matter, it is competent for this court to allow the defect to be cured if application be seasonably made therefor. p. 221.

9. The new undertaking here being a full compliance with the statutory requirements as to each appeal, and having been filed before the motions to dismiss were heard, it is proper to deny such motions with or without costs to the moving parties, as justice requires. p. 222.

10. Respondents' counsel having treated the appeals as properly taken, with knowledge or full means of knowledge of the facts up to a time when a change of position on their part would be prejudicial to appellants, and having given no reason for not calling the court's attention to the defects at an earlier date, and such defects having been promptly cured as soon as called to the attention of appellants' counsel, no terms should be imposed as a condition of denying respondents' motions and allowing the appeals to stand, except that appellants be required to submit the same upon the merits when reached in their order. p. 222.

## II.

The court, preliminary to deciding the appeals upon the merits, having caused a reargument upon this proposition:

"The property of an insolvent corporation having been placed under the control of a receiver appointed by the court in a winding-up suit, and it being claimed that such receiver, in the course of his administration, has wrongfully lost such property or some portion thereof, his attorneys and others participating in the wrong; is it competent for the court to make the alleged guilty parties defendants in the pending suit with some creditor, or creditors, standing for all persons so cir-

cumstanced, as plaintiff or plaintiffs, broaden out the complaint so as to cover the new matters by a supplemental bill, litigate the same, and include in the general decree in such suit recoveries against all of such alleged guilty parties according to the nature or extent of their liabilities?"

*Held*, in respect thereto as to points raised by counsel, and others suggested:

11. A challenge to the jurisdiction of the court of the subject matter of the litigation in any action is proper at any time in the progress thereof. Whether counsel raise the question or waive it, or expressly consent to the jurisdiction, does not change the situation. p. 224.

12. If the defect of jurisdiction springs from want of power the result is void; if from inexcusable departure from established principles governing the exercise of judicial power, it is erroneous and may and ought to be set aside upon appeal regardless of the attitude of counsel in respect thereto upon either side. pp. 227, 228.

13. The constitutional jurisdiction of the circuit courts of this state is substantially coextensive with that of the English courts of King's Bench, Common Pleas, and Chancery combined. p. 227.

14. A court may be without judicial power as to a particular subject matter, or have such power, but by settled principle ought not to exercise it at all or in the particular way. In either case, within the broad meaning of the term, the court is without jurisdiction of the subject matter. p. 227.

15. Want of judicial power as to a particular subject of action renders relief granted to the plaintiff open to challenge, directly or indirectly, as void. Abuse of power in the sense of inexcusable departure from established principles in the exercise of judicial authority, leaves the result binding upon the parties interested till set aside in some appropriate judicial proceeding. p. 228.

16. Judicial action beyond the limits of judicial power is usurpation. Judicial action within the limits of such power, but regardless of settled principles regulating the exercise of such power, is regarded as error of judgment, but may be jurisdictional error, nevertheless, though remediable only as before stated. p. 228.

17. Under the Code, whether a plaintiff plants his cause of action at law or in equity from the aspect of common-law procedure, does not, if improperly planted, raise a jurisdictional question in the strict sense of the term; only a question of practice. p. 231.

18. Whenever there is such a violation of established practice or principles in regard to the exercise of judicial authority as to

seriously interfere with the efficiency of judicial instrumentalities to administer justice, the error is jurisdictional. p. 231.

19. The jurisdiction of courts of equity is defined by principles, not by precedents; the former govern, the latter illustrate. p. 234.

20. New principles of equity are not to be added by judicial policy, but old ones are subject to development to meet new conditions. p. 235.

21. The relief within the power of equity jurisdiction to afford where legal remedies are inadequate or do not exist at all, is limited only by the wrongs to be redressed or the rights to be protected; this not extending, however, to mere violations of moral obligations. p. 235.

22. In an action to administer the property of an insolvent corporation and enforce liabilities germane thereto as a trust fund for the payment of its debts, all persons possessing any part of such fund in a trust capacity, in any legitimate sense, and all persons contingently liable or liable only upon principles of equity, for the benefit of creditors as a class, are proper defendants. pp. 237–240, 249.

23. A receiver of an insolvent corporation in a creditors' action to administer its affairs for their benefit, is a trustee of corporate assets in the right of the corporation for such creditors, and for the latter in their right as to all liabilities to which they may properly resort as a class, not enforcible by the corporation. p. 237.

24. The last foregoing rule includes persons who may have obtained property of the corporation in fraud of its creditors. They are constructive trustees for creditors, and their liabilities as such may properly be directly established in the creditors' suit. pp. 237–240.

25. The whole subject of enforcing trusts and administering the same is within the exclusive jurisdiction of equity in the absence of any statutory regulation on the subject. p. 241.

26. The statutory remedy by sequestration is not a right of action, new or old. It is at most a mere remedy of a provisional character, for use in an action which exists, except as regards mere form, independently of the statute, such remedy being merely in aid thereof. It is a substitute for the common-law writ of sequestration. p. 243.

27. Generally speaking, courts of equity will not, without legislative policy favorable thereto, manifested in some way, render a corporation incapable of performing its corporate duties and practically terminate its existence by sequestering its property and taking charge of its affairs, though it is within judicial power to do so if necessary to the ends of justice. p. 243.

28. The practice of administering the affairs of an insolvent corporation for the benefit of creditors by proceedings in a general creditors' suit, does not depend upon the statute. So far as the statutes go they are confirmatory or in aid, of the law as it was formerly understood. pp. 244–246.

29. The fact that in a winding-up action creditors cannot act in the right of the receiver, does not militate against liabilities being enforced against parties as defendants in the creditors' action, the legal title to which is in the receiver. The creditors and the receiver have their respective spheres of action. That of the former appertains to the establishment of the trust to its fullest extent, and the enforcement thereof and of the liabilities created by law enforcible upon equitable principles so far as necessary to satisfy the claims of creditors, the effects in money to be covered into the trust fund in the possession of the receiver,—whose sphere of action is wholly administrative in character. pp. 247, 248.

30. A trust as to property having been established, the trustee cannot end his relations to the *cestui que trust* by destroying the identity of the subject of the trust. Such identity being lost, the trustee is yet liable to account in equity to the beneficiary for the loss. p. 251.

31. The doctrine, that when property once impressed with a trust entirely loses that character it cannot be followed and recovered *in specie*, has no application to the subject of whether a trustee may end his personal relations as such by a destruction of the trust fund. p. 250.

32. The doctrine that when the subject of a trust has been destroyed the liability of the trustee is at law, recognized; but the better and common doctrine *held* to be that the trustee is liable in a suit for an accounting as before indicated, and especially where his liability is incidental to a proper subject matter of an action in equity. p. 252.

33. A cause of action to compel an unfaithful trustee and those colluding with him in wasting a trust fund, to account therefor, is not one sounding in tort, though the facts may be such that an action for damages for the wrong might lie. p. 252.

34. The beneficiaries of a trust fund under the control of a receiver may, by permission of the court to whom the latter is accountable, maintain an action against him to compel him to perform his duty. p. 252.

35. A receiver is the agent of the court, and, as such, trustee for creditors, and is liable to account at such times and to such person, and in all respects in such manner, as the court, within the broad field of judicial discretion, may determine. pp. 253, 254.

36. While the usual method of compelling a receiver to account is by summary proceedings in the action in which he was appointed, and the usual way to enforce restitution by him of any sum he may be found upon accounting to have misappropriated or wasted, is by contempt proceedings,—the court, whose agent he is, is not limited to any particular method in that regard. It may adopt any procedure which is reasonable in any view thereof, under the circumstances of the particular case, including that of making the receiver a defendant in a creditors' action, like any wrongful holder of the trust fund or some part thereof, the action still being open so as to admit of that course, and may require issues to be formed by complaint and answer covering the subject, and the same to be tried in the usual way and closed as a part of the general judgment. pp. 253, 301.

37. *Boyd v. Mutual Fire Asso.* 116 Wis. 155, so far as it holds that in case a receiver trustee for creditors wastes the trust fund wrongfully by appropriating the same to his own use or otherwise the creditors have no cause of action which by permission of the court to whom the receiver is accountable they may enforce by action in equity, overruled. p. 262.

38. A receiver or other officer of the court is not a trustee and proper to be made defendant as such, within the meaning of that term as used in sec. 3237, Stats. 1898. p. 266.

39. *Clarke v. Banner & V. P. Co.* 50 Wis. 416, so far as it holds that a person to whom it is claimed property of an insolvent has been transferred in fraud of creditors can be made a defendant in an administrative suit as to such insolvent only for purposes of discovery,—*held* to have been overruled shortly after it was made and never to have been followed. p. 267.

40. Sec. 3228, Stats. 1898, which led to the decision before mentioned, provides a rule of evidence to the end that a party, guilty of participating in the commission of fraud upon creditors of insolvent corporations or fraud for which they may properly call him to account, may be a defendant in a winding-up action, and when called to testify as to his conduct, be incapable of shielding himself from making full disclosure by pleading the ordinary privilege of a witness as to self-incriminating matters. p. 267.

41. Authorities to the effect that a court has no inherent power to dissolve a corporation, have no application to the question of whether it has power to lay hold of and administer the property of an insolvent corporation for the benefit of creditors. The two matters are distinct. The statute provides a right of

action for the former, but only regulations and aids as regards the latter.  p. 268.

42. The doctrine that no creditor can institute a proceeding to obtain any part of the trust fund in the hands of a receiver until it has been awarded him, does not signify that he has no right of action to enforce the trust so that an order of distribution may be made.  p. 269.

43. The fact that the legal title to the trust fund in an administration suit is not in the creditors prosecuting the winding-up action, does not affect their right to an equitable remedy by action against the constructive trustee holders of the funds to be recovered and gathered into the hands of the agent of the court as their regular trustee.  p. 269.

44. It is not an absolute essential to a creditors' action that there shall be a receiver. If only an accounting is sought and there is no need of a provisional remedy because there is no property to be previously conserved, no receiver need be appointed. In any event the creditors' action proceeds from the commencement under their control and the direction of the court, regardless of whether there is a receiver or not.  p. 270.

45. A creditors' action is commenced by a complaint in the nature of a bill in equity. Such complaint is the substitute for, and in all respects performs the office of, the creditors' bill of the old practice. The Code system substitutes the civil action and its appropriate procedure for the former suit in equity or action at law. It only provides a new form of action, leaving the general characteristics of the remedy otherwise the same as before. It is the forms of action, not the substance thereof, as regards the essential of the remedy, that were abolished by the Code.  p. 273.

46. New matters which, had they been known or had they existed at the commencement of an action, might properly have been incorporated in the complaint, may be brought in by amended or supplemental complaint. Such was the old practice, and it is preserved by sec. 2687 of the Code.  p. 274.

47. It is proper in a winding-up action to commence the same in a simple form, according as the necessities of the particular situation may require, and thereafter, with or without leave of the court, according to circumstances, broaden the same out by amended or supplemental complaint so as to bring before the court all parties and all matters proper or necessary to be so circumstanced in order that the entire subject matter, using the term in its broad sense, may be fully dealt with.  p. 274.

48. The doctrine that the Code furnishes a new and complete system of procedure as regards forms of action, and a substitute

as regards names and general characteristics for common-law pleadings, and a system of procedure as regards the same, does not mean that such system includes a form for pleadings and judgment, or for all mere details of practice. p. 277.

49. A misjoinder of causes of action is waived by the defendant if complaint be not seasonably made in the manner prescribed by statute. p. 278.

50. The statute furnishes no form, strictly so called, for a judgment in an action to administer the property of an insolvent corporation for the benefit of creditors, nor for any other. Sec. 3217, Stats. 1898, relates merely to a form of an order of distribution proper to be made in an action or special proceeding. The form of the judgment in all actions of an equitable nature, is governed by established principles of equity jurisprudence, and as indicated in sec. 2883, Stats. 1898. The judgment provided for in sec. 3245, Id., is for the closing up of an action to dissolve a corporation, not one merely to administer its assets for the benefit of creditors. p. 278.

51. Where several persons, in collusion with each other, misappropriate or so waste or misapply property as to become chargeable for the wrong as trustees thereof, they are jointly liable for the entire loss, regardless of the extent to which they may severally have been enriched. p. 280.

52. The constitutional guaranty of the right of trial by jury refers only to such right as it was enjoyed before the constitution. It did not extend then, so it does not now, to actions of an equitable nature. p. 281.

53. A statutory action is not necessarily to be tried by jury. Whether it is or is not so triable is to be determined, in the absence of a statutory declaration on the subject, with reference to whether its general characteristics are those of an action at law or one in equity from the aspect of the old remedies. p. 281.

54. If a receiver, appointed in an action in form to administer the property of an insolvent corporation for the benefit of its creditors, is imposed upon the court by keeping therefrom knowledge of the real purpose of those who nominate him, in the interest of the corporation or its officers, or both, he is to be deemed, as to creditors, the agent of their adversaries. pp. 284, 290, 302.

55. A receiver collusively appointed as above indicated, and enabled to use his office for the benefit of those who are in an adversary capacity to creditors, is not entitled to the usual protection afforded receivers; but may be dealt with, if the court so orders or permits, as a mere agent for such adversaries, and as such made a defendant in the main or an independent action, as

Harrigan v. Gilchrist, 121 Wis. 127.

the court may order or permit, and his conduct judicially investigated in that way and his liabilities enforced by the instrumentalities afforded thereby. In that situation the receiver and his co-wrongdoers may properly be made defendants independently of the statutes, and under secs. 3237 and 3239 thereof as well. pp. 282–293.

56. All of a series of acts having in view the consummation of a single fraudulent purpose, regardless of the number of persons concerned therein, are parts of one subject matter; and where that is a primary subject of action or is an incidental part of a subject of controversy including it and other matters, however numerous, the entire subject matter may be brought into a single action for adjudication. pp. 288, 289.

57. The complications of an action to enforce all liabilities to which creditors of an insolvent corporation may, as a class, properly resort for the satisfaction of their claims, furnishes no justification for so limiting the character thereof as to eliminate therefrom any feature belonging thereto according to the broad principles that have been judicially determined to govern the subject. Those principles, not the difficulties in applying them, mark the boundaries of the subject matter that may be brought into an administration suit. pp. 295–300.

58. One of the most valuable features of equity jurisprudence is the opportunity thereby afforded to judicially lay hold of a subject matter, however large, and however complicated by numerous matters that might under some circumstances constitute each by itself a separate ground of action, bring in all parties directly interested or who should be before the court for their due protection, however numerous, and forever settle the entire controversy, with all its incidental disputes, its major and minor equities. p. 299.

59. Within the broad principles last above stated, no jurisdictional error can be committed so long as there is no unjustifiable prejudicial departure from established practice. pp. 300, 301.

60. If, pending an administration suit, before final judgment, even after the property has been distributed by order of the court, it is claimed upon reasonable ground that the receiver was, by a fraud, introduced into the action to aid the officers of the insolvent to carry out a preconceived design to defraud its creditors while pretending to act as the agent of the court,— it is permissible to make such receiver and his alleged guilty associates defendants in such suit as a method of requiring the receiver to account; and regarding him and his co-wrongdoers as standing for matters germane to the subject of the action, as may properly be done, such practice is fully approved. p. 302.

Harrigan v. Gilchrist, 121 Wis. 127.

### III.

61. In a creditors' action the rendition of a judgment at law, the issuance of an execution thereon, and the return thereof unsatisfied, should be alleged in the complaint, and a defect in that regard may be taken advantage of by demurrer *ore tenus*. p. 306.

62. In a creditors' suit, a sufficient cause of action having been stated in the complaint, a change of parties thereafter, so that no one under the rule last stated, competent at the start to invoke the jurisdiction of the court, appears as plaintiff, or a party to the action, the facts still appearing essential to the cause of action in the beginning, is immaterial. p. 307.

63. Mere delay in moving for leave to bring in a supplemental complaint does not preclude the court from granting a motion to that end. p. 308.

64. A consolidation of several equitable actions, that might have been brought as one, is proper under the statutes and independently thereof. pp. 308, 309.

65. A consolidation of actions means uniting several into one, not consolidation of trials. p. 309.

66. In considering whether findings of fact made by a trial court should be disturbed on appeal, these rules apply:

a. Such findings should stand unless so against the weight of evidence as to indicate, clearly, want of proper consideration of the evidence, mistake by overlooking material evidence, or prejudice, or some other improper cause.

b. It is incumbent on the party alleging fraud to establish it by clear and satisfactory evidence.

c. The first rule does not apply where the result is reached by the trial court through a misapprehension of the law.

d. The first rule applies with more or less significance according to the presence and importance of the elements upon which it is based.

e. The admission of improper evidence is to be deemed immaterial upon appeal unless it clearly appears that but for such evidence the finding would probably have been different.

f. Unless the contrary clearly appears, improper evidence taken under objection will be presumed to have been given no weight. pp. 312–314.

67. A receiver may properly, acting in good faith, at his own expense conserve an equity belonging to the trust if the court, with knowledge of the situation, decides that it were better such equity should be lost than to burden the trust fund to save it. p. 328.

68. A receiver, acting under the circumstances above indicated, may
be deemed to have an equitable lien upon·the property con-
served for the amount of his reasonable expenditures, any
profit obtained to inure to the trust fund. p. 328.

69. Under no circumstances can a receiver rightly speculate with
the subject of his trust for his private gain. pp. 325, 326.

70. Oral evidence as to judicial advice in the administration of a
receivership matter is not necessarily to be rejected or con-
demned as false. p. 329.

71. A misstatement of facts by fraud, negligence, or mistake, in a
petition for judicial advice in a receivership matter, reason-
ably calculated to influence action to the prejudice of creditors
and which has that effect, is a sufficient ground in the same
jurisdiction to support an application by such creditors, sea-
sonably made while the court there has control of the matter,
for relief. pp. 337–339.

72. In an administrative action for the benefit of creditors, if a de-
fendant is charged as trustee of property belonging to the
trust fund on the ground of fraud, and the fraud falls yet the
proof shows that such person has property which belongs to
the trust, the appropriate relief in that regard may be
granted. p. 339.

73. An injury to personal estate survives by statute, and where, if
a person were living, an action in equity could be maintained
against him for an accounting as to property in his possession,
or its equivalent, a judicial remedy survives against his per-
sonal representatives. p. 340.

74. A receiver is not guilty of wrongdoing, necessarily, because he
incurs expense in the collection or conservation of a liability
validly hypothecated by the insolvent as security for a debt
owing by him, because he has no reason to expect such hypothe-
cation to yield a surplus for the trust fund. p. 343.

75. A creditor of an insolvent whose estate is in process of admin-
istration under judicial supervision, having a secured claim
against such insolvent, may prove it to the full amount, and
in such case he is entitled to share with general creditors upon
that basis in every general distribution of trust funds till the
dividends, together with the receipts, if any, from the security,
are sufficient to fully pay such claim, the residue of the se-
curity. remaining to belong to the trust fund or to the owner
of the equity. p. 344.

76. The foregoing is the chancery rule. The rule limiting the claim-
ant, in the circumstances stated, to share with general cred-
itors only on the basis of his claim less the value of his se-
curity, unless he surrenders the latter, is wholly statutory and

. generally confined to administrations under bankruptcy laws. pp. 344, 345.

77. The rule that where there are two funds, one person having security on both and another on one of them, equity will compel the former to first exhaust the security in which his interest is exclusive, is not to be applied to his prejudice. pp. 345, 346.

78. In view of the foregoing, a receiver may properly burden his trust fund, subject to the approval of the court, with expenses of converting into money choses in action or other property in which he has only an equitable title, creditors of the insolvent having the property as collateral, though no surplus is obtainable therefrom, if, under the circumstances, that seems for the best interests of general creditors. pp. 343–347.

79. A receiver may properly be allowed to finish uncompleted contracts of the insolvent, when that, at the time of action in regard thereto, seems for the best interests of general creditors. p. 352.

80. The court will not as of course order its receiver to complete unfinished contracts of the insolvent unless necessary to save investments already made, or otherwise save encumbered property, and such completion is clearly required in the interests of general creditors. In other cases the court and its receiver are to act according to their judgment of the probabilities as to general interests. p. 353.

81. A going manufacturing business,—with its manufacturer's stock, partly constructed machinery, and partly performed contracts, having large investments therein the safety of which depends on completing such contracts,—having been placed in the hands of a receiver to be wound up for the benefit, primarily, of creditors, many of such contract liabilities being validly hypothecated to creditors of the insolvent, and at the outset an order having been made for the temporary continuance of the business in aid of a conservation of the property for general creditors, with power to borrow money upon the credit of the trust fund therefor,—*held*, that such order, by implication, authorized the receiver to complete such contracts if in his judgment the interests of the trust fund would be best subserved thereby, obtaining special advice of the court in doubtful cases. pp. 352–354.

82. An imperfect attempt to give a mortgage, or any act clearly showing an intention to pledge property as security for an indebtedness, or "any transaction, whatever be its form or whatever name the parties may choose to give it," sufficient being done to enable a court of equity to deal with the matter, is in equity a mortgage; and, there being no superior equities,

is as forceful to hold the property for the interest of the mortgagee as any mortgage.  pp. 359, 360.

83. A mortgage of the kind above indicated takes precedence of subsequently acquired rights of creditors in a judicial administration of property of the mortgagor for the benefit of his creditors, and forms a good consideration and justification for the giving of a formal mortgage when, if the equitable right did not exist, a valid security could not be given because of the rights of creditors.  p. 362.

84. If a trustee, whether from good or bad motives, or whether the result be detrimental or beneficial to his *cestui que trust*, becomes a purchaser of the trust property, either directly or by concurrence with another as his agent or associate, the transaction is voidable at the election of such *cestui que trust* if he acts seasonably.  p. 363.

85. In the circumstances last mentioned the *cestui que trust*, by his own act or by the court acting judicially to redress the wrong, cannot, surrendering the property to the wrongful holder, recover more than the damages sustained.  p. 363.

86. Creditors having elected to surrender the property as above indicated, and by untenable claims and misapplication of the law obtained an erroneous judgment requiring much time and expense to obtain a correction of the error, rendering it likely that changes may probably have occurred in the meantime, and there being no real benefits recoverable, it is proper to regard their rights as foreclosed.  p. 364.

87. The unsworn statements of an agent outside the scope of his agency are not proof of the matters indicated therein as regards his principal.  pp. 365–374.

88. In the sale of an electric lighting plant, doing public and private lighting under a public franchise, during the monthly period for which bills to customers are customarily rendered, there being some coal and other supplies on hand for immediate use in that regard, the intention being obvious that the sale was intended to carry, as incident to the property, the going business, nothing appearing to the contrary, such sale *impliedly* includes such unfinished monthly contracts and the supplies on hand, they being deemed mere incidents of the plant.  p. 370.

89. In the trial of an action, if the trial judge at the close of the evidence, as to a matter brought in by amendment on the trial entitling the adverse party to a continuance, announces an opinion as to the effect of such evidence respecting such new matter, having good ground to believe that such announcement will be relied upon by such adverse party, and such party does so rely, and thereafter a decision is rendered materially at

Harrigan v. Gilchrist, 121 Wis. 127.

variance with such opinion,—the case should be reopened as to such new matter upon seasonable application being made therefor with reasonable probability that upon a new hearing ·such adverse party can successfully meet such new matter and is guilty of no inexcusable laches. pp. 374, 375.

90. The undisputed reasonable evidence of one witness, though a party interested, should control as to a question of fact. p. 383.

91. In administering a receivership trust, ordinary advisory orders may properly be granted *ex parte*, and the fact that they are so granted is not evidence tending to show infidelity on the part of the receiver. p. 384.

92. A creditor's expenses, incurred by instituting and prosecuting, prudently and to effect, a suit on behalf of himself and all other creditors of an insolvent corporation, to have its property sequestered and judicially administered for their benefit, may properly be allowed as expenses of such administration. p. 390.

93. The interests of creditors of an insolvent corporation having hypothecations consisting of bills receivable or other choses in action, made by it to secure them,—in property in the hands of a court receiver for the benefit of creditors generally, are not adverse to those of the receiver or such general creditors, there being no question as to the validity of such hypothecations. p. 393.

94. In the circumstances above suggested, legal services rendered the secured creditors as regards enforcing their collateral against the collateral debtors or making formal proof of the principal creditor's claim for filing with the court in the receivership matter, are not inconsistent with the performance of legal services at the same time for the receiver. p. 393.

95. It is not essential nor expected that the general attorney for a receiver whose administration is of such a character as to warrant him in burdening the trust with the expenses of legal services of a general and continuous character, will keep an itemized account of services performed by him. The custom is for the court to allow such sum for expenses of that character as in its judgment the nature of the case reasonably demanded and which were performed. pp. 397, 402, 454.

96. The amount allowable for the personal services of a receiver is to be governed by the subject matter of the administration, the care exercised, the degree of success attained, the manner of the accounting, and all other considerations bearing on the actual value thereof, the rate to be that characterizing somewhat similar services in official life. p. 435.

97. The expenses allowed a receiver for legal assistance are to be governed by the reasonable necessities in that regard, assuming that the receiver has properly discharged the duties which belong to him personally to perform, the time necessarily spent in the administration, the grade of service required, the efficiency of that rendered, the benefit to the trust, the fidelity displayed, and all other circumstances throwing light on the question, the rate to be that ordinarily paid for somewhat similar services in official life. p. 438.

98. The better way to determine the proper amount to be allowed a receiver for legal assistance is to view the whole situation from the standpoint of the results accomplished in the end, without much or any regard to any itemized account. That does not militate against awarding on account reasonable amounts for expenses of that character during the progress of the administration. pp. 394–402.

99. Advisory orders may properly be entered *ex parte* in a receivership matter, and are expected to be so entered as a general rule. p. 384.

100. A receiver is expected to apply to the execution of his trust the discretion of an ordinarily careful business man in business pursuits of a somewhat similar nature, acting in ordinary matters, and as to mere details in others, upon his own judgment without responsibility for losses happening through mere mistakes of judgment. pp. 384, 385.

101. A court, within the boundaries of judicial discretion, may make its own rules as regards the time and manner in which its receiver's account shall be examined and passed upon. p. 414.

102. If a court refers its receiver's account for the taking of testimony and reporting the same with conclusions, such proceeding is not governed by the statute or rules of court regarding references of actions for trial. p. 414.

103. In case of such a reference of a receiver's account, the court may close the same at any time, discharging the referee and causing the whole subject to be brought before him for settlement in the light of such proceedings as shall have been had before the referee, and such other aids as he may call to his assistance, not transcending sound judicial discretion. p. 414.

104. Recitals of fact in a judicial order, the truth of which must be presumed, in the absence of evidence to the contrary, to have been known to, or established to the satisfaction of, the judge making such order, should not be held to be untrue or fraudulent if they may be reasonably viewed in a light which will avoid such result. p. 424.

105. Tested by custom, it is not improper for a referee or a court to delegate to an interested attorney the labor of preparing findings of fact and conclusions of law for the approval and sanction of such referee or court, though the practice itself, aside from such custom, is of doubtful propriety and its discontinuance is advised, this, however, being expressed in the opinion as a personal view of the writer thereof.  pp. 396, 419.

106. The mere *pro forma, ex parte* settlement of an important receiver's account, where creditors are dissatisfied therewith, *held* to be an indiscretion.  pp. 433, 434.

107. A judge should not sit to review the mere exercise of judgment by his predecessor, but should leave the parties aggrieved to their remedy by appeal.  p. 428.

108. Notwithstanding the foregoing general rule, if a judge is clearly satisfied that an order in an action still pending in his court was granted by his predecessor without the exercise of judgment, through mistake or some fraud perpetrated upon the court, or some indiscretion so manifest that the judge granting the same, if in a position to do so, would in all reasonable probability give relief therefrom, or if satisfied that had the adverse parties been heard the result would have been different, and that failure in that regard is attributable to excusable mistake or neglect,—he may set such order aside.  p. 429.

109. Money paid on a judicial order or judgment subsequently set aside, may be recovered back in an action for money had and received, payment being presumed to have been made upon the implied understanding that restoration would take place under such circumstances.  p. 441.

110. That rule does not apply to a person receiving money from another in the extinguishment of an indebtedness *inter partes*, which money shall have been previously adjudged to such other against a third person, upon the adjudication being vacated, so as to enable such third person to recover the same of the one receiving it.  He can recover only of such other.  p. 440.

111. A person cannot sue upon one cause of action and recover upon another; but that does not apply where the cause of action is not proved as alleged, yet a liability is established within the scope of the subject stated, and everything in respect thereto is fully litigated so that an amendment might properly be granted conforming the pleadings thereto; nor militate against the rule that, a court of equity having taken jurisdiction of a subject matter for one purpose, which is not fully established on the trial, a liability notwithstanding being established upon a full hearing, within the scope of such subject, the court will

retain the case and grant such relief as is within its jurisdiction to afford. p. 442.

112. A person having property alleged to belong to a trust fund which he ought to restore thereto, being prosecuted for an accounting and charged with having obtained possession thereof by fraud, fraud failing, yet wrongful possession of the trust fund being fully established, the proper judgment enforcing restoration may be rendered. p. 442.

113. If an attorney accepts employment from a receiver, and, joining with his employer, submits to the court the question of the amount to be allowed him out of the trust fund for his services, the result is binding on him till set aside in some appropriate way, though the liability to him is personal as regards the receiver; and if thereafter the receiver pays the sum allowed and subsequently the adjudication in respect to such allowance is properly changed, the allowable sum being reduced, a cause of action thereby accrues to the receiver to recover the excess. p. 444.

114. An implied promise having been raised as indicated in the foregoing, and become enforcible, interest runs from the date of the payment. p. 444.

115. Expense of a receiver in the settlement of his account, caused by creditors contesting matters in respect thereto, which he reasonably incurs, may properly be allowed to him as legitimate charges against the trust fund. p. 446.

116. If in the settlement of the receiver's account only creditors are interested adversely to the receiver, and they all in good faith litigate with the receiver matters respecting his final account, resulting in a judgment for costs being rendered against them, the court may properly provide that such judgment shall be paid out of the trust fund, or, if paid by the creditors, that they shall be reimbursed therefor out of such fund. p. 450.

117. When several defendants severally appeal from a judgment rendered against them, and succeed, there is not necessarily as many prevailing parties as there are individual appellants for the purpose of the taxation of costs in this court, under sec. 2949, Stats. 1898. Such of the appellants as are united in interest are to be deemed as constituting but one prevailing party, though they may have separate appeals. p. 449.

[Syllabus by Marshall, J.]

Appeals from a judgment of the circuit court for Eau Claire county: A. J. Vinje, Judge. *Reversed in part.*

Winding-up action. *James T. Barber* and the McDonough

Manufacturing Company, a corporation, as creditors of the National Electric Manufacturing Company—neither having obtained a judgment against it, and none having been otherwise obtained—commenced an action in the circuit court for Eau Claire county, ostensibly under sec. 3216, Stats. 1898, and its associate sections, against the electric company to sequestrate its property for the benefit of its creditors. The complaint contained numerous allegations showing urgent necessity for removing such property beyond danger of attack by individual creditors, and those usual in such actions, except as to the existence of a creditor's judgment and the exhaustion of all legal remedies to collect the same without success. The action, though in form adversary, was in fact friendly in that the officers of the corporation deemed it advisable that such proceedings should be taken to place the property of the corporation beyond the reach of individual hostile action by creditors, and promoted the same. The person who had been general counsel for the corporation from the time of its organization severed his relations in that regard to take charge of the sequestration proceedings. He prepared the complaint and was the attorney for the plaintiffs. He also prepared the defendant's answer, a brother attorney signing the same and appearing as the defendant's attorney. Such answer admitted the allegations of the complaint.

Upon the pleadings so prepared R. E. Rust, a director and the secretary of the corporation, was in due form appointed receiver of its property. Seasonably thereafter he qualified pursuant to such appointment, and possessed himself of the corporate property. The order of appointment contained the usual injunction as to the commencement of other actions against the corporation and as to the disturbance of its assets in the hands of the receiver or otherwise. Such proceedings were thereafter taken in the action that on June 10, 1893, an order was entered for all creditors of

the insolvent to exhibit their claims against it and come into
the action within a time therein specified under penalty of
being barred from participating in the distribution of the
corporate property. Notice to creditors was given as required
therein.   September 15th, thereafter, it being supposed that
there was a defect in the complaint in such action in that
statutory requisites prescribed in sec. 3216, Stats. 1898,—
viz., the rendition of a judgment against the corporation, the
issuance of an execution thereon, and the return thereof un-
satisfied in whole or in part,—were not alleged and that the
facts in that regard did not exist, the attorney in such action,
himself a creditor of the corporation, obtained a judgment
against it, caused an execution to be issued thereon, which
was returned unsatisfied, and then commenced a second cred-
itors' action against it in his own name, setting forth substan-
tially the same facts as before, and, in addition, the statutory
requisites mentioned.   In the commencement of such action
he caused F. M. Miner to appear for him as attorney, and the
attorney who interposed the first answer to do likewise in the
second action.   Such second action was treated, as the fact
was, as supplementary to the first action.   Like such action,
while adversary in form, it was in fact in accordance with
the desire of the corporate officers and promoted by them.
Upon the complaint and answer R. E. Rust was reappointed
as receiver by the court, the order recognizing the pendency
of the first action, his connection therewith, and the character
of the second action as in aid thereof, all his acts under
his first appointment being expressly ratified and confirmed.
Under the second appointment Rust requalified in due form,
and thereafter assumed to be lawfully in possession of the cor-
porate property under the later appointment as well as the
earlier one.   After the second appointment till the two ac-
tions were formally consolidated as hereinafter stated, they
were treated as one, all orders and papers being entitled as
in both.

R. E. Rust, under such appointments, administered the duties of his office till he disposed of all the property of the insolvent and disbursed the proceeds of the same pursuant to the orders of the circuit court and was discharged. The proceedings immediately leading to such discharge consisted of a petition setting forth the history of the administration and praying for a final discharge and to have the compensation of the receiver and his attorney fixed by the court; an order upon such petition for hearing and for notice of such hearing to be given to all parties interested; the giving of such notice; the filing of objections by certain creditors; an order of reference to take evidence and report the same with findings; a report by the referee; subsequent proceedings in respect thereto that will hereafter appear in detail; the decision by the court thereon; and three orders pursuant to such decision, allowing the receiver's account and fixing his compensation and that of his attorney and counsel, and fully discharging him and exonerating his bondsmen.

After the occurrences above detailed *T. A. Harrigan* and others, creditors of the corporation, filed a petition setting forth reasons for a formal consolidation of the two actions, for the vacation of the orders allowing the receiver's account and discharging him, and the orders respecting his compensation and that of his attorney and counsel, and also certain orders forming the basis for disbursements made by him, and for a reorganization of the action by making the plaintiffs therein defendants, and the petitioners and other creditors who had filed claims, and such others as might choose to participate in the litigation, plaintiffs; and bringing into the action as parties defendant, H. H. Hayden, *Fitch Gilbert,* R. E. Rust, *George T. Thompson, John S. Owen,* D. R. Moon, *A. J. Rust,* the Bank of Eau Claire, the *Chippewa Valley Bank,* the Westville Lumber Company, for the purpose of enabling plaintiffs to litigate all questions as to their responsibility to the insolvent corporation for the benefit of

its creditors growing out of their dealings with the corporation and its property. Such proceedings were taken upon such petition that March 18, 1898, an order was duly entered as follows:

1. Consolidating the two actions into one.

2. Making *James T. Barber* and H. H. Hayden defendants.

3. Dismissing the action as to the McDonough Manufacturing Company.

4. Making *T. A. Harrigan, Morgan Brooks, Fred Bonell, Edward P. Allis Company,* and *Eureka Tempered Copper Company* parties plaintiff, with the right of any and all other creditors of the insolvent corporation to be made such parties plaintiff at any time upon due application to the court and notice to those specially made plaintiffs, or their attorneys, and to the attorneys of the defendants, and upon their sharing equally the expenses and costs of the litigation with those already parties plaintiff.

5. Making T. F. Frawley, *Fitch Gilbert,* R. E. Rust, *George T. Thompson, John S. Owen,* D. R. Moon, *A. J. Rust,* the Bank of Eau Claire, the *Chippewa Valley Bank,* and the Westville Lumber Company parties defendant.

6. Authorizing the plaintiffs in the action as reorganized to serve upon the defendants an amended summons and complaint, tendering such issues to the defendants as they might deem proper, within twenty days from the date of the order.

7. Permitting any defendant so served to answer the complaint within twenty days from the date thereof.

8. Vacating the three orders entered by the circuit court December 30, 1897.

The facts alleged tendering new issues to be litigated, affecting the persons, firms, and corporations brought into the litigation as defendants, were, in the main, these: 480 shares of the capital stock of the corporation were issued, without being previously or thereafter paid for, to persons named as

defendants. The distribution was to existing stockholders ostensibly as a dividend out of surplus assets legitimately applicable therefor. The corporation was then hopelessly insolvent to the knowledge of the recipients of such stock. January 1, 1893, the board of directors of the corporation consisted of *Fitch Gilbert, George T. Thompson,* Peter Truax, *James T. Barber, John S. Owen, Morgan Brooks,* and Ralph E. Rust. *Gilbert* was the president, Rust the secretary, and *Thompson* the treasurer. Rust, Truax, and *Barber* were directors of the insolvent from its organization till its suspension. *Gilbert* and *Thompson* were directors from about 1889, *Brooks* from February, 1891, and *Owen* from October, 1892, till such suspension. During the last year the insolvent was a going concern H. C. and E. B. Putnam were stockholders, and said *Thompson* was a director and the treasurer thereof, and the three were also sole stockholders and directors of the defendant *Chippewa Valley Bank, Thompson* being the cashier thereof. W. A. Rust and H. H. Hayden, two of the stockholders of the insolvent, were largely interested in the defendant Bank of Eau Claire, Rust being the president and Hayden the vice president thereof. The three Rusts were close relatives of each other and of *John S. Owen,* and the four were largely the proprietors of the Rust-Owen Lumber Company and the Westville Lumber Company. D. R. Moon and *James T. Barber* were respectively president and vice president of the Northwestern Lumber Company. The individuals specifically named were intimately associated as officers and directors of the insolvent and otherwise, throughout the period of its existence as a going concern. Hayden was at different times its president, and during the whole of its business existence he was general counsel and manager of its legal business. He was at the same time largely the adviser and legal counsel of all the defendant corporations named, and of the stockholders of the insolvent, and of all the defendants. For several months prior to January 1, 1893, said individuals

were fully informed that the electric company was hopelessly
insolvent.    About January 1, 1893, to fraudulently secure
payment of various sums of money due them in severalty or
otherwise, or to the corporations named in which they were
interested (the particular items of indebtedness referred to
being specified), they formed a fraudulent scheme to divert
the assets of the insolvent to the special benefit of themselves
and that of the corporations in which they were interested by
securing payment to themselves of the indebtedness so speci-
fied.    Such conspiracy was subsequently fully consummated.
In furtherance of such scheme, prior to the appointment of
the receiver such individuals caused substantially all the
available notes, bonds, bills, and accounts receivable, owned
by the insolvent, and contracts in which it had a pecuniary
interest, to be secretly transferred to themselves according to
their creditor relations to the insolvent, and to the corpora-
tions in which they were interested.    To further consummate
such scheme the participants therein caused the insolvent to
make excessive purchases of supplies shortly before its sus-
pension.    The two winding-up actions consolidated into this
were in fact friendly suits, though in form adversary.    At-
torney Hayden, who was a director of the insolvent and in-
terested with his associates as aforesaid, in fact directed both
sides of both suits and secured the appointment of one of
the conspirators as receiver.    The proceedings resulted in the
appointment of the receiver without notice to the general
creditors, the purpose thereof being to forestall any effort on
the part of such creditors to obtain an equitable distribution
of the assets of the insolvent corporation in a legitimate wind-
ing-up proceeding.    Further to consummate such scheme
they caused the receiver to employ T. F. Frawley, an attor-
ney conversant with the facts, the understanding being that
he and said Hayden, though ostensibly acting for the receiver,
should in fact cause the latter's administration to be con-
ducted in the private interests of the members of the com-

bine; that they should be in fact attorneys for such members, but assume such an attitude as to enable them to obtain their compensation out of the assets of the insolvent. That part of the fraudulent conspiracy was consummated, $5,000 being paid said Hayden and $11,252 said Frawley, said payments being ostensibly for services rendered to the receiver, whereas the labor performed was largely in aid of the said fraudulent scheme. Further in pursuit of such scheme the receiver, while ostensibly administering his trust, performed much service for the private gain of the members of the combine as holders of hypothecations from the insolvent, taking credit for all such services as receiver, and received the sum of $7,500 which was largely therefor. After taking possession of the property of the insolvent the receiver continued to operate the manufacturing plant for several months, paying the expenses out of the general assets of the insolvent, during which time large amounts of money were expended in completing contracts in which the pecuniary interest of the insolvent had been assigned to members of the combine as aforesaid, and in order that they might realize thereon. He also expended large sums of money in repairing machinery sold under contracts assigned as aforesaid in order that the assignees might realize thereon. The nominal assets of the insolvent aggregated $490,000. The amount realized by the receiver, as claimed by him, was $81,000, subject to the expenses of administering the trust, which expenses, as claimed by him, exceeded the entire amount so realized. Such expenses were, as indicated, largely in aid of the members of the combine to enable them to realize upon the assets of the insolvent assigned to them before the receivership. The plaintiffs had no knowledge of the alleged wrongful scheme, or the facts alleged to have occurred in the consummation thereof, till about July, 1897. That then obtained was not definite. Additional information came to them in such a way that it was not till long thereafter that

they became possessed of the alleged facts in detail as to the consummation of such a scheme.

The prayer for relief was in part as follows: (1) That every defendant stockholder who received stock not paid for in full be adjudged to be liable for the deficiency to the creditors participating in the action. (2) That an accounting be had between the receiver's representatives and the insolvent, of the administration of his office in respect to all matters set forth in the complaint, and such representatives be required to refund all moneys retained by the receiver for services and all lost or wasted by him through his wrongful conduct. (3) That all defendants who received any benefit from assets assigned to them prior to the receivership as alleged in the complaint be required to refund the same by payment thereof into court or to the successor of the receiver. (4) That defendant Hayden be required to refund all moneys received by him from the receiver for services, and that defendant Frawley be required to do likewise.

The defendants thus charged with liability upon the ground of fraud joined issue with the plaintiffs, and D. R. Moon's representatives also pleaded in abatement his death, and the statute of limitations. When the cause was brought up for trial they interposed a demurrer *ore tenus,* which was overruled. A trial was had, with a result which can best be understood, as to the matters to be reviewed here, by giving the substance of the findings in respect thereto. We will proceed to do that.

The allegations of the complaint as to the commencement of the first action being a friendly suit, the second of the same character and in aid of the first, the insolvency of the corporation and the existence of grounds for the winding-up suit when the Hayden action was commenced, were sustained. The indebtedness existing and established in the action by the participants therein at the time of the commencement of the

action, less payments made thereon, obtained from sources other than property in possession of the receiver, such payments, however, having been reported and noted by him, was found to be $226,453.02. It was further found that there were some unreported payments received by some of the creditors from hypothecations, which should go in reduction of their claims. The amount due each creditor on the face of the proceedings was specified. The stockholders of the corporation were exonerated from the charge of having received dividend stock and rendered no consideration therefor, or being liable in respect thereto. As to such stock it was held that there was a *bona fide* surplus of corporate assets over liabilities according to inventories and records made in good faith, and that when the dividend stock was authorized and received the persons immediately concerned in the transaction in good faith believed that such surplus in fact existed and was a proper subject for distribution among stockholders and used by them in payment for the so-called dividend stock. The stockholders, directors, and officers of the corporation were also fully exonerated from having entered into any conspiracy in fraud of the general creditors of the corporation prior to March 15, 1893, and of having, pursuant to any wrongful agreement entered into prior to that time, diverted the assets of the insolvent to their own use as security for pre-existing liabilities of such insolvent to them or to corporations in which they were interested. They were also exonerated from the charge of causing the insolvent to make excessive purchases of supplies between January 1, 1893, and the commencement of the first action, in contemplation of its suspension, or for the purpose of carrying out any agreement between themselves to the prejudice of general creditors. All of the defendants brought into the action by the supplemental complaint were exonerated from all charges of wrong-doing which they were therein called upon to answer for, except as

may otherwise appear by findings of fact, which will be now given in substance, with numbers corresponding to the originals:

72. Between May 15 and May 18, 1893, the defendants determined to speedily close up the business of the insolvent, being convinced that no relief from its financial difficulties could be obtained.

73. All participants in stockholders' and directors' meetings subsequent to May 18, 1893, knew that proceedings would soon necessarily be taken to wind up the corporate affairs.

113. Before the commencement of the first action it was agreed between defendants *Gilbert,* R. E. Rust, Hayden, and *Thompson,* to begin the same so as to forestall any litigation by general creditors, and to thereby secure to themselves control of the corporate assets so that an equitable distribution thereof might be prevented and the defendants be able to secure an unlawful preference as to claims held by them and by corporations in which they were interested; and also to secure large sums of money out of such assets for pretended services in relation to the receivership.

114. R. E. Rust's first appointment was secured pursuant to such agreement. He participated in the preconceived plan aforesaid, and aided in carrying it out until his discharge.

115. He retained T. F. Frawley as his attorney, who, about that time, was fully advised of such preconceived scheme. Thereafter, till the receiver was discharged, he aided in carrying out such scheme.

116. From September 4, 1891, until *immediately before* the receiver's appointment, Hayden was general counsel for the insolvent. He resigned such position to take service under the receiver May 23, 1893, continuing therein till the receiver was discharged, and *aiding from first to last in* carrying out said scheme.

117. Had the receivership matter been properly handled it would have been closed up in about eighteen months.

118. In 1894 the receiver collected $6,353.95, $2,623.24 being for the benefit of parties holding hypothecations made by the insolvent before its suspension.

119. In 1895 $1,744.91 was collected.

120. In 1896 $5,824.16 was collected, substantially all being from one creditor, and through the medium of a mercantile agency.

121. $757.36 was collected in 1897.

122. The receiver realized from the corporate property $88,000 in all, which included $11,000 collected on hypothecations held by certain of the defendants, the same being paid to them by order of the court.

123. The receiver, by court order, operated the manufacturing plant for a time, exceeding his authority, however, by borrowing $19,500 when his power in that regard was limited to $5,000.

124. The receiver's inventory was filed October 19, 1893. Soon thereafter it was removed from the court files, since which time no trace of it has been found though diligent search therefor has been made by the clerk of the circuit court.

125. Soon after the receiver's appointment the stockholders of the insolvent, the Bank of Eau Claire, the *Chippewa Valley Bank,* and the Westville Lumber Company, through attorneys Hayden and Frawley, filed proofs in due form of their respective claims against the insolvent, no mention being made of security turned out before the suspension of the corporation, held by the claimants.

126. No report was filed by the receiver till June 23, 1897. Until then, general creditors were ignorant of the administration of affairs by him.

127. Prior to such date none of the creditors, other than

those named as defendants, were familiar with any of the matters connected with the handling and disposition of the assets of the insolvent.

128. Knowledge of the pledging of corporate assets before the suspension was confined to those immediately concerned in giving and taking the security.

129. May 16, 1892, *Gilbert, Thompson,* and R. E. Rust, for the accommodation of the insolvent, indorsed its $8,000 note to the National Exchange Bank of Milwaukee. The note was renewed from time to time with the same indorsements, the last being January 18, 1893, when the indorsers received from the insolvent, as security, an assignment of an electrical plant at Brookfield, Indiana, which was invalid. May 18, 1893, the insolvent mortgaged such plant to the indorsers to secure them, no consideration, however, then passing between the parties. The mortgage was recorded in Indiana the day R. E. Rust was first appointed receiver, the expense thereof being subsequently charged against the assets of the insolvent. The mortgage was given to allow, and taken to obtain, an unlawful preference, defendant Hayden acting for the parties to the transaction with knowledge of all the facts.

130. In aid of the original fraudulent scheme the receiver, *Gilbert, Thompson,* Frawley, and Hayden, July 12, 1893, obtained a court order to sell such plant at private sale for the amount due the National Exchange Bank of Milwaukee, if practicable, otherwise to make public sale thereof upon ten days' notice in an Eau Claire paper.

131. Prior thereto it was agreed between *Thompson, Gilbert,* and the receiver to become owners of the plant by private purchase.

132. That was well known to Hayden and Frawley, who participated in consummating the same, securing in aid thereof the order before mentioned.

133. July 18, 1893, such plan was consummated, the property being conveyed in form to *Thompson,* the real purchasers, however, being *Thompson, Gilbert,* and the receiver. The purchase price for the property was $8,287.20, the limit mentioned in the order as to the making of a private sale. The sale was reported to the court in form and confirmed.

134. The value of the plant when sold was the amount paid therefor.

135. Upon the sale being confirmed the receiver furnished *Thompson* a copy of the order authorizing it, a copy of the report of sale and of the order confirming the same, and the receiver's deed, taking a receipt therefor. The court, throughout, was kept in ignorance of the interest of *Thompson* and the receiver in the sale.

136. At the time of the sale, by book account, the Brookville plant owed Rust, receiver, $1,160.30.

137, 138. He was familiar with the facts in reference to the account.

139. Soon after the sale the parties interested formed a plan for organizing a corporation to take over the title to the property. That was consummated, the stock of the corporation being issued in equal proportions to R. E. Rust, *Gilbert,* and *Thompson.* The plant was thereafter operated for their benefit.

140, 141. The amount due from the Brookville plant to the receiver at the time of the sale was $556.50. That was wrongfully appropriated, by the parties concerned in the sale, to their own use.

142. Subsequent to the sale the parties interested conceived the idea and agreed to take the property as of the date of their mortgage thereof, May 18, 1893, instead of as of the date of the sale.

143. That was not known or authorized by the court.

144. Had the property been sold as of May 18, 1893, the

amount coming to Rust, receiver, on the account against the Brookville plant, would have been $450.32.

145. Said sum was wrongfully appropriated by the parties to the sale, to their own use in operating the plant after May 18, 1893.

146. March 15, 1897, the receiver, under oath, informed the court that the account against the Brookville plant at the date of his appointment was $1,196.40, and was uncollectible and worthless.

147. Such proceedings were had that such account, with others, aggregating $22,000 face value, were in form, June 27, 1897, sold for $49.50, a court order having been obtained authorizing a sale thereof, the court being informed that the property was worthless.

148. When such representation was made as to the Brookville plant account, the receiver knew that $556.50 had been collected and made available to pay the same, but had been converted by him and his associates to their own use.

149. Prior to the receivership an account of $1,550, due the insolvent from the Consolidated Engineering Company, had been assigned to R. E. Rust, *Gilbert,* and *Thompson* as security for their endorsements on a $3,500 note to the Bank of Eau Claire.

150. After the receivership commenced that account was garnished. The assignees intervened and were successful. Litigation followed against the debtor in the name of the receiver, resulting in the collection of $866.66, which was paid to him. All such litigation was conducted by or through the mercantile agency of R. G. Dun & Co.

151. Subsequent to the aforesaid collection the court was informed by the receiver that the money in fact belonged to him personally, and to *Thompson* and *Gilbert.* Payment thereof was ordered accordingly

152. Prior thereto the receiver expended $145 of receivership money in making the collection.

153. *Thompson* and *Gilbert* knew when they participated in the matters respecting such account, that T. F. Frawley was acting for them in the matter at the expense of the receivership.

154. Frawley was paid $430 out of the receivership assets for his services in respect to such account.

155. The receiver acted with knowledge of the facts in regard to the receivership assets bearing the burden of collecting said account.

156. June 21, 1893, Rust, as receiver, charged to *Gilbert* and *Thompson,* $10.75 for expenses respecting an hypothecation held by them, and later obtained permission to charge the same to receivership expenses.

157. A contract between the insolvent and the Bucyrus Steam Shovel & Dredge Company was hypothecated, before the suspension, to *Thompson, Owen, Gilbert,* and Moon as security for their indorsement of a $12,000 note to the National Exchange Bank of Milwaukee.

158. The insolvent had agreed to install for said company, before December 15, 1892, certain electrical machinery, R. E. Rust, *Thompson,* and C. A. Daigh guaranteeing performance. The agreement provided for $50 per day damages for delay and the guarantee covered that feature.

159. By May 23, 1893, $5,510.09 had been expended upon the contract, or $960.09 in excess of the contract price for installation.

160. May 23, 1893, said Bucyrus Company, independent of the aforesaid contract, owed the insolvent $1,795.34.

161. When the receiver was appointed, he, *Gilbert, Thompson, Owen,* and Moon knew the proceeds of the aforesaid contract would be required to discharge the note to the National Exchange Bank of Milwaukee.

162. June 6, 1893, the receiver notified *Owen* that the contract was not completed and that there was a generator on hand designed to be used for that purpose, and that he could

not go on with the contract without the assignees thereof guaranteeing payment for such machine; that upon security being given him for $2,500 for the machine, within a reasonable time, it would be used as designed.

163. July 1, 1893, the receiver informed the court in writing of the Bucyrus Company contract, the assignment thereof, and that the assignees required him to complete the same or to deliver to them the property designed therefor. The court was further informed that the aforesaid generator was of the value of $1,500, and requested to give directions in the premises. Thereupon the receiver was ordered to ship the generator, to collect all the money payable upon the contract for the benefit of the assignees thereof in excess of $1,500, and to hold that for further advice. Prior to such proceedings the Bucyrus Company notified Rust, *Thompson,* and *Gilbert* that their liability for the stipulated damages heretofore mentioned would be enforced.

164. Between September 14 and November 16, 1893, the receiver expended in completing the Bucyrus contract, $2,646.24, without any judicial authority except as aforesaid.

165. February 7, 1894, the receiver informed the court of the facts with reference to the Bucyrus contract, that the contract had been completed, that $5,986.95 was due thereon, that payment had been refused and would have to be enforced by judicial proceedings, and that it was in the interests of the general creditors that he should do so free from any claim of *Gilbert, Thompson, Owen,* and Moon. Judicial authority to do that was asked for, the fruits of the proceedings, when obtained, to be subject to the claim of *Gilbert, Thompson, Owen,* and Moon by reason of the contract assigned to them as aforesaid. They consented thereto.

166. Before the last circumstance occurred the Bucyrus Company paid the receiver, independently of said contract,

$600, leaving due from such company on the independent account, an undisputed balance of $1,195.34.

167. At the time of the occurrence stated in 165 the situation as to dealings with the Bucyrus Company contract stood thus: The amount expended prior to the suspension and remaining unpaid was $5,710.09; the amount due outside the contract was $1,195.34; the amount expended by the receiver in executing the contract was $2,646.24.

168. Further, at the time of such occurrence, all parties concerned knew that nothing could be realized from the Bucyrus Company for general creditors.

169. As per judicial consent given, the receiver commenced judicial proceedings to enforce a lien against the property of the Bucyrus Company to the extent of $5,996.95.

170. His attorney in such matter, T. F. Frawley, was paid out of the assets of the insolvent for his services in the matter $446.80. Other expenses were incurred in such matter to the extent of $187.90.

171. Nothing was realized therefrom, the result being that the sums expended in respect thereto were wholly lost.

172. *Gilbert, Thompson, Owen,* and Moon, in participating in the receiver's handling of such matter, purposed having the expenses of collecting their claim paid out of receivership money.

173. When said generator was used as aforesaid, it was charged by the receiver to *Gilbert, Thompson, Owen,* and Moon. Thereafter he obtained an order of court exonerating such parties therefrom.

174. Previous to the receiver's appointment the insolvent hypothecated a $1,500 account against the Bigelow Electric Supply Company to *Gilbert* and *Thompson* as security for their indorsement of several of its notes. After such appointment the receiver paid $127.36 out of receivership money in collecting the collateral for the holders thereof, all concerned

knowing that it was to the prejudice of the general creditors. The receiver also paid out of the assets of the insolvent, to Attorney Frawley, $214.90 for services in respect to the enforcement of such collateral.

175. During the time the insolvent did business, it installed at Asheville, North Carolina, an electrical plant for the contract price of $32,000, receiving as part payment bonds from the People's Light, Heat & Power Company, of Asheville, of the face value of $14,500. The total issue of such bonds was $17,000. March 23, 1893, $6,000 thereof were held by the *Chippewa Valley Bank* as collateral; $5,000 by M. G. Shaw for the same purpose; $3,500 by the insolvent; $1,500 by J. A. Lyman of Asheville, and $1,000 by W. Barnhart of Asheville.

176. A short time before the appointment of the receiver, $1,000 of the bonds were sent to Asheville to be used in payment for certain real estate upon which the electric plant had been constructed, but the owner would not accept the same.

177. Shortly prior to such appointment the Asheville plant had been sold by the bondholders and bid in by H. B. Walmsley for $5,001 for those other than the ones residing at Asheville. The latter refused to become parties to the purchase. Their part of the proceeds of the sale was $735. It was necessary to pay that, and $1,100 for land upon which the plant was constructed.

178. The receiver had no judicial direction, nor did he ask for any, in respect to protecting the interests of the general creditors in the Asheville bonds, except as herein stated.

179. Immediately after his appointment he began to deal with the Asheville bonds held by him, and the Asheville plant, as individual owner thereof. Such conduct continued until he was discharged. In that he was guilty of wrongful conduct as follows: In not disclosing to the court the ownership of the bonds sought to be used in payment of the real estate upon which the plant was situated; in disclosing to the court

the ownership, as assets of the insolvent, of but $2,500 of such bonds when the amount was in fact $3,500; in representing to the court by verified petition that prior to the receivership the insolvent had contracted to install the plant at Asheville and that the contract had been assigned to *Thompson,* Shaw, and himself as security for moneys loaned the insolvent, knowing that no such assignment had been made and that the plant had been completed long prior to the receivership and sold as aforesaid; in concealing from the court that machinery had been sold by him from the Asheville plant for $1,400; in endeavoring through his attorney to obtain judicial authority to sell to himself, as property of no value, the Asheville bonds forming a part of the assets in his hands as receiver, representing such bonds to be $2,500.

180. June 27, 1897, said Asheville bonds, with other assets, aggregating $22,000, were in form sold to De Alton S. Thomas for $49.50.

181. The receiver fraudulently converted to his own use the $3,500 of Asheville bonds, they being then worth, reasonably, $1,000.

182. July 30, 1895, he expended, as expenses in connection with the Asheville plant, $524.26, charging the same to himself and *Thompson.*

183. Subsequent to April 8, 1897, the receiver, represented by his attorney, petitioned the court for and obtained an order in effect making such charge of $524.26 expenses of the receivership.

184. Soon after the receivership commenced the receiver began personal suits at Asheville as part owner of the Asheville bonds, which suits are still pending.

185. Defendant Hayden was and is one of the attorneys in such litigation.

186. Such wrongful conduct of the receiver was with the knowledge of Frawley, Hayden, and *Thompson.*

187. The charge against *Thompson* respecting the Ashe-

ville plant was properly chargeable to the *Chippewa Valley Bank* as holder of the Asheville bonds as security.

188. Prior to August 6, 1896, the receiver expended $161.71 respecting an account against Armour & Co. of Chicago, assigned by the insolvent to the *Chippewa Valley Bank* prior to the suspension, charging the same to *Thompson*, its cashier, the parties concerned knowing that nothing could be realized in any event for general creditors. Thereafter the receiver, by order of the court induced by him, made such charge a part of the general expense of the receivership.

189. The receiver paid out $853.80 in completing a contract with the St. Louis Electric Light & Power Company, hypothecated to *Gilbert,* Rust, and *Barber* prior to the suspension, he, and the parties to be benefited, knowing that nothing could be realized for the benefit of general creditors. The expenditure was first charged to the parties beneficially interested, but afterwards to the expense of the receivership administration.

190. Prior to July 1, 1893, the receiver paid $51.20 in completing a contract assigned to Rust, *Gilbert,* and *Thompson* as security, all parties concerned knowing that nothing could be realized for general creditors.

191. He used $184.97 of receivership assets in the collection of an account against the National Electric Manufacturing & Construction Company of New York, knowing that it was held by the *Chippewa Valley Bank* as security.

192. He and the officers thereof knew that nothing collected upon said account could go to general creditors.

193. Before the receivership the insolvent hypothecated an account due to it from Caspari, Whittaker & Co. as follows: $1,550 to *Thompson* and *Gilbert;* $1,150 to said *Thompson* and *Gilbert* and R. E. Rust; $2,880 to said *Gilbert;* and subsequently to the appointment of the receiver, with the knowledge and consent of said parties, he expended

out of the assets of the insolvent $369.72 on account of such security.

194. When such expenditure was made the receiver and all parties concerned knew that nothing could be realized upon such security for the benefit of general creditors.

195. April 8, 1897, the receiver informed his attorney that he had an account against *John S. Owen* and others for $1,500 for the machine, used in executing the Bucyrus contract, one against *Gilbert,* Rust, and *Barber* of $853.88 used in executing the contract with the St. Louis Electric Light & Power Company; one against *Gilbert,* Rust, and *Thompson* of $10.75 for expenses incident to an account against the Globe Shoe & Clothing Company of St. Louis; one against Truax for $46.51, used respecting an account against Cook County Hospital; one against *Thompson* of $161.71, for expenses as to an account against Armour & Co.; one against *Thompson,* Shaw, and Rust of $524.26, for expenses as to an account against the Asheville plant; and that he desired the court to release the debtors because he had been unable to collect anything upon the accounts; that an account known as the Asheville bond account, for $2,500, was of no value, and he desired authority to sell it to himself.

196. Thereupon the attorney prepared a petition to be and which was verified by the receiver, setting forth the existence of such accounts; that when the expenditures were made it was supposed there was a margin in the collaterals realizable for general creditors; that none of the parties against whom the charges were made realized any benefit therefrom; that they insisted they were not justly chargeable therewith, and that the receiver coincided with that view.

197. The receiver and his attorney and counsel then knew that no further sum could be collected upon the hypothecations involved. Their purpose was to wrongfully relieve the debtors from their liability to pay the expenses.

198. No proceeds from any of the hypothecations inured to the benefit of general creditors.

199. All expenditures made by the receiver respecting them were known by him and the holders thereof to be for the benefit of the latter.

200. From beginning to end the receivership was managed by Rust and his attorney and counsel for their sole personal benefit and that of *Thompson* and *Gilbert* and the *Chippewa Valley Bank,* pursuant to the original fraudulent scheme stated.

201. It was part of such scheme that all the assets of the insolvent should be absorbed without paying anything to general creditors.

202. Frawley charged the receiver for all services rendered for him, and all for the persons holding the hypothecations as well.

203. Such charges were largely in excess of what was reasonable in any event, as for instance: $1,450 in connection with the sale of the manufacturing plant for $7,500, a reasonable charge being limited to $200; $500 for preparing a petition for confirmation of the sale of the plant and an order to that effect, whereas $50 would have been reasonable; $265 in connection with the sale of the Brookville plant, while a reasonable charge could not have exceeded $50.

204. Frawley charged the receiver large amounts, and received the same out of receivership money, for services not rendered by him at all, as, for example: $100 for collecting of the Monroe Water Works & Lighting Company, the services being rendered by *John S. Owen;* $100 for collecting $2,550 upon certain bonds, the services being rendered by the *Chippewa Valley Bank;* $50 for collecting $1,104.09 of the Ball Electric Company, payment being in fact made directly to the receiver and the money turned over to Peter Truax who held the claim against said company as collateral; $50 for collecting $1,130 on a note, the services being in fact ren-

dered by *Gilbert,* who was the owner thereof; $120 for collecting $2,500 of the Pennsylvania Electric Company; $60 for collecting $1,530 of Chas. H. Baker; $20 for collecting $275.75 of the Reis Electric Specialty Company; $50 for preparing a paper in the sale of the Brookville plant, it being in fact prepared, to the attorney's knowledge, by H. H. Hayden, who made a charge therefor.

205. His total charges were $8,218.31, though he was allowed in addition, $3,092.42.

206. On several occasions during the administration of the receivership, to the prejudice of general creditors he presented petitions to the court, signed by the receiver, containing representations known by the parties to be false, and omitting therefrom facts requisite for the court to know in order to act intelligently.

207. During Attorney Hayden's professional career of many years prior to the receivership, his uniform custom was to charge upon his books in detail for all professional services rendered.

208. His charges against the receiver aggregated $429.74 for services and $50 for expenses.

209. That included an item of $200 for services in obtaining the first appointment of the receiver. It was originally charged to *James T. Barber,* one of the plaintiffs in the first action, but later charged to the receiver.

210, 211. In each instance where he rendered a service for the receiver he charged therefor, all such charges amounting to 429.74, as indicated.

212. He obtained, for services rendered the receiver, $4,952.02 and $50 for expenses, pursuant to the aforesaid fraudulent scheme.

213. While acting for the receiver he also acted as attorney for various persons holding hypothecations, his attitude being sometimes in hostility to general creditors. His services in the whole were compensated for by receivership

moneys obtained as aforesaid, the total exceeding the actual value of his services for the receiver by $4,047.82.

214. *Ex parte* orders were obtained by Frawley, acting as attorney for the receiver, June 11, 1894, allowing the latter: $4,000 as part payment for services, and himself and Hayden each $3,000.

215. Payments to Hayden were as follows: $1,000 January 15, 1894; $2,000 June 18, 1894; $1,952.02 December 30, 1897, in addition to the $50 for expenses.

216. Payments to Frawley were as follows: $2,000 January 3, 1894; $1,000 June 11, 1894; $8,341.63 December 30, 1897.

217. Those to Frawley included $197.61 for expenses.

218. Those to Rust, receiver, were as follows: Prior to June 11, 1894, $4,000; December 30, 1897, $3,427.82.

219. Seasonably after the filing of the receiver's report defendant Truax, on behalf of himself and another, both being large creditors, filed objections thereto and petitioned the court for a reference to a referee for an investigation of the disputed matters, and a report of the evidence taken in that regard to the court.

220. The petition was granted, the reference, however, being to take the evidence and report the same with the referee's conclusions as to the facts, and particularly to take the evidence and report in respect to items charged for legal services, the same being classified under several heads.

221. The contestants, by their attorney, endeavored to have the order not require the referee to make findings, while Hayden and Frawley urged that it should include such duty, and prevailed in that regard.

222. December 21, 1897, while the referee was engaged in the performance of his duties, Frawley secured an *ex parte* order requiring him to conclude the same and file his report by December 27, 1897. Later he obtained another *ex parte*

order that the referee should file his report by December 30,. 1897.

223. The taking of testimony ended that day.   On the· same day Frawley prepared the report, with findings of fact.. The next morning the referee signed it, and with the evi-- dence, consisting of from 500 to 600 typewritten pages, and all other papers in his hands respecting the cause, filed the· same with the clerk of the circuit court, the court being in ses- sion, and Frawley, Hayden, and the receiver being present..

224. Thereupon Frawley, Hayden, and the receiver caused verbal notice to be given to the contestants' attorney that the· court was ready to pass upon the report. ·Such attorney, treat- ing such notice as imposing no duty upon him, did not visit the court.

225. The report was not submitted to such attorney, nor· did he have any notice, other than as aforesaid, of any pro- ceedings in respect thereto on December 30, 1897.   His con- duct was based on the statute and the court rules, which were· well known to Frawley and Hayden and the receiver, as to notice of proceedings upon the report of a referee after the filing thereof.   The findings specially directed to be made by the referee were intentionally omitted from his report, his conduct in that regard being brought about by Hayden, Fraw- ley, and the receiver.            .  ·

227. Upon Hayden and Frawley becoming advised that the attorney for the contestants would not appear and partici- pate in the hearing on said day, they and the receiver held a consultation at the courthouse, the Revised Statutes, and the· rule of court in respect to the treatment of referees' reports· being discussed, resulting in a determination that, so long as the report and findings as prepared remained on file, the court had no power to make or enter any order in respect to the matter before the expiration of ten days, and that the term of office of the presiding judge would expire within that time.

Hayden, Frawley, and Rust then agreed, in furtherance of the aforementioned fraudulent conspiracy, that if they were to secure an order on the report on that day, such report and the findings as prepared by Frawley and on file must necessarily be withdrawn and a different report substituted. Thereupon, by concert of action by all of the parties named, such withdrawal fraudulently occurred and said parties caused to be prepared a brief certificate merely certifying, by the referee, that he had taken certain testimony and reported the same to the court. After such preparation a messenger in the employ of Mr. Frawley was sent to the referee to obtain his presence. Soon thereafter the referee arrived at the courtroom, and thereupon he, Frawley, Hayden, and Rust retired to a small room adjoining such room, for consultation, a suggestion to do so being made to the referee by the other parties named. In such room at that time, Frawley, Hayden, and Rust submitted to the referee the certificate prepared as aforesaid, requesting his signature thereto and stating that the circuit court had ordered his report and findings to be withdrawn from the files and such certificate to be substituted for the findings. The statute and circuit court rule before mentioned were considered at that time. The result of the consultation and the statements made to the referee was that the latter complied with the request of his associates to sign said certificate. Thereafter such certificate was attached to the papers in place of the findings, and the same were then filed by the referee with the clerk.

228. Upon the filing of the new report, Hayden and Frawley presented to the court and obtained judicial sanction of orders allowing the receiver's account and discharging him, and exonerating his bondsmen, and fixing the compensation to be paid to him for his personal services, and the amount to be allowed to him for expenses incurred in the employment of Mr. Hayden as his counsel and Mr. Frawley as his attor-

ney, and of their filling those positions during the term of the receivership.

229, 230. In preparing the final order Frawley and Hayden embodied therein recitals in substance as follows: The attorney of the contestant procured an enlargement of the time for filing the referee's report till December 30, 1897, to permit of his taking evidence as to the value of the services of the receiver, his attorney, and counsel. Prior to such enlargement, the court directed that such report should be filed before December 30, 1897, at which time the matter in dispute would be heard and disposed of by the court. The parties consented thereto and the referee having filed his report of the evidence, and the same being in the form required by the court, to wit, that he should report the evidence taken upon the hearing, such being the construction placed by the court upon its order of reference, being an order of reference to take and report the evidence.

231. The idea of such attorneys in making such false recitals was that the term of court would end December 30, 1897, precluding creditors of the insolvent from attacking the order except upon appeal, where such recitals would be regarded as verities.

232. By December 15, 1897, Frawley, Hayden, *Gilbert, Thompson,* and the receiver, knew an organization of general creditors existed, bent on securing an investigation of the receivership matters, and obtained the orders mentioned, supposing they would preclude such an investigation.

233. The allowances made to the receiver and attorneys December 30, 1897, exceeded the entire available assets in the hands of the receiver, so they divided what there was between themselves *pro rata,* each bearing his proportionate share of the deficiency.

234. No effort was made in the receivership proceedings to enforce payment of any of the insolvent's accounts by the judgment of the court.

235. All court orders in the receivership proceedings were obtained *ex parte.*

236. The services performed by the receiver and by Frawley and Hayden were fraudulent and valueless to general creditors.

237. The reasonable value of the receiver's services, honestly rendered, would not exceed $4,000.

238. That of the services of Frawley, $3,000.   .

239. That of the services of Hayden, $300.

240. Except as indicated, the charges against the defendants, contained in the complaint, are not sustained.

The conclusions of law reached by the court upon such findings, necessary to appear here, other than those common to winding-up actions, are these in effect: (4) Judgment for $84.50, with interest thereon from June 18, 1893, should be rendered against defendant *Gilbert,* for receivership moneys wrongfully applied by him as indicated in finding 75. (5) Judgment should be rendered against defendant *Owen* for $129.52, with interest from July 21, 1893, on account of a wrongful depletion of receivership assets as indicated in finding 87. (7) A joint judgment should be entered against *Gilbert,* and *Thompson,* and W. A. and *A. J. Rust* as executors of the last will and testament of R. E. Rust, deceased, for $8,287.20, with interest from July 17, 1893, because of the fraudulent disposition of the Brookville plant as indicated in the findings. (8) A like judgment should be entered against such parties for $556.50, with interest from July 17, 1893, for money due R. E. Rust as receiver, from the Brookville plant, and illegally appropriated by said *Gilbert, Thompson,* and R. E. Rust personally. (9) And a like judgment should be rendered for $155.72 and interest thereon from August 18, 1894, on account of receivership moneys used for the benefit of *Gilbert, Thompson,* and R. E. Rust respecting the account against the Consolidated Electrical Engineering Company of St. Louis, Mo. (10) Also a like judg-

ment for $51.20, and interest from July 1, 1893, on account of receivership moneys expended for the benefit of *Gilbert* and *Thompson* respecting the Cassadaga Free Association account. (11) And a like judgment against *Gilbert, Thompson, Owen,* and said Rusts as executors as aforesaid, and *Sumner G.* and *Frank H. Moon* as administrators with the will annexed of D. R. Moon deceased, for $2,834.14, with interest from March 18, 1896, on account of receivership moneys dissipated for the benefit of *Gilbert, Thompson, Owen,* R. E. Rust, and D. R. Moon, respecting the Bucyrus contract. (12) A like judgment against the *Chippewa Valley Bank, Thompson,* and the Rusts as executors as aforesaid, for $524.26 and interest from July 30, 1895, on account of receivership moneys used respecting the Asheville plant for the benefit of said bank, *Thompson,* and R. E. Rust. (13) A judgment against the Rusts, as executors as aforesaid, for $1,000, and interest from October 1, 1893, on account of the value of the Asheville bonds converted by R. E. Rust to his own use as indicated in the findings of fact. (14) Also a joint judgment against *Gilbert, Thompson,* and the Rusts as executors as aforesaid, for $127.30 and interest thereon from January 14, 1895, because of receivership moneys wrongfully used respecting the Bigelow Electrical Supply Company account. (15) A like judgment against the *Chippewa Valley Bank, Thompson,* and the Rusts as executors as aforesaid, for $161.71 and interest thereon from August 6, 1894, because of receivership moneys wrongfully used respecting the Armour & Co. matter. (16) A like judgment against *Gilbert, James T. Barber,* and the Rusts as executors as aforesaid, for $853.80 and interest thereon from August 25, 1893, because of a depletion of the assets of the insolvent respecting the contract with the St. Louis Electric Light & Power Company, mentioned in the findings. (17) A like judgment against the *Chippewa Valley Bank,* and the Rusts as executors as aforesaid, for $184.97 and interest from August 6,

1896, for receivership moneys wrongfully used respecting the National Electric & Construction Company account. (18) A like judgment against *Gilbert, Thompson,* and the Rusts as executors as aforesaid for $369.72 and interest thereon from June 6, 1894, on account of receivership moneys wrongfully used respecting the Caspari, Whittaker & Co. account. (19, 20, 21) No compensation should go to either the receiver, T. F. Frawley, or H. H. Hayden, because of wrongful conduct in the receivership proceedings. (22) A joint judgment should be entered against the Rusts as executors, and Frawley and Hayden for $23,523.86, with interest from January 3, 1894, on $2,000; from January 15, 1894, on $1,000; from June 11, 1894, on $5,000; from June 18, 1894, on $2,000; and from December 30, 1897, on $13,523.86. (24) All orders entered in the receivership proceedings prior to and inclusive of the time of the discharge of the receiver should be modified or set aside so far as inconsistent with the foregoing. (26) Costs in favor of the plaintiffs should go, generally, against defendants *Barber* and *Gilbert,* W. A. and *A. J. Rust* as executors as aforesaid, *Thompson, Owen,* and *Sumner G.* and *Frank H. Moon* in their capacity as personal representatives of D. R. Moon, H. H. Hayden, T. F. Frawley, and the *Chippewa Valley Bank,* in a sum not exceeding $500 in addition to taxable disbursements.

Judgment was in due time perfected in accordance with such findings and conclusions and others not necessary to specially mention. Eight separate appeals were taken therefrom, the findings and conclusions involved as to each having been duly excepted to. The following is a detailed statement of such appeals, and, in brief, the ultimate questions raised and the findings challenged:

1. Appeal by W. A. and *A. J. Rust,* as executors as aforesaid, the ultimate complaint being of that portion of the judgment charging them with liability for $1,395.67, principal and interest, for the conversion of the Asheville bonds men-

tioned in conclusion 13, and, generally, for costs according to conclusion 26, the findings of fact excepted to being 175 and 178 to 181 inclusive

2. Appeal by the *Chippewa Valley Bank, George T. Thompson,* and W. A. and *A. J. Rust* as executors as aforesaid, complaining of being charged with liability for $524.26, $161.71, and $184.97, with interest thereon, aggregating $1,128.04, because of the misuse of receivership moneys as indicated in conclusions 12, 15, and 17, and with liability for costs as per conclusion 26; the findings of fact in respect to the matter excepted to being 182, 183, 188, 192, 199, and 200.

3. Appeal by defendants *Gilbert* and *Owen,* W. A. and *A. J. Rust* as executors as aforesaid, and *S. G.* and *F. A. Moon* as personal representatives of D. R. Moon deceased, complaining of the judgment charging them with general liability for costs under conclusion 26, and with liability for $2,834.14 with interest, making $3,536.02, for receivership moneys wrongfully appropriated as held in conclusion 11; the findings excepted to in respect thereto being 159, 161, 163, 164, 168, 170, and 172.

4. Appeal by *Gilbert, Barber,* and the Rusts executors as aforesaid, 'from those parts of the judgment charging them with liability for costs as per conclusion 26, and for $853.80 with interest, making in the aggregate $1,196.68, on account of a wrongful depletion of receivership assets as indicated in conclusion 16, the findings of fact excepted to being 189, 199, and 200.

5. Appeal by *Gilbert, Thompson,* and the Rusts as executors, from the adjudged liability against them for costs as per conclusion 26, and liability for $8,287.20 and interest thereon, on account of the illegal disposition of the Brookville plant as indicated in conclusion 7; and $556.50 with interest, for the misappropriation of the proceeds of an account due from such plant as indicated in conclusion 8; and $155.72

with interest, for moneys misappropriated in respect to the Consolidated Electrical Engineering Company as indicated in conclusion 9; and $51.20 with interest, for moneys misappropriated in connection with the Cassadaga Free Association account, as indicated in conclusion 10; and $2,834.14 with interest, for a wrongful dissipation of the receivership assets in respect to the Bucyrus contract as indicated in conclusion 11; and $127.30 and interest, for wrongful appropriation of receivership assets in respect to the Bigelow Electrical Supply Company account as indicated in conclusion 14; and $369.72 and interest, for misappropriation of receivership assets in respect to the Caspari, Whittaker & Co. account as per conclusion 18; the aggregate being $13,436, exclusive of costs; the findings of fact excepted to being 72 to 133 inclusive, 135, 136, 138 to 145 inclusive, 147, 148, 153, 154, and 155.

6. Appeal by H. H. Hayden, T. F. Frawley, and the Rusts, executors, from the adjudged liability against them for costs as per conclusion 26, and liability for $23,523.86 and interest, aggregating $29,071.90, on account of moneys wrongfully obtained by them out of the receivership assets as per conclusion 22, the findings of fact in respect thereto excepted to being 113 to 128 inclusive, and 176 to 187 inclusive.

7 and 8. Appeals by defendants *Gilbert* and *Owen* from the judgment in respect to several matters, and among them their adjudged liability for $182.94 and $113.58, respectively.

The form of the notices of appeal, as to whether single or not, was this: the parties, joining, "severally and separately appeal." The form of the bond as to each appeal, except those numbered 6 and 7, respecting the same feature, was as follows: "The above named appellants, feeling aggrieved thereby, intend to appeal, now therefore we, etc., do hereby, pursuant to the statute in such case made and provided, un-

dertake that said appellants will pay all damages and costs which may be awarded against them on said appeal, not exceeding the sum of $250, and do also undertake, etc., the said appellants will pay the amount to be directed to be paid by that part of said judgment so appealed from, etc., affirmed," etc. The other two bonds, as to such feature, though worded somewhat differently, were substantially the same. After the record was filed in this court the respondents moved to dismiss all of the appeals for insufficiency of the bonds in that, while as to each appeal there were several parties appellant, each appealing for his own behalf, there was but one appeal bond. Thereafter, and before such motion was heard, the appellants moved the court for leave to give a new bond curing the defects claimed by respondents to exist in those on file.

The cause was first argued and submitted on October 25 and 26, 1902.

For the appellants, upon the motion to dismiss the appeals, there was a brief signed by *H. B. Walmsley,* attorney for H. H. Hayden, by *C. T. Bundy* and *R. P. Wilcox,* attorneys for the other appellants, and by *W. P. Bartlett,* of counsel for W. A. and *A. J. Rust,* executors of the last will of R. E. Rust, deceased. Upon the merits there was a brief signed by *Frawley, Bundy & Wilcox,* attorneys for appellants other than H. H. Hayden, and by *W. P. Bartlett,* of counsel for W. A. and *A. J. Rust,* executors; a separate brief signed by *H. B. Walmsley,* attorney for H. H. Hayden; a supplemental brief signed by *Frawley, Bundy & Wilcox;* and a reply brief signed by *Frawley, Bundy & Wilcox, C. T. Bundy,* and *H. B. Walmsley,* attorneys, and by *W. P. Bartlett,* of counsel for W. A. Rust and *A. J. Rust,* executors. The oral arguments were by *C. T. Bundy* and *H. B. Walmsley.*

For the respondents there were briefs by *F. M. Miner* and *Fleming & Blum,* attorneys, and *Olin & Butler,* of counsel,

and the cause was argued orally by *J. M. Olin, H. L. Butler,* and *F. M. Miner.*

In support of the motion to dismiss the appeals it was contended, on behalf of the respondents: (1) The appeals should be dismissed because of the insufficiency of the undertakings. There is a separate appeal by each defendant. It is competent for one to separately appeal from a joint judgment against him and others. Stats. 1898, sec. 3048; *In re Luscombe's Will,* 109 Wis. 186, 195. The fact that different notices of appeal are included in the same instrument does not render the appeals any the less several. *Sharon v. Sharon,* 68 Cal. 326, 9 Pac. 187, 192. The notices must be given effect according to their terms—according to their plain intent. *Johnson v. C., M. & St. P. R. Co.* 43 Wis. 431; *Olinger v. Liddle,* 55 Wis. 621; *Wood v. Fisk,* 63 N. Y. 245; *Montgomery v. American Central Ins. Co.* 106 Wis. 543. An appeal is a purely statutory right. *Western U. R. Co. v. Dickson,* 30 Wis. 389, 392; *State ex rel. Andrews v. Oshkosh,* 84 Wis. 548, 556. And statutory regulations with respect to the taking of an appeal must be strictly complied with. 2 Ency. Pl. & Pr. 213. Taking, for instance, the undertaking on behalf of *Gilbert, Thompson,* and *Rust,* which is the pattern of all the others, it is void for uncertainty. It does not specify to which of the several appeals contained in the notice it relates. *Kelly v. Leachman,* 5 Idaho, 521, 51 Pac. 407; *Wallace v. McKinlay,* 6 Idaho, 95, 53 Pac. 104; *Home & L. Asso. v. Wilkins,* 71 Cal. 626, 12 Pac. 799; *In re Heydenfeldt,* 117 Cal. 551, 51 Pac. 543; *Centerville & K. I. D. Co. v. Bachtold,* 109 Cal. 111, 41 Pac. 813; *Chamberlain v. Sage,* 14 Wis. 193; *White v. Appleton,* 14 Wis. 190. The undertaking is to pay all costs and damages which may be awarded against "said appellants," i. e., those referred to in the notice. The liability of the sureties being *strictissimi juris* (*Drinkwine v. Eau Claire,* 83 Wis. 430), they could only be held liable for damages and costs

awarded against said appellants *jointly.* *Zane v. De Ona-tivia,* 135 Cal. 440, 67 Pac. 685; *Wood v. Fisk,* 63 N. Y. 245. The obligation of the sureties is limited to $250; but the respondents were entitled, under the statute, to under-takings to that amount *on each appeal.* *White v. Appleton,* 14 Wis. 190, 192. (2) The appeals should be dismissed be-cause no notice was given to the defendant corporation. "The adverse party mentioned in the statute is one who has an in-terest adverse to the reversal of the matter appealed from." *Crowns v. Forest L. Co.* 99 Wis. 103; *Rogers v. Shove,* 98 Wis. 271; *Wheeler v. Hartshorn,* 40 Wis. 83, 96; *Frost v. St. Paul B. & I. Co.* 57 Minn. 325, 59 N. W. 308; *Thomp-son v. Ellsworth,* 1 Barb. Ch. 627; *Cotes v. Carroll,* 28 How. Pr. 436; *Barnes v. Stoughton,* 6 Hun, 254. The recovery in this action is a corporate asset. The corporation is therefore a necessary party to the action. *Land, L. & L. Co. v. Mc-Intyre,* 100 Wis. 245, 256; *Gager v. Paul,* 111 Wis. 638, 651. Except where the corporation has transferred its inter-est in the assets to an assignee, in which event the assignee takes the place of the corporation and becomes an indispen-sable party. *Gores v. Field,* 109 Wis. 408, 415. Failure to serve the statutory notice on any adverse party is fatal to the appeal. *Munk v. Anderson,* 94 Wis. 27; Elliott, App. Proc. § 144; *Hamilton v. Blair,* 23 Oreg. 64, 31 Pac. 197; *Butte Co. v. Boydstun,* 68 Cal. 189, 8 Pac. 835; *Herriman v. Men-zies,* 115 Cal. 16, 44 Pac. 660; *Hunderlock v. Dundee M. & T. I. Co.* 88 Ind. 139; *Curten v. Atkinson,* 29 Neb. 612, 46 N. W. 91. As to appeal by corporation whose functions have been suspended by receivership, see *Stolze v. Manitowoc T. Co.* 100 Wis. 208. That if it might appeal it is necessarily an "adverse party" entitled to notice, see *Rogers v. Shove,* 98 Wis. 271. (3) The defects are jurisdictional and not subject to correction. An appeal cannot be perfected after the lapse of the statutory period. Secs. 2831, 3039, Stats. 1898; *Herrick v. Racine W. & D. Co.* 43 Wis. 93; *Munk v.*

*Anderson,* 94 Wis. 27; Elliott, App. Proc. § 128; *Hall v. Gilman,* 90 Wis. 455. No question is presented here of the omission to perfect an appeal "by mistake or accident" referred to in sec. 3068, Stats. 1898. *Tyson v. Tyson,* 94 Wis. 225, 232. But this statute does not permit an appeal to be perfected after the lapse of the statutory period. *Drinkwine v. Eau Claire,* 83 Wis. 429; *Thompson v. Thompson,* 24 Wis. 517; *Shafer v. Eau Claire,* 105 Wis. 239.

For the appellants, in opposition to the motion to dismiss, it was argued, among other things, that, the notice of appeal having been given, "any other act necessary to perfect the appeal or make it effectual" may be done under the terms of sec. 3068, Stats. 1898. *Johnson v. N. W. Live Stock Ins. Co.* 107 Wis. 337; *Rockman v. Ackerman,* 109 Wis. 639; *Tenney v. Madison,* 99 Wis. 539; *Russell v. Bartlett,* 9 Wis. 556; *Helden v. Helden,* 9 Wis. 557; *Smith v. C. & N. W. R. Co.* 19 Wis. 89; *Ulrich v. Farrington Mfg. Co.* 69 Wis. 213; *Branger v. Buttrick,* 30 Wis. 153; *Gilbank v. Stephenson,* 30 Wis. 155; *Falk v. Goldberg,* 45 Wis. 94; *Grant v. Connecticut M. L. Ins. Co.* 28 Wis. 387; *White v. Polleys,* 20 Wis. 503. The benefit of this curative statute cannot be restricted to the two years after the entry of judgment (1) because the legislature has not said so, and (2) during such two years there is no need of the statute, the right to appeal during that time being absolute. The two years had expired in *Johnson v. N. W. Live Stock Ins. Co.* 107 Wis. 337. The undertaking feature of the statute is not a matter of jurisdiction, and the undertaking may be waived. Sec. 3051, Stats. 1898; 1 Ency. Pl. & Pr. 1000; *In re Luscombe's Will,* 109 Wis. 186, 194. The whole provision as to undertakings for costs is void. The legislature has no power to put any such bar between a litigant and his rights in this court. Const. art. I, sec. 9; Id. art. VII, sec. 3; *Smythe v. Boswell,* 117 Ind. 365, 20 N. E. 263; *Hutts v. Martin,* 131 Ind. 1, 30 N. E. 698. The statute is repugnant also to the federal constitution.

Amendm. XIV; *Williamson v. Liverpool & L. & G. Ins. Co.* 105 Fed. 31; *Yick Wo v. Hopkins,* 118 U. S. 356; *Mutual F. Ins. Co. v. Hammond,* 106 Ky. 386, 51 S. W. 151; *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150.

Upon the merits of the appeals counsel for the appellants other than H. H. Hayden argued: (1) The plaintiffs having alleged actual fraud and conspiracy against each of the appellants, they must prove such allegations or the complaint will be dismissed. *Kruschke v. Stefan,* 83 Wis. 373; *Truesdell v. Bourke,* 145 N. Y. 612; *Barnes v. Quigley,* 59 N. Y. 265; *Gallup v. Bernd,* 132 N. Y. 377; *Truesdell v. Sarles,* 104 N. Y. 164; *Carter v. Glass,* 44 Mich. 154; *Mt. Vernon Bank v. Stone,* 2 R. I. 129, 57 Am. Dec. 709; 11 Ency. Pl. & Pr. 895 and notes. (2) In an action brought for actual fraud relief cannot be had by proving a case of constructive fraud. *Eyer v. Potter,* 15 How. 42; *Piper v. Hoard,* 107 N. Y. 67; 11 Ency. Pl. & Pr. 890. (3) The evidence is insufficient to warrant a finding of actual fraud. Fraud must be proved by clear and satisfactory evidence legitimately pointing thereto. 8 Am. & Eng. Ency. of Law, 854; Kerr, Fraud & Mistake, 382; *Greer v. Caldwell,* 14 Ga. 207; *Shaw v. Gilbert,* 111 Wis. 169. (4) The mortgage given to *Gilbert, Thompson,* and Rust on May 18th, 1893, on the Brookville plant, was a valid and subsisting obligation, even if on that day the officers of the company had determined upon a cessation of business. The informal assignment of Jan. 19th, was, in any event, sufficient evidence of an agreement by the corporation, to secure these appellants. Valid security can be given officers and directors of an insolvent corporation at any time, if given pursuant to a valid prior agreement that such security should be given. *Stout v. Yaeger M. Co.* 13 Fed. 802; *Cowen v. P.-G. Co.* 188 Pa. St. 542, 38 Atl. 1075; *Paulding v. Chrome S. Co.* 94 N. Y. 334; *Coats v. Donnell,* 94 N. Y. 168; *Brower v. Brooklyn T. Co.* 21 N. Y. Supp. 324; 5 Thompson, Corp. 5134; *Appeal of*

*Neal,* 129 Pa. St. 64, 18 Atl. 564; *Young v. Northern Illinois C. & I. Co.* 13 Fed. 806; *Fourth Nat. Bank v. American M. Co.* 11 Sup. Ct. 52, 29 Fed. 611; *Chicago T. & T. Co. v. Smith,* 158 Ill. 417, 41 N. E. 1076; *Clark v. Iselin,* 21 Wall. 360; *Cook v. Tullis,* 18 Wall. 332; *Burdick v. Jackson,* 7 Hun, 488; *Baker v. Harpster,* 42 Kan. 511, 22 Pac. 415; 3 Thompson, Corp. § 4068. The informal assignment of Jan. 19th, 1893, was good in equity as a contract to convey. *Dreutzer v. Lawrence,* 58 Wis. 594. (5) The mortgage of May 18th being valid, the court should either have affirmed the sale of the plant by the receiver to himself, *Gilbert,* and *Thompson,* or set aside such sale and reinstated the mortgage, compelling the said appellants to account for the rents and profits. *Duncomb v. N. Y., H. & N. R. Co.* 84 N. Y. 198. (6) Appellant Frawley, not being an officer, stockholder, or director of the corporation, cannot be held liable in this action. Sec. 3216, Stats. 1898; *Clarke v. Banner & V. P. Co.* 50 Wis. 416. (7) The orders of the court directing the receiver to charge to profit and loss certain amounts, to complete the Bucyrus contract, and other similar orders directing him as to his duty, are administrative in their character, are discretionary, and will not be reviewed by this court. 17 Ency. Pl. & Pr. 881 and cases; *Union Nat. Bank v. Mills,* 103 Wis. 39; *Mercantile T. Co. v. Farmers' L. & T. Co.* 81 Fed. 259. (8) The court and judge making the appointment has the exclusive power to determine the compensation to be paid the receiver, and in doing so can and should consider his personal knowledge of the services rendered and responsibilities assumed. *Union Nat. Bank v. Mills,* 103 Wis. 39; 17 Ency. Pl. & Pr. 878, note, and cases cited. (9, 10) The expenditures of a receiver, made in good faith, for the purpose of reducing to possession, pursuant to the order appointing him, the assets of the corporation, whether encumbered or unencumbered, are properly paid out of any money in his hands at the time of the

final distribution.   The marshaling of the funds in the hands of the receiver and apportioning the expenditures incurred by him in the performance of his trust, is for the court and not the receiver.   Sec. 3245, Stats. 1898; *Speiser v. Merchants' Ex. Bank,* 110 Wis. 506.   (11) If the court erred by allowing the receiver's report as filed, and by allowing to him as credits the expense of collecting hypothecated accounts, such error can be corrected by proper proceeding, and his account surcharged; but it constitutes no sufficient ground to warrant the court in holding that the receiver, his attorneys, and the appellants holding hypothecations were guilty of fraud or dishonesty in the administration of his receivership. *Shaw v. Gilbert,* 111 Wis. 189; *Schwartz v. Keystone O. Co.* 153 Pa. St. 283, 25 Atl. 1018.   (12) A receiver who is authorized by the order of appointment to operate a manufacturing plant is thereby authorized to purchase materials, employ labor, and to complete all uncompleted contracts. *Sager Mfg. Co. v. Smith,* 60 N. Y. Supp. 849, 60 N. E. 1120. (13) The allowance made to the receiver and his attorneys in this case was made by the judge making the appointment upon legal rules and was not excessive for the services rendered.   *Union Nat. Bank v. Mills,* 103 Wis. 39; *Henry v. Henry,* 103 Ala. 582; *In re Little,* 62 N. Y. Supp. 27, 59 N. E. 1125.   (14) The allowance of attorneys' fees is an allowance to the receiver as a disbursement, and such allowance having been paid pursuant to the order of the court, the attorneys receiving it are not liable to the creditors therefor. If improperly allowed, or excessive, such allowance or excess can be charged back to the receiver on a restatement of his account, and he be compelled to account to the creditors for the balance which should be in his hands after all proper credits are allowed him.   *Henry v. Henry,* 103 Ala. 583; *Kirker v. Owings,* 98 Fed. 499; *Mills v. Ross,* 57 N. Y. Supp. 680.   (15) If a receiver improperly disburses funds belonging to the estate, without authority of the court, he is

liable to the creditors in an action brought by a new receiver, both personally and on his bond. *Mills v. Ross*, 57 N. Y. Supp. 680. (16) No part of the proceeds realized from the sale or collection of encumbered assets can be used to pay the expense of the receivership. All such must be paid out of the general assets. *Moore v. Lincoln Park Co.* 196 Pa. St. 519, 46 Atl. 857; *Lane v. Washington H. Co.* 190 Pa. St. 230; *Speiser v. Merchants' Ex. Bank,* 110 Wis. 506. (17) The creditors of the corporation had a lawful right to file their claim for the full amount, without regard to the security by them held or the amount collected thereon, and to receive their proportion of any dividends declared, based on the full amount of their claim. *Chemical Nat. Bank v. Armstrong,* 59 Fed. 372, and cases; *In re Simpson,* 55 N. Y. Supp. 697; *People v. Remington,* 121 N. Y. 328; *In re Bates,* 118 Ill. 524; *Citizens' Bank v. Patterson,* 78 Ky. 291; *Brown v. Merchant's & F. Nat. Bank,* 79 N. C. 244; *Kellogg v. Miller,* 22 Oreg. 406; *Miller's Estate,* 82 Pa. St. 113; *Third Nat. Bank v. Haug,* 82 Mich. 607. (18) When objections are made to a receiver's account it is proper to order a reference to a master, to hear evidence and report on their correctness. 17 Am. & Eng. Ency. Pl. & Pr. 837. (19) A master's report on a receiver's account does not require confirmation, and does not admit, therefore, of exceptions. 17 Ency. Pl. & Pr. 839; *Cowdrey v. Railroad Co.* 6 Fed. Cas. No. 3293. (20) Where the order of reference does not require the referee to report to the court the facts found, he has no authority to report them, and if he does there is nothing before the court on which to base exceptions. *Royal v. Baer,* 17 Ind. 332. (21) The court erred in consolidating the actions and removing as plaintiff the only judgment creditor of the corporation. None but judgment creditors can maintain such an action. *Hinckley v. Pfister,* 83 Wis. 64. (22) The court erred in vacating the administrative order which fixed the compensation of the receiver and

his attorneys. Such order was exclusively under the control of the judge who administered the trust. *Mercantile T. Co. v. Farmers' L. & T. Co.* 81 Fed. 259; *Union Nat. Bank v. Mills,* 103 Wis. 39; *Olson v. State Bank,* 72 Minn. 320, 75 N. W. 378. (23) D. R. Moon was not shown to be an officer or director of the corporation and sustained no fiduciary relation to it or its creditors, and this cause of action for fraud and conspiracy abated with his death. *John V. Farwell Co. v. Wolf,* 96 Wis. 10; *Lane v. Frawley,* 102 Wis. 373. (24) So, also, the cause of action against R. E. Rust, in so far as the same is based on fraud, conspiracy, or conversion, abated with his death. (25) The demurrer *ore tenus* of all of the appellants should have been sustained as the complaint did not allege that the plaintiffs, or any of them, were judgment creditors of the insolvent corporation, or that an execution had been returned against said corporation unsatisfied. *Hinckley v. Pfister,* 83 Wis. 64. (26) The plaintiffs should not be permitted to recover in this action on account of their laches in failing to appear and file exceptions to the receiver's final account as filed, and by reason of their failure to object to the manner in which the court was administering the trust during the receivership. *Twin-Lick O. Co. v. Marbury,* 91 U. S. 587; *Marsh v. Whitfore,* 83 U. S. 482; *Follansbe v. Kilbreth,* 17 Ill. 522; *Dillingham v. Moran,* 81 Fed. 760. (27) The test of a receiver's action in incurring expense, without the express order of the court, is "Would a man of ordinary business capacity, and prudence, in the conduct of his own business, be likely to incur the same expense?" *Schwartz v. Keystone O. Co.* 153 Pa. St. 253. (28) This court will consider only the competent evidence preserved in the record, and will not consider the unidentified scraps of paper, memoranda, telegrams, etc., received by the trial court. *Lace v. Schoenhalss,* 93 Wis. 665; *Smith v. Perry,* 52 Neb. 738, 73 N. W. 282.

For the appellant H. H. Hayden it was argued, among

other things: (1) There being no controverted questions of
fact, and the suit being in equity, the examination in this
court must be, as to the matters appealed from, absolutely
*de novo;* and no weight whatever is to be allowed to any-
thing found or decided below because *the trial court so found
or decided it. Dietz v. Neenah,* 91 Wis. 422, 426; *Candee
v. W. U. Tel. Co.* 34 Wis. 471, 483; *Milwaukee Co. v.
Pabst,* 70 Wis. 352, 360; *Wheelock v. Tanner,* 39 N. Y. 481,
486; *Farmers' Bank v. Vail,* 21 N. Y. 481, 486; *Southard
v. Behrns,* 52 Neb. 486, 72 N. W. 860, 861; *Pratt v. Foote,*
9 N. Y. 463, 465; *U. S. v. Pugh,* 99 U. S. 265, 270; *Draper
v. Stouvenel,* 38 N. Y. 219, 223; *Fellows v. Northrup,* 39
N. Y. 117, 119, 120; *Mason v. Lord,* 40 N. Y. 476, 484.
(2) Fraud must be proved by clear and satisfactory evi-
dence. 1 Jones, Ev. § 190; *Shaw v. Gilbert,* 111 Wis. 165,
188, 189; *Lavassar v. Washburne,* 50 Wis. 200, 201; 14
Am. & Eng. Ency. of Law (2d ed.) 203. (3) No cause of
action arises from a mere showing that a conspiracy has been
formed; there must be a showing of *acts* which have *damaged*
the plaintiff. *Smith v. Nippert,* 76 Wis. 86, 88; 6 Am. &
Eng. Ency. of Law (2d ed.) 873–875. (4) Plaintiffs hav-
ing made their case upon allegations of actual fraud, if that
is not proved, they cannot recover upon any other theory of
liability in this action; and defendants are entitled to judg-
ment of dismissal herein. *Kruschke v. Stefan,* 83 Wis. 373,
383; *Truesdell v. Sarles,* 104 N. Y. 164, 167; *Eyre v. Pot-
ter,* 15 How. 42, 56; *Piper v. Hoard,* 107 N. Y. 67, 72;
*Miller v. King,* 88 Hun, 181, 182. (5) Appellant Frawley,
not being an officer or stockholder of the corporation, could
not be made a defendant in this action; and this being a
statutory action, this objection is a "question of jurisdic-
tion." *Clarke v. Banner & V. P. Co.* 50 Wis. 416, 418;
secs. 3216–3228, Stats. 1898. (6) Orders which are purely
administrative, and which involve only questions of business
judgment or sagacity—of business policy,—will not be dis-

turbed on appeal, and cannot be in any way affected by the
fact that they are improvident or prove unprofitable—no
abuse of discretion being made to appear. *Mercantile T.
Co. v. Farmers' L. & T. Co.* 81 Fed. 254–259; *Weeks v.
Weeks,* 106 N. Y. 626; *Wabash, St. L. & P. R. Co. v. Cen-
tral T. Co.* 22 Fed. 269, where Justice BREWER directed re-
ceiver to carry out a bad bargain, made under an order.
(7) It is the duty of the receiver, under the court's direc-
tion, to reduce to possession, and realize on, all assets, en-
cumbered as well as unencumbered, and to pay the expenses
of so doing out of the general fund in his hands. All the
money which comes to the receiver's hands is a single fund,
which is all equally subject to any payments which the court,
or a statute, may order to be made from it. *In re Assignment
of Riddell,* 93 Wis. 564, 566; secs. 3217, 3245, Stats. 1898.
(8) The amended complaint was insufficient because it failed
to allege that any plaintiff was a judgment creditor. *Hinck-
ley v. Pfister,* 83 Wis. 64, 82; sec. 3216, Stats. 1898. (9)
The consolidation of two or more suits is within the sound
discretion of the court, and leaves each suit entirely separate
and distinct, and operates only as a mere *carrying on to-
gether* of suits supposed to involve identical issues, in order
to expedite the hearing and diminish expense. *Toledo, St. L.
& K. C. R. Co. v. Continental T. Co.* 95 Fed. 497, 506;
*Hinckley v. Pfister,* 83 Wis. 64, 75, 83; 4 Ency. Pl. & Pr.
695. (10) An order directing the receiver to pay counsel
or himself a certain sum of money for services, or a sum to
any other person, or to deliver property to any person, is a
*final judgment,* and can be re-examined only by an appeal
in the regular course or an application for relief within the
statutory one year. *In re Commonwealth F. Ins. Co.* 32
Hun, 78; 15 Ency. Pl. & Pr. 317; *Trustees v. Greenough,*
105 U. S. 527; *Stuart v. Boulware,* 133 U. S. 78; *Hovey v.
McDonald,* 109 U. S. 150; *Blossom v. M. & C. R. Co.* 1
Wall. 655; *Central R. & B. Co. v. Pettus,* 113 U. S. 121;

*Williams v. Morgan,* 111 U. S. 684; *Hinckley v. G. C. & S. R. Co.* 94 U. S. 467; *Sage v. Railroad Co.* 96 U. S. 712; *Ex parte Farmers' L. & T. Co.* 129 U. S. 206; *Burnham v. Bowen,* 111 U. S. 776; *Fosdick v. Shall,* 99 U. S. 235; *Forgay v. Conrad,* 6 How. 201; *Simms v. Simms,* 20 Sup. Ct. 58, 61; *Merchants' Bank v. Crysler,* 67 Fed. 388. In each of the foregoing, irrespective of form or phraseology, the supreme court, or circuit court of appeals, looking to the substance, found a *final* judgment or decree; for by statute the appeal to those courts is limited to such. *Drake v. Kochersperger,* 170 U. S. 303; *Butterfield v. Usher,* 91 U. S. 246; *Speiser v. Merchants' Ex. Bank,* 110 Wis. 506; *Union Nat. Bank v. Mills,* 103 Wis. 39; *Leadville C. Co. v. McCreery,* 141 U. S. 475; *Central T. Co. v. Grant,* 135 U. S. 207; *Weeks v. Weeks,* 106 N. Y. 626; *Mercantile T. Co. v. Farmers' L. & T. Co.* 81 Fed. 254. Being final judgments and not being appealed from within two years, nor opened within the statutory one year, they could be attacked, if at all, only by a direct suit in equity to set them aside for fraud. *Farwell v. Great Western T. Co.* 161 Ill. 522, 44 N. E. 891. But this is not a suit of that character. (11) On no possible theory can the judgment stand against either Hayden or Frawley, being solely for money paid them by the receiver to discharge his personal indebtedness to them for legal services rendered to him. Neither the court nor the litigants employ counsel for the receiver. He does this personally, becomes personally bound as an individual for the services, and the court allows him sums *as reimbursement* for such expenses incurred and paid by him. *Stuart v. Boulware,* 133 U. S. 78; Gluck & Becker, Receivers, 361, note, citing *Walsh v. Raymond,* 58 Conn. 251; Id. 355, citing *Tennessee v. E. & K. R. Co.* 4 Baxt. (Tenn.) 92; *Florida C. R. Co. v. Bisbee,* 18 Fla. 60; *Maxwell v. Bank of New Richmond,* 101 Wis. 286, 291. (12) Complainants are barred by laches. *Cutter v. Iowa W. Co.* 96 Fed. 777; Freeman, Judgments,

sec. 142; 15 Ency. Pl. & Pr. 347, notes 4, 5; *Galena & S. W. R. Co. v. Ennor,* 116 Ill. 55. (13) The allowance to the receiver for counsel fees, and for his own services, in lump sums, is the proper method. Compensation for the service of counsel is never a matter of an aggregate of specific items, and bears no analogy to an itemized bill for merchandise. *Greeley v. Prov. S. Bank,* 103 Mo. 212, 17 Ency. Pl. & Pr. 843; *Perry-Mason S. Co. v. Sykes,* 72 Miss. 390, 28 L. R. A. 277; *Stuart v. Boulware,* 133 U. S. 78; *In re Louisiana S. B. & S. D. Co.* 40 La. Ann. 514, 4 So. 301; *Boston S. D. & T. Co. v. Chamberlain,* 66 Fed. 847, 848; *Trustees v. Greenough,* 105 U. S. 527. Counsel and attorney's fees do not consist of items at all. *Tracy v. Stearns,* 61 How. Pr. 265; *Sanford v. Ruckman,* 24 How. Pr. 521; *Eliot v. Lawton,* 7 Allen, 274; *Wilson v. M. & N. W. R. Co.* 31 Minn. 481, 18 N. W. 291, 292. Nor need an attorney to make charges in his books; if he fails to do so, the court fixes the compensation on some reasonable general rule; and may fix it by annual retainer for general services. *Hughes v. Dundee M. & T. I. Co.* 21 Fed. 169. And if charges are made, they are immaterial, for the court fixes the compensation largely upon its own knowledge. *Union Nat. Bank v. Mills,* 103 Wis. 39; *Harrison v. Perea,* 168 U. S. 311; *Olson v. State Bank,* 72 Minn. 320; 17 Ency. Pl. & Pr. 843. And a judge may carry this personal knowledge with him from the circuit and use it in review in the circuit court of appeals. *Boston S. D. & T. Co. v. Chamberlain,* 66 Fed. 847, 848. And the court *may* fix such compensation *entirely* upon personal knowledge, *without hearing any evidence.* *Fowler v. Equitable T. Co.* 141 U. S. 411; *Speiser v. Merchants' Ex. Bank,* 110 Wis. 506, 523. (14) The compensation allowed the receiver in the court's orders for his own services, and for counsel fees, was no more than was reasonable, and was well inside the authorities. *Schwartz v. Keystone O. Co.* 153 Pa. St. 283, 25 Atl. 1018; *Trustees v. Greenough,* 105

U. S. 527; *Cowdrey v. G., H. & H. R. Co.* 93 U. S. 352, 354; *Union Nat. Bank v. Mills,* 103 U. S. 39. (15) There was no impropriety in Hayden or Frawley-conducting litigation for creditors of the corporation, secured by undisputed hypothecations made by the corporation, the receiver *not being a party* to such litigation, and having *an interest* in the enforcement of such claims, because entitled to the excess, if any, of the security, Hayden being paid for such services in full by the creditors, without any claim upon the receiver therefor. 3 Am. & Eng. Ency. of Law (2d ed.) 297, 298; *Shaw v. Bill,* 95 U. S. 10, 14. (16) Valid orders of the court directing its receiver, on its application, may be made without notice, and in this country it is the common practice so to make them. *Weeks v. Weeks,* 106 N. Y. 626. If notice were necessary, it would be presumed, the *contrary* not *expressly appearing upon the record. Falkner v. Guild,* 10 Wis. 563, 573. There is no rule of law or practice forbidding so making such orders without notice. *Merchants' Bank v. Crysler,* 67 Fed. 388. At the worst, if objectionable, it would be only *irregular* or *erroneous. 'Merchants' Bank v. Crysler,* 67 Fed. 388. And such an objection can be reached only by appeal from the judgment. 11 Am. & Eng. Ency. of Law, 843, 844; *Jackson v. Astor,* Pin. 137, 158; *Tallman v. McCarty,* 11 Wis. 401, 406, 407; *Falkner v. Guild,* 10 Wis. 563, 571; *Amory v. Amory,* 26 Wis. 152, 160; *Gale v. Best,* 20 Wis. 44, 47; *Arnold v. Booth,* 14 Wis. 195. (18) No claim lay against Rust for what he received for allowances for counsel fees, because he paid it over *under orders* of the court; a subsequent reversal or vacation of the order would be immaterial, and would not make the receiver liable. The party objecting must get a *stay* of the order complained of until it can be reviewed. If he neglects to do this, and the receiver pays, the latter is protected. *Florida C. R. Co. v. Bisbee,* 18 Fla. 60; Gluck & Becker, Receivers, 356; *Maxwell v. Bank of New Richmond,* 101 Wis. 286, 288; *Palmer v.*

*Truby,* 136 Pa. St. 556, 20 Atl. 516; *In re Home P. S. F. Asso.* 129 N. Y. 288, 15 N. Y. Supp. 211, quoted 20 Am. & Eng. Ency. of Law (1st ed.) 119, col. 1.   (23) An attack upon a judgment or order for fraud in its making must show that by some trick, device, or otherwise, the court was induced to do something different from what it intended to do, and which it would not have done except for such fraud. *Fisher v. Simon,* 67 Fed. 387; *U. S. ex rel. Fisher v. Williams,* 67 Fed. 384; *Fisher v. Hepburn,.* 48 N. Y. 41, 53. (26) A chancellor will decline to act, when what is prayed for amounts substantially to his sitting in review upon another chancellor.   *Fisher v. Hepburn,* 48 N. Y. 48, 53; *Winship v. Pitts,* 3 Paige, 259; *Astor v. Ward,* 3 Edw. Ch. 391; *Greenwich Bank v. Loomis,* 2 Sandf. Ch. 76; *In re Livingstone,* 34 N. Y. 577; *Arnold v. Oliver,* 64 How. Pr. 452; *Marvin v. Weider,* 31 Neb. 774, 48 N. W. 825; *Oglesby v. Attrill,* 14 Fed. 214.   (27) Fraud that will justify the reexamination of a judgment or order must be some fraud whereby complainant's antagonist in some way prevented him from having an opportunity of obtaining the relief to which he was entitled.   *Brooks v. O'Hara,* 8 Fed. 533; *U. S. v. Throckmorton,* 98 U. S. 65; *Greene v. Greene,* 2 Gray, 361. (28) The original written assignment. upon the Brookville plant was an equitable mortgage.   *Bridgeport E. & I. Co. v. Meader,* 72 Fed. 115, 118.   The mortgage related back under the "renewal doctrine."   *Chattanooga Nat. Bank v. Rome I. Co.* 102 Fed. 755, 757, 758.   (29) This court tries the case on the competent evidence alone.   2 Ency. Pl. & Pr. 474; *Lace v. Schoenhalss,* 93 Wis. 665; *Smith v. Perry,* 52 Neb. 738, 73 N. W. 282, 284.

For the respondents, on the merits, it was contended, *inter alia:* (1) There was no error in the order of March 18, 1898. The statute fully authorized the consolidation of the actions. Sec. 2792, Stats. 1898.   The parties had in substance con-

sented. *Eau Claire F. & S. Co. v. Laycock,* 92 Wis. 81. No
one was prejudiced thereby. *Lauterbach v. Netzo,* 111 Wis.
322. The court had power to strike out *Barber* and Hayden
as plaintiffs. Such power is expressly conferred by our stat-
ute, is inherent in courts of equity, and has been frequently
exercised. Sec. 2830, Stats. 1898; 1 Ency. Pl. & Pr. 466;
Pomeroy, Remedies, sec. 247; *Day v. Buckingham,* 87 Wis.
215; *Hewett v. Adams,* 50 Me. 271; *Hall v. Laver,* 3 Younge
& C. 191; *Lloyd v. Makeam,* 6 Ves. Jr. 145; *Durand v.
Hutchinson,* 2. Dickens, 456. It is well settled that even a
sole plaintiff may be removed and persons having a beneficial
interest substituted. *State ex rel. Milwaukee v. Ludwig,* 106
Wis. 226; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107
Wis. 493, 502; *Wilson v. Welch,* 157 Mass. 77; *Hamlin v.
Baxter,* 20 Kan. 134; *Price v. Wiley,* 19 Tex. 142; *Hubler
v. Pullen,* 9 Ind. 273; *Johnson v. Vail,* 14 N. J. Eq. 423;
*Pool v. Morris,* 29 Ga. 374; *Jennings v. Springs,* 1 Bailey,
Eq. (S. C.) 181; *Winkelman v. Kiser,* 27 Ill. 21; *Silber L.
Co. v. Silber,* L. R. 12 Ch. Div. 717; *Plunket v. Joice,* 2
Sch. & Lef. 159. The objection that a plaintiff has not re-
duced his claim to judgment and attempted to collect under
execution, is not jurisdictional, but merely goes to the ade-
quacy of the remedy at law. *State ex rel. Fowler v. Green
Lake Co.* 98 Wis. 143, 152. When the order in question was
made, the present plaintiffs had no remedy at law, since they
had been required to come into the Hayden action, and re-
strained from proceeding elsewhere. The same practice pur-
sued in this case was sanctioned by this court in *Gager v.
Marsden,* 101 Wis. 598; *Wechselberg v. Michelson,* 105 Wis.
452. By changing their position in the litigation the original
plaintiffs were in no way aggrieved. *Day v. Buckingham,* 87
Wis. 215. Each and every of the defendants, including Hay-
den, answered to the merits, without any suggestion of the
adequacy of a legal remedy, or of the incompetency of the
plaintiffs to maintain the action, and hence effectually waived

any objection which might have been made. There was no error in the provisions of the order of March 18 affecting the interlocutory orders made prior to December 30, 1897. The power of the court to modify or vacate interlocutory orders made at any time before judgment is expressly given by our statute, and is recognized by all the authorities. Sec. 2814, Stats. 1898. Federal decisions, cited by appellants, holding that certain orders would be considered final judgments within the meaning of the appeal statutes are exceptional, and the doctrine of them has been narrowed by the more recent decisions. *McGourkey v. T. & O. C. R. Co.* 146 U. S. 536; *Latta v. Kilbourn,* 150 U. S. 524. None of them presented the question whether *ex parte* orders for the payment of money by the receiver, in the course of the administration proceedings, would be appealable. Even were such orders appealable, they are none the less orders, which may be modified or set aside *pendente lite. Gile v. Colby,* 92 Wis. 619; *Pleasants v. S. R. Co.* 93 Fed. 93. There was no error in that part of the order of March 18 which removed the receiver. The removal by the court of its own officer rests in its sound discretion, and its action is not subject to review. Smith, Receiverships, 565; Gluck & Becker, Receivers (1st ed.) sec. 114, p. 489. That he was an officer of the corporation should have precluded his appointment in the first place, and was sufficient ground for his removal. *McCullough v. Merchants' L. & T. Co.* 29 N. J. Eq. 217; *People v. Third Ave. S. Bank,* 50 How. Pr. 22; *Att'y Gen. v. Bank of Columbia,* 1 Paige, 511; *Bank of Monroe v. Schermerhorn,* 1 Clarke, Ch. 366; *Atkins v. W., St. L. & P. R. Co.* 29 Fed. 161, 173; *Wood v. Oregon D. Co.* 55 Fed. 901; *In re Colvin,* 3 Md. Ch. 278, 302. That he himself had interests adverse to the general creditors, as the holder of preferred claims, should have precluded his appointment, and demanded his removal. 2 Beach, Mod. Eq. Pr. § 749; *McCullough v. Merchants' L. & T. Co.* 29 N. J. Eq. 217;

*Schwartz v. Keystone O. Co.* 153 Pa. St. 283, 25 Atl. 1018. That, as shown by the records, he had not stood impartially between the unpreferred and the secured creditors, but had aided the latter at the expense of the former to secure the benefit of their securities, demanded his removal. *Speiser v. Merchants' Ex. Bank,* 110 Wis. 506. That his own conduct was to be investigated was sufficient cause for his removal. Gluck & Becker, Receivers (1st ed.) sec. 116, p. 496; *Beach,* Receivers, sec. 796; *McCullough v. Merchants' L. & T. Co.* 29 N. J. Eq. 217. (2) There was no error in overruling the demurrer of the executors of D. R. Moon, deceased. By Moon's answer on the merits all grounds of his demurrer were waived except sufficiency of facts and jurisdiction of court. Sec. 2654, Stats. 1898; *Davis R. L. Co v. Home Ins. Co.* 95 Wis. 542, 547; *Jones v. Foster,* 67 Wis. 296; *Monson v. Lathrop,* 96 Wis. 386; *Phillips v. Carver,* 99 Wis. 561, 572. But one cause of action is stated; hence there was no misjoinder. *Gager v. Marsden,* 101 Wis. 598; *South Bend C. P. Co. v. George C. Cribb Co.* 105 Wis. 443; *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125, 139; *Foster v. Posson,* 105 Wis. 99; *Killen v. Barnes,* 106 Wis. 546; *Adkins v. Loucks,* 107 Wis. 587, 594; *Egaard v. Dahlke,* 109 Wis. 366; *Coddington v. Canaday,* 157 Ind. 243, 61 N. E. 567, 573. That directors, officers, or stockholders will be held liable for the fraudulent appropriation to themselves, or the turning over to others, of the assets of a corporation, when it is insolvent or its officers know or have reason to know that suspension is impending, is well settled. *Ford v. Plankinton Bank,* 87 Wis. 363; *Hinz v. Van Dusen,* 95 Wis. 503; *Rowe v. Leuthold,* 101 Wis. 242; *Slack v. N. W. Nat. Bank,* 103 Wis. 57; *Glenwood Mfg. Co. v. Syme,* 109 Wis. 355, 361. With stronger reason, the appropriation to themselves, or the payment to others, after suspension, of the property of the corporation, to secure their individual obligations, or otherwise, to the prejudice of the general creditors, will render officers, di-

rectors, and stockholders liable. All liabilities of officers, directors, and stockholders, of every nature, so far as they run to the corporation, its creditors, or to any class thereof, and whether based on negligence, wilful wrong-doing, either individually or conspiring among themselves or with others, or even if based upon a penal statute, must be enforced in this exclusive suit. *Hurlbut v. Marshall,* 62 Wis. 590; *Ballin v. Loeb,* 78 Wis. 404; *Ford v. Plankinton Bank,* 87 Wis. 363; *Ballin v. Merchants' Ex. Bank,* 89 Wis. 278; *South Bend C. P. Co. v. George C. Cribb Co.* 97 Wis. 230; *Gores v. Day,* 99 Wis. 276; *Gager v. Bank of Edgerton,* 101 Wis. 593, 598; *Foster v. Posson,* 105 Wis. 99, 102; *Cunningham v. Wechselberg,* 105 Wis. 359; *Killen v. Barnes,* 106 Wis. 546; *Gores v. Field,* 109 Wis. 408. Irrespective of the statutes relating to wind-up proceedings, this court has frequently granted relief against conspirators, in actions in equity, and has declared joint and several judgments against them for the damages sustained. *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125; *Spaulding v. North Milwaukee T. S. Co.* 106 Wis. 481, 498; *Franey v. Warner,* 96 Wis. 222; *Fountain S. P. Co. v. Roberts,* 92 Wis. 345. When, as here, the tortious act benefited the estate of the wrongdoer, the cause of action survived at the common law, always where the suit was in equity, and the same where the suit was at law, unless the form of the action required the plea of not guilty. 21 Ency. Pl. & Pr. 325; *Allen v. Frawley,* 106 Wis. 638; *Cheney v. Gleason,* 125 Mass. 166; *U. S. v. Daniel's Ex'rs,* 6 How. 13; *Head v. Porter,* 70 Fed. 498; *Griswold v. Hilton,* 87 Fed. 256; *People v. Gibbs,* 9 Wend. 30; *Byxbie v. Wood,* 24 N. Y. 607, 609, 612; *Payne's Appeal,* 65 Conn. 397, 32 Atl. 949; *Hench v. Metzer,* 6 S. & R. 272, 273; *Penrod v. Morrison,* 2 Penr. & W. 126, 130; *Hayden v. Vreeland,* 37 N. J. Law, 372, 395; *Shafer v. Grimes,* 23 Iowa, 550; *Baker v. Crandall,* 78 Mo. 584, 47 Am. Rep. 126, 129; *Lee's Adm'r v. Hill,* 87 Va. 497, 12 S. E. 1052; *Garth v. Cotton,* 1 Ves. 524, 3 Atk. 751;

*Pulteney v. Warren,* 6 Ves. Jr. 73; *Peek v. Turquand,* L. R. 2 Eng. & Ir. App. 325; *Phillips v. Homfray,* L. R. 24 Ch. Div. 439. The rule prevails whether or not any fiduciary relation exists. *Head v. Porter,* 70 Fed. 498. Where one of several defendants jointly proceeded against dies, the action survives against his representatives to the full amount of the plaintiff's property loss, irrespective of the portion which the defendant had received. *Cheney v. Gleason,* 125 Mass. 166. In cases where the wrongdoer was benefited, even the early doctrine of the common law that the action would abate where its form was such as to require the plea of not guilty, was reluctantly followed. *Hambley v. Trott,* 1 Cowp. 375; *Keite v. Boyd,* 16 S. & R. 300. And has been since modified by extending the survivability of the action to all cases where the wrongdoer's estate was benefited, irrespective of the form of the action. *Phillips v. Homfray,* L. R. 24 Ch. Div. 439, 454; *Baker v. Crandall,* 78 Mo. 584, 47 Am. Rep. 126; *Booth's Adm'rs v. Northrup,* 27 Conn. 325; *Lee's Adm'r v. Hill,* 87 Va. 497, 12 S. E. 1052; *Martin's Adm'r v. B. & O. R. Co.* 151 U. S. 673; *Schreiber v. Sharpless,* 110 U. S. 76. The collusive obtaining of the property of the corporation by Moon and his co-pledgees would create, by legal implication, a promise to return the same to the corporation, or to pay to the corporation the value thereof, rendering him and them jointly liable for the value thereof as upon implied contract. *Dow v. Deissner,* 105 Wis. 385, and cases cited. Wherever such legal implication may arise, the action will not abate, whatever its form. For another reason, the cause of action against Moon should be held to survive his death. The receiver Rust occupied a fiduciary relation toward the corporation whose funds were misappropriated. Moon was a stockholder colluding with his co-pledgees who were stockholders, and with the receiver. He thereby assumed a similar relation toward the corporation. The cause of action would be held to survive his death by reason of his fiduciary relation.

21 Ency. Pl. & Pr. 358; *Killen v. Barnes,* 106 Wis. 546, 563; *Wineburgh v. U. S. S. & St. R. Co.* 173 Mass. 60; *Warren v. Para R. S. Co.* 166 Mass. 97; *Concha v. Murrieta,* L. R. 40 Ch. Div. 543; *Bathyany v. Walford,* L. R. 36 Ch. Div. 269; *Stebbins v. Palmer,* 1 Pick. 71. (3) As to the demurrer *ore tenus* of the defendant Frawley, the enforcement of the liabilities charged against the other defendants requires his presence, he having participated in the unlawful acts upon which their liabilities are based. If his liability cannot be worked out herein, and if, as is apparently conceded, theirs may be, it simply results that the receiver or the officer or the stockholder who has unlawfully misappropriated the assets of the corporation must be prosecuted in the wind-up suit, while others, who have acted in collusion with the receiver or the officer or the stockholder, must be prosecuted in a separate suit, even though all are parties to one fraudulent scheme to accomplish the misappropriation, and those who receive the benefit are sought to be charged as trustees, with the defaulting officers, for the benefits they have received. Our statutes and the decisions of this court are clearly against any such unreasonable proposition. Sec. 3237, Stats. 1898; *Hurlbut v. Marshall,* 62 Wis. 590, 606; *Hurlbut v. Tayler,* 62 Wis. 607; *Ballin v. Loeb,* 78 Wis. 404; *Ford v. Plankinton Bank,* 87 Wis. 363; *South Bend C. P. Co. v. George C. Cribb Co.* 97 Wis. 230; *Gager v. Marsden,* 101 Wis. 598; *South Bend C. P. Co. v. George C. Cribb Co.* 105 Wis. 443; *Gager v. Paul,* 111 Wis. 638. Where equity may properly assume jurisdiction over a trustee, to hold him to account for his wrongful acts, it will, in the same suit, assume jurisdiction and grant relief as against all those in collusion with him or to whom he may have transferred assets in his hands. 15 Ency. Pl. & Pr. 271; 2 Cook, Corp. § 656; *Peabody v. Flint,* 6 Allen, 52, 57; *Ryan v. L., A. & N. R. Co.* 21 Kan. 365; *Salomons v. Laing,* 12 Beav. 377. Where a trustee—and that the officers or receiver of a suspended corporation are

trustees will not be questioned—diverts the assets of a corporation, all are jointly liable to an accounting in equity therefor, and will be held jointly liable for the fruits of the fraud, irrespective of the amount realized by each. *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125, 135; *Spaulding v. North Milwaukee T. S. Co.* 106 Wis. 481, 498; *Franey v. Warner,* 96 Wis. 222; *Fountain S. P. Co. v. Roberts,* 92 Wis. 345. Under a statute like our sec. 3216, providing for the sequestration of the assets of an insolvent corporation, that "sequestration" necessarily involves the making of parties to the action, with the corporation, all persons who have in their possession any corporate assets, and that notwithstanding the joinder of such persons and the assertion of liabilities against them, the complaint will be deemed to state but one cause of action. *Proctor v. Sidney S., B. & F. Co.* 40 N. Y. Supp. 454. (4) There was no error in the judgment against *Gilbert, Thompson,* and the executors of Rust for the proceeds of the sale to them of the Brookville plant. The conclusion of the court that the giving of the mortgage on the plant May 18, 1893, to the three officers and directors named, as security to them for an endorsement theretofore made of the paper of the corporation, the corporation being at the time of the giving of the mortgage, to the knowledge of the officers, hopelessly insolvent, and the closing of its business having already been determined upon, constituted an unlawful preference, is well sustained by the authorities. *Hinz v. Van Dusen,* 95 Wis. 503; *Ford v. Plankinton Bank,* 87 Wis. 363; *Barth v. Koetting,* 99 Wis. 242; *Rowe v. Leuthold,* 101 Wis. 242; *Slack v. N. W. Nat. Bank,* 103 Wis. 57; *Glenwood Mfg. Co. v. Syme,* 109 Wis. 355; *Swift & Co. v. Dyer-V. Co.* 28 Ind. App. 1, 62 N. E. 70; *Bosworth v. Jacksonville Nat. Bank,* 64 Fed. 615; *Lippincott v. Shaw C. Co.* 25 Fed. 577; *Montgomery v. Phillips,* 53 N. J. Eq. 203, 31 Atl. 622; *Savage v. Miller,* 56 N. J. Eq. 432, 39 Atl. 665; *Lowry B. Co. v. Empire L. Co.* 91 Ga. 624, 17 S. E. 968; *Atlas T. Co.*

*v. Macon H. Co.* 101 Ga. 391, 29 S. E. 27; *Tillson v. Downing,* 45 Neb. 549, 63 N. W. 836; *Slough v. Ponca M. Co.* 54 Neb. 500, 74 N. W. 868; *National W. P. Co. v. Columbia Nat. Bank,* 63 Neb. 234, 88 N. W. 481; *Reynolds v. Smith,* 60 Neb. 197, 82 N. W. 627; *W. P. Noble M. Co. v. Mt. Pleasant E. C. Inst.* 12 Utah, 213, 42 Pac. 869; *Gottlieb v. Miller,* 154 Ill. 44, 39 N. E. 992; *Goodyear R. Co. v. George D. Scott Co.* 96 Ala. 439, 11 So. 370; *U. S. Rubber Co. v. American O. L. Co.* 96 Fed. 891; 2 Cook, Corp. § 693. The claim that such preference was given in pursuance of the assignment of Jan. 18, 1893, and that the assignment was given at a time and under circumstances when the corporation might lawfully prefer its officers, is without merit. The assignment was not witnessed, and was not sealed with the corporate seal. It was a nullity, and conferred no rights whatever. Sec. 2216, Stats. 1898; *Rockwell v. Elkhorn Bank,* 13 Wis. 653, 657; *Galloway v. Hamilton,* 68 Wis. 651; *Marvin v. Anderson,* 111 Wis. 387, 392; 4 Thompson, Corp. § 5060; Angell & Ames, Corp. § 291; 2 Morawetz, Corp. (2d ed.) § 582; *Allen v. Brown,* 6 Kan. App. 704, 50 Pac. 505; *Shropshire v. Behrens,* 77 Tex. 275, 13 S. W. 1043; *Mott v. Danville Seminary,* 129 Ill. 403, 21 N. E. 927, 929; *Danville Seminary v. Mott,* 136 Ill. 289, 28 N. E. 54, 55; *Washington & P. T. Co. v. Cullen,* 8 Serg. & R. 517; *Wheelock v. Moulton,* 15 Vt. 519; *Koehler v. Black R. F. I. Co.* 2 Black, 715, 717; *Dobbins v. Etowah Mfg. Co.* 75 Ga. 238; *Beatty v. Marine Ins. Co.* 2 Johns. 109; *Williams v. C. & H. R. Co.* 5 Eng. L. & Eq. 497, 503. The assignment was made by the president and secretary as officers and directors of the corporation, to themselves personally. Such a deed is, on its face, void even where the statutory requisites of execution have been complied with. *Cook v. Berlin W. M. Co.* 43 Wis. 437; *Haywood v. Lincoln L. Co.* 64 Wis. 639; *Glenwood Mfg. Co. v. Syme,* 109 Wis. 355; *Swift & Co. v. Dyer-V. Co.* 28 Ind. App. 1, 62 N. E. 70. Such a conveyance could only be jus-

tified, if at all, by the clearest evidence of special authority given by the corporation to the officers so to do, independently of their votes or influence, and the onus of showing such authority would rest upon the officers claiming under the assignment. *Ludington v. Palton,* 111 Wis. 208; *Swift & Co. v. Dyer-V. Co.* 28 Ind. App. 1, 62 N. E. 70; *Pitman v. Elmore,* 93 Mo. App. 592, 67 S. W. 946; *Finch Mfg. Co. v. Stirling Co.* 187 Pa. St. 596, 41 Atl. 294. To say that the assignment, though not enforcible, should operate as a promise to give security, is to say that the assignment is not a void thing, as the courts hold, but is valid as an executory contract. *Grant v. Minneapolis B. Co.* 68 Minn. 86, 70 N. W. 868; *Cole v. Dealham,* 13 Iowa, 551. Under the authorities, it would add nothing to the legality of the mortgage of May 18, even if it were given in execution of an agreement made prior to the time when the corporation became insolvent, at least unless the agreement were such that it would be specifically enforced. *Copeland v. Barnes,* 147 Mass. 388; *In re Jackson I. Mfg. Co.* Fed. Cas. No. 7153; *Bank of Leavenworth v. Hunt,* 11 Wall. 394; *In re Thomas Wood,* 5 Fed. 443; *Arnold v. Maynard,* 2 Story, 349, Fed. Cas. No. 561; *Morey v. Millikin,* 86 Me. 464, 30 Atl. 102; *Montgomery v. Phillips,* 53 N. J. Eq. 203, 31 Atl. 622. (5) There was no error in respect of the judgment rendered for expenditures made by the receiver in completing, perfecting, and collecting upon pledged contracts or accounts. The rule is well settled that a receiver should not assume the execution of a contract which is onerous to the estate, or which may result in depleting the assets in his hands, and that so to do is to create an unlawful preference. Smith, Receiverships, § 35; *Scott v. Ranier P. & R. Co.* 13 Wash. 108, 42 Pac. 531; *United E. S. Co. v. Louisiana E. L. Co.* 71 Fed. 615; *General E. Co. v. Whitney,* 74 Fed. 664; *Dushane v. Beall,* 161 U. S. 513; *Southern Ex. Co. v. W. N. C. R. Co.* 99 U. S. 191; *Quincy, M. & P. R. Co. v. Humphreys,* 145 U. S. 82; *St. Joseph &*

*St. L. R. Co. v. Humphreys,* 145 U. S. 105; *Sun Flower O. Co. v. Wilson,* 142 U. S. 313; *Central T. Co. v. East Tennessee L. Co.* 79 Fed. 19; *Ames v. Union P. R. Co.* 60 Fed. 966; *Union L. & T. Co. v. S. C. M. R. Co.* 49 Fed. 267; *Farmers' L. & T. Co. v. C. F. & Y. V. R. Co.* 73 Fed. 715; *Central T. Co. v. M. & N. G. R. Co.* 51 Fed. 15; *Ellis v. B. H. & E. R. Co.* 107 Mass. 1. But whether the receiver was or was not bound to complete such a contract or to incur expense in realizing upon it, makes no difference in the result. Pledged as it was, if he spent the funds of the estate in completing or realizing upon it, the expenditures were incurred in the creation of a fund for the benefit of the lien holders, and the fund so created should bear the expenses incurred in its creation. *Speiser v. Merchants' Ex. Bank,* 110 Wis. 506, 519, 520; *T. T. Haydock C. Co. v. Pier,* 78 Wis. 579; *Fuller v. Abbe,* 105 Wis. 238. All who actively and fraudulently participated in procuring and receiving the benefit of such expenditures are jointly bound to make good the amounts so diverted to their benefit, irrespective of the extent of the benefit which each may have received. *Spaulding v. North Milwaukee T. S. Co.* 106 Wis. 481, 498; *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125, 135; *Fountain S. P. Co. v. Roberts,* 92 Wis. 345; *Franey v. Warner,* 96 Wis. 222; *Banner v. Schlesinger,* 109 Mich. 262, 67 N. W. 116. Even if the pledgees were not themselves trustees, and had not actively participated in the procuring of the preference, they would be liable with him for the return of the expenditures made because of their receipt of the benefits arising therefrom with knowledge that the expenditures were made in violation of Rust's duty as trustee. *Wetmore v. Porter,* 92 N. Y. 76, 81; *First Nat. Bank v. Nat. Broadway Bank,* 156 N. Y. 459, 467; *Warren v. Union Bank,* 157 N. Y. 259, 268; *Duncan v. Jaudon,* 15 Wall. 165; *Kitchen v. Bedford,* 13 Wall. 413; *Shaw v. Spencer,* 100 Mass. 382; *Goldthwaite v. Ellison,* 99 Ala. 497, 12 So. 812; *Ludington v. Patton,* 111 Wis. 208,

239, 242; *Lee v. Horton*, 104 N. Y. 538, 541; *Pittsburg 'M. Co. v. Spooner*, 74 Wis. 307, 320; *French v. Pittsburgh V. & H. Co.* 184 Pa. St. 161, 39 Atl. 63. The making of such expenditures by the trustee, in breach of his trust, and the receipt of the benefit thereof with knowledge, or means of knowledge, that the payments were made in breach of the trust, constitute a joint conversion on the part of him paying and those receiving, rendering all equally liable for the repayment of the amount paid. *Western U. T. Co. v. Franklin C. Co.* 70 N. H. 37, 47 Atl. 616; *Pierson v. McCurdy*, 33 Hun, 520, 100 N. Y. 608; *Kavanaugh v. Taylor*, 2 Ind. App. 502, 28 N. E. 553; *Covington v. Anderson*, 16 Lea, 310; *D. M. Osborne Co. v. Plano Mfg. Co.* 51 Neb. 502, 70 N. W. 1124; *Ryan v. L., A. & N. R. Co.* 21 Kan. 270, 294; *Robertson v. Hunt*, 77 Tex. 321, 14 S. W. 68; *Hill v. Campbell*, 54 Neb. 59, 74 N. W. 388; *Smith v. Briggs*, 64 Wis. 497; *Barth v. Graf*, 101 Wis. 27, 35; 1 Sutherland, Damages (2d ed.) § 140. As to the effect of the orders of the court made in reference to the foregoing matters, it is well settled that a receiver will not be protected in the payment of money, or in other action, by an order of the court obtained in bad faith or in violation of his duty. *Sweet v. Converse*, 88 Mich. 1, 49 N. W. 899; *In re Shea*, 57 Minn. 415, 59 N. W. 494; *Schwartz v. Keystone O. Co.* 153 Pa. St. 283, 25 Atl. 1018; *Matter of Commonwealth F. Ins. Co.* 32 Hun, 78; *People v. Family F. Soc.* 52 N. Y. Supp. 867. Even where such an order is obtained by a receiver upon notice, in good faith, and without breach of his trust, so that it will protect him for expenditures made under it, it will not shield the persons for whose benefit the expenditures are made from liability, if it develops that the order was irregular or improvidently granted. *In re Home P. S. F. Asso.* 15 N. Y. Supp. 211, 129 N. Y. 288; *Palmer v. Truby*, 136 Pa. St. 556, 20 Atl. 516; *Boice v. Conover*, 54 N. J. Eq. 531, 543, 544, 35 Atl. 402. (6) There was no error in the judgment against Hay-

den, Frawley, and the representatives of Rust. That a receiver is not entitled to compensation where he has been guilty of negligence or misconduct, or breach of trust, even where he acts without fraudulent intent, is well settled. *Speiser v. Merchants' Ex. Bank,* 110 Wis. 506; *Davis v. Swedish-Am. Nat. Bank,* 78 Minn. 408, 81 N. W. 210; *Schwartz v. Keystone O. Co.* 153 Pa. St. 283, 25 Atl. 1018. It is equally well settled that trust funds may not be depleted by the payment of compensation to attorneys who have acted in bad faith, or adversely to the interest of the trust, or who represent conflicting interests. *Davis v. Swedish-Am. Nat. Bank,* 78 Minn. 408, 81 N. W. 210; *Speiser v. Merchants' Ex. Bank,* 110 Wis. 506; *T. T. Haydock C. Co. v. Pier,* 78 Wis. 579; *Farwell v. Great Western T. Co.* 161 Ill. 522, 44 N. E. 891, 920; *Strong v. International B. L. & I. U.* 183 Ill. 97, 47 L. R. A. 792; *Vieth v. Ress,* 60 Neb. 52, 82 N. W. 116; *Adams v. Woods,* 8 Cal. 306; *Schwartz v. Keystone O. Co.* 153 Pa. St. 283, 25 Atl. 1018; *In re Clauser's Est.* 84 Pa. St. 51; *Clapp v. Clapp,* 1 N. Y. Supp. 920; *Smith v. Wise,* 132 N. Y. 172; *Perry-Mason S. Co. v. Sykes,* 72 Miss. 390, 28 L. R. A. 277; *Platt v. Archer,* 13 Blatchford, 351. Even were the question one between attorney and client, the attorneys, under the facts of this case, would be precluded from recovering compensation. *Strong v. International B. L. & I. U.* 183 Ill. 97, 47 L. R. A. 792; *Brackett v. Norton,* 4 Conn. 517, 10 Am. Dec. 179. (7) The action would not necessarily fail, even though conspiracy and fraud were not proven. No variance short of an entire failure of proof is material. And if the proof might have been admitted under an amendment to the complaint, the case made by the complaint could not be deemed to be unproved. *Reisz v. Supreme Council,* 103 Wis. 427; *McNally v. McAndrew,* 98 Wis. 62; *Slater v. Cook's Estate,* 93 Wis. 104. In this case there was but one cause of action,—that for closing up the corporation, and, as incidental thereto, compelling an ac-

counting by defendants for the disposition of this property and funds for the benefit of its creditors. *Hurlbut v. Marshall,* 62 Wis. 590, 601; *Gager v. Marsden,* 101 Wis. 598; *South Bend C. P. Co. v. George C. Cribb Co.* 97 Wis. 230, 105 Wis. 443. But were the scope of the action merely conspiracy and fraud, there would here be no failure of proof, though it were assumed the evidence established no conspiracy. The gist of the action wherein conspiracy is charged is the damage, and not the conspiracy. *Martens v. Reilly,* 109 Wis. 464. Though the proof of conspiracy fail, recovery may be had against any one or more of the defendants who may have caused the damage. 6 Am. & Eng. Ency. of Law (2d ed.) 872; *Hutchins v. Hutchins,* 7 Hill, 104; *Jones v. Baker,* 7 Cowen, 445; *Parker v. Huntington,* 2 Gray, 124; *Booker v. Puyear,* 27 Neb. 346, 43 N. W. 133; *Van Horn v. Van Horn,* 56 N. J. L. 318, 28 Atl. 669; *Fountain S. P. Co. v. Roberts,* 92 Wis. 345.

The cause was reargued on December 11, 1903.

For the appellants, on the reargument, there was a brief signed by *Frawley, Bundy & Wilcox,* attorneys for W. A. and *A. J. Rust,* as executors, *Lydia A. Frawley,* as executrix, *F. H.* and *S. G. Moon,* as administrators, *J. T. Barber, Fitch Gilbert, George T. Thompson,* and *Chippewa Valley Bank,* and by *W. P. Bartlett,* of counsel for W. A. and *A. J. Rust,* executors; and a separate brief signed by *H. B. Walmsley,* attorney for H. H. Hayden. The cause was argued orally by *C. T. Bundy, H. B. Walmsley,* and *W. P. Bartlett.*

For the respondents there was a brief signed by *F. M. Miner* and *Fleming & Blum,* attorneys, and *Olin & Butler,* of counsel, and oral argument by *J. M. Olin, H. L. Butler,* and *F. M. Miner.*

The following opinion was filed April 19, 1904:

## I.

### MOTIONS TO DISMISS APPEALS.

MARSHALL, J.   Many questions are presented for consideration on the motions to dismiss.   Perhaps most of them could well be passed without even a mention thereof.   It is certain, as will be seen, that those upon which the motions must turn are few in number and simple.   However, as others are of interest as practice matters, and distinguished counsel have with great industry briefed all of them, it is considered best to make this opinion a response to each and all which they so seem to regard of sufficient importance to ask it, and have devoted so much professional energy to aid in a right conclusion in respect to being reached.

1. First, we have the question of whether there was a fatal omission as regards complying with sec. 3049, Stats. 1898, because the notices of appeal were not served on the National Electric Manufacturing Company, the insolvent corporation, and in the initiatory proceedings the sole defendant.

Cases here on appeal must necessarily have their appropriate parties, properly brought into court, else jurisdiction cannot exist to do more than dismiss.   One of such parties is known in the initiatory proceedings as the adverse party. That does not necessarily include, in a jurisdictional sense, persons on the side of the adverse decision sought by some on that side to have reversed or modified, even if there is an adversity of interest between them (*Hunter v. Bosworth,* 43 Wis. 583); though it is said that one so circumstanced,— whether treated as an adverse party or not, for the purposes of service under the section under consideration,—may have all the rights thereof as regards a hearing on the appeal if he so desires.   The adverse party does not necessarily include merely the opposite party appearing upon the record.   A per-

son may be an appellant or an adverse party within the meaning of the statute and his name not appear in the litigation resulting in the decision at all. If he has a substantial interest adverse to the decision, that is all that is required for an appellant, whether it be direct or by privity created between himself and the person against whom the decision was rendered by reason of succeeding to his rights after the decision or subsequent to the commencement of the action. *Rogers v. Shove,* 98 Wis. 271, 73 N. W. 989; *Crowns v. Forest L. Co.* 99 Wis. 103, 74 N. W. 546; *Hiscock v. Phelps,* 2 Lans. 106; *Cotes v. Carroll,* 28 How. Pr. 436; *Barnes v. Stoughton,* 6 Hun, 254; *Pickersgill v. Read,* 7 Hun, 636; Baylies, New Trials & Appeals (2d ed.) 145. To determine when the appeal statute is satisfied as to an appellant or a party aggrieved or an adverse party, while, *prima facie,* the original parties on the record may answer, the supreme test is the possession of some substantial interest adverse to the judgment, a revision of which is sought in the appellate court.

We are unable to see how the insolvent corporation,— which, according to the record, exists at best only in name; that has surrendered all its property to the court so far as it is capable of doing so, and in no event, according to the undisputed facts and its own confession, can profit by the judgment; moreover, that has filed a declaration in this court, in effect, that it has no concern at all with what comes of the matter in controversy here,—can be considered an adverse party to the appellants.

It was held in *Gores v. Field,* 109 Wis. 408, 415, 84 N. W. 867, 85 N. W. 411,—an action to recover of the officers of a corporation circumstanced as this one for the benefit of its creditors, property thereof misappropriated by such officers while the corporation was a going concern,—that it was not an interested party in the litigation, required to be joined in the suit under the general rule governing the enforcement of the right of a corporation at the suit of another. It would

seem to follow logically that, in a sequestration suit under the statutes, after the same has passed the stage rendering the presence of the insolvent necessary in order that its liabilities may be adjudicated and the assets under its control taken into the custody of the court, the corporation is not an adverse party as to its creditors in further proceedings in the litigation to secure the honest application of the trust property—that in the possession of the court and that misapplied, if any, by its officers before suit brought—to the payment of its indebtedness. If that be so, then the insolvent corporation here is not an indispensable party to the appeals. In the case cited it was said that the corporation was as far removed from pecuniary injury as if it were legally dissolved. The situation here is stronger yet. The corporation is dead for all purposes except the settlement of its affairs. The purpose of the suit is to wind it up, in a business sense, and the judgment of this court practically has that effect. It is really, for all practical purposes, as though it never was. It can neither injure nor be injured. It has nothing to render up, and that which the pending litigation seeks to obtain can never reach its treasury. Strictly speaking it has no treasury, even though it has a sort of existence for the purpose of the settlement of its affairs, since all it had; including that unlawfully parted with by its officers, if any, before the commencement of this action, and that surrendered by it and subsequently dissipated by those called upon to administer the same, if any there be, reachable in this litigation, constitutes a trust fund for its creditors. It is their sole property by the undisputed facts, since at the very best it will pay but a small percentage of the corporate liabilities. The corporation cannot in any sense be considered even a remote *cestui que trust*. It needs no further argument to show that it is as far removed from the status of one having a substantial interest in the judgment in favor of its creditors, now sought to be impeached, as one can imagine.

It may be stated as a rule of practice, deducible from the foregoing, that in an action under sec. 3216, Stats. 1898, and its associate sections, to sequestrate and distribute the assets of an insolvent corporation, when the sequestration shall have been fully accomplished and the liabilities fully ascertained, rendering it certain that under no circumstances will the assets discharge the same, in subsequent proceedings in the litigation in respect to realizing upon the trust fund by the creditors,—whether against unfaithful administrators thereof in the suit causing a diminution of the same, or guilty participants with them, or against officers of the corporation or guilty participants with them in misapplying the corporate assets after the status of the same shall have been fixed as a trust fund for the benefit of its creditors,—the corporation is not an interested party adverse to either party to the litigation under the appeal statute.

2. The next proposition for consideration has to do with the character of the appeals as regards whether they are single or joint. We see no escaping from the position of respondents' counsel that the parties in each notice of appeal did not intend thereby to take one appeal, but purposed that each in his own behalf should appeal. To that end they gave each notice the effect of as many notices as there were parties appellant mentioned therein, and the service thereof the effect of an attempt to institute an independent appeal for each of such parties. Notwithstanding the ingenious argument of able counsel to the contrary, there can be, it seems, no misunderstanding the meaning of these words, which are a fair sample of what is contained in all of the notices: *"Fitch Gilbert* and *John S. Owen* severally and separately appeal." They mean, if they mean anything, that each, independent of the other, invokes the jurisdiction of the appellate court. The bond as to each notice is clearly inconsistent therewith. It is a single obligation for $250. The premise, preceding the obligatory clause, uses language as regards the occasion there-

of, appropriate only to a joint appeal and a single undertaking. "The above named appellants intend to appeal," etc. Such clause is in perfect harmony therewith: "Appellants will pay all damages that may be awarded against the appellants, not exceeding $250." So, while we have numerous groups of persons, each person with a separate appeal, there are only as many undertakings as groups. That does not satisfy the calls of sec. 3052, condemning every appeal as "ineffectual for any purpose" unless an "undertaking be executed on the part of the appelant by at least two sureties," to the effect that "the appellant will pay all costs and damages which may be awarded against him on the appeal, not exceeding $250."

Counsel for appellants advance the idea that a proper construction of a single undertaking, in form to answer for the default of several persons, is that it is one to answer for the default of each, hence a several undertaking, thus satisfying the statute, citing *Vandyke v. Weil,* 18 Wis. 277. We are unable to see that the doctrine of that and similar cases applies here. It is to the effect that a single undertaking for a single appeal by several appealing jointly, is an obligation to answer for the amount specified therein for all of the defaults, whether joint or several, as regards the matters to secure which the undertaking is given. That is quite familiar, but it comes far short of holding that when two persons appeal separately, either by independent notices or joining in one notice so worded as to give it the effect of two, and give one undertaking appropriate to a single appeal, such undertaking can by construction be held to be two, each for $250, and thus satisfy the calls of the statute. An obligation to the extent of $250 for the defaults, joint or several, of a number of persons acting jointly of course satisfies the statute. It would hardly seem that rules for construction would be required to discover that, though the early decision seems to have been reached by the aid thereof. But there is no way by which one

undertaking for $250 can be turned into several such, without plainly violating the statute.

3. Next it is contended on the part of respondents' counsel that though the notice of appeal was served as required by sec. 3049, and the record transmitted to this court, no jurisdiction was obtained here for any purpose whatever; and that the defect is not remediable. On the other hand appellants' counsel just as confidently contend that the failure to execute the bonds required, or to serve the same as the statute provides, does not militate against jurisdiction having been conferred here for some purposes; citing in support of that, *Helden v. Helden,* 9 Wis. 557; *Russell v. Bartlett,* 9 Wis. 556; *Smith v. C. & N. W. R. Co.* 19 Wis. 89; *White v. Polleys,* 20 Wis. 503; *Grant v. Connecticut M. L. Ins. Co.* 28 Wis. 387; *Branger v. Buttrick,* 30 Wis. 153; *Ulrich v. Farrington Mfg. Co.* 69 Wis. 213, 34 N. W. 89. The effect of those cases is that the mere taking of an appeal by the service of a proper notice and sending the record here does not give the court such jurisdiction as to enable it to hear the cause, but does give it the necessary jurisdiction to enable it to permit the appeal to be perfected by the service of a proper bond, or cure any other defect in the proceedings within the period limited by statute for appealing; and that, if the proper undertaking is executed and filed, but not properly served, the court acquires such jurisdiction as to enable it to hear and decide the cause, the adverse party not seasonably objecting, failure in that regard being deemed a waiver of such service or an estoppel as regards suggesting such failure with effect. In that the court, as will be seen, gave force to the statute in all substantial essentials. Sec. 3052 says that: "To render an appeal effectual for any purpose an undertaking must be executed," etc. That suggests at once that an appeal may have an existence before the execution of the undertaking, though not for all purposes. The term "any purpose" clearly includes the duty of the clerk below to certify

up the record, and proceedings here as regards a hearing of
the cause. The clerk has no right to act in the matter till he
can accompany the papers with some semblance, at least, of
a proper undertaking under sec. 3052. That is the effect of
sec. 3050. That the former section means as indicated must
be the case to render it harmonious with sec. 3049, to the
effect that any appeal will be deemed "taken by the service
of the notice of appeal and perfected on the service of the
undertaking for costs, or the deposit of money instead, or the
waiver thereof as hereinafter prescribed." The waiver men-
tioned is required to be in writing. Sec. 3051. Consistent
with the meaning we attribute to secs. 3049, 3050, and 3052,
we have sec. 3068, providing that:

"When a party shall in good faith give notice of appeal
and shall omit, through mistake or accident, to do any other
act necessary to perfect the appeal or make it effectual or to
stay proceedings, the court from which the appeal is taken
or the presiding judge thereof, or the supreme court or one
of the justices thereof, may permit an amendment or the
proper act to be done, on such terms as may be just."

So, as said in *Grant v. Connecticut M. L. Ins. Co.* 28
Wis. 387, when a notice of appeal is duly served in good
faith, jurisdiction is at once conferred upon this court as well
as the trial court for some purpose, i. e., that of permitting
the appeal to be perfected so that it can be heard. Such juris-
diction is not ordinarily exercised here in advance of the
transmission of the record hereto, though it may be, and
should be when necessary to prevent a miscarriage of justice.
Obviously, this court could not proceed to hear a cause upon
appeal without compliance with sec. 3052. To do so would
be to act in defiance of the statute as regards a right wholly
statutory. *White v. Polleys,* 20 Wis. 503, does not go so far
as to decide to the contrary of this. It is only to the effect
that, if the bond is executed in compliance with such section
and duly transmitted to this court for the benefit of the ad-
verse party, the cause may proceed to judgment unless such

adverse party seasonably objects. That is, the party may waive the service of the undertaking, but not the execution thereof and filing the same in the record. The rule obviously cannot apply to this case in any event, since, as we have seen, sec. 3052 was not complied with at all, since it cannot be said that the giving of one undertaking in the sum of $250, covering several appeals, is the giving of a separate undertaking in that sum for each of such appeals.

4. Next counsel for appellants challenge the power of the legislature to require security for costs as a condition of invoking the jurisdiction of this court. They refer to the constitutional provision conferring appellate jurisdiction here, and also that part of the bill of rights adopted from Magna Carta, providing that, "Every person ought to obtain justice freely and without being obliged to purchase it, completely and without denial, promptly and without delay." Such statutes as those under consideration have existed in the face of similar constitutional provisions for a hundred years or more. Courts exercised authority of a like nature theretofore, though fenced about by Magna Carta. The subject has had the attention of this and other courts, and the law in respect to it has been so thoroughly settled that any lengthy discussion thereof anew would seem quite out of place were it not for the confidence with which the matter is now pressed upon our attention and the fact that this is the second time in recent years that the subject has been presented to this court.

True, appellate jurisdiction conferred here, within the meaning of the constitution, cannot be restricted by legislative authority, but such jurisdiction has regard to that exercised before the constitution was adopted, not to remedies by appeal, which are purely legislative creations. 'The permission to use the machinery of this court as to such a right being purely statutory, it is competent for the legislature to prescribe such conditions in respect thereto as it sees fit, the same as it is for it to withhold the right altogether, leaving

litigants solely to their common-law remedies. *Western U. R. Co. v. Dickson,* 30 Wis. 389; *Gianella v. Bigelow,* 92 Wis. 267, 65 N. W. 1030. The law in that regard was very tersely stated by Mr. Justice RYAN in the first case cited, this language being used: "An appeal is purely a statutory remedy, and unless given by statute the right does not exist." The idea is this: The hearing of an appeal given by statute is within the constitutional jurisdiction of this court; the creation of a right to a particular method of bringing about a review here, of the decision of the lower court, is within the constitutional authority of the legislature. To invoke the jurisdiction of this court, which exists by constitutional grant, is one thing; the remedy by which it is accomplished is another. The only constitutional remedies guaranteed are those specially preserved, exercisable by common-law writs in their appropriate spheres.

For authorities to the effect that courts were never deemed controlled by Magna Carta as to requiring security for costs, either in law or equity, we refer to *Bradwell v. Weeks,* 1 Johns. Ch. 325; *Mayer v. Tyson,* 1 Bland (Md.) 559; *Swift v. Collins,* 1 Denio, 659; *Dyer v. Dunivan,* 3 How. Pr. 135; *People ex rel. Fuller v. Oneida Common Pleas,* 18 Wend. 652; 1 Dan. Ch. Pr. 35; 3 Bla. Com. 399. . The question of whether the constitution has changed that was discussed and decided in the negative in the recent case of *Christianson v. Pioneer F. Co.* 101 Wis. 343, 77 N. W. 174, 917. For examples that other courts that have spoken on the subject are in harmony therewith, see *Nease v. Capepart,* 15 W. Va. 299; *Haney v. Marshall,* 9 Md. 194; *Holt v. T. & R. R. Co.* 81 Md. 219, 31 Atl. 809; *Gesford v. Critzer,* 7 Ill. 698.

As explained in *Christianson v. Pioneer F. Co.,* the provision of our bill of rights, taken from Magna Carta, means no more than it formerly did. It grants no new right, but guarantees one existing at common law. Therefore, when we take the measure thereof by common-law rules, we have its

constitutional scope. The burdens which the Magna Carta provision was designed to lift and secure immunity from, bear no resemblance whatever to those legitimate expenses of litigation which we call costs, or security for the payment thereof, to the prevailing party. They were those exactions, common once, when standards of official conduct, as regards judicial administration, were so incomparably lower than in modern times that we can hardly appreciate how they could ever have been deemed justifiable, as they doubtless were. They were bribes, so to speak, demanded and received by officers exercising judicial power in the king's courts, in the nature of consideration for the use of judicial machinery. In effect, justice was to some extent a matter of bargain and sale. The exactions were not to pay for any legitimate expense, but went to enrich the judicial head, or some one acting thereunder and by his authority. Strange as it may seem, that practice was not deemed to involve any moral turpitude. It was supposed to be to such a degree attributable to sovereign prerogative that the uprooting thereof was accomplished only by a formal relinquishment by the sovereign and a grant to the people, the form thereof being this: "We will not sell the right and justice to any one, nor will we refuse it, or put it off." Sir Edward Coke's explanation of the scope of that pledge would seem to have given rise to the phrasing of the idea as we now find it in our own and other constitutions:

"The king, in the judgment of the law, is ever present and repeating in all his courts, '*Nulli vendemus, nulli negabimus, aut differemus rectum vel justitiam*' (We neither sell nor deny, nor delay, to any person, equity or justice), and therefore every subject, for injury done him '*in bonis, in terris, vel persona*' (in person, goods, or body) by any other subject, be he ecclesiastical or temporal, without any exceptions, may take his remedy by the course of the law and have justice and right for the injury done to him, freely without sale, fully without any denial, and speedily without delay."

In construing any provision of the bill of rights taken from the English Charter, it must not be forgotten that no new restriction was intended thereby, but that the sole purpose thereof was to preserve those valuable safeguards against excessive use of sovereign authority that had become a distinguishing characteristic of English liberty. That idea cannot be found better stated than by COOLEY, J., in *Weimer v. Bunbury,* 30 Mich. 201, 214:

"The truth is, the bills of rights in the American constitutions have not been drafted for the introduction of new law, but to secure old principles against abrogation or violation. They are conservatory instruments rather than reformatory; and they assume that the existing principles of the common law are ample for the protection of individual rights, when once incorporated in the fundamental law, and thus secured against violation."

It is suggested, as conclusive evidence that the right to use judicial remedies under the common-law system was free and that the provision of our bill of rights referred to was designed to prevent conditions thereof being created here, that appeals in England were always allowed, even to the House of Lords, without any burdens being imposed on the appellant. A more careful examination of the subject would have shown that the right to impose reasonable conditions as to costs and security for costs was never questioned in the English courts. Special favors, it is true, were granted to persons in need thereof, to sue *in forma pauperis,* upon proof being made that otherwise justice would be denied (1 Dan. Ch. Pr. [6th Am. ed.] 38, 155); but generally, costs and security for costs, in some form, in personal actions, were exacted, after the days of Magna Carta. At first the system was somewhat after the course of the old mischievous custom, though shorn of the real wickedness thereof, since the exactions were required as amercements in the nature of revenue for the sovereign. The imposition went against the losing

party as a penalty: in the case of the plaintiff for unjustly bringing the defendant into court; and in the case of the defendant for unreasonably resisting the plaintiff's demand. 3 Bla. Com. 399. Later by legislation costs were given the plaintiff, when a prevailing party, but not to the defendant under the same circumstances. 6 Edw. I, c. 1. Subsequently the same privilege was extended to defendants. 23 Hen. VIII, c. 15. Soon amercements for the enrichment of the sovereign treasury were abolished. 24 Hen. VIII, c. 8. Laws providing for security for costs naturally followed. By the statutes of 3 Jac. I, c. 8, and 3 Car. I, c. 4, § 4, it was provided that in personal actions, with few exceptions to fit particular cases: "No writ of error should be allowed, unless the party bringing the same, with two sufficient sureties, shall first be bound unto the party for whom the judgment is given, by recognizance to be acknowledged in the same court, in double the sum to be recovered by the former judgment, to prosecute the said writ of error with effect, and also to satisfy and pay, if the said judgment be affirmed, or the writ of error non prossed, all and singular the debts, damages, and costs adjudged upon the former judgment, and all costs and damages to be awarded for the delaying of the execution." 3 Bla. Com. 411, note. Long before the separation of this country from England Blackstone said in giving the state of the law as it then existed:

"If a writ of error be brought . . . after verdict, he that brings the writ or that is plaintiff in error, must find substantial pledges of prosecution, or bail: to prevent delays by frivolous pretences to appeal; and for securing payment of costs and damages, which are now payable by the vanquished party in all, except in a few particular instances, by virtue of the several statutes."

Thus it will be seen that substantially every element in our statutes as to costs and security for the payment thereof, is found in the laws of England as they existed before the Revolution, and that it was never supposed there was anything in

Magna Carta inconsistent therewith. By gradual approaches,. so to speak, the doctrine of the civil law in its entirety was reached and engrafted upon the English system: *"Victus, victori in expensis condemnandus est,"*—the vanquished is to be. condemned in costs to the conqueror. We inherited the principle thereof as part of the common law. In some form it has found a place in the code of every state of the Union that has followed common-law ideas, notwithstanding the adoption at the same time, in the constitutions of such states, of the essential principles of Magna Carta.

We often see it stated that costs are a creature of the statute; that costs were not given at common law. *Wisconsin C. R. Co. v. Kneale,* 79 Wis. 89, 95 N. W. 248; Parsons, Costs, § 1. That is liable to be misunderstood by not considering that the common law of England is not synonymous with the common law of this country. The former does not include the English statutes. As the only way costs were imposed before such statutes was by amercements for the benefit of the king, or possibly an addition to the verdict or the judgment of ·the jury (5 Ency. Pl. & Pr. 108), it is right to say costs were not allowed by the common law of England. But the principles of the English statutes amending the common law and existing at the time of our Revolution, suitable to our condition and in harmony with our constitution and statutes, are a part of the common law of this country. *Coburn v. Harvey,* 18 Wis. 147; *Kellogg v. C. & N. W. R. Co.* 26 Wis. 223. As only the principle of the English statutes as to costs and security for costs has been regarded as thus made a part of the common law of this country, the idea that costs are regulated wholly by statute is of course true. *Nash v. Meggett,* 89 Wis. 486, 494, 61 N. W. 283.

In harmony with the law as stated, the writ of error, commonly known as the writ of right, which our constitution so carefully preserved, providing that it shall never be prohib-

ited (sec. 21, art. I), has uniformly been held to be subject to reasonable regulations, including the imposition of security for costs. 7 Ency. Pl. & Pr. 827. In *Ripley v. Morris,* .7 Ill. 381, a general statute requiring the filing of security for costs in civil actions was held to apply to one commenced by writ of error. Our statute, sec. 3054, Stats. 1898, requiring security for costs when a cause is removed on writ of error to this court the same as in case of a statutory appeal, was sustained in *Lombard v. Cowham,* 34 Wis. 300, as a reasonable regulation of the use of the writ. That, it was said, was permissible before the constitution was adopted, and the term therein respecting the writ is to be construed with reference to the conditions then existing.

The foregoing quite extended discussion of the validity of statutes on the subject of costs, and the incidents thereof, though going no further than to respond to the different phases of counsel's argument, is probably unnecessary; yet it will be helpful if it shall prove efficient to guard against a recurrence of the subject being presented to this court for consideration. The treatment of the matter in *Christianson v. Pioneer F. Co.* 101 Wis. 343, 77 N. W. 174, 917, it was thought would finally close the matter here; but such, it is seen, has not been the case.

5. The next proposition submitted as fatal to the motion to dismiss is that sec. 3052, Stats. 1898, is class legislation, hence contrary to the spirit of our constitution and the fourteenth amendment to the national constitution, prohibiting any state from denying to any person within its jurisdiction the equal protection of the laws. The authorities relied on in support of that are *Williamson v. Liverpool, L. & G. Ins. Co.* 105 Fed. 31; *Yick Wo v. Hopkins,* 118 U. S. 356, 6 Sup. Ct. 1064; *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150, 17 Sup. Ct. 255; *Mut. F. Ins. Co. v. Hammond,* 106 Ky. 386, 51 S. W. 151. All of those cases, if we understand them, support the opposite view to the one advocated by coun-

sel. They deal with enactments arbitrarily creating classes and imposing upon members of one burdens not borne by persons generally. The idea that a law which applies to all alike, as does the one in question, is such an enactment merely because the circumstances of particular members of the community may be such that the burden of complying therewith is harder for them to bear than for others, has no support in the authorities nor in the principle of equality before the law, which is the fundamental idea of our system of government. The fact that one person may be poor and another rich is something that the law does not take note of, necessarily. It is for all alike, regardless of wealth or station.

6. Counsel for appellants contend that, if there be not an effective answer to respondents' motion in any of the points heretofore discussed, the supplemental return to this court—showing that before the motions to dismiss were heard due application was made to the court below for leave to perfect the appeals by filing there an undertaking under sec. 3052 as to each of them, regarding every appellant as standing independently of all others, the granting of such application, the execution of an instrument intended to accomplish that purpose, the service thereof as required by sec. 3049, and the return of the same to this court as required by sec. 3050—cures the defect claimed and renders the appeals perfected for all purposes. That the practice, in any view of the matter, was correct, is sufficiently indicated by what has been said; but it is very clearly shown in *Tyson v. Tyson,* 94 Wis. 225, 68 N. W. 1015. If a failure to give a proper undertaking in the first instance were to be classed as an excusable mistake or accident, then it was in the power of the court below to allow the omitted act to be done, as it did, under sec. 3068. If such failure cannot be so classed, but the omission was excusable in any view of the matter, then it is proper for this court to allow the supplemental return with effect, if the new undertaking be sufficient in form, and to deny the

motions to dismiss with or without terms according as justice, under all the circumstances, would seem to demand. The cases cited in the early part of this opinion amply demonstrate that. Our examination of the new instrument leads to the conclusion that it is in legal effect an obligation in the sum of $250 as to each appellant; that is, it is equivalent to as many undertakings of $250 each as there are appeals, regarding the number thereof to be equal to the number of appellants. In that view, we see no reason why the fact that there is but one instrument for all, instead of one for each appellant, should militate against its efficiency as complying with the statute.

Ordinarily the practice in such cases is to allow the appeal to be perfected in the manner sought here upon terms, but exceptional circumstances may justify or demand that no terms be imposed, as was the case in *Tyson v. Tyson.* Here there can be no doubt that appellants' counsel acted in the best of faith in serving the first undertakings. They erred in a matter of judgment. Had their attention been seasonably called to such error it would probably have been corrected without the labor the matter has given to the attorneys on both sides and to this court. It appears that the first undertakings were served on respondents' counsel December 6, 1900. For nearly two years thereafter they treated the case as properly in this court for a hearing when reached in its order; and the rules in regard to the service of cases and briefs were satisfied. In the meantime several stipulations were made with appellants' attorneys in respect to the case, in effect conceding full jurisdiction here. The cause was continued on stipulation twice, on one of which occasions the writing required appellants' attorneys to pay respondents' attorneys the sum of $100. True, the record shows payment of a less sum, which was probably according to some supplementary agreement, but the effect is the same. Several supplemental returns were made. One motion was

made by respondents' attorneys to dismiss the appeals for want of prosecution, which was disposed of upon the theory that the case was here for all purposes. Not till the September term of court for 1902, the fourth term after the first return was filed here, and not till the case was about to be set down for argument, was the defect in the appeals called to the attention of the court or counsel on the other side by the making of these motions. Moreover, there is no showing in the moving papers why the motions were not made at an earlier date. Nothing said, of course, militates against the right to make the motions, to secure the benefit of a proper bond and to raise the judicial question; but the situation shows fault upon the part of respondents' attorneys in not moving in the matter at a much earlier day. It would seem that, if there could be a case justifying the withholding of terms for granting the favor to appellants' attorneys of allowing the supplemental return to stand as effective for the purposes intended, even if the granting of the application in the court below does not remove the matter beyond the discretionary power of this court—which it probably does if the difficulty to be remedied falls under sec. 3068—other than that the favor shall not cause delay in the final disposition of the case, this is one. That has been submitted to. It is therefore considered that the supplemental return fully perfects the appeals, and that the motion to dismiss the same should be denied without costs; and it is so ordered.

## II.

### JURISDICTION OF THE TRIAL COURT.

An important subject remains to be considered before reaching a point where the merits of the appeals can be examined. All questions pertaining to the jurisdiction of this court to entertain the appeals being settled favorably thereto, except for an incidental statement in the original briefs of

counsel, the next subject calling for consideration, so far as counsel are concerned, would be the alleged errors of the trial court in the exercise of its jurisdiction. Quite independently of such incidental suggestion, serious doubt arose during our deliberations as to the right of the circuit court, under any circumstances, to entertain a suit of the nature of this one, as presented by the supplemental bill. That concerns, of course, the jurisdiction of such court of the subject of the action, and was not waived by going to trial upon the merits. It seems, respecting the principal defendants at least, that the point was not urged below, if suggested, nor presented by counsel here at first in a way to call the attention of the court to the matter as one likely to be vital to the case.

A challenge to the jurisdiction of the trial court of the subject matter of the action is proper at any time; and, without the question being urged by counsel. It is not only proper for this court, but it is its duty, to make all investigations necessary to satisfy itself in regard thereto with reasonable certainty. *Pollard v. Wegener,* 13 Wis. 569; *Damp v. Dane,* 29 Wis. 419; *Butler v. Wagner,* 35 Wis. 54; *Mathie v. McIntosh,* 40 Wis. 120; *Meyer v. Garthwaite,* 92 Wis. 571, 66 N. W. 704; *In re Klein,* 95 Wis. 246, 70 N. W. 64; *Burnham v. Norton,* 100 Wis. 8, 75 N. W. 304; 12 Ency. Pl. & Pr. 187, 190:

"When it appears that the court has no jurisdiction over the subject matter of the suit, it will take notice of the defect whether objection is made or not, and will dismiss or stay proceedings *ex mero motu,* and it is its duty to do so without determining any other matter involved in the litigation."

The instances are very rare where any court has ventured to invade the salutary doctrine above stated for the purpose of saving a party from consequences, however severe. It would be difficult to assign any justification for such an invasion that

would leave it free from condemnation as being an act of usurpation, since it goes to the question of power. A court is all-powerful within its jurisdiction, but is absolutely powerless in any legitimate sense when acting outside thereof. Notwithstanding that limitation upon the judicial function which cannot be passed without entering the field of usurpation, and the duty of the judiciary to set, most significantly, an example of submission to law, the call for vindication of right from a plane seemingly beyond the legitimate realms of law, in the strict sense of the term, a plane of mere moral obligation, has sometimes been too strong, it is feared, to be resisted; and in the endeavor to respond thereto, jurisdictional boundaries have been overstepped, actually or in effect (*Boone's Adm'r v. Shackleford's Adm'r*, 66 Mo. 493)—the court seeking to justify it upon grounds of estoppel *in pais*, or some other,—preventing the party against whom relief is granted from being heard to raise the jurisdictional question. It is doubtful whether a court would be justified under any circumstances in assuming jurisdiction of a subject matter which neither the law gives nor the parties could bestow by consent, by either neglect or refusal to take its bearings in that regard, by the limitations upon its power set by the organic act by which it was created.

With the views above expressed, notwithstanding, as indicated, it seemed that there was practical submission to the power of the trial court in this case by appellants, when the appeals were taken up for decision, after a full argument thereof upon the merits, we were confronted at the threshold of our deliberations by the necessity to determine whether such court had not gone so far in an attempt to do justice as to transgress its jurisdiction. Doubts in that regard became so serious that it seemed that counsel for the respective parties should have a full opportunity to aid the court to the best of their ability in reaching a right conclusion, and to

that end this question was formulated, definitely covering the subject, and a reargument thereon ordered:

"The property of an insolvent corporation having been placed under the control of a receiver appointed by the court in a winding-up suit, and it being claimed that such receiver, in the course of his administration, has wrongfully lost such property or some portion thereof, his attorneys and others participating in the wrong; is it competent for the court to make the alleged guilty parties defendants in the pending suit with some creditor, or creditors, standing for all persons so circumstanced, as plaintiff or plaintiffs, broaden out the complaint so as to cover the new matters by a supplemental bill, litigate the same, and include in the general decree in such suit recoveries against all of such alleged guilty parties according to the nature or extent of their liabilities?"

The eminent counsel upon both sides responded to the order for a hearing upon such question by elaborate, learned, and helpful arguments covering a wide range of principles deemed by them to aid in or control its solution. We have endeavored not to pass over one of the learned counsel's suggestions without devoting thereto that careful study which in any reasonable view of the matter it seemed to require to enable us, in the end, to arrive at a just conclusion, all the time being taken for that purpose which seemed necessary or could be used to any appreciable advantage. We shall not undertake to embody in this opinion all of the counsel's points in detail with the reasons for our conclusions in respect thereto, but we will endeavor to treat all specially, not involved in and answered by the declaration of some general principles.

Some observations at the outset seem proper in view of the broad field covered by the arguments of counsel and the court's study of the subject, respecting the scope of the jurisdiction of the circuit courts; not with the idea of declaring anything new, but that we may have a perspective, so to speak, before the mental vision as we proceed, of the vast

extent to which such jurisdiction extends in weighing out justice between man and man.   We shall see that, standing where we will and looking where we may, judicial power is present to prevent and redress wrongs.   We take a view to the very horizon of our mental perception within the scope of human capacity to violate obligations other than those of a purely moral nature, and the jurisdiction of our circuit courts, except as specially restricted by statute within legislative power to do so or by the constitution itself—those exceptions not, however, affecting the matter in hand—is found to occupy the whole field with instrumentalities designed, and as well adapted as human wisdom has been capable of making them, to execute its function to completeness.   Such court, subject to the exceptions suggested, has original jurisdiction in all matters, civil and criminal, within the state, together with appellate jurisdiction from all inferior courts, with power to use all writs necessary to carry into effect its orders, judgments, or decrees (Const. art. VII, sec. 8), a jurisdiction early declared by this court to be "greater, probably, than was ever before our time, in a free government, delegated to one tribunal: the united powers of the English King's Bench, Common Pleas, Exchequer, and Chancery." How vast that is in its chancery field can best be appreciated by applying thereto the standard of measurement which the distinguished men who have been significant in the development of our system have taught us must be used to span it: "Equity will not suffer a wrong to go without a remedy."   The term "wrong" in the maxim, as before indicated, has here a significance which does not reach violations of mere moral rights.   Any other wrong is said to involve a corresponding primary legal or equitable right, with an equitable or legal remedy, according to circumstances, for the former, and an equitable remedy for the latter.   Pomeroy, Eq. Jur. 424.

In the foregoing the term "jurisdiction" is used in its broad, general sense,—that of judicial power.   A court may

have jurisdiction of a particular subject matter, but by settled judicial policy ought not to exercise it. Again, it may,— by the settled law, established by its own practice, deemed to be as binding as the written law—have power in a constitutional sense to adjudicate disputed matters of a particular character, acting by recognized unbending principles of procedure, but not jurisdiction to adjudicate such matters in the particular way attempted. In either case it is common to say of an excessive exercise of authority, that the court is without jurisdiction. If the excess has reference to want of power over the subject matter, strictly so called, the result is void and may be successfully challenged directly or collaterally. If it has reference merely to the judicial method of exercising power, the result is binding upon the parties to the litigation till reversed or set aside in some of the ways appointed by law. The former is usurpation; the latter error of judgment. That rule is said to be universal,—to apply to the highest court as well as the lowest. The former cannot render a valid judgment outside of its constitutional authority, while its error within the scope of its authority stands on no higher plane than that of the latter, except for the fact that there is no tribunal to which an appeal can be taken to correct it. As Justice BALDWIN, in *Voorhees v. Jackson,* 10 Pet. 449, 474, put the matter:

"The only difference in this respect between this and any other court is, that no court can revise our proceedings. . . . If not warranted by the constitution or law of the land, our most solemn proceedings can confer no right which is denied to any judicial act under color of law, which can properly be deemed to have been done *coram non judice;* that is, by persons assuming the judicial function in the given case without lawful authority."

Applying the foregoing to the question in hand, time need not be spent in demonstrating that there was no want of jurisdiction in respect thereto in the sense of want of power. Upon the face of the complaint and the evidence in support

of it, there were many wrongs to be righted. The matter had not passed beyond the control of the court. It had constitutional authority, or, in other words, jurisdiction over such subjects and of the parties. Was judicial power invoked in a proper way,—one which, by settled principles, it was permissible for the court to recognize as legitimate, whether consented to by the adverse party or not? If that must be answered in the negative, then, irrespective of whether the question was suggested for consideration by appellants, and although the judgment entered may be binding as long as it stands, the trial court obtained no jurisdiction of the subject matter of the litigation and its decree must be reversed on that ground. The rule is well stated in 12 Ency. Pl. & Pr. 120, thus:

"Every power exercised by any court must be found in and derived from the law of the land, and be exercised in the mode and manner prescribed by that law. If the court cannot try the question except under particular conditions or when approached in a particular way, the law withholds jurisdiction unless such conditions exist or the court is approached in the manner provided, and consent will not avail to change the provisions of the law in this regard."

This and other courts have frequently declared that principle this way, in substance: Where the circuit court possesses jurisdiction in the broad sense of the term, but ought not to exercise it in the way invoked, or at all in the given circumstances, it should be deemed, to all intents and purposes, except in the sense of want of power strictly so called, to be without jurisdiction. Where it ought, regardless of the attitude of the parties, to decline to act, it should be deemed, regardless of such attitude, not to have jurisdiction to act. *In re Klein,* 95 Wis. 246, 70 N. W. 64; *Burnham v. Norton,* 100 Wis. 8, 75 N. W. 304; *Scott v. Whitlow,* 20 Ill. 310, 312; *Curtiss v. Brown,* 29 Ill. 201; *Williams v. Detroit,* 2 Mich. 560, 585; *People ex rel. Davis v. Sturtevant,* 9 N. Y. 263; *Bangs v. Duckinfield,* 18 N. Y. 592; *People ex rel.*

*Gaynor v. McKane,* 78 Hun, 154, 28 N. Y. Supp. 981. An examination of those cases will demonstrate that, while the term "want of jurisdiction of the subject matter," strictly speaking, refers to want of power, in most cases in equity it applies either to whether power possessed should be exercised at all, or in the particular way, or under the particular circumstances; and in all of such cases error is deemed to be judicial in the sense that the result is binding till reversed or set aside in some proper way. When there is said to be want of jurisdiction in such cases, the idea intended to be conveyed is that "it would be erroneous to exercise judicial power, and the decree would be reversed on appeal." *Curtiss v. Brown, supra.* This remark was made in that case:

"We often find the jurisdiction denied, where the power exists, but ought not to be exercised, and in this sense is the word 'jurisdiction' usually used, when applied to courts of chancery. Where there is a want of power, the decree is void collaterally; but where there is said to be a want of jurisdiction merely, it is only meant that it would be erroneous to exercise the power, and the decree would be reversed on appeal."

In *Bangs v. Duckinfield, supra,* the court said:

"There are, I apprehend, few cases in which the position [that the decree is void for want of power] could be affirmed in respect to a court possessing general jurisdiction in law and equity, on grounds relating to the subject matter of the controversy."

And in *Williams v. Detroit, supra,* the rule was declared to be that:

"When the subject of the suit is embraced under any of the appropriate heads of equitable jurisdiction, the court will take cognizance of it, notwithstanding there may be a remedy at law, or other circumstances exist, which would induce the court to refuse to entertain jurisdiction in the particular case, unless the defendant raises the objection by demurrer, or claims the benefit in his answer."

The foregoing leads to this: The circuit courts of this
state have, under the constitution, succeeded to all the ju-
risdiction formerly exercised by courts of law and courts of
chancery as well; and though old forms of enforcing judicial
remedies have been abolished, that does not mean, necessarily,
that the remedies have been abolished. The forms have
ceased to exist, but substituted therefor and in place of all
we have one form of remedy, denominated a "civil action."
Sec. 2600, Stats. 1898. Whether a plaintiff declares in
equity or at law, or if at law declares in respect to matters
ordinarily cognizable by a court of equity, so long as the sub-
ject matter is within the power, strictly so called, of the
court to adjudicate it, does not generally involve any ques-
tion of the jurisdiction of the subject matter or question of
whether the complaint states a cause of action, or any other
question not subject to waiver by failure to raise it by de-
murrer or answer or which is not so waived by going to trial
upon the merits without objecting other than by a demurrer
*ore tenus. Becker v. Trickel,* 80 Wis. 484, 50 N. W. 406;
*Sweetser v. Silber,* 87 Wis. 102, 58 N. W. 239; *Hoff v. Ol-
son,* 101 Wis. 118, 76 N. W. 1121. The question of whether
principles of equity jurisprudence are involved in such a case
and can be applied therein, involves a question of practice,
strictly speaking. *Martin v. Martin,* 112 Wis. 314, 317, 87
N. W. 232, 88 N. W. 215.

Applying the foregoing here, there is good ground for hold-
ing that there is no jurisdictional question in any sense of the
term that should be considered at this stage of the litigation,
barring the subject of whether the statutes (secs. 3216 and
3239, Stats. 1898) in effect prohibit an action being reor-
ganized as this was,—which will be considered later. But,
as before indicated, a departure from established practice
may be deemed so important as to be legitimately regarded
as jurisdictional error to the extent that, though not avail-
able to avoid the judgment as the result of an excess of

power, it may be raised by the adverse party for the first time on appeal as a ground of reversal, or the court may and ought to take notice of it—whether insisted upon by such adverse party or not, and even if such party expressly waives it—and reverse the judgment upon that ground alone. That is recognized in *Livingston v. Livingston,* 4 Johns. Ch. 290, where Chancellor KENT suggested the power of waiver in such cases as exercisable as a general but not as a universal rule. In *Williams v. Detroit,* 2 Mich. 560, it was said:

"It is obvious there must be exceptions to the rule. Otherwise, every question which could be litigated at law, might be brought into a court of chancery for adjudication, if both parties should consent thereto."

True, and so any number of questions between any number of parties, so long as such questions were proper, in any view, for judicial determination, might be so presented, and this court, notwithstanding its power of superintending control, would be powerless to compel observation of those orderly methods prescribed by the unwritten and written law as the embodiment of judicial and legislative wisdom for the highest attainable degree of perfection in the administration of justice: all semblance of a definite system would be lost sight of and the confusion of things would fatally affect the ability of trial courts, and appellate courts as well, to arrive at the real truth and justice of disputed matters with due regard to the convenience of litigants and the safeguarding of their rights. In that view the judicial rule should be firmly applied, suggested in *Meyer v. Garthwaite,* 92 Wis. 571, 66 N. W. 704, and *Burnham v. Norton,* 100 Wis. 8, 75 N. W. 304, that while a trial court, though possessing power and jurisdiction in the general sense, ought not under the circumstances to exercise it, such exercise, whether by consent of the parties or not, is to be deemed, for the purposes of a reversal upon appeal, akin to total want of

jurisdiction of the subject matter in the broad sense of the term.

It was the purpose of the court in framing the question for counsel, to draw their attention upon the reargument to the suggestion on the main inquiry, of whether the circuit court possessed jurisdiction of the subject of this action in the sense of that term used in the closing lines of the last paragraph. From the arguments of counsel it is not clear that they fully comprehended the import of the question, though the numerous points presented by them in the main bear more or less upon the vital point of uncertainty in respect thereto. Counsel upon the side of appellants do not wholly agree between themselves as to the nature of the defect in the proceedings. It is referred to on the one hand as a defect in procedure, and upon the other as a total want of jurisdiction because in effect prohibited by statute. Appreciating, during the argument, that a defect in a mere matter of procedure is generally waived by not seasonably insisting upon it, and that it does not go to the jurisdiction of the subject matter other than in an exceptional sense, circumscribed within very narrow limits, when the point is not raised specially in the trial court, it was denominated a defect in jurisdiction of the subject matter, because, first, judicial power over the subject, proper to be litigated in this form of action, is dependent upon and wholly given by statute, and does not include the matter in controversy; and, second, the proceedings adopted for vindicating the rights claimed to exist are so utterly foreign to the practice of courts and inconsistent with the status of the parties and the property sought to be recovered in the form of money, that appellants should not be compelled to submit to it, nor should the court in any event permit it. This latter ground, at least, is within the domain of practice, but suggests such an abuse of it as to amount to a defect of jurisdiction of the subject matter, under the doctrine already discussed.

To support the proposition last suggested it is insisted that there are no precedents to be found in the books, of any suit exactly like this, one where the creditors have been permitted, in a winding-up action,—upon its being alleged that the court's receiver and others, by various means, including frauds upon the court, have converted assets of the insolvent to their own use under the forms of law, in part execution of a collusive agreement entered into by them before the receivership proceedings commenced, such commencement and the final payment of the receiver and his legal assistants for their services being also in part execution of such agreement, which in the whole had in contemplation the conversion of all of the property constituting the insolvent's estate,—to make such alleged guilty parties defendants and to redress the wrongs committed by them, enforcing by means of money judgments the restoration to the court's control for the benefit of creditors of an equivalent for the property so wrongfully appropriated. True, the suit is novel in character, but so are the alleged circumstances giving rise thereto. If, before a court of equity could take jurisdiction of a principal subject, complicated by numerous incidental matters germane thereto, it were always obliged to test its authority by precedent, in any other sense than to refer thereto as illustrative of principles to be applied, it would often find itself incompetent to settle a controversy without a multiplicity of suits or to grant relief at all adequate to the nature of the case. The scope of equity jurisdiction is by no means closely fenced about by precedent. It it were, there could be no further development to meet new conditions as they arise. Certain principles in equity jurisdiction are established, and dominate in the administration of justice in that field with as much certainty as do principles upon the law side, so to speak, of the court. But mere precedents are of no avail except to illustrate the extent to which principles have been applied. The textwriters disagree, in some respects, in the

manner of stating that rule, but are in harmony in this: While new principles are not to be added to those long established for the government of equitable remedies, the rules, not the precedents, are to control. There is no vitality in precedents; there is in rules. They are susceptible of expansion along every line necessary to reach new conditions. The ingenuity of man in devising new forms of wrong cannot outstrip such development. In all situations and under all circumstances, whether new or old, the principles of equity will point the way to justice where legal remedies are infirm. Precedents will be a constant guide, but never a bar. Where a new condition exists, and legal remedies afforded are inadequate or none are afforded at all, the never-failing capacity of equity to adapt itself to all situations will be found equal to the case, extending old principles, if necessary, not adopting new ones, for that purpose. That is a very old doctrine. It will be found declared in the decisions of this and other courts. Lord REDESDALE's statement of it in *Bond v. Hopkins,* 1 Sch. & Lef. 413, 429, has been adopted by eminent textwriters as being so accurate and clear as to leave little or no room for improvement:

"There are certain principles, on which courts of equity act, which are very well settled. The cases which occur are various; but they are decided on fixed principles. Courts of equity have, in this respect, no more discretionary power than courts of law. They decide new cases as they arise by the principles on which former cases have been decided, and may thus illustrate or enlarge the operation of those principles; but the principles are as fixed and certain as the principles on which the courts of common law proceed."

So, it is said, grantable relief in equity, the case falling within its principles, is limited only by the primary right and those so germane thereto as to be deemed properly connected therewith for the purposes of the litigation, or the primary wrong, including those incidental thereto and proper to be redressed therewith.

"It has never placed any limitations to the remedies it can grant, either with respect to their substance, their form, or their extent; but has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition, in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed." 1 Pom. Eq. Jur. § 111.

Mr. Pomeroy, in those few lines, most fittingly pictured the nature and scope of equity power. Though no precedent may be at hand in a given situation, since principles of equity are so broad that the wrong involved need not go without a remedy, its doors will swing open for the asking, and a new precedent be made, an old principle again being illustrated. Applying that to the matter in hand, if it falls within some one of the well-recognized heads or principles of equity, we need not hesitate to sustain the jurisdiction of the circuit court because there are no precedents to go by, even if the claim in that regard be borne out by the facts.

The conclusion reached in the last paragraph suggests the next subject to be treated. Does the matter in hand, on principle, belong within the field of equity jurisprudence? That suggests, as a minor question, What is the dominant purpose of this litigation? That is governed by a few elementary principles. It is the settled law that the property of a corporation in a state of suspension because of insolvency, constitutes a trust fund for the benefit, principally, of its creditors, so that its officers cannot deal therewith to their personal advantage. Their status in such circumstances is that of trustees for the creditors, subject, however, to their right to deal with the property, until taken into the possession of the court, as any other debtor might deal with his property, excepting, however, the disability as regards special benefits to themselves. *Hinz v. Van Dusen*, 95 Wis. 503, 70 N. W.

657; *Slack v. N. W. Nat. Bank,* 103 Wis. 57, 79 N. W. 51; *Marvin v. Anderson,* 111 Wis. 387, 87 N. W. 226. Until by proper proceedings the corporation shall have been deprived of its liberty to deal with its creditors, it may, as before indicated, pay one of them in preference to another; but when so deprived by the remedy of sequestration, in an action where such remedy is appropriate, the effect thereof is to impress upon its property a trust for creditors, subject to valid liens thereon, and any interference with such property thereafter in violation of the trust is unlawful. In such circumstances every person in possession of any part of the trust property is in a proper sense a trustee, and subject to be dealt with accordingly. That has become elementary. A receiver, appointed by the court to take charge of such property, by virtue of his office succeeds, for the benefit of creditors, to all the property and all the causes of action belonging to the corporation, in its right, and to all corporate property transferred by it in fraud of creditors, the transferee participating in the fraud, in the right of the creditors themselves; and he becomes, as holder thereof, trustee for such creditors. High, Receivers, § 315.

The last-mentioned feature of the status of a receiver is not always recognized, and for that reason it is sometimes suggested, as in this case, that the right to recover property transferred by a corporation in fraud of creditors is a right of creditors only,—does not pass to the receiver in a winding-up proceeding, and cannot be vindicated in the receivership action. That overlooks the fact that a transfer in fraud of creditors is deemed, as to them, to leave the property subject to their claims substantially as before, that such property constitutes a part of the trust fund for general creditors, and as the entire trust must necessarily be worked out through one proceeding, every holder of property of the corporation, and every holder of property in the right of a corporation, but in fraud of creditors, is, as to them, the pos-

sessor of a part of the fund, and is, as such, a trustee and
liable to account as such in the action.  The true doctrine on
this subject, as applied to an insolvent corporation in a state
of suspension, is well stated in Gluck & Becker on Receivers
of Corporations, § 58, in these words:

"Property—and by this is meant any conceivable kind—
may have gone beyond the recall and reach of the corpora-
tion itself, and yet, by reason of the fraud practiced, may
still be subjected to the claims of creditors and the rights of
stockholders, under the familiar rule that fraud vitiates
nearly, if not all transactions.  Such property, so far as the
creditors and stockholders are concerned, still remains a part
of the trust estate and therefore a part of the assets of the
corporation.  There is no sound reason why the court can-
not marshal those assets as well as other assets of the corpo-
ration for the benefit of the same parties."

See, on the same point, *Pittsburg C. Co. v. McMillin,* 119
N. Y. 53, 23 N. E. 530; *Rudd v. Robinson,* 54 Hun, 347,
7 N. Y. Supp. 535; *Oneida v. Thompson,* 92 Hun, 16, 37
N. Y. Supp. 889; *Cummings v. Am. G. & S. Co.* 87 Hun,
598, 34 N. Y. Supp. 541; *Proctor v. Sidney S. B. & F. Co.*
8 App. Div. 42, 40 N. Y. Supp. 454; *Hayes v. Kenyon,* 7
R. I. 142; *Monitor F. Co. v. Peters,* 40 Ohio St. 575; *Chi-
cago & A. B. Co. v. Fowler,* 55 Kan. 17, 39 Pac. 727; *Alex-
ander v. Relfe,* 74 Mo. 495; Thompson, Corp. §§ 3562–3564;
2 Morawetz, Priv. Corp. 867.  The authorities cited are to the
effect that all the assets in which the creditors of the in-
solvent corporation are entitled to share equally, whether the
same are under the control of or have passed from the cor-
poration, constitute a trust fund, and every one holding any
part of the same in the capacity of a trustee, whether of an
express trust, in any sense, or in any trust capacity known
to the law, may be charged in a single action for the con-
servation of the whole for the use of all the beneficiaries.

Much has been written on the subject under discussion in
recent years, but nothing has been really added to what was

decided in *Hurlbut v. Marshall,* 62 Wis. 590, 22 N. W. 852, which followed the decisions in New York under a statutory system similar to ours. The court there said, in effect, that in a suit of this kind all officers, directors, stockholders and all other persons who shall have taken and carried away and converted property or funds of the corporation wrongfully, are trustees for the corporation, and remotely for creditors, and may be compelled in the winding-up suit to account therefor as parties defendant. In the recent case of *Williams v. Brewster,* 117 Wis. 370, 93 N. W. 479, all previous cases on the subject were collated and discussed. It would seem a work of supererogation to go over the subject, or any branch of it again. It is sufficient to state the doctrine, which is as old as the system found in our statutes and long antedates its adoption here. Such doctrine is this: The primary purpose of a suit being to wind up an insolvent corporation and distribute its assets ratably among its creditors, the enforcement of all liabilities of officers and stockholders to the corporation, whether created by law or otherwise, and all liabilities of directors and stockholders to creditors created by law, are germane to the main purpose of the litigation and not only may be joined therewith as a part thereof under the established rules of equity jurisdiction, but, under the scheme of the Code for working out the various liabilities in which creditors of a corporation as a class are interested, must be so joined, and the liabilities of all others to creditors, of a trust nature, may be so joined.

The rule which, independently of the statute, charges an officer of a corporation who has dissipated, wrongfully, a part of the trust fund as a trustee thereof and renders him liable to account accordingly as a party defendant in the action, must, of necessity, charge any other person who has obtained property of a corporation in fraud of creditors as a trustee thereof. So far as they are concerned, the property belongs to the trust fund for the payment of the debts of the corpo-

ration the same in the one case as in the other. The fact
that in the one case the liability is to the corporation primar-
ily, and in the other primarily to the creditors, makes no
difference. The winding-up suit is to be regarded as im-
pounding all such liabilities for the benefit of all the cred-
itors. If that were not so, while creditors as a class were
participating in the distribution of the assets acquired in the
right of the corporation, individual creditors would be en-
forcing liabilities of persons not officers of the corporation
who obtained property from it in fraud of its creditors. The
orderly way, and the only way consistent with our system,
as the court has repeatedly declared, is to treat all who have,
as to creditors, directly or indirectly obtained possession of
corporate property wrongfully, as liable to account therefor
as parties defendant, after the manner of trustees.

Some difficulty has seemed to exist in determining who are
and who are not proper parties defendant in such a suit
according to the foregoing doctrine, because of the use of
the term in *Hurlbut v. Marshall,* "if the officers, directors
or stockholders, or any one else have," etc., conveyed or car-
ried away any part of the trust fund; and the language in
*Arthur v. Willius,* 44 Minn. 409, 413, 46 N. W. 851, "The
proceedings are intended to be so elastic as to be susceptible
of development during their successive stages of progress, as
to reach not only all the corporate assets, but also all liabil-
ities of stockholders and others so far as necessary for the
payment of creditors." That language was used in respect
to the proper parties to bring into the litigation as defend-
ants. No serious difficulty need be experienced when it is
comprehended that the subject of the litigation in the whole
is the gathering in of the parts of a trust fund and the ad-
ministration of such fund,.and that the theory is that the fund
is impressed with the trust for all purposes of the suit as
soon, at least, as sequestration has been effected, and till the
same is turned over to the court or its officers the holders

thereof are in the nature of trustees and liable to account as such. This, of course, does not include mere debtors of the corporation. Neither the language in *Hurlbut v. Marshall,* nor that in *Arthur v. Willius,* was intended to be so understood. If it were otherwise, some evidence thereof would be found in subsequent cases. The result of the decisions on this branch of the case leads to the conclusion that, all the liabilities in this litigation are legitimately to be considered as parts of one trust fund held for the time being by many persons chargeable therewith as trustees, the whole, when gathered into the control of the court, to be distributed among the creditors of the defendant corporation as *cestuis que trustent;* that none of the persons charged occupy the status of mere creditors of the corporation or of any one else.

We have now reached a point where it seems that when this litigation started and when it was reorganized into its present form, the subject to be dealt with in a physical sense was a trust fund. There was then a trust. There were trustees holding the trust fund subject to the order or decision of the court,—to that extent equitably, in any event, bound to execute the trust. There were creditors, a class of persons who were the equitable owners of the trust property—*cestuis que trustent* within well-settled principles—equally interested in the primary right to have the trust fully executed. Where was to be found the remedy to enforce that right? Unity of procedure was necessary to avoid a multiplicity of suits. The right was purely of an equitable character. Does it not follow, necessarily, that the only jurisdiction to cope adequately with the matter was that of equity? The doctrine is elementary, that where the remedial right is equitable the remedy is in equity and nowhere else. So the administration of trusts was, as a rule, never entertained by courts of law. Their machinery and methods are entirely inadequate for the purpose. Equity jurisdiction is exclusive in such mat-

ters in the absence of any statutory regulation of the matter. 22 Ency. Pl. & Pr. 91; 1 Perry, Trusts, § 17.

"All actions for the establishment of the fiduciary relation, for the execution and enforcement of trusts, or of the obligations arising out of the trust relation, and for the investigation and adjustment of differences between the parties to a trust, are within the exclusive jurisdiction of equity," except as modified by statute or special rules of court. "This rule includes, not only express trusts, but also trusts arising by implication of law." 2 Beach, Trusts and Trustees, § 750.

It is not to be understood by the foregoing that no action can be maintained by a *cestui que trust* in any circumstances against a trustee of any sort except in equity. Such actions may be brought, are brought, under a very great variety of cases. The purpose thereof, though, is not to establish and administer or enforce a trust. That is a special field of jurisdictional activity which originated and took its form in courts of chancery and has always been deemed peculiarly a function of such courts. In 27 Am. & Eng. Ency. of Law (1st ed.) 271, the law on the subject, deduced from a multitude of authorities, is stated thus:

"The execution and enforcement of trusts and trust obligations, the adjustment of disputed rights under them, the investigation and settlement of accounts between parties in confidential relations, the establishing of the existence of a fiduciary relationship, are questions which fall naturally within the primary and exclusive jurisdiction of chancery courts."

What has been said would seem to conclusively answer in the affirmative the inquiry as to whether the subject of this action, in its entirety, must be classed as one governed by principles of equity, and be dealt with in the manner attempted, unless the long line of decisions of this court in respect to the matter, pertaining to winding-up suits, either were wrongly decided or do not extend to persons not officers

or stockholders of the corporation who, wrongfully as to creditors, have become possessed of the trust fund or some part thereof so that they may be charged with liability therefor as defendants in the action; or unless bringing into the litigation, as defendants, the receiver and his alleged guilty participants in the wrongs complained of, as they were brought in, and the litigation of the alleged matters in respect to them, was a fatal invasion of a statutory proceeding or such a prejudicial departure from established methods of dealing with such matters as to require the court to condemn the proceedings as fatally tainted with jurisdictional error.

We have now arrived at a point where propositions suggested by counsel for appellants challenge special attention. The following are so dependent upon one of them that they can best be considered together:

A winding-up suit under the Code, with the sequestration feature, is a new remedy given by statute.

Being purely statutory and in derogation of the common law, the legislative enactment authorizing it should be strictly construed.

There is no power of sequestration independent of the statute. Such being the case, every feature of this suit for which justification cannot be found in the statute, evinces a jurisdictional defect.

If the first of such propositions falls, all must fall with it. True, without disclaiming judicial power in the matter, it is laid down by textwriters, and in many judicial opinions, that the general jurisdiction of courts of equity, independently of the statutes, does not extend to the sequestration of the property of a corporation,—its destruction, so to speak, as regards the exercise of its franchise. High, Receivers, § 288. But the remedy by sequestration, as formerly understood, is not a suit, but a means in a suit, ancillary in character, of rendering the purposes of the litigation effective, like the remedy by attachment in an action at law; or it was a means

to enforce a decree in equity, like an execution to enforce a judgment at law. The instrument formerly used was the writ of sequestration. It has been superseded or rendered useless, in most jurisdictions at least, in this country, by a statutory method of sequestration, but the name and the nature of the remedy have not been changed. It is not improbable that the old method of sequestration could yet be resorted to if necessary. Many courts in this country have so held, and some have held to the contrary. A full discussion of the subject may be found in the text and note thereto in 19 Ency. Pl. & Pr. 542. We need not go into the question. It is enough for the matter in hand that the right of sequestration in a suit of this kind, either under the statute or independently thereof, according to the holdings of this court on the subject since 1860, at least, exists; that it goes only to ousting the corporation from the possession and control of its assets; and that the remedy is not necessary nor used in respect to any of the numerous liabilities to creditors in such an action, which the corporation itself could not enforce. No one on reflection, it would seem, would venture to assert that the rights of creditors of an insolvent corporation to treat its property as a trust fund primarily for their benefit, and to a remedy in equity to administer the trust, are dependent on the statutory remedy or any other remedy of sequestration. The trust-fund doctrine itself is purely a judicial creation. 3 Thompson, Corp. § 2951. That author suggests, as the originator of it, Mr. Justice Story, and the occasion of its incorporation into the jurisprudence of this country, or the initiation thereof, the decision in *Wood v. Dummer,* 3 Mason (U. S.) 308, decided in 1824.

Can there be any doubt that, if there were no statutory aid in the matter, courts of equity would have power to deal with any kind of a trust fund, effectually protecting the interests of all parties therein, and in a single action bringing all of them before the court? There is no such thing under

the statute, nor was there at common law, as a suit or action, so to speak, of sequestration. There was and is a judicial remedy in equity to enforce a trust in favor of creditors respecting the property of an insolvent corporation, and in aid thereof we have the sequestration remedy afforded by the statute. This court early took most advanced ground on the subject of whether the equity power of the court in such matters was dependent upon the statute. *Adler v. Milwaukee P. B. Mfg. Co.* 13 Wis. 57; *Nazro v. Merchants' Mut. Ins. Co.* 14 Wis. 295; *Coleman v. White,* 14 Wis. 700; *Merchants' Bank v. Chandler,* 19 Wis. 434; *Terry v. Chandler,* 23 Wis. 456. At the time of the early decisions the only suggestion in the statutes of a remedy to sequestrate the property of a corporation was by petition to the court in an action after the return of an execution, upon the judgment therein, unsatisfied. The statute read as follows:

"Whenever a judgment shall be obtained against any corporation incorporated under the laws of this state, and an execution issued thereon shall have been returned unsatisfied, in whole or in part, upon the petition of the person obtaining such judgment, or his representatives, the circuit court within the proper county may sequestrate the stock, property, things in action, and effects of such corporation, and may appoint a receiver of the same." Sec. 18, ch. 148, R. S. 1858.

When *Adler v. Milwaukee P. B. Mfg. Co.* was before the court, it was insisted that the statutory method of obtaining sequestration was exclusive, and that it was not by action, but by petition. Some uncertainty existed as to whether the statute on the subject was sufficiently definite to be enforcible. This court, after a thorough review of the subject, held as indicated in the following language:

"From this view of the general powers of courts of equity to manage and control the affairs of failing and bankrupt corporations it becomes a matter of very little practical importance whether . . . sections 18 and 19 of chapter 148

of the revision of 1858 [now sec. 3216, Stats. 1898] are
operative or not. If operative they are in affirmance of the
law as it was previously understood; if inoperative, no sub-
stantial change is occasioned. If they can be enforced, they
only go to strengthen the powers which courts of equity here-
tofore possessed, to remove doubts, and to render the rules
by which such proceedings are governed more stable and un-
deviating."

Our statute was adopted verbatim from New York, and the
courts there early held that a bill in equity, according to the
practice in vogue in this state since the decision of the case
to which we have referred, was proper, irrespective of the stat-
ute on the subject. The same difficulty was experienced there
as here, in respect to the real purpose of the statute makers,
as will be found by reference to *Judson v. Rossie G. Co.* 9
Paige, 598. In High, Receivers, § 298, the statutory remedy,
so called, of sequestration is referred to as a "right which
is given by statute in many if not in most of the states; and
it may be regarded as an extension or enlargement of the gen-
eral jurisdiction of courts of equity." It will be noted that
in the early case decided in this state it was held that the stat-
ute did not give any right not possessed before. In *Hanson
v. Davison,* 73 Minn. 454, 461, 76 N. W. 254, under a sys-
tem the same as ours, the court referred to the statutes on the
subject in effect thus:

They indicate and regulate to some extent the remedy,
leaving to the court the duty of making it effectual by an ap-
plication of the principles of equity jurisprudence:

We should say in passing, that after the early decisions in
this state were made, to which we have referred, the statute
was changed by adding the word "action" after the word
"petition" so as to make the same conform to the judicial
policy of the state.

Enough has been said on this subject to indicate clearly
that it long since ceased to be an open question here, as to
whether the sequestration feature of our statutes in respect

to insolvent corporations is anything more than an aid to the power previously possessed by courts of equity, if even that. It has been common to speak of a winding-up suit as a statutory action, but that came about because of statutory features or aids: by no means because the remedy afforded creditors, to treat the property of an insolvent corporation and other liabilities as a trust fund for their benefit, was originated by statute.

Counsel for appellants say that the plaintiffs could act only in the right of the receiver, and as he could not pursue the winding-up action they have not the capacity to do so. That proposition primarily goes to the legal capacity to sue, and would have been good ground, if true, for a demurrer to the amended complaint. Since no such demurrer was interposed, and the defect, if there be one, appears on the face of the complaint, it was of course waived. *Moir v. Dodson,* 14 Wis. 279; *Smith v. Peckham,* 39 Wis. 414; *Wood v. Union G. C. B. Asso.* 63 Wis. 9, 22 N. W. 756.

Viewing the proposition in its jurisdictional aspect—that of whether the reorganization of the action so as to permit it to proceed as it did was such a violation of established practice that it should be condemned on that ground alone—we are unable to perceive why respondents should not pursue the winding-up action because the receiver could not. Counsel cite to our attention authorities to the effect that a receiver cannot institute a winding-up action; that if a receiver sues in the progress of administering his trust, as he obviously may in many situations, he must use the same remedies as any other party. That is, if the cause of action is equitable he must sue in equity, and if at law he must institute a legal action; that a receiver cannot prosecute for the collection of a penalty upon an official bond of the person whose property he is appointed receiver of, because the creditors are not beneficially interested in such a penalty, and that a winding-up suit must be brought by one entitled by statute to bring it.

How any of those propositions, if correct, support the idea that because a receiver cannot prosecute a winding-up action the creditor cannot, is not perceived. The logic indulged in by counsel would seem to be that because a party not entitled to prosecute a particular suit is not entitled to do so, the party so entitled cannot. Certainly, we are not called upon at this late day to declare that creditors of an insolvent corporation may institute an action to administer its property primarily for their benefit, and use therein all the machinery provided by law to make such action effective, including that for sequestering the corporate property,—taking it from the corporate control into that of the court. The receiver never institutes such an action, nor does he prosecute it, except in the name of the creditors, by their consent, and under the order of the court. The action is the creditors' action, when brought by them, from start to final judgment, the purpose thereof being to bring all the property of the corporation, and all property, whether belonging to the corporation or not, to which its creditors on the basis of equality have a right to look for the payment of their debts, into one fund, and to administer the same primarily for their benefit. It may, and necessarily must, be pursued to the end by the equitable owners of the fund. The fact that the receiver cannot pursue the action only argues that the creditors may and must. In their names the trust fund must be brought under the control of the court. If a judgment in the action for the recovery of property or its value be entered, it is to be executed in the names of the plaintiffs, not that of the receiver, the proceeds, however, remaining under the control of the court. The office of the receiver is administrative from beginning to end. *Lyman v. C. V. R. Co.* 59 Vt. 167, 180, 10 Atl. 346. He can institute suits which appertain to such duties. The creditors cannot, without violating established practice, bring such suits. So it seems that the *cestuis que trustent,* the creditors, and the receiver, have separate and well-defined spheres of

action. All that appertain to the establishment and enforcement of the trust belong in that of the former; all that appertain to the mere administration thereof belong in that of the latter. So to say that because a receiver cannot institute or prosecute an action of this kind the creditor cannot, is clearly a *non sequitur*.

Again it is said that a person colluding with the receiver in wasting the trust fund cannot be made a party to a suit originally commenced, and called to account in that way: (a) because there is no authority for such practice in the statutes; (b) because the receiver is not a trustee for creditors; (c) because only specific property could be followed in any event, and that, as shown by the complaint, not being attainable, there is no remedy. We will consider each of such propositions.

a. We have already shown that the statute is not a limitation upon the equity power of the court to enforce a trust where the subject of the trust is the property of the insolvent corporation. It is rather an extension of such power, if any were needed, so that, under general principles of equity jurisprudence, in a suit to establish a trust or to enforce it, every person holding any part of the trust fund in the capacity of a trustee in any legitimate sense, may be made a party defendant. We need not look into the statute for authority to do so.

b. The idea that the receiver is not a trustee for creditors seems to have no merit. It springs from the idea that a receiver is the agent of the court—"the arm of the court," as the term is often used. But he is not the trustee for the court in any legitimate sense. Neither the court nor its receiver has any real interest in the property to be administered. The legal title which vests in the receiver is in trust, not for the court, but for those having the equitable title, who, in a case of this kind, obviously, are primarily the creditors. So, while he represents the court in the sense that he derives his power from the court and acts for the court, he represents all the

parties entitled, primarily or otherwise, to the trust fund, and
is a trustee for them, and is so treated in all the authorities.
*Atchison v. Davidson,* 2 Pin. 48; *Henning v. Raymond,* 35·
Minn. 303, 29 N. W. 132; *Haxton v. Bishop,* 3 Wend. 13;
*Curtis v. Leavitt,* 15 N. Y. 9, 44; *Libby v. Rosekrans,* 55
Barb. 202; High, Receivers, § 314; Beach, Receivers, § 667;
23 Am. & Eng. Ency. of Law, 1065.     The law on this ques-
tion, as it is found generally laid down in the books, is not
anywhere more tersely stated than in the early case decided
in this court and above cited, where it is said: "The property,
to all intents and purposes, is the property of the creditors;
and the receiver holds the property and assets in trust for the·
creditors, as the agent of the court."

c. We fail to see how the doctrine—that when trust prop-
erty has lost its identity as such and there is no property into
which it can be traced and which can be said to presently in-
clude it, when there is no specific thing which can be pointed
to as the subject of the trust, in a controversy between the·
beneficiary and debtor of the trustee for the payment of his
claim out of such debtor's property, the trust must be deemed
to have perished with the destruction of the identity of the·
subject thereof—changes the status of such beneficiary as re-
gards such property to that of a mere creditor, as held in
*Nonotuck S. Co. v. Flanders,* 87 Wis. 237, 58 N. W. 383;
nor how the general doctrine, that when trust property has·
changed in form so as to be impossible of identification the
*cestui que trust* cannot claim any specific thing as forming
the subject of the trust,—applies to this case, or leads to the·
conclusion that a destruction of the subject of the trust ter-
minates the trust·relation not only as to the property but as
to the beneficiary.     True the court, in the *Nonotuck Case,*
quoted with approval from *Little v. Chadwick,* 151 Mass.
110, 23 N. E. 1005, these words: "When trust money be-
comes so mixed up with the trustee's individual funds that it
is impossible to trace and identify it as entering into some·

specific property, the trust ceases. The court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it cannot be traced, the equitable right of the *cestui que trust* to follow it fails." But the words "the trust ceases," and the words, "the equitable right of the *cestui que trust* to follow it fails," refer, not to the destruction of the trust relation when once established between the trustee and the *cestui que trust*, and disability of the latter to compel the former to account, but to disability to claim any specific property as constituting the subject of the trust. The trust fails only in respect to there being property impressed by a trust and recoverable *in specie*. It would be a strange doctrine to promulgate, that a trustee, by destroying the trust fund, could thereby terminate his trust in all respects and the *cestui que trust* have neither a remedy to reach the specific property, nor one to compel the trustee as such to account for the value thereof. We assume, when counsel say there is no remedy, that they mean there is no remedy in equity. They cannot mean that there is no remedy at all. The mere statement of the matter would seem to so exhibit the infirmity of the proposition suggested as to leave little justification for further considering it. Property impressed with a trust retains its character in that regard in the hands of the trustee regardless of any change in form which leaves the identity of it in any legitimate sense discoverable, and also in the hands of any other person claiming under the trustee, with notice of the trust, till such trust shall have been executed. 27 Am. & Eng. Ency. of Law (1st ed.) 262, and cases cited; Perry, Trusts, § 828. Trust relations once created, as regards the personal element, survive the wrongful removal of the subject of the trust in any way beyond the reach of the beneficiary. The latter may, by judicial proceedings, enforce an accounting by the trustee for the full value of the property wasted or otherwise wrongfully converted. The uniform rule as to administrators, executors, receivers, and trustees, in

general, is to charge them with the trust fund and require
them to account for it or its value. *Barker v. Barker,* 14
Wis. 131; *Williams v. Williams,* 55 Wis. 300, 12 N. W. 465,
13 N. W. 274; *Simmons v. Oliver,* 74 Wis. 633, 43 N. W.
561; *Oliver v. Piatt,* 3 How. 333; *Lathrop v. Bampton,* 31
Cal. 17. True, the liability of the trustee, when there is no
trust property, is personal, and he may be sued at law. True,
also, there are authorities to the effect that the right is strictly
legal and the remedy legal. *Lathrop v. Bampton, supra.*
But the better rule, it seems, is that the *cestui que trust* may
always sue in equity for an accounting. Perry, Trusts, § 843.
But, in any event, when the liability is germane to a principal
cause of action which is equitable, as in this case, it is en-
forcible as a part of a single subject matter.

The point is made that the suit, as reorganized, was to re-
cover upon a cause of action sounding in tort, and that such
matters are not within equity jurisdiction. The conclusive
answer to that is that the cause of action as to each of the
parties here is for an accounting, not for damages. Whether
the recoveries went beyond the cause of action does not go to
the subject we now have under consideration. *Dunphy v.
Kleinsmith,* 11 Wall. 610, upon which counsel rely, supports,
so far as it goes, their claim that appellants may be made to
restore to the trust fund whatever they wrongfully obtained
from it.

Appellants put great confidence in the proposition that the
creditors have no right of action against the receiver. Why
the *cestuis que trustent* have not the same right to a suit in
equity to enforce a trust when the receiver is the trustee and
the court appointing permits or orders that he be proceeded
against that way, as in case of any other trustee, is difficult
to understand. Counsel upon neither side of the case have
produced any authority directly upon the question. That au-
thorities are difficult to find in respect to the matter is not to
be wondered at, since the remedy by summary proceedings

before the court for an accounting, and an action thereafter upon the receiver's bond, if necessary, are the usual methods adopted to redress a wrong committed by a receiver. While it is true that the court may compel the receiver to account at any time, and in any manner it sees fit, not transcending the limits of judicial discretion, and true that he is not a litigant in the action unless legitimately made so,—he is the agent of the court still, being trustee for the creditors as we have seen, and under the control of the court. Why may not the court, then, adopt the method resorted to in this case under the peculiar circumstances disclosed in the complaint? That it was within judicial power to do so, unless for some reason judicial discretion was abused, follows necessarily from the fact that the trial judge in such a matter is not limited to any particular method. The fact that the usual course is to cite the receiver before the court without the use of any process, strictly so called, does not argue that he cannot be compelled by such a process to appear, as he undoubtedly may be. The fact that the disputed matters upon the receiver's account are usually tried by the court in a summary way, or, if complicated, they are referred to a master and passed upon by the court upon the coming in of his report, does not argue very strongly that the court might not cause issues to be framed in respect thereto and tried as ordinary issues are tried before the court; and that even an advisory verdict of a jury might be taken if deemed proper by the court, cannot well be doubted. The dearth of decided cases as to such matters only evidences that the control of a court of equity over its receiver, and the manner in which he shall account, is so absolute that whatever proceeding may have been adopted from time to time in such matters, the instances are extremely rare where any one has ventured to question it, and in such instances, so far as we can discover, not successfully.

In *Akers v. Veal*, 66 Ga. 302, it was held that the general

power of a court of equity as to a receiver's account extends to even requiring a formal trial of issues, but that the receiver is not entitled to a jury trial as a matter of right, in the absence of a special statute creating it. In 23 Am. & Eng. Ency. of Law, 1061, a rule is deduced from the authorities cited, and stated thus:

"A receiver is directly responsible to the court by which he was appointed, and is accountable in such manner, or to such persons, as the court may direct;" and such court "may, in its discretion, require him to account at any time."

In *Schenck v. Ingraham*, 5 Hun, 397, the facts were these: In a suit to wind up a partnership, the partnership assets came into the possession of a receiver appointed for that purpose. In the settlement of his account, by false representations made to the court respecting the amount of labor performed by him and his attorneys in the administration of the trust fund, an order was obtained allowing them $6,218 out of a total fund of $8,415.04. The entire fund was distributed by order of the court. The creditors commenced an independent action in equity to annul the order upon the ground of fraud. Such creditors had not become parties to the original action. Issues were joined in the second action, and upon a trial thereof the complaint was dismissed upon the merits. The plaintiffs appealed. In the right of the plaintiffs in such action a motion was then made in the original suit to have the order set aside and vacated, and the motion was denied. An appeal was then taken from both the judgment in the creditors' action and the order in the receivership action. On the appeal the judgment in the creditors' action was affirmed on the merits, but it was held that, were the evidence sufficient to sustain the allegations of fraud, the judgment would be reversed. The appeal as to the order was successful. It was reversed upon the ground that sufficient was shown upon the motion to establish that it was fraudulently obtained. The court directed the appellants to

be made parties to the proceedings in the receivership action, and that the order awarding to the receiver compensation for his services and expense of legal assistance, and distributing the residue of the trust property and discharging him, should be vacated. We do not find that this case has been disturbed in the courts of New York. It would indicate that an order obtained by fraudulent representations to the court, settling a receiver's account and distributing the trust property, may, if the court having jurisdiction of the matter permits, be set aside in an equitable action brought in the same court by a person interested in such fund; and that in such action all the guilty participants in the fraud may be made to account. We need not apply the doctrine of that case further than to hold that the action in which the receiver was appointed being still pending, and the jurisdiction of the court to vacate the order still perfect, it may be vacated on motion, and an issue then be raised in the action covering the matter of the account, and tried. The particular manner of causing the issue to be formed being within the discretion of the court, some serious prejudice to the rights of the adverse parties must needs be shown to warrant condemning the one adopted as jurisdictional error.

*Monitor F. Co. v. Peters,* 40 Ohio St. 575, is another instance of a court entertaining an independent action in equity to coerce its receiver to do his duty. The decision was grounded on the idea that creditors are entitled to have the trust fund out of which they are to obtain their pay, if at all, promptly administered, and that, though the ordinary method of enforcing that right is by proceeding in the receivership action, the discretionary power of the court over the matter is sufficient to permit such right to be vindicated in an independent action. Counsel seem to concede here that if such is the case, the power in that regard is broad enough to accomplish the same thing by making the defendant respond as a party in an action wherein he is accountable.

*Mills v. Ross,* 57 N. Y. Supp. 680, is cited to our attention. The facts there were these: A receiver, by order of the court, paid out the fund in his hands. Persons claiming to be the real owners thereof, and that it was obtained from the receiver wrongfully, brought an independent action against the persons so acquiring it to recover the same, and it was held that the action was not maintainable; that the plaintiffs should have sought relief in the receivership action. We are unable to discover anything in the decision militating against the right of a court to allow its receiver to be proceeded against in the action in which he was appointed, if it sees fit.

*Clapp v. Clapp,* 7 N. Y. Supp. 495, is cited to our attention as indicating that the practice adopted in this case was entirely wrong. A careful analysis of the case shows that it is rather against appellants' position than in favor of it. The facts were these: A receiver having been guilty of misfeasance and nonfeasance to the prejudice of creditors, to whom the property he was appointed to take possession of and administer primarily belonged, was induced to resign his trust and surrender the property in his possession to a successor without any legal proceedings to that end. A successor was appointed. The order entered in respect to the matter designated a referee to state the predecessor's accounts with the trust property and to ascertain what allowance should be awarded him for expenses and services, and what payments he had received. In advance of the coming in of the report he turned over to his successor all the trust property in hand. He made a claim for a balance due, of $15,995.15 for expenses, commissions, and services. On the hearing before the referee the creditors were parties and were fully heard. The referee allowed $9,762.62. Thereupon the new receiver paid $5,000 upon such allowance. There was proof before the referee of gross mismanagement of the trust, both by acts of commission and omission. The court upon the coming in

of the report changed the conclusions of the referee in a radical manner. One of the changes consisted in this: Upon the ground that the receiver failed to collect certain claims which he ought to have collected, and failed in other respects to perform his duty, to the great prejudice of the creditors, whereby greater loss to the trust fund was suffered than the total amount due such creditors, he was peremptorily ordered to pay the claims of such creditors, aggregating over $12,000. The idea entertained by the court was that the amount of the uncollected claims should be counted as loss regardless of the fact that the title to such claims passed to the new receiver upon his appointment, and regardless of whether they were collectible by such receiver or not. There was no proof before the referee or the court as to the collectibility of such claims. Upon appeal it was held that the deposed receiver was liable to account for the full amount of all loss caused by his mismanagement, but only upon proof being produced establishing the amount thereof; that since a new receiver was appointed, the liability was to him, the whole matter to be worked out through that channel, and that he possessed title to the uncollected claims and title to the liability of the old receiver to account for the loss caused by him. "It is to him," said the court, "that he [the old receiver] has become accountable, inasmuch as the latter has been placed in his own relation to the creditors who are seeking payment, out of this estate, of the debts owing to them." 1 N. Y. Supp. 926. The order of the court below was reversed, with directions to such court to send the matter to a referee to determine the amount of loss to the estate caused by the misconduct of the ex-receiver, giving the creditors interested full opportunity to be heard, a final order to be entered upon the coming in of his report in accordance with the opinion of the court.

The foregoing history is not taken from 7 N. Y. Supp. 495, referred to by counsel. The opinion there was delivered

upon a reargument. It cannot well be understood without being read in connection with the. opinion given when the case was in fact decided. *Clapp v. Clapp,* 1 N. Y. Supp. 919. From such history it will be seen that the liabilities claimed against the receiver here are, in the main at least, within the principle of that decision. The idea advanced by counsel, with supporting authorities, that for whatever the receiver lost by negligence or fraud he is only personally liable to the creditors in an action at law, or that there is no liability at all because a destruction of the trust fund ends the trust, and the idea that the only liability for the breach of trust is on the receiver's bond, do not seem to have occurred to or been appreciated by the learned court that made the decision. Every expression in the opinion and every conclusion reached is in strict harmony with the liability of the receiver here as claimed upon the face of the complaint. The practice adopted there in settling the receiver's account was by trial before the referee. Whether a trial in some other way would have been permissible is not adverted to in any respect. The practice adopted, of assuming that assets have been lost merely because not collected in money as they should have been by the ex-receiver, notwithstanding the title thereto has passed to the new receiver and notwithstanding they may be convertible into money by him, was condemned. There being a receiver, through whom the rights of the creditors could be worked out, the practice of requiring the old receiver to make good the loss caused by him by compensating the creditors directly, was condemned. The practice challenged here by counsel, as we have seen, that the unfaithful receiver is liable to respond to a trustee for the creditors to the extent of the full amount the trust property has by his mismanagement been diminished, was approved. The practice of forming and trying issues in that regard, giving to creditors a full opportunity to be heard in respect thereto, they being deemed the real parties in interest, was ap-

proved. All these principles, on the reargument, were affirmed, the court using the language quoted by counsel as supporting their contention that the creditors have no cause of action and cannot have one in the circumstances of this case:

"What·was left against the appellant [the old receiver, after he delivered to his successor the property on hand] was a liability to account for and pay over to his successor so much as the estate had been diminished or lost by his inattention, carelessness, or misconduct. And no authority has been found or cited imposing any greater degree of liability than this upon him. To that extent he should . . . indemnify this estate for the loss it has sustained through his mismanagement and misconduct. But before any further proceedings can be had for the payment of the loss so sustained, it must be ascertained by proof showing how far · the assets diminished in value, or were lost, owing to the misconduct of appellant as receiver. The proceeding in the end, so far as he may be liable in case of his nonpayment of the amount in this manner to be proved against him, will be one for his punishment by way of contempt."

The court, as will readily be seen, used the expression with reference to the proceedings in that case, that "before the court should compel the old receiver to pay any sum of money on account of the loss sustained by creditors through his mismanagement, the amount of the loss should be ascertained." That is, of course, sound. The respondents proceeded here in harmony therewith. The court further said that, the amount of the receiver's liability having been ascertained upon a trial of the issue before the referee, and the finding in that regard affirmed, and he having refused to pay the same, the proceeding to enforce payment is "one for his punishment by way of contempt." That certainly is the usual way of enforcing a judicial order for the payment of money. It is an unwarranted conclusion to draw therefrom, however, that judicial power cannot be exercised in any other manner. The learned court did not say that it could not.

We certainly cannot hold that a person, possessed of ample property within the reach of the court to pay a sum of money ordered by it to be paid by him, can successfully defy it to enforce its order other than by contempt proceedings. The constitutional power of circuit courts, as we have seen, extends to the use of any writ necessary to "carry into effect their orders, judgments and decrees." It may use a writ of *fi. fa.*, or any other known to the law, which is appropriate, or even frame a new one if no old one is sufficient. Since the policy of our law is against imprisonment for debt, it would seem that no legitimate objection can be raised by the wrongdoer because his liability is enforced by a mere judgment for money collectible by execution instead of an order or judgment in form requiring payment of money, enforcible by contempt proceedings. So it seems, as indicated at the outset, that instead of *Clapp v. Clapp* sustaining counsel's position that in the circumstances of this case there is not, and cannot be, any cause of action in favor. of creditors, it supports the very opposite, except as regards the mere matter of practice here adopted, of compelling the receiver and his associate wrongdoers to account to the court for the benefit of the creditors and at their suit as parties in the action; and that is not condemned in any way, so far as we can discover, since the holding that the account should be made to the new receiver as the representative of the creditors, instead of to them directly as a class, the money recovered to be paid into court and distributed according to the court's order, is grounded on the fact that there was a receiver standing in the place of the creditors, to whom an accounting could be made. It is inferable from the court's opinion that, if the amount of the liability had been properly established in the trial before the referee, the order for the payment thereof directly to the creditors in accordance with their respective equitable interests therein, instead of to the receiver for them, would not have been deemed a prejudicial

departure from the regular order of judicial administration in such matters. We have spent much time on this case because of the great importance appellants' counsel seem to attribute thereto in support of their views, while, as indicated, to us it is more in harmony with the views of respondents' counsel.

A number of cases are cited to our attention, holding that proceedings must be had in the receivership action to settle the receiver's account before action is maintainable upon his bond. We are unable to see how the decisions or the expressions made therein throw any light on the point under discussion. This quotation is made from Gluck & Becker, Receivers, 414:

"If he owes a duty to a creditor of the corporation and he fails or omits to perform that duty, the trust estate will not be made chargeable for such neglect of duty if the loss has been sustained by the creditor, but the liability of the receiver will rest entirely upon his personal undertaking, and can only be enforced in a court of law."

Taking that literally, the absurdity of it is such that no comment thereon would seem to be necessary. The idea that the only remedy of a creditor of a corporation, whose property is in the hands of a receiver, for misfeasance or nonfeasance in his office to the injury of such creditor, is an action at law, has no support in principle or authority. The textwriter did not mean that, though his language might well be taken that way, without careful consideration, as indicated by the use thereof by the learned counsel for appellants. The author based the text on *Gaehle v. Snowden,* 56 Md. 345. Counsel cite the same case, and it seems without appreciating what is really there decided, which is that the violation of a purely personal obligation incurred by a receiver to a creditor—such as a failure by the former to file the latter's claim left with him for that purpose, whereby the claim is lost—does not create any liability of the former as trustee, to be re-

dressed in equity or at all; that it is a mere negligent act, to be redressed, if at all, the same as if committed by any other person to whom the claim might be intrusted for placing it on file. The court said it was the duty of the creditor to file his claim with the court, not with the receiver. It will be readily seen that the decision is sound, but very far removed from any question involved here.

The proposition of counsel, that there is no cause of action against a receiver in favor of the creditors, pursuable in the winding-up action in the circumstances of this case, has better support in *Boyd v. Mut. F. Asso.* 116 Wis. 155, 90 N. W. 1086, 94 N. W. 171, than anywhere else, or than any authority cited to our attention by counsel, so far as appears, or any which we can discover. It is confidently asserted that such decision really rules this case on such proposition in favor of appellants, if adhered to. That action was reorganized very much as this was. The difference between the two is this: There a new receiver was appointed, who was by order of the court joined with the creditors, while here the action was ordered to proceed in the name of the creditors alone. The question there, as to whether the ex-receiver could be required to account by action, was not raised by counsel nor referred to in the opinion. It seems to have been taken for granted that he could be so required, if the court so ordered. It was held that a good cause of action was stated in the complaint against such ex-receiver in favor of his successor, but that it was solely the cause of action of the latter; that the creditors had no cause of action against him, while they did have a cause of action, well stated in the complaint, for winding up the corporation and administering its property as a trust fund for the benefit of creditors, in which all parties holding parts of such trust fund were properly made defendants in order to reduce all to the possession of the court, represented by its receiver, for the benefit of creditors. The liability of Smith was made up of

two elements: $281.73 alleged to have been fraudulently paid him by the officers of the corporation before the receivership action was commenced, he being a guilty participant in the fraud; and $500 and other sums not specified, lost or wasted by him through nonfeasance or misfeasance in the performance of his duties as receiver. That the liability of the old receiver for whatever it was worth was an asset, so to speak, of the trust fund, was not and of course could not well be questioned. But as the court,—perhaps without that careful consideration of the matter that might have been given thereto, that, however, not being apparent at the time of the decision,—held the title to the liability to be legal in character, to be vested in the new receiver and enforcible only by him in an action legal or equitable in form, it was decided that the two causes of action—one in favor of the new receiver against the ex-receiver, and the creditors' action against the other defendants—were improperly united. From the foregoing analysis of the situation it will be seen that the legal title to the right against the old receiver as such, and that against him by reason of his having obtained moneys of the corporation by fraud before his appointment, were no more vested in the new receiver than the title to anything else forming a part of the corporate assets, and that the equitable right to such liability was in the creditors of the corporation the same as the right to any other of the numerous liabilities which they were entitled to have marshalled into the possession of the court in the form of money for the payment of their debts. As to the $281.73, the old receiver, upon principles well established, might have been made a defendant at the time the action was commenced. He was properly made a defendant as to that part of the trust fund which he came to the possession of after he was appointed receiver, and which he wrongfully retained, if any one so circumstanced was properly joinable, unless the fact that he was answerable to the court therefor in a sum-

mary way, after the manner generally adopted for compelling receivers to account, was exclusive. If that feature of his case precluded the creditors from proceeding against him by action, so it did, likewise, the new receiver. The latter, in the performance of his administrative duties, had a right to institute proceedings to compel the old receiver to account. The creditors, as equitable owners of the property misappropriated by the old receiver, had the same right. In either case, money produced would form a part of the trust fund in the hands of the new receiver. Neither the receiver nor the creditors had a right, strictly speaking, to a remedy by action against the old receiver. Both had a right to the ordinary remedy against him. That either did not have a right to the extraordinary remedy in such cases of a civil action, if the court was willing or ordered its receiver to be charged in that way, unless to permit such a proceeding would be an abuse of judicial discretion, would be difficult to maintain. It seems that the creditors did have, as part of the primary purpose of that action, the right to join the old receiver and call him to account for the money fraudulently obtained by him before the receivership suit was commenced, without the permission of the court except as to time of bringing him in, and the right to join him as to the wrongful use of the trust fund, by the court's permission, unless such practice, as before indicated, must be deemed so prejudicial to the rights of parties and the orderly conduct of judicial proceedings as to be regarded as jurisdictional error.

The conclusion from the foregoing is that, while it is true that creditors in the circumstances of those in this case have no right of action against the court's receiver, using the term in the sense of a civil action pursuable as a matter of absolute right, they have a wrong to be redressed, either by a civil action or by a special proceeding to be instituted by them; and since the court has, within the boundaries of a

broad discretionary authority, the right to say how such re-
dress shall be accomplished, circumstances may justify a pro-
cedure in the form of a civil action, the parties being ar-
ranged according to their interests; and if the court orders
that prócedure to be adopted, then the creditors may be said
to have a right of action against the receiver.

Counsel urge upon our attention these propositions: (a)
The court has no power to enter a judgment in a winding-up
action against the receiver and those acting guiltily with
him in diminishing the trust property, for the amount of
the loss caused by them.  (b) The statute does not authorize
making the receiver, or any officer of the court, a party.
(c) The word "trustees" in sec. 3237, Stats. 1898, does not
include receivers.  (d) The statutory right against officers
has reference to such officers while acting in office for the
corporation.  (e) The power of the court is limited by the
provisions of the statute.  (f) No judgment can be entered
in such an action as this, other than one specifically author-
ized by statute.  They all proceed upon the theory that the
statutes, sections 3216 to 3239, inclusive, give a new right
and a new remedy, with appropriate procedure, and are ex-
clusive.  That, as we have seen, is not the case.  The stat-
utes, generally speaking, are merely declaratory of the com-
mon law.  *Gores v. Day,* 99 Wis. 276, 74 N. W. 787, is to
that effect, so far as it was necessary to go in that case;
while in *Adler v. Milwaukee P. B. Mfg. Co.* 13 Wis. 57,
as we have before seen, even as to the sequestration feature
of the statutes, it was held to have added nothing to the
power of the court which it did not possess independently
thereof and was permitted to exercise when necessary; that
"they [the statutes] only go to strengthen the powers which
courts of equity heretofore possessed, to remove doubts, and
to render the rules by which such proceedings are governed
more stable and undeviating;" that in any event they only
govern the proceeding against the corporation itself "when

a sequestration of its stock, property, things in action, and effects, and the appointment of a receiver, are sought." The method of reaching others holding property to which such sections are applicable, so far as not specially prescribed, was left to be governed by the usual practice in courts of equity.

Counsel for respondents on this branch of the case, contend that the word "trustees," as used in sec. 3237, Id., includes a receiver. We are unable to read the statute that way. It seems to plainly refer, as counsel for appellants contend, to a trustee in his capacity as an officer of a corporation, not to one acting for the corporation and others as agent of the court. The proposition that R. E. Rust was properly made a party defendant as a trustee of the corporation, cannot be approved.

*Clarke v. Banner & V. P. Co.* 50 Wis. 416, 7 N. W. 309, is cited as indicating that in any event the making of Rust and his associates parties for any purpose except that of discovery, was improper. It is difficult to see how that case can have any bearing on any question raised here, except to condemn the practice of making persons parties defendant who are alleged to have come into possession of assets of the corporation before sequestration proceedings were started, in fraud of creditors. It would be decisive against the respondents on that subject, if sound. That it is otherwise, tested by any or all of the numerous decisions made before and after its rendition, touching to some extent or entirely the subject involved, will appear obvious from a mere statement of what was there held. The gist of the decision is stated correctly in the syllabus thus:

"In an action under secs. 3216–3228, R. S., . . . where it is not sought to hold the officers or stockholders personally liable under sec. 3221, the circuit court has power only to sequester the property, to appoint a receiver, and to compel the corporation to account."

"In respect to any person to whom it is alleged that any transfer of property of the insolvent corporation has been made," it can "merely compel such person 'to testify in relation thereto,' " under sec. 3228.

It will be seen that the court adopted the idea that the statute affords a new and exclusive remedy, and that, as it makes no provision for judgment against persons obtaining property of the corporation in fraud thereof or of its creditors, but does provide by sec. 3228 that such persons may be compelled to testify in relation to such property, and does provide by sec. 3219 that the receiver appointed in the action may sue for and recover property belonging to the corporation, the right of action is vested wholly in the receiver. The fact was overlooked that sec. 3219, as it has many times been construed, does not refer to persons holding the property of the corporation as trustees for it or for its creditors; also the fact that secs. 3237 and 3239 expressly provide that officers of corporations may be made to account in a suit by creditors for all loss caused by their mismanagement, and to render up an equivalent in money for such loss, and that guilty participants with them may also be made to account as parties and render up their ill-gotten gains. The further fact was overlooked that sec. 3228 prescribes only a rule of evidence, so that guilty parties may be made to testify in respect to their wrongful conduct regardless of the general rule that a person cannot be compelled to incriminate himself. In *Hurlbut v. Marshall,* 62 Wis. 590, 22 N. W. 852, decided a few years later, the doctrine of *Clarke v. Banner & V. P. Co.* 50 Wis. 416, 7 N. W. 309, was entirely ignored, as it has been ever since the case was decided. We do not find it referred to in any subsequent case. It has been cited to the court's attention in briefs of counsel, but for some reason the opportunity has not been heretofore improved to record the fact that it does not state the law correctly—that it is entirely out of har-

mony with the decisions of this court from *Adler v. Milwau-kee P. B. Mfg. Co.* to *Hurlbut v. Marshall,* and was in the latter case in effect overruled.

From numerous authorities holding that a court of equity has no inherent power to dissolve a corporation, and that statutory power in that regard, "both as to the conditions upon which it may act and the judgment it may enter, must be strictly followed," counsel for appellants deduce the conclusion, seemingly, that such doctrine applies to the judicial power to sequester property of an insolvent corporation and to wind up its affairs so far as necessary to apply its assets in payment of its liabilities. The language of the proposition is borrowed from 22 Ency. Pl. & Pr. 1236, but changed by substituting for the idea of dissolving the corporation, strictly so called, that of taking possession of corporate property and administering the same for the payment of its debts. The two are entirely distinct, and so far as they are referred to in the statutes are there so treated. Secs. 3216 to 3239 refer to the latter; secs. 3240 to 3251 to the former. The one, as we have seen, merely supplements the general equity jurisdiction of the court, no provision being made therein for a statutory judgment. If the proposition under discussion affected this and similar cases, no judgment could be rendered at all. The other not only gives the right of action, but provides the procedure to be followed, including the judgment to be rendered, and being by its terms not cumulative, it is exclusive, upon familiar principles often proclaimed by this court. *May v. Black,* 77 Wis. 101, 45 N. W. 949; *Finney v. Guy,* 106 Wis. 256, 265, 82 N. W. 595; *Pollard v. Bailey,* 20 Wall. 520; *Fourth Nat. Bank v. Francklyn,* 120 U. S. 747, 7 Sup. Ct. 757; *Huntington v. Attrill,* 146 U. S. 657, 13 Sup. Ct. 224; *Patterson v. Lynde,* 112 Ill. 196. Of course, if one confuses an action to dissolve a corporation with one to administer the property of an insolvent corporation as a trust fund for the benefit of its

creditors, he will very readily fall into the error that a winding-up action, using the term with reference to the rights of creditors being primary, is a statutory action in all respects, and that the warrant for every step therein must be found in the statutes. There seems to be no need for such confusion, since it would be impossible to conduct such an action wholly according to specific statutory guides. Such an action is statutory only in that the statute indicates by implication that a suit in equity, covering all the matters directly and incidentally material to the interests of creditors, is the remedy to be resorted to. The statute contains no complete system on the subject in any other sense, nor anything approaching one, and the practice of the court since *Adler v. Milwaukee P. B. Mfg. Co.* 13 Wis. 57, has always been in harmony with this idea.

We are referred to the principle that no creditor in a winding-up proceeding has a right to proceed against the receiver to obtain any part of the property in the custody of the law till it has been duly awarded to him by the order of distribution. True, but this is not an action of that kind. It is one to accumulate *in custodia legis,* in the form of money, the assets properly belonging to the trust fund, so that an order of distribution may be made. An action to enforce a trust so as to put the court in possession of the trust fund is one thing; and an action by a *cestui que trust* to obtain an equitable proportion of such trust fund is quite another.

The point is suggested that the creditors could not properly maintain this action because the legal title to the property recoverable is not in them. In support of that numerous decisions of the federal courts are mentioned, holding that where an assignee in bankruptcy has been appointed, creditors cannot, during the pendency of the trust or after it has been closed, maintain an action to recover any liability for the benefit of creditors; that all such liabilities must

be realized and distributed through the medium of the assignee in whom the title thereto vests. We are unable to see how such cases have anything to do with this class of cases. The procedure referred to is governed by the terms of the bankruptcy statute as construed by the federal courts. The procedure in this class of cases is governed by the general principles of equity jurisprudence, supplemented by such aids as the statute affords in the administration of a trust and the marshalling of all assets, whether at the time of the institution of the suit under the control of the corporation, or whether equitable or legal, possessed by persons in the capacity of trustees in any sense for creditors. The practice in respect thereto is entirely different from that under the national bankruptcy act. The creditors' action reaches directly all assets of the nature referred to, not because they have any legal right thereto, but because they have an equitable right with an appropriate equitable remedy to enforce the same to the extent of reducing the possession thereof to that of the court for the satisfaction of their claims.

Many propositions are presented for consideration upon the theory that the property, whether consisting of tangible things or the mere personal liability of parties who have wrongfully converted the tangible property to their own use, or otherwise wrongfully lost it, must necessarily be recovered by a receiver. That is a mistake. When the situation presented is that of a trustee who has squandered the trust property, and the *cestui que trust* only desires to make him account in money for the loss, an action for such accounting may be maintained in equity without any receiver. A receiver is necessary only where there is property to be protected and administered pending the suit, or to be taken possession of and converted into money in administering a trust, or there are wrongs which cannot be remedied without one. At the time this suit was reorganized and again made active, the trust property, as alleged in the complaint, had all been

wrongfully lost in one way and another. As to the greater part of it, the only recourse for creditors was to hold the wrongdoers to their liability to account and make compensation for the loss they had caused. The only way to encompass the whole situation in one suit was by a proceeding of some sort in the one pending. It did not take a receiver to give the court jurisdiction of the subject matter. None was needed, because there was no property in the custody of the court, and none to come into such possession other than in the form of money as a result of the accounting and submission to the commands of the court. Where only an accounting is required, a receiver is never deemed necessary. High, Receivers, §§ 34, 35. There are many instances in the books of creditors' bills to enforce such liabilities without the use of a receiver. Of course, from the very nature of the remedy, no receiver can well be used till there is something to receive. *Gores v. Day,* 99 Wis. 276, 74 N. W. 787; *Gores v. Murphy,* 109 Wis. 408, 84 N W. 867, 85 N. W. 411; *Schenck v. Ingraham,* 5 Hun, 397; *Chicago & A. B. Co. v. Fowler,* 55 Kan. 17, 39 Pac. 727. In *Gores v. Day,* because there was an assignee, he was said to be a necessary party; but the maintenance of the action in the right of the creditors was sustained both under the statute and independently thereof. The common practice in creditors' actions, so far as relates to those holding property forming the subject of the trust or some part thereof as trustees, in a capacity hostile to the creditors or otherwise, is to charge them as defendants, making no use of a receiver, necessarily, till one is needed to hold property as the agent of the court. It will be remembered that in *Clapp v. Clapp,* 7 N. Y. Supp. 495, it was in effect held that if there was not a receiver standing as the representative of creditors as to property once *in custodia legis* and lost by the wrongdoing of the court's agent, such agent could be compelled to account directly to the creditors at the instance

of the injured beneficiaries, and made to compensate them directly for the amount of their loss.

It is said that the statutory action cannot be regarded as in any respect a suit commenced by creditors' bill in analogy to the old equity practice, nor as a modification of it. The only authority cited in support of that is *Clarke v. Banner & V. P. Co.* 50 Wis. 416, 7 N. W. 309. As we have seen, so far as it bears on counsel's point it was wrongly decided and was in effect overruled in *Hurlbut v. Marshall,* 62 Wis. 590, 22 N. W. 852, and subsequent cases. Further, as we have shown, the manner of administering the property of an insolvent corporation is not by a statutory action in any other sense than that it is by an equitable action with the ordinary incidents of such actions, supplemented by whatever aids the statute affords. That was early held in *Mann v. Pentz,* 3 N. Y. 415, which was followed here in *Adler v. Milwaukee P. B. Mfg. Co.* 13 Wis. 57. The same authorities hold that the complaint in such an action is to all intents and purposes a creditors' bill. The authorities generally maintain that view.

"It has become the settled law of this country that the assets of an insolvent corporation constitute a trust fund for the payment of its debts. . . . A creditor's remedy, by creditor's bill, or proceeding in the nature of a creditor's bill, against a corporation, its officers and stockholders, is firmly established." Smith, Eq. Rem. of Cred. § 29.

To the same effect is *Ballin v. Loeb,* 78 Wis. 404, 47 N. W. 516. The action was there called a statutory action, merely in the sense, however, that the sections of the statute for the administration of the assets of an insolvent corporation require that it shall constitute the subject matter of one suit to be commenced and carried on according to principles of equity. It seems almost a waste of energy to pursue this subject, as the authorities are uniform against counsel's proposition. When we speak of a creditors' bill

under the Code, we mean, of course, the Code substitute for the common-law pleading. It is only mere forms of action that are abolished by the Code. The substance survives. In place of the bill in equity of the old practice, we have the complaint in the civil action of the Code. Where the pleading is in an action to redress a wrong such as formerly was the subject of a suit in equity commenced by creditors' bill, we often speak of it by its old name. The better way would be to speak of it as a complaint in the nature of a creditors' bill, so as not to lose sight of the fact that the Code, so far as forms of action are concerned, is a complete substitute for the old system, while so far as the real substance of things is concerned it remains substantially as before. *Kollock v. Scribner,* 98 Wis. 104, 73 N. W. 776; *Crowns v. Forest L. Co.* 102 Wis. 97, 99, 78 N. W. 433. The prime essential of a creditors' suit is the exhaustion of legal remedies. *Northwestern I. Co. v. Central T. Co.* 90 Wis. 570, 63 N. W. 752, 64 N. W. 323; *Hughes v. Hunner,* 91 Wis. 116, 120, 64 N. W. 887. A proceeding by a judgment debtor, after the return of an execution upon his judgment unsatisfied, to charge the unleviable property of an insolvent corporation with the payment of its debts and to wind up its business affairs as regards creditors, satisfies that essential and is probably the most common of any way of doing so in modern practice where equity jurisdiction is resorted to as formerly, respecting the remedy by creditors' bill, but by the new form of action created by the Code. The pleading is a creditors' bill, strictly so called, but under the Code name for the plaintiff's first pleading. Speaking on the general subject of creditors' bills, in 5 Ency. Pl. & Pr. 395, the author uses this language:

"A class of creditors' bills constantly increasing in frequency, comprises bills brought by creditors of insolvent corporations for a ratable distribution of their assets, to reach property that has been misappropriated and misapplied, or to

collect for the benefit of creditors unpaid stock subscriptions."

So it is plain that the claim of counsel that it was not proper practice to bring in the new defendants and litigate the matters as to them, alleged in the complaint, in the manner common in suits in equity commenced by a general creditors' bill, cannot be sustained.

But, say counsel, it is not permissible to bring in, by a supplemental complaint, a subject matter not existing at the commencement of the action. The answer to that is that no such subject was so brought in, in this case. The new matter was germane to and formed a part of the original subject. It is only new matter, constituting a new and independent cause of action, that is necessarily excluded from a supplemental bill. That is the rule of the old practice (21 Ency. Pl. & Pr. 28), and it is preserved by sec. 2687 of the Code in the following language:

"The plaintiff and defendant, respectively, may be allowed, on motion and on such terms as may be just, to make a supplemental complaint, answer, or reply alleging facts material to the case occurring after the former complaint, answer, or reply, or of which the party was ignorant when his former pleading was made."

The restriction thus indicated has always been distinctly recognized in the decisions of this court. *Noonan v. Orton,* 21 Wis. 283, 293; *Ely v. Wilcox,* 26 Wis. 91; *Orton v. Noonan,* 29 Wis. 541, 544; *Orton v. Noonan,* 30 Wis. 611, 613. The general practice in creditors' actions, to reach the property under the control of an insolvent corporation, and other property, tangible and intangible, proper to be deemed parts of the trust fund for the payment of the corporate creditors, is to commence the same in a simple form. Great diligence, as a rule, is required in the initiatory step in order to effect an equitable levy upon the corporate assets before they can be dissipated or become incumbered.

Danger in those respects having been guarded against, upon those interested primarily in the success of the litigation becoming conversant with the full scope of the subject proper to be brought into the action, it is customary, with or without permission of the court, as the situation of the case may require, to serve an amended and supplemental complaint covering the entire field as it existed at the time of the commencement of the action and as enlarged by subsequent events. That has been repeatedly sanctioned by this court. The extent to which a complaint may thus be broadened out, the location of the original parties upon the record be changed, and the way new ones may be placed, so that, so far as practicable, those united in interest as creditors to work out the trust, may appear as plaintiffs and all adverse parties appear as defendants, is well illustrated in *Hurlbut v. Marshall,* 62 Wis. 590, 22 N. W. 852; *Gager v. Marsden,* 101 Wis. 598, 77 N. W. 922; and *Boyd v. Mut. F. Asso.* 116 Wis. 155, 90 N. W. 1086, 94 N. W. 171. The practice elsewhere, under systems similar to ours, is the same, and is indicated by the treatment of the subject in the able opinion by MITCHELL, J., in *Arthur v. Willius,* 44 Minn. 409, 412, 46 N. W. 851:

" 'It is an action not proceeding in the ordinary way of actions at law by trial of simple issues, judgment, and execution, but by the exercise of powers peculiar to the former courts of chancery.' The proceedings are susceptible of being molded into almost any form necessary to accomplish their purpose of securing a full and final adjustment of the rights and liabilities of all parties growing out of the corporate business. During the progress of the proceedings new parties may be admitted or brought in, and new issues introduced from time to time, as they become necessary for the final winding up of the affairs of the corporation, and the enforcement of all the rights of creditors. The original complaint need not state more than a case for the sequestration of the corporate assets. Neither stockholders, directors, nor creditors (save the one who institutes the suit), need be

made parties in the first instance. Other creditors may sub-
sequently come in or be brought in. Stockholders and di-
rectors may also be brought in for the purpose of enforcing
their individual liability. This may be done at the in-
stance or upon the complaint of any creditor who has be-
come a party to the proceedings. In short, the proceedings
are intended to be so elastic as to be susceptible of develop-
ment during their successive stages of progress, as to reach
not only all the corporate assets, but also all liabilities of
stockholders and others so far as necessary for the payment
of creditors."

The conclusion on this point must be that there is nothing
subject to criticism in the practice adopted here, unless the
fact that, though enforcing the liability of the receiver and
his associates in wrongfully wasting or converting its prop-
erty to their own use as alleged, is germane to the original
purpose of the suit, the practice in the enforcement of such
exceptional liabilities was so prejudicially departed from
as to constitute jurisdictional error.

But, it is said, if ch. 140, Stats. 1898, does not permit
such an action as this, no other statute does, hence it can-
not be maintained. In support of that counsel points (a)
to the doctrine that the Code is a complete substitute for
common-law forms of action and procedure both at law and
in equity, and that it furnishes no form for a complaint or
a judgment to fit this case; (b) that a cause of action not ex-
isting at the time of the commencement of the action cannot
be brought in by amendment or supplemental complaint;
(c) that the new cause of action here does not affect all the
parties, hence is not joinable with the original cause of
action; (d) that the defect of misjoinder is not waived by
not objecting on that ground; and (e) that the statutes, secs.
3217 to 3245, provide a form for a final order and a judg-
ment, but that the former was not followed and the latter does
not fit this case. Assuming, as we must, that all of such prop-
ositions are supposed by counsel to have merit in respect to

the controversy to be solved, we will consider them seriously.

a. True, the Code is a complete system. It took a long time for the bench and bar to thoroughly appreciate that; and it would now be a misfortune to say anything or render any decision which would cast a shadow of doubt upon it. But in order to maintain the integrity of the new system we must not confuse it with matters that have nothing to do therewith. Much difficulty has been experienced since the inception of the reformed procedure in New York, by confusing the term "remedy," as used in the statutes, with "procedure," forms of action with the substance thereof, and procedure, as regards statutory essentials, with mere details of practice. In a strict statutory sense there are but two remedies known to our system to protect any right or redress any wrong. They are denominated "actions" and "special proceedings." Sec. 2954, Stats. 1898. Every ordinary proceeding in a court of justice by which one party prosecutes another for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense, is an action. Sec. 2595, Id. Every other remedy is a special proceeding. Sec. 2596. Every action for the enforcement or protection of private rights or the redress or prevention of private wrongs is a civil action. The distinction between actions at law and suits in equity, and the forms of such actions and suits, have been abolished. Sec. 2600. The persons having an interest in the subject of the action and in obtaining the relief demanded, other than in exceptional cases, are plaintiffs and joinable as such. Sec. 2602. All persons claiming an interest in the controversy adverse to the plaintiff, or who are necessary parties to a complete determination or settlement of the question involved, may be defendants. Sec. 2603. The first pleading in the case is denominated the "complaint," its general features only being prescribed by statute. The central idea thereof is that it must deal only with facts constituting the

cause of action. Sec. 2646. The general features, only, of the judgment to be rendered are prescribed by statute. Sec. 2883 *et seq.* The Code, other than in exceptional cases, furnishes no form, strictly so called, either for the complaint or the judgment. The general requisites of both are pointed out, and fit a winding-up action as well as a simple action to recover upon a promissory note.

b and c. These we have answered. The error of counsel is in assuming that the new matter brought in constitutes a new subject of action. It was a part only of the original subject matter.

d. We cannot agree with counsel that a misjoinder of causes of action is not a subject of waiver. They overlook the fact that sec. 2649 of the Code expressly provides that improper union of causes of action is ground for demurrer, and that sec. 2654 expressly provides that a failure to object to such joinder in the manner pointed out by the statute waives the question.

e. True, where the Code furnishes a form for a judgment which is, expressly or by implication, exclusive, that form must be followed. But there is nothing in sec. 3217, or in sec. 3245, condemning the judgment here under that rule, or condemning the procedure calling for such judgment, as prejudicial error or error at all. Sec. 3217 does not deal with the matter of a judgment, but with an order closing a special proceeding instituted in an action where legal remedies for the collection of the judgment therein shall have been exhausted or an administrative order executed after a judgment rendered in an independent action. Sec. 3245 has no reference to an action of this kind at all. It refers only to proceedings to dissolve corporations. An action to that end is in every sense statutory, and of course statutory requisites of the judgment must be followed.

This is stated for consideration: The recoveries against the receiver and his alleged guilty associates should be re-

versed because (a) the statute does not authorize them; (b) the proceeding is entirely unwarranted; (c) the complaint does not support them; (d) the receiver cannot be charged in an incidental proceeding with liability for loss wrongfully caused or permitted by him.

a. This has already been answered. The statute does not prohibit redressing the wrongs in the manner resorted to. It indicates that a proceeding in the nature of a creditors' bill is the proper proceeding. It may add to, but does not take from, what might be brought into the action upon the general principles of equity jurisprudence. Those principles include making the liabilities of the parties available for creditors in the winding-up suit. Whether the particular manner of accomplishing that adopted here was within the discretionary power of the court is the only question left.

b. Counsel base this on *Stahl v. Gotzenberger,* 45 Wis. 121, where a statutory action—one to foreclose a mortgage, but with incidents showing that the trial was necessarily by the court—was tried before a jury and a judgment was entered by the clerk without the court's passing on the issues involved or even directing the entry of the judgment. Of course it has no relevancy whatever to the question to be determined here.

c. This is based on *Reynolds v. Stockton,* 140 U. S. 254, 11 Sup. Ct. 773, where, in a creditors' action commenced in New York to reach property in the possession of a receiver, and upon a complaint limited in its scope thereto, a judgment was rendered as if the action were brought to reach that and property in the hands of a receiver in an adjoining state as well. We are utterly unable to see any analogy between that and the case in hand. The judgment here is responsive to the complaint in every particular.

d. This is based on *Mechanics' Nat. Bank v. Landauer,* 68 Wis. 44, 31 N. W. 160. That relates to an independent action against a receiver. Counsel used the term "incidental

proceeding." "Independent action" would have been more appropriate; as the one used tends to give a wrong idea of the case cited. The authority is in harmony with others cited in the course of this opinion, that a receiver may be made to account for loss sustained by creditors through his unfaithfulness, and that the manner of the accounting is within the absolute control of the court appointing him to the extent of sound judicial discretion, and that circumstances may justify even an independent action against the receiver. These words are quoted with approval from High, Receivers:

"The more common practice, and that which has been generally commended by the courts, is to hear and determine all rights of action and demands against a receiver by petition in the cause in which he was appointed, without remitting the parties to a new and independent suit; and it rests wholly within the discretion of the court to grant leave to bring an independent action against its receiver, or to determine the controversy upon petition in the original cause, directing, if necessary, an issue to be tried by a jury as to questions of fact or of damages." Sec. 254b.

The point is made that in no event can a receiver and his alleged guilty associates be legitimately charged in an equitable action with any greater liability than to respond, each for himself, for the amount of the trust property he received. That has very little, if anything, to do with the subject of jurisdiction. We say this in passing to prevent any misconception as to why it is noticed that counsel make the point. The charge in the complaint is that such alleged guilty parties fraudulently colluded together to appropriate to their own use the trust fund, and consummated their purpose. The facts found support the charge and specify the amount in money so lost to the creditors. The judgment is based, as to them, upon their joint participation in the wrong. In such circumstances all are liable as constructive cotrustees, and may be made to account in an equitable action. Every person who, through fraud of which he is guilty or has guilty

knowledge, obtains property of another, equity will convert into a trustee for such other and deal with him in many respects the same in redressing the wrong to such other as if he were a trustee of an express trust. 1 Perry, Trusts, §§ 166, 167. When the fraud is perpetrated by several acting in concert, all are equally trustees and are jointly liable. Neither can escape any part of the liability because of the fact that his co-conspirator was the real beneficiary. The property received by each is deemed to have been received by all, and to constitute the subject of a single trust, with all the liabilities incident to the trust relation. *Fountain S. P. Co. v. Roberts,* 92 Wis. 345, 66 N. W. 399; *Pittsburg M. Co. v. Spooner,* 74 Wis. 307, 42 N. W. 259; *Franey v. Warner,* 96 Wis. 222, 71 N. W. 81; *Zinc C. Co. v. First Nat. Bank,* 103 Wis. 125, 79 N. W. 229; *Hebgen v. Koeffler,* 97 Wis. 313, 72 N. W. 745. This subject, for the purpose of orderly treatment of the appeals, might better have been reserved for another branch thereof,—that which merely concerns whether the proper judgments were rendered.

The practice adopted violates the right of trial by jury, say the learned counsel. This is based upon two erroneous assumptions: (a) that the right to a sequestration remedy is a right of action; (b) that a statutory action is necessarily an action at law within the constitutional guaranty. The right of sequestration, as we have seen, is a mere right to a special proceeding in an action. A statutory action may or may not be an action at law according as the statutory incidents conform to one or the other from a common-law standpoint. *Willer v. Bergenthal,* 50 Wis. 474, 7 N. W. 352; *Bentley v. Davidson,* 74 Wis. 420, 43 N. W. 139. The only right of trial by jury guaranteed by the constitution is the right as enjoyed at the time the constitution was adopted. There is no such right as regards a statutory action unless such action is coupled with statutory incidents indicating that it is strictly legal in character, or the remedy of trial by jury

is expressly given by the statute. There is no such thing as the right of trial by jury in such a case as this, because the action is not statutory in any sense, because all the statutory incidents of the action indicate that it is strictly of equitable cognizance, and further, because it is strictly an equitable action with statutory aids, and cannot properly be called a statutory action at all in any other sense than that the statutes, as the court has frequently held, indicate, as plainly as if they contained an express declaration on the subject, that the action is of the nature known only to courts of equity under the old system, to enforce a trust for the benefit of creditors; and because, if it were otherwise, there is no suggestion in the statute of any right of trial by jury as to any of the issues, and all the statutory incidents point to an action in equity as the only one that will encompass the whole situation. We must say in passing that we treat this feature of counsel's argument only because it is suggested. It is the first time, so far as any indications in the books show, that a court has been called upon to declare that there is no such thing as a constitutional right of trial by jury in an action to marshal the assets of an insolvent corporation into a fund for the benefit of its creditors.

Respondents' counsel suggest that it was proper to bring R. E. Rust and all the officers of the corporation into the litigation, and T. F. Frawley as well, both under the statute and independently thereof, by reason of what was alleged on good ground to have occurred before the receivership commenced, and which, though not found in all respects as alleged, was to such an extent as to warrant the court in retaining the case as to all of them and to redress the wrong of which they were guilty as alleged, committed before as well as after the suit was commenced. That is entitled to a prominent place in our considerations. It gives to the situation to be dealt with an aspect not necessarily involving at all the question of whether a receiver, fairly appointed in a

winding-up action, and those thereafter colluding with him in wasting the trust fund placed in his charge, may be brought into such action as defendants and made to account as such for their wrongdoing.

It is alleged in the complaint that as early as January 1, 1893, the directors of the corporation, which included substantially all of the appellants except T. F. Frawley, alleged to have been guilty participants with Rust, receiver, in the wrongs committed by him as such, as alleged, knew that the corporation must necessarily go into liquidation, and that they then entered into an agreement between themselves to divert the corporate assets from their proper channel,—that of a trust fund for the creditors of the corporation,—to their own benefit, and that all the steps thereafter taken, which resulted in accomplishing that end, including the commencement of this action and the appointment of Rust as receiver, were but steps in the execution of the fraudulent agreement entered into. It is further alleged that T. F. Frawley thereafter, with full knowledge of all the facts, became a co-conspirator with the others. The claim of the respondents, so alleged, is consistent with the findings, with this exception: The date of the fraudulent agreement is placed between May 15 and May 18, 1893. It is sufficient for this discussion to say that the agreement was found to have been entered into before the commencement of the action, and that all of the wrongs for which redress is adjudged are found to have been committed in execution thereof. "The receivership," the court found, "from its inception on May 23, 1893, to its close on December 30, 1897, was managed by said receiver, and by his attorney, T. F. Frawley, and his counsel, H. H. Hayden, for the sole interest and benefit of the said receiver and said attorney and counsel and said *Geo. T. Thompson, Fitch Gilbert,* and the said corporation, the *Chippewa Valley Bank,* in pursuance of said conspiracy to unlawfully appropriate the assets of said defendant company for the benefit

·of said parties above named against the interests and rights
·of the general creditors of the said defendant, the National
Electric Manufacturing Company." We have nothing to do
at this point with the question of whether that severe indict-
.ment of the appellants is borne out by the evidence. That
will come later. It has nothing to do with the jurisdiction
·of the court to entertain the case as it did. If it be true that
·the court was defrauded into selecting Rust as its receiver,
·and that the scheme of appellants, entered into and carried
·out, was as alleged, then the effect thereof, as contemplated
·and in fact, was to leave the property of the corporation more
.completely under the control of its officers than it would have
been had no receiver been appointed, and the receiver and
his attorneys and counselors, the active participants in the
fraud, cannot be considered in any other light than as agents
·of the corporation or of its officers. Under the forms of law,
·according to the complaint and the findings, the court was
·used as a shield to protect the officers of the corporation and
their attorneys from hostile attack, while they proceeded at
their leisure to put the assets of the corporation into their
·own pockets. Can it be possible that such things can be done
·in such a way, and yet the court that has been imposed upon
is powerless, responding to. the appeals of creditors upon
·whom the loss has fallen, to treat the wrongdoers so mildly as
·to make them defendants in the suit commenced ostensibly
for the benefit of creditors, and compel them to account the
same as if no receiver had been appointed? Is it true, as
claimed, that in such a suit as this the court can be imposed
·upon and made unconsciously to be the very source of power
·to commit a great wrong to creditors, and yet the order ob-
·tained by means of the imposition have such efficacy that
when the whole scheme is exposed *prima facie* to the view of
the court, showing that it had its inception before the action
was commenced, and that such action was a step in the
·execution thereof, the fraudulent receiver can successfully

claim to have rights by reason of his office, entitling him to· such a measure of protection at the hands of the court that, with all the vast power it is said to possess, it cannot, if it sees fit, make him account in the manner adopted here, or, if necessary, treat the whole receivership proceeding as a mere means of enabling the officers of the corporation to handle its property regardless of the rights of those equitably entitled' thereto, and. as such so far void that all parties concerned are· accountable as defendants the same as if the receivership order had never been made? If a court, in an action commenced and pending before it, cannot treat an order, obtained, as the complaint alleges and the trial court found the one appointing Rust receiver was, and those obtained by him, alleged and found to have been fraudulently secured in the execution of a wicked purpose, as at least so far void as to warrant making the guilty persons parties defendant in the action, either as original wrongdoers or as an efficient way of trying the issues in respect to the charges made against them, then the elementary principle that fraud vitiates everything, rendering that into which it enters void or voidable, and the· doctrine that a court with full chancery jurisdiction may compel its receiver to account to such persons and in such manner· and at such times as in the exercise of sound judicial discre-· tion it may deem best, must have a very important exception.

In *Schenck v. Ingraham,* 5 Hun, 397, which we have before alluded to, where the receiver and his attorneys converted the trust fund to their own use very much as it· is· said the receiver and his attorneys did in this case, it was held that upon the facts being established showing that the orders in question were obtained by fraud upon the court and in fraud of creditors, it was the "duty of the court to disregard them as a mere device or fraud, invented for misappro-· priating what justice required should be paid to the creditors· of the firm whose affairs it was the object of the action to settle." The claim was made in that case, as here, that the order‑

of the court furnished the receiver and his co-conspirators some measure of protection, and to that the court said:

"The object of the law in allowing the court to take it in charge, was to prevent it from being wasted, destroyed, or squandered, in order that a proper disposition of its proceeds could be made among the persons having lawful claims upon them. That has been completely frustrated and defeated in the present instance. The fund designed for creditors and others interested in the property producing it, in this instance, has been entirely exhausted by the claims allowed to the receiver and his counsel, and it is confidently claimed that this court shall, after all that has been done, maintain the proceedings as valid through which that has been accomplished. A result of that character would justly involve the administration of the law in the most unqualified and deserved condemnation. For, under the forms of law, it would protect and sanction the most apparent injustice. No lapse of time less than that prescribed for the commencement of actions would either justify or excuse the court for a failure to vacate and annul proceedings which appear to have been resorted to as, and successfully rendered, the means of such transparent injustice. Its power in this respect is ample, and it would be unworthy of the name of a court of justice if this distribution of the property put into the hands of its officer for preservation and protection should be permitted to stand."

It will sufficiently appear by the language quoted, that the holding was that the order obtained by a fraud upon the court was utterly void; that it was subject to be regarded as of no force whatever if properly challenged at any time within the period of the statute of limitations.

Looking only to the charges made against the appellants in the complaint and the findings in support thereof, the quoted language applies very fittingly here. If the findings are borne out by the evidence, then the property of the corporation never really passed out from under the control of its officers and their attorneys, except as it was divided up between them as private property. The office of receiver was

a mere cover behind which, in fancied security, such officers and attorneys, those who conspired together to defraud the creditors before the action was commenced, at a time when they were responsible to the creditors as trustees of the corporate property, used up the trust fund for their private benefit. It would seem that, upon the most familiar principles of equity jurisprudence, the court having jurisdiction of the parties and the subject matter could deal with such a situation as if the order obtained by fraud upon it were entirely effaced from the record, so far as operating to any extent to protect the guilty parties. If that be not so, then the tribunal supposed to be the embodiment of the accumulated wisdom of ages, and possessing jurisdiction greater than any other earthly tribunal ever created to the end that justice might prevail between man and man, may, by cunning and selfishness, be made the most efficient means of defeating justice, the court being induced, unconsciously, to tie its own hands, rendering fraud within the very temple of equity, in the very case in hand, a bar to its administration. We cannot indorse that doctrine.

In justice to the learned counsel for appellants, to whose industry and professional acumen we owe much, enabling us to elucidate the question submitted for reargument, we acquit them, as does the learned counsel for respondents, of at least making prominent in defense of their clients any claim that they can shield themselves behind the office of receiver, if the findings of the court are borne out by the evidence that the whole proceedings which resulted in the wrongs complained of were but the means resorted to to carry out a fraudulent conspiracy to defeat the rights of the creditors of the corporation, entered into before the action was commenced. True, one of the counsel argues that Mr. Frawley was not properly made a party defendant because he was never an officer of the corporation, and that the act making him a party was jurisdictional error because the action was statutory and be-

cause there is no provision in the statute for making other persons parties than officers. But other counsel appear to admit, inferentially, that Mr. Frawley was properly made a party if he was a participant in executing a fraudulent conspiracy to defraud creditors, entered into before the action was commenced. As we have before seen, the fact that he was not an officer of the corporation makes no difference with the power of the court in respect to him, if he in fact was a constructive trustee for creditors, of some part of the trust fund, as in effect alleged. Of course, all officers, and all colluding with them to defraud creditors before the action was commenced, were proper parties under sec. 3227, and on general principles of equity, as has been uniformly held in this class of cases, and as we have heretofore seen. In addition to the authorities we have heretofore cited to that, we will name the following, some of which are aptly referred to in the brief of the learned counsel for respondents: *Powers v. Hamilton P. Co.* 60 Wis. 23, 18 N. W. 20; *South Bend C. P. Co. v. George C. Cribb Co.* 105 Wis. 443, 81 N. W. 675; *Proctor v. Sidney S., B. & F. Co.* 8 App. Div. 42, 40 N. Y. Supp. 454, 456; *Cummings v. Am. G. & S. Co.* 87 Hun, 598, 34 N. Y. Supp. 541; *Wood v. Sidney S., B. & F. Co.* 92 Hun, 22, 37 N. Y. Supp. 885; *Reed v. Stryker,* 4 Abb. Dec. 26; *Randolph v. Daly,* 16 N. J. Eq. 313; *Burns v. Beck & G. H. Co.* 83 Ga. 471, 10 S. E. 121. A few quotations from the cited cases will emphasize what has been said. This from the opinion of PUTNAM, J., in *Proctor v. Sidney S., B. & F. Co.,* is in harmony with judicial expressions generally on the subject:

"I am inclined, therefore, to believe that this action, the object of which is to reach corporate assets, was properly brought, not only against the corporation, but also against those parties who have such corporate assets in their possession; that the complaint, which joined the corporation with those who had illegally obtained its property, claiming to recover that property for the benefit of creditors, contained but

a single cause of action; that the well-settled principles applicable to a creditor's suit against an individual should be deemed to apply to this creditor's action against a corporation."

*Wood v. Sidney S., B. & F. Co.* was a creditor's action in which there was a claim that the debtor's property had been placed beyond the reach of the creditors pursuant to a fraudulent scheme. All parties concerned in the alleged wrongful transaction were made defendants. The court said in respect to the complaint:

"The unlawful transfer, both through the sales under the judgments and the sale to Brooks, is treated as an act done in pursuance of one scheme, and the complaint is framed upon the theory that in equity a right existed on behalf of the plaintiffs to have anything that was done in pursuance of that scheme adjudged fraudulent and void, and to require all those who had received any property through it to account for the amount so received. All persons are therefore made parties who did in any manner participate in such transaction, and received anything through it."

In *Reed v. Stryker,* the court said in respect to an analogous transaction, quoting with approval from a previously decided case:

"The general right claimed by the bill is a due application of the property of John Fellows to the payment of the judgment. The subject of the bill and of the relief, and the only matter in litigation, is the fraud charged in the management and disposition of that property, and in which charge all the defendants are implicated, though in different degrees and proportions. The defendants, therefore, have one common interest among them all, centering in the point in issue in the cause; and different matters of different natures are not demanded by the bill. It is one matter."

The court further said, quoting from Chancellor KENT, in *Brinkerhoff v. Brown,* 6 Johns. Ch. 139:

"There·was a series of acts on the part of the persons concerned in this company, all produced by the same fraudulent intent, and terminating in the deception and injury of the

plaintiffs. The defendants performed different parts in the same drama; but it was still one piece—one entire performance, marked by different scenes."

The importance of the feature of this case, upon the complaint and findings, in determining the question under consideration, that Rust, receiver, was, though ostensibly the hand of the court, in fact the hand of the officers of the corporation defendant, and that Mr. Hayden and Mr. Frawley, though ostensibly the attorney and counsel of the court's officer, were in reality in that capacity for the officers of the corporation, justifies us in some further discussion of it.

The conception of a receiver is some one to take manual possession, for the court, of property,—to take it out from the possession of others and hold it for the better security of those who may be ultimately entitled thereto. The proceedings are in their very nature adversary to those holding the property and controlling it at the time of the appointment. When the receiver acts, in a legal sense the court acts. It reaches out "its arm" so to speak, and does the work requiring physical action, directed by business judgment, by using that of its officer. Now when such officer secures his appointment in the interests of those as to whom, in form, the proceedings are adversary, by imposing upon the court; when he acts in form for the court but in fact by a preconceived plan for the very persons from the possession and control of whom the property involved was designed to be removed; when by reason of the fraud the officers of the corporation, as in this case alleged and found, instead of being ousted from the control of its property by an equitable levy for the benefit of creditors in the only way the court could accomplish that, judicial instrumentalities are turned into mere means of enabling the officers of the corporation, through their agent, in greater security than before, to control the corporate assets for their own benefit:—it seems that the receiver has no status whatever as an agent of the court; that his real position is

that of an agent for the guilty parties who secured his appointment; and that his possession is but a continuation of their possession. If there were no authorities to guide us on that, it would seem, on principle, that there would be no escaping the conclusion indicated. But we are not entirely without guides. The fact that there are but few does not cause doubt in our minds upon the soundness of the doctrine. It rather indicates that the instances are rare where any such imposition upon creditors and the court, as is alleged and found here, was successfully attempted, and perhaps still more rare where it has been exposed.

In *Taber v. Royal Ins. Co.* 124 Ala. 681, 26 South. 252, the court had to deal, in a creditor's action, with an action previously commenced, in which a receiver was appointed as a result of collusive proceedings. It was said most emphatically that there can be but one administration of a trust fund, and that the court having, by the legitimate appointment of a receiver, really taken to itself such fund, other proceedings interfering therewith were necessarily superseded. But it was held that the appointment of the first receiver, ostensibly as the agent of the court but really as the agent of those already in possession of the trust fund, was not the commencement of an administrative proceeding by a court in any legitimate sense, and a real taking of the trust fund into its possession for that purpose; that the property in the hands of such receiver should be deemed not to be in the possession of the court, but in the possession of the corporation through its agent. The receiver was so treated, the court saying of the situation, this:

"We dismiss the consideration of the previous suit commenced by the absconding officers of the company, in which a receiver was improvidently appointed by the court, as having no bearing whatever in this case. It was collusive and fraudulent, and never amounted to a *lis pendens* in behalf of creditors, nor was there any administrative decree rendered therein. . . . Though a receiver was nominally appointed,

his position could amount to nothing more than a custodian introduced by the corporation itself."

The supreme court of Texas had occasion to speak of the same subject in *Texas & P. R. Co. v. Gay,* 86 Tex. 571, 605, 26 S. W. 599, 613, and did so in these words:

"The theory on which a receiver is held to be an officer of the court appointing him, and not the agent of the owner, whose property is placed in his possession, is that the property to be controlled is taken from the custody and management of its owner and made subject to the control of the court without his consent; but when the defendant owner asks the court to do this, he, in effect, asks the court to make an appointment for him, and it is but just that a receiver so appointed should be held to be his agent.

"That a plaintiff collusively acts with a defendant for such a purpose only aggravates the case; for this enables the owner to impose upon the court, and such plaintiff has no ground for complaint if the receiver be held the agent of the owner in reference to every act out of which, in the management of the property, obligations to other persons may arise."

That doctrine seems so reasonable and so in accord with principle, that we venture to say no court or reputable text-writer can be found to have said anything to the contrary. We find an express adoption of such doctrine in Beach, Receivers, §§ 206, 384; and find it referred to significantly in 23 Am. & Eng. Ency. of Law (2d ed.) 1040, subd. 10.

In view of the last foregoing discussion, the point made by respondents' counsel, that it is expressly given to the court, if the power does not otherwise exist, by sec. 3239, Stats. 1898, to direct the liabilities sought to be enforced in this litigation to be treated as they were, is not without force. Sec. 3237 provides that:

"The circuit court shall have jurisdiction over directors, managers, trustees and other officers of corporations: to compel them to account for their official conduct in the management and disposition of the funds and property committed to their charge; . . . to compel payment by them to the cor-

poration whom they represent and to its creditors of all sums of money and of the value of all property which they may have acquired to themselves or transferred to others, or may have lost or wasted by any violation of their duties as such directors, managers, trustees or other officers;" and "to set aside all alienations of property made by the directors, trustees or other officers of any corporation contrary to the provisions of law or for purposes foreign to the lawful business and objects of such corporation, in cases where the person receiving such alienation knew the purposes for which it was made."

Sec. 3239, Id., provides that jurisdiction to do all those things "shall be exercised in an action . . . by any creditor of such corporation" if the case may require it or the court so direct. Here R. E. Rust, as alleged by respondents and found by the court, was introduced into this litigation by fraud, to act as the agent of the corporation and its officers, and did so act, with the results complained of. If that be true, then the misappropriation of the trust property was to all intents and purposes the act of such persons, their agents, and other guilty participants, the same as if the semblance of a possession of such property by the court were entirely out of the case. That would present a plain case within the statute, authorizing the court to take jurisdiction of the matter at the suit of the injured creditors. The language of the statute is significant in that it is to the effect that the jurisdiction shall be exercised by either of several persons named, including creditors, as may be necessary or as the court may direct. It has heretofore been suggested that in so far as authority to instigate a suit of this nature is indicated by the statute it is a mere declaration of the common law. *Gores v. Day,* 99 Wis. 276, 74 N. W. 787. To that we adhere. If there is any significance in the words of the statute, "as the case may require or as the court may direct," it is in the indication that the court has absolute authority within the boundaries of judicial discretion, to determine who shall represent as plaintiffs the per-

sons primarily interested in redressing the wrongs referred
to in sec. 3237. The courts have uniformly exercised that
discretion, as we have before seen, to the extent of entirely re-
arranging the parties to the record in suits of this kind, mak-
ing those who instituted the suit defendants, and substituting
new parties as plaintiffs. The court exercised the same dis-
cretionary power here; and that brings us back to the point
at which we have several times arrived: Whether the court
committed jurisdictional error or not depends upon whether
discretionary power was abused, and under the circumstances
of this case so abused that, after a trial upon the merits, this
court should say that jurisdiction of the subject matter was
not acquired.

We have now been over, point by point, specifically or gen-
erally, all except one of the reasons suggested for our consid-
eration of why the practice in this case should be condemned
as jurisdictionally infirm. Assuming, as we must, that each
reason put forward by the learned counsel for appellants was
thought by them to have merit, we have avoided ignoring any
one of them, regardless of whether any seemed to us to be
without significance. The result is that some subjects have
received as careful attention as if the case might turn there-
on, which, we must say, are not really open to serious discus-
sion from a judicial standpoint. How best to frame an opin-
ion where a large number of points are presented by able
counsel, with supporting authorities supposed to demonstrate
the soundness of each and with reasons supposed to make the
same applicable to some phase of the case in hand, is not al-
ways easy to determine. To consider and decide the vital
questions only, which are usually few in number, and brush
the rest aside, greatly economizes labor and space and fur-
nishes all that is essential for the final decision to rest upon,
and probably satisfies the strict measure of judicial duty; but
it is liable sometimes to leave counsel more or less uncertain
in mind as to whether their labor to aid the court has been ap-
preciated and their labor to serve their clients not been in

great part wasted, and whether the decision might not have been different had the points treated, apparently, as so unimportant as not to call for more than a mere mention if even that, been carefully examined. Though it has entailed much labor upon the court, the broader method has been adopted in this case, of discussing to some extent every question presented, though it seemed to us in some instances that only elementary principles were involved, or questions not open to controversy in view of previous decisions of the court. Our references have been chiefly to points suggested by appellants' counsel, because that seemed to be the logical way of treating the matter, and because the discussion of appellants' points incidentally covered the grounds upon which respondents claim that an affirmative answer to the court's question should be given. We will now proceed to consider the remaining proposition submitted by appellants' counsel.

We may briefly state counsel's proposition thus: The complicated character a suit may assume, as evidenced by the one before us, in the practice which an affirmative answer to the court's question would establish, indicates the absurdity of such practice and condemns it utterly. . Numerous illustrations are given by the learned counsel, of their conception of the practice in these winding-up suits, extended, as it is supposed it would be, in order to cover the matters litigated in this suit. Viewing the practice as counsel treats it, we do not wonder that the exclamation is made: "Can it be claimed that the legislature ever intended such a result!" After all that has been written, endeavoring to make the scope of this class of suits easily determinable, it is evident by the illustrations given by counsel that if this one falls within the rule a very erroneous idea of such scope is yet liable to be entertained by the profession. That suggests further effort to mark the boundaries of the principles involved. This is the result which counsel apprehend might follow stamping the practice in question as proper:

If, subsequent to the commencement of an administration

suit and the sequestration of the assets possessed by or under the control of the debtor, these liabilities should be incurred, the parties responsible could, by supplemental bill, be brought into the litigation and the wrongs redressed:

A tenant of some part of the trust property, liable to an action of unlawful detainer.

A hostile claimant of some part of the land belonging to the trust property, so circumstanced as to be liable under ordinary conditions to an action of ejectment.

A person, so circumstanced, as to land belonging to the trust, as ordinarily to be liable to an action to remove a cloud upon title.

A person takes some part of the trust property under claim of title in such circumstances as commonly to render him liable at the suit of the rightful owner to an action of replevin.

A person in the employ of the receiver embezzles some part of the trust fund.

One commits a trespass upon realty belonging to the trust.

Now, so far as the legislature has spoken on the subject of the administration of the property of an insolvent corporation for the benefit of its creditors, as we have heretofore seen, it has merely indicated by implication, though as plainly as if it were done expressly, that it shall be after the manner of suits in equity commenced by general creditors' bill. Such a bill is properly filed against every person as defendant, possessed of any part of the trust fund in the capacity of trustee for creditors, and also against any person who should be made a defendant for his due protection and to prevent multiplicity of suits. He is liable to the creditors as a class, but upon grounds rendering the liability not enforcible except so far as necessary. There is the test of the scope of the subject matter of the suit. That it does not include any such matters as those suggested in counsel's illustrations, or any claim involving merely the relation of debtor and creditor, or any liability of an officer of the corporation purely personal to a particular creditor, as explained in *Killen v.*

*Barnes,* 106 Wis. 546, 82 N. W. 536, seems plain. That it does include all claims, statutory or otherwise, against officers and stockholders of the corporation as such, whether considered as assets of the corporation and so a part of the trust fund proper, or liabilities to the creditors as a class to be enforced only so far as necessary to pay them, and forming a part of the trust to that extent, and all liabilities against persons occupying the position of constructive trustees for the creditors by reason of their having obtained the property of the corporation in fraud of creditors, has often, in terms or in effect, been heretofore declared, the most recent instance being *Williams v. Brewster,* 117 Wis. 370, 93 N. W. 479. The trust relation to creditors, within these rules, of all the defendants brought into this litigation by amendment, has heretofore, it seems, been clearly demonstrated. While it does not appear especially difficult to apply the proper test and determine what matters may be and what may not be brought into a winding-up suit without violating established practice, in view of the difficulties experienced in the administration of the remedy, as indicated by the recurrence of controversies in respect to the matter, since the court many years ago recorded its judgment in respect thereto in *Hurlbut v. Marshall,* 62 Wis. 590, 22 N. W. 852, where, after explaining in detail the scope of the remedy in harmony with the foregoing, the court said, "all of the principles involved are elementary and not at all abstruse,"—something further, it seems, should be said. The declaration that all of the principles involved are elementary and not at all abstruse does not necessarily mean that there may not be many situations where difficulties may legitimately exist after applying established principles, in determining whether a person is liable to account as trustee, within the broad meaning of that term, to the creditors, but only in case of clear error in that regard should the ruling in respect thereto, by the court charged with the duty of supervising the administration of a trust, be disturbed.

It has been common to point to the supposed complicated

character of these administration suits, as counsel have done in this case, as a reason for restricting their scope, or as a reason why some particular matter involved should not be deemed a legitimate part of the subject matter of the action. In many cases that has been done apparently without appreciating the dominating principle involved. A good instance of that is *Gager v. Marsden,* 101 Wis. 598, 77 N. W. 922, where, as in this case, the appellant's counsel mistook mere parts of one subject matter for distinct causes of action, and confused the relation between the trustee and the *cestui que trust* with that between debtor and creditor, and liabilities purely personal to one with liabilities to a class and only contingently enforcible; and so misconceiving the true boundaries of an administration suit referred to the practice in such cases, as this court has been constrained to outline it, as "confusing and complicated to a degree entirely inconsistent with a safe and reasonably convenient administration of justice."

Of course, nothing new was declared in *Hurlbut v. Marshall* as to the legitimate scope of a suit in equity to administer the trust fund. The whole subject involved was covered by the doctrine that the liabilities referred to were to be deemed a trust fund and treated as such. The case only went to the extent of holding, perhaps more plainly than before, that the legislature intended, by secs. 3216 to 3239, inclusive, Stats. 1898, that a creditors' action against an insolvent corporation should be commenced and prosecuted according to principles of equity for the judicial administration of a trust, all the beneficiaries thereof being proper plaintiffs and all holders of property in the capacity of trustees for them in any sense, or liable to them as a class, by virtue of the statute being considered as legitimate parts of the trust fund to be administered, being defendants. The principles of the judicial administration of a trust fund for creditors had long been theretofore established. There can be but one such administra-

tion. The court first acquiring jurisdiction by the filing of a proper bill and the commencement of a proper suit, whether all of the necessary parties are first brought in or not, retains it to the end. *Northwestern I. Co. v. Land & R. I. Co.* 92 Wis. 487, 66 N. W. 515. All actions theretofore commenced affecting the trust property are adjourned, so to speak, thereinto, and all subsequent actions interfering with the trust property are thereby barred. The whole subject matter is necessarily encompassed by the one suit, and nothing can be legitimately allowed to judicially occur that will impair its unity. One of the purposes of such unity is to avoid multiplicity of suits. The dominating idea is that equality is equity, that it should exist as to benefits and burdens, and that such end can only be accomplished by participation of all persons standing in the relation of *cestuis que trustent* and trustee, and all affected by extraordinary liabilities not to be enforced except upon equitable principles, so far as necessary to meet the demands of the creditors contingently and equally, should be brought into the litigation. The principles involved mark the boundaries of the subject matter to be administered. So far as the boundaries are thus set courts should not endeavor to restrict them because they include a great number of issues of different sorts between plaintiffs and defendants, and different equities as to one class of plaintiffs from those of others, all to be worked out in one omnibus proceeding. It is not infrequent that the profession and the bench feel like revolting at the magnitude of such an undertaking, and yet one of the most valuable features of equitable remedies is the opportunity they afford the court to lay hold of a subject matter, however large, made up of a single primary right and all rights germane thereto, however numerous, or several such subject matters under certain circumstances, bring all parties directly interested before the court, with all parties necessary to be there for their due protection, and settle the entire controversy by a single decree in a single administration proceed-

ing, giving to each party his just measure of relief or pro-
tection, and each his just measure of punishment, forever
closing the primary dispute and all so connected therewith as
to be legitimately considered a part thereof. It would be a
backward step in the administration of justice to let the mag-
nitude and complexities of a single subject matter lead to a
sacrifice of one iota of such principle.

If the mere magnitude of the work, the number of parties
and issues, and variety of relief demanded, legitimately in-
cluded within a single subject matter, would furnish any jus-
tification for failing to vindicate the established practice to
its full extent, this case—with its record of between 6,000
and 7,000 pages, and requiring, after all the industry of coun-
sel had been exhausted in condensing such a vast amount of
material into as small a compass as practicable, about 3,400
pages of printed matter to present it—would accomplish that
result; but it does not. Principles do not change with the
magnitude and difficulties of cases. Of course, there is no
danger of such liabilities as the learned counsel suggests in
his illustrations being included within the subject matter of
an administration suit. They, like any other mere thing in
action, pass to the receiver and become a part of the trust
property in his possession, to be converted into money at his
suit if necessary, while the liabilities of trustee defendants
and of those whose responsibilities are only enforcible upon
equitable principles, are to be marshaled into the trust fund
in money by direct proceedings in the main suit. The di-
viding line, so far as the principles involved are concerned,
is plain. Probably, except for the bar that established prac-
tice has set up in the matter, the liabilities enforcible for ben-
eficiaries of the trust fund in a winding-up suit might be very
much extended, as intimated in *Peck v. Elliott,* 79 Fed. 10,
cited by respondents' counsel. There the federal court held
that its authority extended to gathering mere dues from cred-
itors of the corporation defendant into the trust fund in

money, by independent suits in the name of its receiver, or by making the debtors defendants in the winding-up suit. That is in harmony with what we have said to the effect that the power of the court in such matters is plenary except so far as it is limited by sound judicial discretion. It is so effectually limited here that the making of mere debtors parties defendant in the original suit would be deemed most serious error.

The final conclusions that must be drawn from the foregoing seem clear.

All of the alleged liabilities made a part of the subject matter of this suit by the supplemental bill, either were unknown to the creditors when the suit was commenced, or they thereafter accrued. They are all material to the original purpose of the action,—the one subject thereof. Had they existed at the origin of the litigation, they could have been made a part of the plaintiff's cause of action. Unless the receivership feature is a bar, it is within the discretionary authority of the court to permit them to be made a part thereof by the supplemental bill. While the general practice in settling a receiver's account, and the amount for which he is liable for breach of trust is by special proceedings in the action wherein he was appointed, issues being made up and tried before the court or referee or otherwise as to the court may seem best, the beneficiaries having full opportunity to be heard in the matter, and the general way of enforcing payment of whatever sum the receiver may in such proceedings be adjudged liable for is by way of contempt proceedings,—that method is not exclusive. The whole subject is under the control of the court within the boundaries of sound judicial discretion. It might in exceptional circumstances permit an independent action to be brought against its receiver by the beneficiaries of the trust; or, if the original suit were yet open, permit him to be made a defendant therein and the matter involved be closed by the general decree.

If it is alleged as to a receiver, that during the course of his administration he pursued a systematic course hostile to the primary beneficiaries, concealing his conduct from the knowledge of the court till the trust fund was, by him and those fraudulently colluding with him, wasted or put beyond the reach of such beneficiaries, except so far as the same could be recovered by judicial proceedings, and there is probable ground for believing that the charge is true, and the issues raised in the action in respect to the trust are still open, it is competent for the court, on such showing, to permit the claim on behalf of the creditors, against the receiver and his alleged guilty participants, to be treated as a part of the original subject of the action, and to be brought into it for trial by supplemental bill.

If an action is commenced ostensibly to administer the assets of an insolvent corporation, but really pursuant to a fraudulent agreement between its officers or its officers and others, to enable them to control the corporate assets for their own benefit, and in execution of such fraudulent scheme those controlling the suit induce the court, by false pretenses, to appoint as receiver one of their own number who will use his office to enable them to effect their wrongful purpose, and he does so use it, the court may, upon being satisfied of a probability that such fraud has been committed, for the purpose of having the truth of the matter judicially determined, permit the creditors to treat such receiver as having been the agent of the corporation and its officers, and the assets of the corporation to have been by his aid continued under their control, though being ostensibly under the control of the court. In such circumstances it is eminently proper for the court— the condition of the suit being such that under any circumstances a supplemental complaint might be made—to allow such officers and such agent to be made parties defendant and charged as trustees for creditors, as to the property of the corporation still in their hands, and the value of all wrongfully

appropriated by them or otherwise lost through their wrongful conduct, or that of either of them, in execution of the original fraudulent design.  To bring such parties into the suit as defendants on either of the contingencies mentioned, it is believed, would not be a stretch of judicial discretion, and on the last one mentioned would be a very wise exercise of judicial power.

Upon a review of the whole situation, we can see no legitimate ground for appellants to complain.  They had as full an opportunity to be heard in their defense as they would have had if any other method, adequate under the circumstances to meet the case, had been adopted.  Certainly, no good ground exists for the court to hold that the practice adopted was such an abuse of judicial power as to constitute jurisdictional error.  On the contrary, in view of the feature of the case as to Rust being really the arm of the corporation defendant and its officers, instead of that of the court, the practice adopted meets with our approval.

## III.

### APPEALS.

We have now reached the merits of the appeals.  There are many questions to be considered in respect thereto.  If we were to discuss each appeal at length as regards matters of evidence, and the legal principles applicable thereto as well, this opinion would unavoidably be extended to such length that it seems best not to take such course, but to confine what we may say mainly to conclusions reached on minor and ultimate questions.  The details involved have been studied with all the care that could reasonably be devoted thereto, having regard to the important interests involved.  Notwithstanding the great length of the record, we trust nothing has been overlooked.  The importance of fully understanding the evidence

in all its bearings, in view of the extraordinary character of the findings, could not well be overestimated. By such findings a score or more of men of the foremost in professional and business life in the community in which they resided, as appears, and whose integrity in their relations with their fellow-men we must assume was above reproach, are condemned as having been guilty of conceiving and executing one of the most far-reaching and dangerous frauds of which we have any history in the records of judicial investigations; a fraud that required in its consummation the services of the agents of one of the highest judicial tribunals known to our law, and which obtained that aid; a fraud, if we must take the findings as right, so manifest in the various steps in its consummation, as they were brought before the court, that it could not have escaped the notice of the judicial head having charge of the matter, without such inattention thereto as to make him, morally at least, a party to the wrong. Nothing equal to it has before come to our attention in experience or research. The characters of these prominent men, in business, professional, and official life, stand condemned before the bar of justice, and condemned so severely as to blacken their reputations beyond reasonable hope of the cloud being lifted, if the indictment be found to be justified by the law and the evidence. Four of the most prominent figures in this picture, and the three most prominent of them, have, as the record shows, since the action was commenced, entered upon that journey from which there is no return. If the conclusions reached by the trial judge are warranted by the evidence and the law, the judgment complained of comes far short of fully remedying the wrongs these men were guilty of, as regards the parties plaintiff directly interested; much less the administration of justice which they abused and in effect corrupted. If the conclusions of fact were reached by the trial court by overlooking material evidence or disregarding it, or drawing unwarranted inferences, and by misconceiving the rules of law

applicable to the case, a wrong has been done to these men, under the sanction of the law, and by distinguished and conscientious administration of it in the court whose judgment we are to review, of such a nature that, after the jurisdiction of this court shall have been exhausted to remedy it, the living parties now resting under the condemnation and those who stand for and feel the load of the absent participants will still be sufferers. These considerations are all entitled to, and will, receive attention in determining the scope of what should be said in order to vindicate the justice of the judgment complained of, if it is right; and vindicate the integrity of the condemned parties, so far as the evidence and the law will warrant, if the conclusions of the trial court and the judgment based thereon are found to be unjust.

A few questions are common to all the appeals. We will give attention to them at the outset.

A demurrer *ore tenus* was interposed as to each defendant. This seems to have been done upon the theory that it was not permissible to bring the matter litigated before the court by a supplemental bill or by proceedings in the way attempted, as to the receiver and his alleged co-wrongdoers; or upon the ground that a creditors' action against an insolvent corporation is wholly statutory and that no warrant is found in secs. 3216 to 3239, inclusive, Stats. 1898, covering the subject, for including the matters charged against the appellants; or because the supplemental complaint did not show that the condition precedent to the right to commence a creditors' action—the issuance of an execution to enforce a money judgment against the corporation and return thereof unsatisfied—had been fulfilled; or because the facts pleaded show inexcusable laches; or because damages caused by an actionable fraud cannot be recovered in an equitable action, and particularly not as part of a trust fund in a winding-up proceeding of this sort. We are left somewhat in the dark as to just what counsel did rely upon. Errors are assigned as to each appeal,

because the demurrer was overruled, but very little is said by
counsel in respect thereto. Most of the reasons we have men-
tioned as likely to have been in the mind of counsel as a basis
for their position have been treated in discussing the juris-
dictional question. There, incidentally, it seems, enough was
said to indicate that none of the suggested reasons can be suc-
cessfully urged in support of the alleged insufficiency. The
pleader stated in the complaint but one cause of action, and
in that charged each defendant with a degree of responsi-
bility fatally involving him in the wrong complained of. In
other words, if there is a cause of action against one, it is
against all.

True, as counsel suggest, it is essential to a cause of action
in equity by creditors, to administer the property of an in-
solvent corporation for their benefit, by statutory regulation
and otherwise, that it be alleged that all legal remedies for
the collection of the moving creditor's claim have been ex-
hausted by the establishment thereof at law, the issuance of
an execution thereon in a good-faith attempt to collect the
same, and a return of such execution unsatisfied. *Hinckley
v. Pfister,* 83 Wis. 64, 82, 53 N. W. 21; *State ex rel. Fowler
v. Circuit Court,* 98 Wis. 143, 151, 73 N. W. 788; *Davelaar
v. Blue Mound I. Co.* 110 Wis. 470, 474, 86 N. W. 185; sec.
3216, Stats. 1898. Respondents' counsel, answering that
proposition, suggest, in effect, that the rule laid down in
*Hinckley v. Pfister,* that a defect in the complaint in regard
to such essential cannot be raised by demurrer *ore tenus,* has
been overruled, citing *Hoff v. Olson,* 101 Wis. 118, 76 N. W.
1121, and *Johnson v. Huber,* 106 Wis. 282, 284, 82 N. W.
137. *Meyer v. Garthwaite,* 92 Wis. 571, 66 N. W. 704; *Bige-
low v. Washburn,* 98 Wis. 553, 74 N. W. 362; *Post v. Camp-
bell,* 110 Wis. 378, 384, 85 N. W. 1032, and many other such
cases, might have been added. They are only to the point
that an objection to the sufficiency of a complaint in equity,
that it shows the plaintiff has an adequate remedy at law, is

waived unless raised by demurrer on that ground. That does not reach the question of whether the essential to a cause of action in a creditors' suit, where sequestration is sought, that all legal remedies shall have been exhausted in the manner before indicated, not being stated in the complaint, the defect can be raised by demurrer *ore tenus*. A defect of that character does not involve a mere matter of practice, such as whether the proper forum for the plaintiff to invoke is that of law or that of equity, as in the cases cited by counsel for respondents (*Martin v. Martin,* 112 Wis. 314, 317, 87 N. W. 232, 88 N. W. 215), but whether there is any cause of action at all. However, we are unable to discover that there is any such defect in the complaint in this case. It shows by appropriate allegations that a judgment was duly rendered at law in favor of H. H. Hayden against the insolvent corporation; that execution was duly issued on such judgment, and was duly returned unsatisfied; that thereafter the judgment creditors commenced an action which by due proceedings assumed the form of, and is in fact, the action in which the judgment complained of was rendered. Because, in the supplemental complaint, Mr. Hayden was made a defendant, so that it did not appear that any plaintiff, as the parties appeared upon the record at the trial, was so circumstanced as to be competent to commence such an action, is not material. The court having legitimately become possessed of the subject matter involved, the place thereafter occupied on the record by the person invoking the jurisdiction of the court at the start, whether plaintiff or defendant, or whether he dropped out of the litigation altogether, the fact still appearing by the complaint that the jurisdiction of the court was properly invoked, could make no difference. The mere arrangement of parties on the record in an equity case, in order that those united in interest may appear as plaintiffs and those adverse thereto may appear as defendants, the former standing for the subject matter of the action upon sufficient facts alleged, pertains to mere

judicial administration and is under the supreme control of the court within the boundaries of sound judicial discretion.

The point that the complaint shows the conduct of plaintiffs respecting the matters of controversy presented by the supplemental complaint was fatally tainted with laches, does not appear to have support. The complaint contains specific allegations to the effect that none of the facts alleged, upon which the liability of appellants is predicated, came to the knowledge of the respondents till shortly before the application was made for a reopening of the litigation and leave to bring in the new matter and new parties. No situation is disclosed indicating that respondents were guilty of negligence in not earlier discovering the facts so that, by the rules on that subject, they should be denied judicial aid. *Bostwick v. Mut. L. Ins. Co.* 116 Wis. 392, 421, 89 N. W. 538, 92 N. W. 246. It is fairly inferable from the complaint as a whole that the circumstances which moved respondents to action, resulting in their appeal to the court to reopen the case, occurred at the time of and within a short period before the final closing-up of the receivership matter, and that nothing occurred prior to such period, known to plaintiffs or which they could reasonably be charged with knowledge of, so tending to suggest unfaithfulness on the part of the receiver that the respondents should have discovered, earlier than they did, the evidence of wrongdoing if it existed. In any event, there being no element of estoppel to be dealt with, and no fatal negligence on the part of the respondents, and no difficulty as regards the subject matter of the supplemental complaint, except as regards the time of bringing such matter to the attention of the court, whether the facts justified the court in permitting such complaint or not, does not go to the cause of action. It was a mere practice matter, addressed to the sound discretion of the court.

A point is made that the consolidation of the action commenced by *James T. Barber* and another, and the one com-

menced by H. H. Hayden, into one, and the allowance of a supplemental complaint as if only a single action remained, was an unwarranted proceeding. Counsel suggest, seemingly with confidence, that consolidation of actions means only consolidation of trials; that is, a trial of several actions together, not the trial of one action instead of several actions. Counsel cite authorities supposed to support that view. We do not feel justified in taking time to discuss them. In our judgment their import has been overlooked by counsel, and they have further overlooked the statute, sec. 2792, Stats. 1898, which expressly indicates, as of course the fact is, that consolidation of actions means the creation of one out of two or more that might reasonably have been brought as one. That power, as to actions formerly cognizable only in equity, exists independently of the statute. *Biron v. Edwards,* 77 Wis. 477, 46 N. W. 813. This was eminently a proper case for the exercise of such power. There could not be, without violating established practice, more than one action allowed to administer the property of the corporation and, incidently, other liabilities for the benefit of its creditors. Necessarily, the first one properly commenced superseded the other. Such other, since both were commenced in the same court, and judicial consent was given, became adjourned, so to speak, into the properly commenced action, as a matter of course, and the entry of the formal order in that regard only recorded the fact. From the time of the commencement of the Hayden action and the proceedings thereafter recognizing the status of the first action and affirming what had been done therein, there was really but one action to proceed.

The complaint charged that, as early as January 1, 1893, appellants *Thompson, Gilbert, Owen,* and *Barber,* and the deceased persons, Rust, Hayden, and Moon, all of whom were officers and stockholders of the corporation, knew that it was hopelessly insolvent, and then entered into a conspiracy to appropriate to their own use its assets in fraud of general

creditors, and that in pursuance thereof, prior to May 18, 1893, they caused to be hypothecated to themselves and to corporations in which they were interested, for the purpose of securing previously contracted debts of the insolvent to themselves and such corporations, a large amount of the insolvent's assets. Acts, in great detail, were alleged to have occurred pursuant to such conspiracy, all of which were covered, favorably to the respondents, with like detail in the findings, followed by a conclusion to the effect that all of such hypothecations were legitimately made, and that no such conspiracy as that alleged, or any other, prejudicial to the creditors of the insolvent, was formed by the alleged guilty parties prior to May 15, 1893. None of the acts on the part of such persons, alleged to have occurred to the wrongful prejudice of creditors prior to that time, were so found, and none before the commencement of the first receivership, May 23, 1893, except one, viz., the giving of the Brookville mortgage May 18, 1893, which will be considered in appeal No. 5; but it was found that some time after May 15, 1893, and before the commencement of the *Barber* action, the alleged guilty persons formed a conspiracy to place the property of the corporation with a court receiver, and to cause it to be administered by him, acting ostensibly as agent of the court but really as their agent, so as, in the end, under the forms of law, to appropriate such property to their own use. That finding, as indicated, was not based upon any direct or circumstantial evidence showing wrongdoing as to any occurrence before the date of the supposed conspiracy. Up to that time, which, as has been seen, was on the eve of the commencement of the receivership action, all of the alleged guilty parties stand forth wholly innocent of the indictment against them contained in the complaint. The hypothecations alleged to have been made were in fact made, but all but one of them, as found by the court, and that in legal effect, as we shall see hereafter, were made for a sufficient consideration while the

corporation was a going concern and its assets were free from any impress of a trust for the benefit of creditors. *Slack v. N. W. Nat. Bank,* 103 Wis. 57, 79 N. W. 51. The law in that regard in this state, when the supplemental complaint was made, was not so well settled as it was later when the cause was tried.

It seems quite evident from the complaint that it was framed upon the theory that the mere fact that the corporation was insolvent, if such were the fact, at the time the hypothecations were made, notwithstanding it was a going concern and might, so far as then known, continue in business indefinitely, impressed its assets with a trust for creditors, disabling its officers from dealing therewith, as to creditors, by taking security for debts due from it to them or those due to others secured by their responsibilities. Facts were alleged in great array, as regards occurrences long prior to the commencement of the action, which at the outset, it seems, were supposed to point conclusively to a precedent agreement and to its consummation, the legal effect of which, whether the occurrence took place by concert of action or not, would be a fraud upon creditors. However, in harmony with the settled principles as understood at the time of the trial, the court held, in the end, that no fraud was inferable therefrom as a fact, nor resulted therefrom as a matter of law. Up to this point the learned court, in reaching minor conclusions, followed the order adopted in the complaint. The evidentiary facts were first found, upon which the ultimate facts and conclusion of law claimed depended. When that was reached the alleged guilty parties were exonerated, not condemned. The findings were framed in an orderly and logical way, since the truth of the matter which the court was in quest of was to be disclosed if at all by circumstances. From that point on, the order seems to have been reversed. Instead of finding the existence of facts from which fraud might reasonably be inferred, if inferable at all, followed by the ultimate con-

clusion in respect thereto which the circumstances seemed to call for, the conclusion was reached at the outset and from that standpoint the actions of the parties thereafter—which in the main at least, if found wrongful at all, would under ordinary circumstances have been attributable and attributed to error of judgment from a business standpoint, or mistake of law, in the absence of some very clear indication to the contrary—were found to be successive steps in consummating the original design. The structural features of the findings, which the learned court which tried the case doubtless adopted at the suggestion of the learned counsel for the prevailing parties, are not entirely without significance in determining whether the evidentiary circumstances were found from the proper standpoint, and in determining whether fraud should or should not be inferred therefrom, which is in the main the basis for the judgment complained of.

The question of whether the findings of fact are supported by the evidence in the light of correct principles of law, is common to all the appeals. We are constrained in our considerations not to review at the outset the finding as to the alleged guilty parties having entered into the fraudulent combination held to have been made, but to consider the evidentiary circumstances as found, and after passing upon the exceptions to the findings in that regard, to then consider whether what remains of such findings supports the conclusion of fact as to the fraudulent conspiracy or not.

In considering the exceptions to the findings, these familiar principles will be recognized and applied. They are mentioned here to avoid referring to them in detail as the review of the case proceeds:

1. 'Since the circuit judge who tried this issue had the benefit and advantage of a personal examination of the witnesses, and was better qualified to judge of the weight to be given to their testimony by the usual tests of credibility, than this court can be, his finding of the main facts ought not to be dis-

turbed without such a clear and palpable preponderance of the evidence against it as will create a positive conviction in our minds that he erred in his conclusion.' *Rice v. Jerenson,* 54 Wis. 248, 251, 11 N. W. 549; *Zoesch v. Thielman,* 105 Wis. 117, 80 N. W. 1107; *Vilas v. Bundy,* 106 Wis. 168, 81 N. W. 812; *Johnson v. Goult,* 106 Wis. 247, 82 N. W. 139; *Wyss v. Grunert,* 108 Wis. 38, 83 N. W. 1095; *Wussow v. Hase,* 108 Wis. 382, 84 N. W. 433; *Remington v. Eastern R. Co.* 109 Wis. 154, 190, 84 N. W. 898, 85 N. W. 321; *Endress v. Shove,* 110 Wis. 141, 85 N. W. 651; *Hill v. Am. Surety Co.* 112 Wis. 627, 88 N. W. 642.

2. The foregoing rule requires, in order to warrant the disturbance of a trial court's findings of fact upon appeal, that such findings shall appear so plainly against the preponderance of the evidence as to be explainable only by want of proper consideration of the evidence, mistake in overlooking material portions thereof, or prejudice, or some other improper cause. *Wyss v. Grunert,* 108 Wis. 44, 83 N. W. 1095.

3. The burden of proof is on him who alleges fraud to establish the same by clear and satisfactory evidence,—not to that degree of certainty which is said to be beyond a reasonable doubt, but by a preponderance of the evidence so clear and satisfactory as to establish the fact found with reasonable certainty, giving due weight to the presumption that human actions in business relations are characterized by good faith, at least as regards responsibilities of which the law takes notice. *"Odiosa et inhonesta non sunt in lege præsumenda; et in facto quod se habet ad bonum et malum, magis de bono quam de malo præsumenda est."* (Odious and dishonest things are not to be presumed in law; and in an act which partakes both of good and bad, the presumption should be more in favor of what is good than what is bad.) Co. Litt. 78; *Rice v. Jerenson, supra; F. Dohmen Co. v. Niagara F. Ins. Co.* 96 Wis. 38, 52, 71 N. W. 69; Jones, Ev. § 190; 14 Am. & Eng. Ency. of Law (2d ed.) 190.

4. The first rule mentioned does not apply where it is manifest that the findings were based upon a mistaken view of the law. *Milwaukee Co. v. Pabst,* 70 Wis. 352, 35 N. W. 337.

5. The first and second rules mentioned apply with more or less force according as the record discloses the existence or nonexistence of those elements upon which it is based. So far as the ultimate facts are dependent upon inferences from undisputed evidentiary matters fully appearing upon the record, the supposed better opportunity for the trial court to discover the proper inference is not to be overcome upon appeal by greater clearness in the evidentiary effect of such circumstances than would be required in viewing the same from an original standpoint.

6. The admission and consideration of improper evidence is deemed immaterial upon appeal in considering the question of whether findings made by the court are supported by the evidence, unless it clearly appears that otherwise the findings would have been different. *Hill v. Am. Surety Co. supra; Duncan v. Duncan,* 111 Wis. 75, 86 N. W. 562. The rejection of proper evidence is deemed immaterial in the circumstances mentioned in the foregoing rule, unless it appears that had it not been for such rejection the findings might probably have been materially different.

7. It is presumed in viewing a trial court's finding that improper evidence taken under objection was given no weight in reaching the final conclusion, unless the contrary appears. *Rozek v. Redzinski,* 87 Wis. 525, 58 N. W. 262; *Farr v. Semple,* 81 Wis. 230, 51 N. W. 319.

While from the wording of the notices of appeal as regards sec. 3052, Stats. 1898, we were compelled to hold that nineteen distinct appeals were taken, appellants are united in interest according as their names appear in the several instruments by which the appeals were taken, except in one case, where there are two appellants, but two distinct interests as regards costs. That is to say, testing the appeals by the in-

terests to be dealt with, we have but eight parties appellant. We will treat them that way.

All questions that will now be treated should be understood to have been raised by proper exceptions. Except where necessary we shall not undertake to mention exceptions or assignments of error.

## Appeal No. 1.

Appeal by W. A. and A. J. *Rust,* as personal representatives of R. E. Rust, deceased.

The facts found by the trial court in respect to this matter appear in detail in the statement preceding the opinion in findings 175 to 181 inclusive. The following history of the matter appears wholly or substantially undisputed in the evidence as we view it. Many of the features are embodied in the findings, though those omitted have a material and perhaps controlling bearing.

The National Electric Manufacturing Company, some three years before the commencement of the first receivership action, which for convenience we will hereafter call the *Barber* action, installed an electric lighting plant at Asheville, North Carolina, on lands owned by J. A. Lyman, it being understood then or some time thereafter, and prior to May 5, 1891, that he would take $1,000 in bonds secured upon the property, for such land. The local company which owned the plant, and the debtor of the electric company, was the People's Light, Heat & Power Company, which we will hereafter call the proprietor company. Prior to May 5, 1891, such company placed a trust deed on the electric plant and the land upon which it was situated, to secure thirty-four $500 bonds, which were to be used, in the main at least, to pay the electric company on construction account. On the day named the latter company opened an account with this bond matter by a debit item of $17,000, and a memorandum that the bonds were received and delivered to George B. Shaw. On

the same date the account was credited with numbers 1 and 2 of the bonds, $1,000, with a memorandum explaining that *they were left with Cobb & Merriman,* attorneys at Asheville, to pay Mr. Lyman for the land upon which the electric plant was situated; and was also credited with numbers 10 to 14 inclusive of the bonds, $2,500, with a memorandum indicating that the same had been delivered to J. A. Lyman. For what purpose the latter delivery was made does not appear, but it does appear that the electric company did not at any time own the bonds so delivered, after May 5, 1891. The $1,000 in bonds "were left with Cobb & Merriman" pursuant to some arrangement to which the proprietor company was a party. Whether the electric company at any time was the owner of such bonds, or controlled them for any purpose, except to deposit the same with Cobb & Merriman for the use of Mr. Lyman, does not appear. The indications are that it did not, and that they were never taken from Asheville by the electric company or its receiver, or any one acting for either to the knowledge of the latter. It never had possession of the bonds, if at all, subsequent to May 5, 1891, the day, so far as indicated, when it first had dealings with the bond matter. In addition we find in the record, in the form of an agreement on the trial: "It is conceded that the amount owned by the receiver was $2,500." That must have been overlooked in drawing the findings. The deposit with Cobb & Merriman was made by the electric company and the proprietor company for the special purpose of paying Mr. Lyman.

Default was early made in the payment of interest upon the bonds, only the first six months' interest being paid. Prior to January 1, 1893, and while it was competent to do so, twelve of the bonds were turned out by the electric company to the *Chippewa Valley Bank* of Eau Claire, Wisconsin, as collateral security, and ten of the bonds were likewise turned out to M. G. Shaw of Eau Claire, five bonds, of $2,500 only, remaining under the control of the electric company. The

facts in that regard were duly entered on the company's books. Thereafter, and before January 1, 1893, the *Chippewa Valley Bank* took charge of the matter of protecting the interests of the Eau Claire bondholders, itself, M. G. Shaw, and the electric company, employing H. B. Walmsley and H. H. Hayden, attorneys of Eau Claire, Wisconsin, in respect thereto. Such attorneys, from first to last, the period reaching down to the trial of this action, looked to the bank as their employer and were paid by it. In all of the transactions by such attorneys as to the matter Mr. Walmsley was the active man, spending considerable time in respect thereto in Asheville.

About January, 1893, Mr. Walmsley discovered that Cobb & Merriman had possession of $1,000 of the bonds for the purpose before indicated, and that Mr. Lyman would not accept the same for the real estate upon which the electric plant was located. Some time thereafter, and long prior to the commencement of the receivership, he obtained possession of such bonds, acting in the interests of all the bondholders he represented. At this time, and at all times thereafter, the $2,500 of bonds sent to Lyman as aforesaid were owned, $1,500 by him, and $1,000 by William M. Barnard, both of Asheville.

Mr. Walmsley took such measures to enforce payment of the bonds, by authority of all the Eau Claire bondholders, but looking to the bank as his employer, that some time prior to the commencement of the *Barber* action he caused the trust deed securing them to be foreclosed and the property to be sold, being himself compelled to bid in the same for the protection of his clients, which he did for $5,001. Lyman and Barnard would not participate as purchasers, and demanded their pro rata share of the $5,001. To settle with them, and with Mr. Lyman for the realty, and pay the trustee's fees upon the foreclosure sale, $1,835 was required. Mr. Walmsley arranged all the matters in that regard at Asheville, mak-

ing a draft upon the *Chippewa Valley Bank* for the amount required less the trustee's fees.

About the time the draft arrived at Eau Claire the *Barber* action was commenced, the property of the electric company being placed in the hands of R. E. Rust as receiver. The books of the insolvent then showed but $2,500 of Asheville bonds controlled by it. The receiver thereafter dealt with the matter in all transactions in regard thereto upon the basis of his holding, in some capacity, five twenty-sevenths, or $2,500 only, of the bonds represented by Walmsley, the others so represented being those held by the *Chippewa Valley Bank* and M. G. Shaw.

Aside from some doubtful liabilities of stockholders and officers of the proprietor company, the bonds were valueless except so far as money could be realized out of the property acquired at the foreclosure sale. Five twenty-sevenths of the money necessary to protect the title to such property in Walmsley and make the same available for the Eau Claire bondholders was a valid charge thereon. No one could have acquired any interest therein under the circumstances, on account of the receivership bonds, except by paying five twenty-sevenths of such money. In that situation Mr. Rust was applied to by Mr. Walmsley, or some other agent of the *Chippewa Valley Bank,* for his share of the $1,835. He complied, using his private funds. He did not deem it proper, without permission of the court, to risk receivership money in the matter, but was willing to take the risk personally rather than to forego all opportunity to realize on the bonds.

Before doing as above indicated, Rust caused the whole situation to be presented to the circuit judge by his attorney, for the purpose of obtaining judicial authority to participate in the proceedings to acquire the Asheville plant and enforce collection of the bonds at the expense of the trust fund, with the result that such authority was refused. The evidence is so undisputed and conclusive on this point that it must be

taken as true unless all rules for weighing evidence are to be set aside. . There is much evidence on the subject, and many circumstances, all in harmony. Counsel for respondents, on cross-examination, asked Mr. Frawley: "Why did the court decline to authorize the expenditure, while he authorized the expenditure in the Bucyrus and other matters ?" to which the answer was given, "The matter was presented to the court,—" to which counsel said: "I know that," when the witness continued: "I will simply tell you what he said: He said he did not think anything would ever be realized out of it, and did not think it would be good business judgment to put in any money down there,—did not think anything would be realized."

Thereafter, during the whole time of the receivership, except as to $524.26 which will be hereafter referred to, when money was required to be advanced on account of the Asheville matter as to the receivership bonds, Mr. Rust paid the same out of his private funds, or assumed liability to do so, as between himself, the *Chippewa Valley Bank,* or *George T. Thompson* as its representative, and M. G. Shaw.

Rust had no knowledge of the $1,000 of bonds before mentioned other than what appeared upon the books as they came into his possession as receiver. He made no account thereof, and though he made some effort to discover their location and ownership, it does not appear that he succeeded. He made inquiry of Mr. Walmsley while the latter was at Asheville about one year after the receivership commenced, but it does not appear to have been made from any supposed value in the bonds, or ownership in himself as receiver, but in order that he might have a complete record of the entire issue of $17,000. Mr. Walmsley, upon the trial, explained his silence as to the $1,000 of bonds by saying that he understood they were deposited by the proprietor company and the electric company to pay Lyman for the realty, and that upon his being compelled, representing the Eau Claire bondholders,

to pay money in lieu of the bonds, he regarded the same as belonging to those who advanced such money. In all the transactions by Rust as receiver, whether with his associates *Thompson* and Shaw, or otherwise, no account was taken of bonds owned by the electric company at the time of the commencement of the *Barber* action, except the $2,500.

After the title to the Asheville plant was perfected in Mr. Walmsley for the Eau Claire bondholders, they believing—and with good reasons therefor—that the best way to realize thereon in money was to disorganize the plant and sell the wreckage, shipping the major part thereof to Eau Claire for that purpose, that course was taken. There is nothing in the record to impeach the good faith of this proceeding, or the judgment which dictated it. The amount thus realized was $4,482.30, out of which Mr. Rust handled $1,452.02, which was accounted for between him, the *Chippewa Valley Bank,* and M. G. Shaw. The amount paid out in respect to the matter, including the first payment of $1,835, and exclusive of attorney's fees, was not less than $2,934.45. We make it from the evidence somewhat more, but as that is all counsel claim we will adopt their figures. Mr. Rust personally, directly or indirectly, paid five twenty-sevenths of the $2,934.45, or became liable therefor. There was left, out of the sum realized from the property acquired at the foreclosure sale, not more than $1,548.45—somewhat less, it seems—to pay the expenses of the attorneys and to apply upon the bonds. Expenses were incurred in connection with disorganizing the Asheville plant and turning the same into money, in addition to the above, to the amount of $524.26. These expenses were incurred largely by the regular agent of the receiver, and were paid by the latter out of receivership moneys, he charging the same to himself, *Thompson,* and Shaw.

After the foreclosure of the trust deed Walmsley and Hayden continued in the employ of the *Chippewa Valley Bank*

in respect to the collection of the Asheville bonds, Mr. Walmsley spending much time at Asheville for that purpose. In his judgment there were certain liabilities of stockholders and officers of the proprietor company enforcible for the payment of the bonds. Upon his advice several suits were commenced, some in the state court and some in the federal court, in North Carolina, to enforce such liabilities. The litigation in that regard was commenced in 1894 and was still pending at the time of the trial of this action, there then being no reasonable hope of recovering anything for bondholders, and nothing having been theretofore recovered. At first Mr. Rust's name as receiver was used with those of other Eau Claire bondholders, in the prosecution of the suits referred to, but upon that fact being brought to his attention he promptly demanded that his name should not appear in that way, as he claimed the $2,500 of bonds personally. The demand was made and reason given therefor by letter. A few days subsequent thereto he again wrote Mr. Walmsley on the subject, explaining that he claimed ownership of the bonds personally because the court would not permit him to represent them in the litigation as receiver,—would not allow any receivership money to be risked in the matter, and that he had to treat the bonds as his own. He directed reports to be made to him as receiver, as the bonds, or the proceeds, might ultimately revert to the trust fund. Seasonably after receiving such letters Mr. Walmsley caused Mr. Rust to appear in the litigation in his personal capacity instead of as receiver. He did not thereafter, as receiver, in any way participate in the litigation.

The entire expenses of the litigation, including those of local attorneys and the amounts paid Hayden and Walmsley for services and expenses, were about $4,000, about $3,000 of which was paid to Hayden and Walmsley, the greater part being paid prior to July 20, 1894. The entire expenditures made in the enforcement of the Asheville bonds, including

the $2,934.45 aforesaid, were $6,970.33, not counting the $524.26 paid by Rust, receiver. The net result of the matter, leaving out the $524.26, was a loss of $2,488.03, five twenty-sevenths of which Mr. Rust paid or became liable for personally. The account with the matter, as to him, should be stated thus:

To five twenty-sevenths of $6,970.33 ................$1,251 87
To receivership moneys chargeable to Rust............   524 26

Total................................................$1,776 13
By amount received from property.....................   830 06

Balance, loss........................................ $946 07

Thus, if the liabilities adjudged as to Rust for the $524.26 and the bonds stand, the trust fund will be relieved from all the burdens of his participating in the Asheville matter, and will be enriched by $1,000 and interest, while a loss of $945.07 and interest will fall on his personal representatives.

In May, 1897, nothing was left to be done to close up the receivership matter, except to close out a large amount of book accounts supposed to be of little or no value, and other accounts where moneys were paid out by the receiver in enforcing hypothecated matters and charged to the holders of the security, to sell some few articles of tangible property, to pass upon the receiver's account, and to distribute the remaining funds in his hands according as the court might order. About this time Mr. Rust's relation to the $2,500 of bonds as stated, and to the suits pending at Asheville, was such that he desired to acquire title to such bonds, and he so informed his attorney, Mr. Frawley, asking him to bring that about. The absolute passing of the title to the bonds to any one without recognizing the equitable claim for the outlay made by him in efforts to collect the same, would have left him without any opportunity whatever to retrieve his loss, and at the same time introduce a person into the pending litigation that might not act in harmony with those who had risked much in pursuing the same. Rust verified his final account

May 28, 1897, and thereafter filed the same in the office of
the clerk of the circuit court for Eau Claire county. The
aforesaid worthless book accounts were therein plainly sched-
uled, and also the other accounts of the moneys paid out of the
trust fund and charged to holders of the collateral. The so-
called worthless accounts included the bond account of $2,500.
In respect thereto a memorandum was made to the effect that
a suit was pending at Asheville, the outcome of which was
doubtful. On the day the account was verified, a petition was
also prepared and verified for presentation to the court, to
obtain authority to dispose of the so-called worthless accounts
in the discretion of the receiver. An order was entered ac-
cordingly. Later a second order was entered in respect to
the same matter, particularly directing the time and manner
of disposing of the accounts and authorizing, also, the sale of
all personal property still on hand. The order was duly exe-
cuted, the sale being made at public auction. De Alton S.
Thomas purchased the accounts for $53, the face of the same
being upwards of $22,000.

Before the sale took place notice was publicly given that
certain of the accounts had been adjusted by order of the
court, including the account of $524.26 against *Thompson,*
*Shaw,* and *Rust,* and that such accounts would be withdrawn
from the sale; that an account against *John S. Owen* had been
paid and would be withdrawn; that a claim against the
Bucyrus Steam Shovel & Dredge Company was involved in
a suit pending in the circuit court for Milwaukee county,
*John S. Owen,* D. R. Moon, *J. T. Barber, Fitch Gilbert,* and
*George T. Thompson* having advanced upwards of $5,000 in
respect thereto; that "Asheville bond account, face value
$2,500," with like bonds owned by the *Chippewa Valley*
*Bank,* were in suit in North Carolina; that the court, upon
application for directions as to the course the receiver should
pursue in reference thereto, had declined to permit him to
expend trust funds in the matter; that substantially $1,000

had been advanced in the litigation by the bondholders interested, and that such amount would have to be paid before any sum realized out of the litigation or upon the bonds could be made available for the purchaser at the sale. Further notice was given that all accounts noted in the schedule as assigned or hypothecated would be sold subject to the rights of the assignees or those to whom the hypothecations had been made. Mr. Thomas bid off the accounts for $53, subject to the conditions indicated. After the sale a report of the same was made to the court; stating particularly the circumstances thereof, including the notice given as regards the Asheville bond account. Report was further made that the purchaser desired not to take the incumbered accounts, but to have them transferred directly to the parties holding the incumbrances. An order was prayed for confirming the sale, and for authority to transfer the accounts in the manner indicated. An order to that effect was thereupon entered.

The disposition of the account against Rust, *Thompson,* and Shaw, of $524.26, will be considered in the next appeal. Suffice it to say here that there is nothing in respect thereto which materially affects the merits of this appeal.

We have studied the foregoing history in vain for a well-grounded suspicion that Rust converted $3,500, or any other amount of receivership bonds to his own use, fraudulently or otherwise, or that the bonds that came to his hands could have been of any value to the trust fund, or for any definite indication that more than $2,500 of the bonds ever belonged to such fund. We cannot set aside the positive testimony of unimpeached witnesses, and find contrary thereto upon conjecture. The material parts of the findings, 175 to 181 inclusive, upon which the judgment is based, as regards the Asheville bonds, cannot be sustained.

Finding 175, to the effect that the insolvent held $3,500 of bonds at the time of Rust's appointment as receiver, is contrary to the plain evidence that $1,000 thereof were set aside

by the proprietor company in connection with the electric company, representing all parties interested in the bonds, for a particular purpose, and that such $1,000 did not thereafter come to the possession of the insolvent or its receiver. It seems that the position taken by Mr. Walmsley,—that the Eau Claire bondholders having contributed the money necessary to take the place of the bonds, they thereby became the owners thereof, inasmuch as the bondholders in the whole, subject to the rights of the proprietor company, owned the escrow,—is not without force. How the conclusion was reached, recorded in the 175th finding, that the electric company received $14,500 of the bonds on construction account, instead of $13,500, we cannot discover, since the evidence shows, as before indicated, that it received for some purpose the entire $17,000 of bonds. That it was a mere conduit, however, for the transmission of $1,000 of the bonds to Cobb & Merriman, all the remaining bonds to be in effect a lien thereon, the same as it was a conduit for the transmission of $2,500 of bonds to Mr. Lyman, which the court found, ultimately, belonged $1,500 to him and $1,000 to Barnard, seems plain. The proof is just as clear that it was the owner of the $2,500 in bonds as that it was the owner of the $1,000. We venture to say that there can be no reasonable doubt on that question.

Finding 176, to the effect that $1,000 of the bonds were sent to Asheville for use in purchasing the real estate of Lyman shortly before the receivership commenced, must be seen from what has been said, to be clearly unsupported. Those bonds were never out of Asheville till long after the receiver was appointed, if at all.

Finding 178, to the effect that the receiver never had nor asked for judicial direction as to the Asheville matter, must be wrong, because the direct evidence, and substantially all evidentiary circumstances as well, are to the contrary. Mr. Frawley, with all the directness, clearness, and fairness, so

far as appears from the record, that could be expected of one
called upon to give in detail the history of a transaction many
years after its occurrence, testified, in effect, that shortly
after Rust was appointed receiver he, Frawley, prepared a
petition for such receiver to present to the court for the pur-
pose of obtaining judicial advice in such matter, setting forth
therein the whole situation, that such petition was presented
to the court, permission being asked therein for the receiver
to participate in such matter at the expense of the trust fund,
and that such permission was refused. No one testified to the
contrary. Mr. Walmsley testified that Mr. Rust informed
him that such was the attitude of the court. Mr. Rust's let-
ters to Walmsley, while the latter was at Asheville, written
in 1894, indicate the same, and further that the receiver ex-
pected, if he realized anything net out of the Asheville mat-
ter, to account therefor. *Mr. Thompson,* who, as agent for
the *Chippewa Valley Bank,* disbursed most of the money
used in the endeavors to realize upon the Asheville property,
testified that he dealt with Mr. Rust, personally, from first to
last, understanding that the court would not permit the trust
funds to be used. None were used at any time, except the
$524.26. Rust's personal participation in the matter was
brought particularly to the attention of the court, with the
reasons therefor, in the petition presented for confirmation of
the sale of the bond and other accounts to Thomas, and then
received judicial sanction. The testimony is undisputed that
the circuit judge was fully conversant with Rust's conduct in
respect to the bonds when that order was entered. Other cir-
cumstances of a significant character might be mentioned, in
harmony with those stated. The only one on the other side
is the feature that the written petition which Mr. Frawley
testified was presented to the court in May, 1893, asking for
permission for the receiver to participate as such in the Ashe-
ville matters, was not on file or produced. Give it all the sig-
nificance it will reasonably bear, and it comes far short, under

the rules governing the subject, of being sufficient to warrant this court in finding that Mr. Frawley, and the other witnesses as well, all testified falsely, and that the circuit judge gave his judicial sanction to a statement of facts that was untrue.

Finding 179, as to Rust's dealing with the Asheville bonds in a capacity adverse to the trust, cannot be sustained for the reasons before indicated. It is wrong as to his having failed to disclose the ownership of the $1,000 of bonds designed to be used in paying Mr. Lyman for the land upon which the electric plant at Asheville was situated, and representing to the court that there were but $2,500 in receivership bonds, well knowing that the amount was $3,500. That is sufficiently indicated by what has been said. It is wrong as to his having wrongfully failed to disclose to the court receipt by him of $1,400 from sales of machinery taken from the Asheville plant. The finding is framed so as to indicate that Mr. Rust made a profit of $1,400 out of the Asheville matter and concealed the same from the court, when the facts in respect thereto, as we have stated, were these: Mr. Rust went into the matter in good faith after informing the court of the situation. He came out with a serious loss, even if matters were left where the circuit judge who passed his account left them. The other parts of finding 179, as to fraudulent or any conduct on the part of the receiver to the prejudice of his trust, we find not to be supported by the evidence.

The final conclusion of fact, No. 181, that the receiver fraudulently converted to his own use $3,500 of Asheville bonds of the value of $1,000, and the conclusion of law that his personal representatives, W. A. and *A. J. Rust* as executors of his last will and testament, are liable for the $1,000 and interest, is clearly wrong, as we have seen. In the circumstances the bonds were in at the time he was appointed receiver, they were of no value. The court displayed good

judgment in not allowing receivership money to be jeopardized by investing the same in the Asheville matter. If it had taken a different course and allowed Rust to burden the trust fund with a proportionate share of the expenses of trying to realize on the bonds, such fund would have been depleted, and the greater the amount of bonds owned by the trust the greater the depletion would have been. It does not appear that Rust at any time purposed making a profit to himself in this matter. He advanced his own money when the court would not permit him to use the trust funds. He was entitled, clearly, under the circumstances, to reimburse himself out of the avails of the Asheville property for the money so advanced, before accounting for any part of it to the trust fund. Aside from the $524.26 which will be considered later, his conduct respecting the bonds, from first to last, in any view we can take of the evidence, was without prejudice to respondents.

The circumstance that, before the proceedings were taken to obtain authority to sell the bonds with other worthless matters, the receiver requested his attorney to have the bond account transferred to him and that his wish was accomplished in the manner indicated, which is pressed upon our attention as quite conclusive evidence of fraud, and presumably greatly influenced the learned trial judge, seems, under the circumstances, to indicate to the contrary. Its influence upon the mind may be various, according to whether viewed through the coloring of a belief, more or less firmly fixed, that there was a fraudulent purpose ruling all the proceedings of the receiver and his attorneys, or viewed from the standpoint of judicial rules, the presumption of innocence being in the balance on the one side, and the searcher after truth looking for evidence of fraud outweighing such presumption and its supports. The bonds were necessarily to go into the hands of some one if the receivership matter was to be closed up. No person would take them and reimburse Rust for his outlay in trying to collect them. There was a faint hope that something

might yet be realized out of the pending litigation. How natural it was that Mr. Rust should desire to possess the bonds, and how appropriate it was that his desire should prevail if the rights of the creditors were in no wise prejudiced! The worthless securities, with other worthless matters, were sold at public vendue by order of the court in the ordinary way of disposing of such property preparatory to closing up a trust for creditors, whether in bankruptcy, in a receivership administration, or in an ordinary assignment for the benefit of creditors. At the sale the situation of the bonds was fairly stated and the sale fairly made. So far as appears there is no claim that can be seriously made, that the bonds were then of any considerable value. After the sale, with a full explanation to the court, it was confirmed, and the receiver, by permission of the purchaser, authorized to turn the bonds over to the party equitably interested therein, whose rights were protected at the sale. That such person was Mr. Rust, it seems the learned court must have understood. True, Mr. Rust in this way possessed himself of the bonds, but he did it, in effect, after they had passed by a fair sale to Mr. Thomas. If it were true that the learned circuit judge was induced to allow such course to be taken because he was deceived, the case might be different. But it seems clear that he must have understood the situation, as Mr. Frawley testified. We cannot look at the failure to call him as a witness, as it seems the learned trial court did. Counsel for respondents now argue with confidence, that since appellants were charged with fraud, it was up to them to call the circuit judge and use all means within their reach to exonerate themselves. We cannot think so. The fact that appellants were charged with fraud did not call upon them to disprove it. They rested their case, on the subject of the knowledge of the circuit judge, on the positive evidence of Mr. Frawley; and numerous circumstances corroborated the same, with substantially nothing to impeach it. To call in the former circuit judge

under the circumstances was not necessary from their stand-point, but was highly important from that of respondents. The latter's attitude indicates that it was deemed immaterial whether the judge acted understandingly or not. If the lat-ter, the evidence of Mr. Frawley was false or the judge was inexcusably inattentive to what was occurring almost under his eyes. If the former, so much the worse for the judge.

In reaching the foregoing conclusion we fully appreciate that a person, acting in a fiduciary capacity, whether he is a guardian, administrator, receiver, or other trustee, can at the best obtain but a voidable title by purchasing the subject of the trust of himself, whether he acts directly or indirectly in the matter. We are not disposed to look with any favor whatever upon any act which has the appearance of violating that salutary doctrine. *In re Taylor Orphan Asylum,* 36 Wis. 534; *Pittsburg M. Co. v. Spooner,* 74 Wis. 320, 42 N. W. 259; *Hutson v. Jenson,* 110 Wis. 26, 40, 85 N. W. 689; *Ludington v. Patton,* 111 Wis. 208, 239, 86 N. W. 571; *Heyl v. Goelz,* 97 Wis. 327, 72 N. W. 626; *McCrubb v. Bray,* 36 Wis. 333; *Melms v. Pabst B. Co.* 93 Wis. 153, 66 N. W. 518. However, it does not apply where the trustee has a legitimate interest of his own to protect and his course upon full explana-tion to the court has been approved. *Scholle v. Scholle,* 101 N. Y. 167, 4 N. E. 334. Nor does it prevent the trustee from purchasing from his vendee, there being no understanding in that regard prior to the sale. *Welch v. McGrath,* 59 Iowa, 519, 10 N. W. 810, 13 N. W. 638; *West v. Waddill,* 33 Ark. 575, 585.; 1 Perry, Trusts, § 195; 2 Woerner, Am. Law of Adm'n, 1086. Furthermore, where the trustee has a legiti-mate interest in the property as in this case, having in good faith and properly advanced money thereon before the sale, the rule is not so stringent as to permit the sale to stand and at the same time punish the purchaser by compelling him to pay for the property to the *cestuis que trustent* regardless of his equity. *Elliott v. Pool,* 59 N. C. (6 Jones Eq.) 42.

*Appeal No. 2.*

Appeal of the *Chippewa Valley Bank,* W. A. and *A. J. Rust,* executors, and *George T. Thompson.* Three distinct matters are involved. We will designate them, for convenience, a, b, and c.

a. The trial court's view as to this is indicated in subdivisions 175 to 183 inclusive, and 195 to 200 inclusive, as to facts, and 12 as to law, in the statement preceding this opinion. The general result, in addition to that stated in Appeal No. 1, is that the receiver, in collusion with the bank and *George T. Thompson,* its agent, used $524.26 for their own benefit in handling the Asheville matter, the receiver charging the same to himself, Shaw, and *Thompson* in the first place with the knowledge, consent, and connivance of his associate, *Thompson,* who was the bank's agent, all concerned knowing that the interests of the trust were not involved, and in the end by falsely representing the character of the account to the court, obtaining an order authorizing the asset to be charged off to expense or loss account.

The facts as to how the receiver came to deal with the Asheville matter personally, as heretofore determined, will be considered verities for the purposes of this appeal. We find nothing in the evidence warranting the finding of the court that there was a fraudulent conspiracy in respect to the matter. The bank had no connection with it except through *Mr. Thompson,* and he had no connection with it except as the bank's representative. There is no reason that we can perceive, according to the principles governing judicial investigations, why *Mr. Thompson's* positive evidence on this point should not be believed. It is corroborated by the circumstances in the case, and not impeached so far as we can discover. According thereto he did not deal with Mr. Rust as receiver in respect to the Asheville matter; he dealt with him personally, with the understanding that the court would not

permit trust funds to be invested, and that he was not a party to any such use in a representative capacity or otherwise. The circumstances substantially all corroborate that. As a general thing, all the money expended in the Asheville matter was advanced by the bank through *Mr. Thompson* and subsequently prorated between the bank, or himself as its representative, Mr. Shaw, and Mr. Rust, the latter being understood to represent five twenty-sevenths of the bonds.

The particulars of how the money in question came to be paid by Mr. Rust and charged as before indicated, in addition to what has been stated, appear to be these: The account covers the period from August 3, 1893, to July 30, 1895. Excepting the first charge of $25, and the last four charges aggregating $19.36 it consists of wages and expenses of W. E. Smith covering a period for some three months prior to July 5, 1894. He was the receiver's employee, looking after receivership matters in various parts of the country and otherwise assisting in the performance of the receiver's duties. He was especially familiar with the Asheville matter. He paid attention thereto to a considerable extent while the plant was being disorganized and the machinery disposed of, rendering his bills for wages and expenses to the receiver as his regular employer. Some money was advanced to him by *Mr. Thompson* as the agent of the bank, which was returned by Mr. Rust.

August 6, 1894, which was prior to the receipt by Mr. Rust of any money out of the Asheville matter, he separated the expense accounts rendered him by Mr. Smith into that pertaining to the Asheville matter from the balance, being $479.90, and charged the same in four items, with full explanation thereof, to himself, *Thompson,* and Rust. That, with the $25, and $19.36 aforesaid, likewise charged, makes the $524.26.

At the time of the aforesaid occurrences the receiver, as such, was interested in nearly all the Asheville bonds. He held $2,500 of them absolutely, and was the owner of the

$11,000 held by the bank and Mr. Shaw, subject to their claims thereon. The indebtedness to Shaw and the bank, secured by the collateral, was provable against the trust fund regardless of the security, as we shall hereafter see. Five twenty-sevenths of all that could be obtained out of the results of the foreclosure, over and above the expenditures in realizing, and the same proportion of all the sums collected out of the supposed personal liabilities of the officers and stockholders of the proprietor company at Asheville, after reimbursing Mr. Rust for his personal outlay, belonged in equity to the trust fund, and Rust so understood it. Suits were pending to enforce such liabilities, with hopes of success based on the advice of eminent counsel. Under all these circumstances the expenditure might well have been authorized by the court out of the trust fund. If, without authorization, under ordinary conditions, it had been charged to the receivership expense account subject to the approval or disapproval of the court when the matter should be brought to its attention, there would have been in the transaction no evidence of fraud, nor evidence, even, of bad judgment. The fact that these matters, which came to the receiver mixed up with others which were unquestionably chargeable to the expense account, were paid before he received any money from the Asheville matters, and were carefully separated from such other matters and spread upon the books as an asset, is inconsistent with the finding of fraud when correct legal principles are applied thereto. Unless the circumstances characterizing the subsequent turning of such asset into a liability are sufficient to warrant such finding, or, looking backward at all the circumstances shown by the record as they will appear at the end of our considerations, it shall appear that the finding of fraud is sustained, it cannot be. The fact, if it were a fact, that the receiver, when he made the expenditure, expected that he would ultimately make the same a charge against the trust funds, without reasonable ground to expect that it would

be balanced by money received into the fund or through his assuming personal responsibility in pursuing such matters, would not of itself necessarily indicate fraud. The idea of the law entertained by the learned trial court on this point, which doubtless was largely a controlling factor in reaching the conclusion attacked, cannot be approved, but we will speak of that at length later.

The circumstances characterizing the conversion of the asset into a liability are these: As before seen, on May 28, 1897, the preliminary report of the receiver, looking to a final closing-up of his trust, was verified, and a few days later it was placed on file. It showed a large amount of accounts receivable, most of which came to the receiver from the National Electric Company, which were of little or no value, but which it was necessary to dispose of in some way in order to close the trust. In addition, there was a class of accounts receivable created by the expenditure of moneys, sometimes under the direction or with the consent of the court and sometimes not, in the completion of contracts for the installation of electric machinery made by the electric company, which contracts were properly hypothecated by it before any trust for creditors was impressed thereon, and which contracts were unfinished at the time the receivership commenced, and the expenditure of money in other ways by the direction of the court or otherwise, in collecting hypothecated accounts,—and charging such expenditures to the holders of the collateral, but without any relations between the receiver and such holders rendering the latter liable to pay the same. Charges were so made, as it would appear in some cases, as a method of keeping account with the transactions, the amount being deemed a preferred claim upon any money that might be realized out of the collaterals, and in others because of doubt as to whether the sum was proper receivership expense, but in no case because of a request, express or implied, by the persons charged, to make the expenditure for them. One of such accounts was the $524.26.

It was necessary in order to close up the receivership to dispose of such accounts by making a sale thereof, or by collecting the same, or by charging the same to expense or loss and gain account. They were not collectible, nor was it proper to sell them for the reasons stated. They were either chargeable to the receiver or to his expense or loss and gain account. He went through the form of demanding payment of the apparent debtors, but payment was refused, as was evidently expected. The proceedings in that regard seem to have been taken, and not improperly, to create proof that the accounts did not represent legal liabilities though such in form. Thereafter, when the general situation was familiar to the court, a petition was prepared by the receiver's attorney, Mr. Frawley, verified by the former, and presented to the court, for an order authorizing the closing out of such accounts by treating the same as matters of receivership expense or loss. The number of such matters was quite large. The manner adopted in presenting the subject to the court was to describe several of them, six in all, including the one in question, and to ask for authority to charge the same off as expense or loss, and to treat all similar accounts in that way. The representation made in the petition as to the $524.26 was this:

"Prior to the appointment of said receiver as aforesaid, the National Electric Manufacturing Company had a contract to install certain electrical machinery at Asheville, North Carolina, and the same has been assigned to Messrs. *Thompson, Shaw, and Rust*, as collateral security for moneys loaned and advanced to said National Electric Manufacturing Company; in moving the machinery from Asheville, and minor details of said plant, the sum of $524.26 was expended necessarily."

In respect to the claims generally, this was said:

"None of the parties against whom said accounts exist, and to whom they are charged . . . received any benefit directly, but were incidentally and indirectly benefited, in that the expenditures enabled them to realize *some amount of their collateral;* but that the items of expense were small as com-

pared with each of the amounts evidenced by the contracts existing therefor, and at the time such expenses were so incurred it was believed *that some margin might be obtained,* and that, in addition to paying the indebtedness due to said several parties, *a surplus would be obtained to the estate.*"

"Said several parties insist that such items are not justly chargeable to them, but that each should be paid out of the surplus *that might or may be received upon the said several matters,* and that it was for the benefit of your petitioner's estate that each be so paid."

"Each of said claims should be adjusted and settled with said parties, so that the said individuals aforesaid be released from all liability, and that said items be by him charged up to expense or other suitable account."

An order was entered in accordance with the receiver's suggestion. Of course it was not true that an indebtedness on contract, growing out of the installation of the Asheville plant, was assigned to Rust, Shaw, and *Thompson* as collateral to a loan made by them before the receivership commenced. It was true that an indebtedness accrued on contract for such installation, and was covered into bonds secured upon the Asheville plant, and was then, in the main, so turned over to Shaw and the *Chippewa Valley Bank,* which *Mr. Thompson* represented. It was true that by reason of the facts heretofore stated, at the time the expenditures were made, Rust was united in interest with Mr. Shaw and *Mr. Thompson* as the representative of the bank, to the extent of his personal expenditures to recover upon the bonds. He had a legitimate interest in the bonds under the circumstances. He was to that extent in substantially the same position as *Thompson* and Shaw, and they were in substantially the same situation as they would have been had they held as collateral the original contract liability for the installation of the Asheville plant instead of the bonds which were substituted therefor some two years before the receivership commenced. The $524.26 was expended necessarily for the purpose stated in the petition; that is, as regards realizing on the indebtedness

created by the original Asheville contract in its form as an indebtedness upon the Asheville bonds; not necessarily in the sense that it was necessary to take the money from the trust fund—and that is not the fair interpretation of the language of the petition when considered in all its parts—but necessary in the sense of what was required to conserve the interests of all who were concerned in the indebtedness held by the parties as collateral. In effect, when the expenditure was made, the three parties, as regards the trust, had a status the same as that of the other persons named in the petition, and as described. The person who drew the petition was negligent. That conclusion we cannot escape. But we see no good reason thus far, under all the circumstances, to hold that he or the receiver were guilty of any greater fault, or that the *Chippewa Valley Bank* or its agent, *Thompson,* was concerned in the matter at all.

The record, at and about the date of the order, showed that the Asheville indebtedness was on bonds, not on contract. Mr. Frawley was not so stupid as to intentionally present three petitions to the court substantially at the same time, followed by a carefully drawn report of a sale a few days thereafter, speaking of the Asheville indebtedness as being on bonds in three of the presentations, and bringing the matter so sharply before the court that it could not well have failed to be appreciated, and in the other speaking of such indebtedness as existing on contract. Nor can we believe the court was so blind as to sign two orders on the same day, and probably at the same time, one mentioning the Asheville indebtedness as existing on bonds and the other on contract at the time the receivership commenced, appreciating that indebtedness in the one was the indebtedness named in the other, and a few days afterwards to sign another order inconsistent with those two. The burden of the petition related to expenditures in respect to hypothecated choses in action of a particular kind,—indebtedness upon contract. That was

the subject undoubtedly in the mind of the person drafting it. The $524.26, except for one circumstance, was governed substantially by the same principles as the others spoken of in the petition. That they should all have been put in the same class is at least excusable. That the one should have been so misdescribed, while indicative of negligence, is not to be wondered at when we see in the deliberate finding of the conscientious court, in dealing with a multitude of matters, mistakes quite as bad. True, if the receiver had kept from the knowledge of his judicial director the true amount of the bonds, as was here found, but with which we cannot agree, and made a profit of $1,400 in dealing therewith, as also found but for which we find no support, the matter would look different.

This language in the petition seems to have had much influence with the trial court in finding the element of fraud:

"Said several parties insist that such items are not justly chargeable to them, but that each should be paid out of the surplus that might or may be received upon the said several matters, and that it was for the benefit of your petitioner's estate that each be so paid."

We are asked to believe that the attorney who drew the petition, and the receiver who verified it, intended by that language to convey the idea that the parties against whom the accounts appeared claimed that the same should be paid out of the surplus to be yet received out of the hypothecated matters, notwithstanding the petition informed the court that the "said several matters" had been entirely closed out or were worthless. The indications are that the learned trial court gave weight to that idea to a considerable degree. We cannot do so. The meaning of the language is obscure; but with its context, when we apply the whole to the subject under consideration, it seems clear that the idea intended to be expressed is that, when the expenditure was made it was believed a surplus would be realized for the trust fund

and that the parties interested thought they were not justly chargeable and that the items should be paid as originally intended, or, if there were no surplus, that they should take the proper course in such cases, and that in the judgment of the receiver such idea should prevail. If we can get any sense out of the language it is not that which is pressed upon our attention. The idea that the petitioner intended the court to understand that it was for the interests of the estate that the items should be paid out of the surplus that had been realized or might be realized from the collateral, which the petition showed was in fact of little value at any time, and at the time of making the petition of no value at all, does not strike us as even possible.

Our conclusion is that the court may probably have been misled as to the character of the account in question, and that otherwise he probably would have denied the petition as to the matter in question, compelling the receiver to charge himself therewith and take his chances of reimbursement from the source he was dependent upon as to other moneys he had advanced in the Asheville matter; that his account should be surcharged to that extent; but that *Thompson* and the bank are in no way liable; that looking at this matter by itself, relief should not go further; that the evidence, so far, will not sustain the finding of fraud; and that, unless a general view of the whole case will change the situation, neither the bank nor *Mr. Thompson* is liable.

The idea advanced by counsel—that, the charge against Rust and his associates being that they fraudulently appropriated receivership money, the cause of action must fall with failure to establish fraud—cannot prevail. The real cause of action is to administer all property for the benefit of the creditors of the National Electric Company properly applicable thereto. The element of fraud has no significance except to raise a trust by construction. Constructive fraud is as effective as actual fraud. Again, a court of equity having

jurisdiction of the whole matter upon a sufficient complaint made in good faith, if the proof fails to show a liability to account on the particular grounds alleged, but does show that the party charged has money or property that should be accounted for to the trust fund, it will not send the parties out of court or let the defendant go free, but will enforce his liability by the proper order or judgment. *Gates v. Paul,* 117 Wis. 170, 94 N. W. 55.

The further idea advanced by appellants' counsel, that by the death of Mr. Rust the action as to him abated, cannot prevail. The claim against the personal representatives, in any view of it, is not a mere action for damages disassociated from property. In one sense it is for the recovery of personal property or for damages to personal estate, and survivable under sec. 4253, Stats. 1898. *John V. Farwell Co. v. Wolf,* 96 Wis. 10, 70 N. W. 289, 71 N. W. 109; *Lane v. Frawley,* 102 Wis. 373, 78 N. W. 593. In the proper aspect the cause of action is for an accounting, which survives at common law and is enforcible against the personal representative. *Whittemore v. Hamilton,* 51 Conn. 153; *Wilby v. Phinney,* 15 Mass. 116; *Hazard v. Durant,* 19 Fed. 471; *Reyburn v. Mitchell,* 106 Mo. 365, 16 S. W. 592; *Hook v. Dyer,* 47 Mo. 214; Hill, Trustees, *303. The general rule is that the maxim, *Actio personalis moritur cum persona* (A personal action dies with the person), where property is involved, does not apply in cases of equitable cognizance, and that remedies in that regard which would exist against a decedent if he were living, exist against his personal representatives. *Schley v. Dixon,* 24 Ga. 273; *Reed v. Copeland,* 50 Conn. 488; 3 Redfield, Wills, ch. 10, § 40.

Many of such actions are covered by our statute, sec. 4253, Stats. 1898, which is supplementary to common-law survivorships. It may safely be stated as a rule without exception, that whenever an action would lie against a trustee if he were living to account for the subject of the trust, his personal rep-

resentatives may be held if they have come into the posses-
sion of the trust fund or property out of which it could be
satisfied if the trustee were in being.

b. The next matter involved in this appeal is $184.97. The
facts, as found by the court, are contained in findings 191 to
192 of the statement, and are to this effect: Prior to the com-
mencement of the receivership, when it was competent to do
so, the National Electric Company assigned to the *Chippewa
Valley Bank* as collateral security, an indebtedness to it of
$9,000, and an account against the National Electric Manu-
facturing & Construction Company of New York of some
$6,000, and during the receivership, with knowledge that
nothing could be collected thereon which would come into the
trust fund, the receiver expended $184.97 in attempting to
collect the same. On the theory running all through the case,
that expenditure under such circumstances must necessarily
be fraudulent, and that the persons holding the collateral,
knowing of such expenditure and consenting thereto by not
objecting, were necessarily guilty participants, the conclu-
sion was reached that the receiver, the *Chippewa Valley
Bank,* and *Mr. Thompson,* were liable jointly.

In this matter the learned trial court made as grave a mis-
take as to the facts as was made in the petition we have just
reviewed; and also seriously erred in applying the law to the
facts as found.

The undisputed evidence as to the expenditure in question
is to this effect: The account against the construction com-
pany was validly assigned to the *Chippewa Valley Bank* as
collateral. While efforts were being made to collect the ac-
count, in the right of the debtor, whose property was in the
hands of a receiver, the latter became a party to the proceed-
ings against the National Electric Company by filing a claim
therein for $29,746.78. It became necessary to obtain evi-
dence in New York, in the form of depositions, to be used
in resisting such claim. The expenditure in question was

made for that purpose. The depositions were duly filed. A trial was had in respect to the claim, the *Chippewa Valley Bank,* as an interested party, taking part in the proceedings, which were all conducted, however, upon the part of the receiver, by his attorney, Mr. Frawley. The depositions so filed were used on the trial, and the result was a decision and judgment in favor of Mr. Rust for costs. The record shows the filing of the claim December 18, 1893, seasonable filing of objections by the receiver, subsequent entry of an order for formal pleadings, filing of an answer by the receiver in accordance therewith, it being entitled in the receivership action and signed by T. F. Frawley, attorney for the defendant and receiver, a reply thereto in due form, by the claimant, proceedings for bringing the issues thus formed to a trial, a trial before the court in March, 1895, and a judgment on the 12th day of such month, deciding the issues and decreeing judgment as before stated. Evidence was given, explaining the items, making the $184.97, the same being $157.73 for services of Countryman & Deboys, and $27.24 fees of Seamore & Hopkins; and that when the matter of paying the same was brought to the attention of the receiver, because of the interests of the *Chippewa Valley Bank* in the matter he declined to pay the charges, and paid them only after referring the matter to his attorney.

It needs no argument to show that the outlay was proper receivership expenses. We cannot believe that the learned trial court considerately found otherwise. It could not well be understandingly found that expense of resisting a claim against the trust fund under the eye of the court, expense that he could not have avoided without abuse of trust, was fraudulently or wrongfully paid out of the trust fund because the *Chippewa Valley Bank* was also interested in the matter. This matter, we apprehend, was confused in the judicial mind, by the dealings with a multitude of things in the final closing-up of this case, in another class of expendi-

tures, receiving much attention during the trial, and neces-
sarily so, with the court's view of the matter, in framing the
findings.

But if the facts were that the expenditure under consid-
eration was made to enforce the collateral with knowledge
that no surplus would come out of the same to be added to
the trust fund, it would by no means follow that it was wrong-
ful. We do not understand the law to be that a receiver must
abandon all assets belonging to the trust because he only holds
a right thereto subject to the claim of a creditor so large as
to exhaust it. Such a rule would lead to the greatest con-
fusion in the administration of trusts of this character. If a
receiver must entirely abandon a chose in action because it
is incumbered by a mortgage, so to speak, to secure an in-
debtedness of the insolvent, he must do the same with any
other kind of property. If a horse or any other tangible thing
comes into his possession or control, subject to such an in-
cumbrance, he cannot take any proceedings at the expense of
the trust fund to the end that the full value of the security
may be realized, without being liable to be charged with a
fraudulent expenditure of trust funds. The mere statement
of the proposition, and its unavoidable consequences, shows
its utter absurdity.

The trial court reached the conclusion we must condemn,
evidently upon the theory that only the amount of a secured
claim against a trust estate in the hands of a receiver, less
the value of the security, concerns the receiver. Even that
would not necessarily condemn as fraudulent, or wrongful,
expenditure from the trust fund in the interest of securing
as great a reduction of the secured debt by the collateral as
possible; because the holder thereof is not bound to have his
collateral valued and applied upon his claim, nor is he bound
to exhaust his collateral and confine his claim against the
trust fund to the balance. True, there is some conflict in the
authorities on this, but the better rule, it seems, and the only

one that can be enforced without trespassing upon the constitutional right of property, is that every creditor of an insolvent, whose property is in the hands of a court receiver for the benefit of creditors, has an equal right with every other creditor in any general distribution that may be made of the trust fund. His right in that regard becomes vested when the creditor relation is established. Every contract right includes, by implication, the law for its enforcement, existing at the time of its inception. *Peninsular L. & C. Works v. Union O. & P. Co.* 100 Wis. 488, 76 N. W. 359; *Bronson v. Kinzie,* 1 How. 311. A creditor, having a vested right to the property of his debtor generally for the collection of his claim, does not lose or impair it by taking security. Having such right, he does not lose or impair it by the circumstance that a receiver stands in the place of his debtor. He may prove his claim to the full amount and share with all other creditors on the basis of the face thereof in every general distribution of trust funds, till such time as, with the dividends received and the proceeds of his security, he shall have received full payment; and if there is then anything left of his security, it will belong to the trust fund. He is entitled to all the advantages of his position as a general creditor, and all the advantages accruing out of holding security, because such was the contract with the debtor.

The general equitable doctrine stated in *Speiser v. Merchants' Exch. Bank,* 110 Wis. 506, 86 N. W. 243, does not militate against what has been said; nor does the doctrine, rightly understood, that when a creditor has two funds of his debtor available for the payment of his claim, while to a general creditor only one of them is available, equity will compel resort by the first creditor in the first instance to the fund in which his right is exclusive,—since such principle is not applicable to situations that will prejudicially affect his contract rights. This court has spoken most decidedly upon that subject. *In re Meyer,* 78 Wis. 615, 623, 48 N. W. 55. A

misapprehension of such principle and a failure to take note that the restriction upon the right of secured creditors in bankruptcy proceedings, as to participating with general creditors in the distribution of the trust fund, is statutory, has led to most of the decisions to the effect that, in the settlement of the affairs of an insolvent through proceedings under a creditors' bill, secured creditors can prove their entire claims and share in the distribution of the fund on that basis only upon surrendering the security. The general rule is to the contrary, as the following authorities will amply show: *In re Meyer, supra; People v. Remington,* 121 N. Y. 328, 24 N. E. 793; *Allen v. Danielson,* 15 R. I. 480, 8 Atl. 705; *West v. Bank of Rutland,* 19 Vt. 403; *Findlay v. Hosmer,* 2 Conn. 350; *Logan v. Anderson,* 18 B. Mon. 114; *Citizens' Bank v. Patterson,* 78 Ky. 291; *Miller's Appeal,* 35 Pa. St. 481; *Patten's Appeal,* 45 Pa. St. 151; *Brough's Estate,* 71 Pa. St. 460; *Smith's Appeal,* 74 Pa. St. 191; *Graeff's Appeal,* 79 Pa. St. 148; *Jamison's Estate,* 163 Pa. St. 143, 29 Atl. 1001; *Moses v. Ranlet,* 2 N. H. 488; *Drew v. McDaniel,* 60 N. H. 481; *Bank Comm'rs v. Security T. Co.* 70 N. H. 536, 49 Atl. 113; *In re Bates,* 118 Ill. 524, 9 N. E. 257; *Furness v. Union Nat. Bank,* 147 Ill. 570, 573, 35 N. E. 624; *First Nat. Bank v. Comm. Nat. Bank,* 151 Ill. 308, 37 N. E. 1019; *Levy v. Chicago Nat. Bank,* 158 Ill. 88, 42 N. E. 129; *Friedlander v. Fenton,* 180 Ill. 312, 54 N. E. 329; *Lewis v. United States,* 92 U. S. 618; *Merrill v. Nat. Bank,* 173 U. S. 131, 19 Sup. Ct. 360; *Aldrich v. Chemical Nat. Bank,* 176 U. S. 619, 20 Sup. Ct. 498; *In re Crystal Springs Bottling Co.* 96 Fed. 945.

An examination of the authorities cited will show plainly that the few exceptions to the rule here adopted grew out of either a misconception of the proper application to be made of the equitable rule as to the rights of parties in a fund where two have a legal right thereto as security and one has also another security; or the adoption of the bankruptcy rule,

either by special statute, or in failing in the beginning to comprehend that the latter rule is wholly statutory. As to the equitable rule mentioned, the Illinois court said in *Friedlander v. Fenton, supra:* "It will not be enforced where it operates to the prejudice of the party holding the double interest."

The Rhode Island court at first, through mistake, adopted the bankruptcy rule, but in *Allen v. Danielson, supra,* acknowledged the error and held that in a general trust for creditors their rights, regardless of security held by them, are measured by their respective claims at the time of the creation of the trust, and that so long as the relation of debtor and creditor exists they are entitled to participate on the basis of the face of their claims in the distribution of the fund. The rule was stated in *People v. Remington, supra,* after a full review of the authorities, thus:

"The creditor is entitled to prove against the estate for what is due to him, and to receive a dividend upon that amount. If the collateral securities are more than sufficient to satisfy any deficiency in the payment of the debt from the dividends, the personal representatives may redeem them for the benefit of the estate."

In *Merrill v. Nat. Bank, supra,* in a masterly opinion by Mr. Justice FIELD, in which the leading authorities in this country and England were reviewed, the rule thus stated was adopted. It was said to be the chancery rule, and that the other rule was wholly a creation of bankruptcy legislation. The prevailing rule in the absence of such regulations, or some statute, was stated thus:

"The secured creditor is a creditor to the full amount due him, when the insolvency is declared, just as much as the unsecured creditor is, and cannot be subjected to a different rule. And as the basis on which all creditors are to draw dividends is the amount of their claims at the time of the declaration of insolvency, it necessarily results, for the purpose of fixing that basis, that it is immaterial what collateral any par-

ticular creditor may have. The secured creditor cannot be charged with the estimated value of the collateral, or be compelled to exhaust it before enforcing his direct remedies against the debtor, or to surrender it as a condition thereto, though the receiver may redeem or be subrogated as circumstances may require."

"When secured creditors have received payment in full, their right to dividends, and their right to retain their securities cease, but collections therefrom are not otherwise material. Insolvency gives unsecured creditors no greater rights than they had before, though through redemption or subrogation or the realization of a surplus they may be benefited."

We must adopt that rule. It does not appear that this court has spoken very decidedly on the subject. The principle involved, though, was fully recognized in *In re Meyer, supra,—In re Bates* and other cases here cited being referred to.

c. The court's view of the evidence as to the third matter in this appeal is contained in subdivision 188 of the findings and 15 of the law appearing in the statement. In short it is this: The receiver, the *Chippewa Valley Bank,* and *George T. Thompson,* its managing. agent, fraudulently converted to their own use $161.71, because the receiver, with knowledge of such agent, expended that sum in the collection of a collateral claim validly hypothecated by the electric company to such bank as collateral to the former's indebtedness thereto, all parties knowing at the time of such expenditure that no surplus could be obtained out of the collection for general creditors. The statement of the matter, in view of what has been said, shows without argument that the court's conclusion was reached by a misapprehension of the law. The disbursement appears to have been ordinary receivership expense,— expense of a kind that would be expected, under ordinary conditions, to be allowed by the court in passing his receiver's account, as a matter of course. The collateral claim exceeded to some extent—small, it is true—the principal debt. The

'claim was large, however, being $1,800. It was against a .perfectly responsible party, and was collectible to the full amount, as the receiver was bound to regard it, in advance, .at least, of a full investigation and reasonable efforts being made by some one to collect it. The holder of the collateral had a right to throw the burden thereof onto the receiver .by refusing to incur any expense in the matter and looking :wholly to the trust fund, though still retaining the security.

The consideration for the collateral claim was electrical machinery. Complaints with reference thereto needed care-.ful attention by some one familiar therewith in order to en-.able the parties interested in the collection of the claim to .have any standing in regard thereto. In such circumstances the receiver sent his regular agent to look after the matter, and his wages and expenses constitute the expenditure in -question. Had the receiver not done as he did, even without any order of the court to protect him, he might have been -chargeable with breach of duty. Nevertheless he took the .precaution to charge the expenses to the holder of the col-lateral and leave it that way till authorized by the court to -charge the same to expense account. The charge to the holder .of the collateral was not authorized by it. Neither the bank nor *Mr. Thompson,* so far as the evidence goes, when correct rules are applied thereto, had any connection with the mat-.ter rendering them or either of them liable.

## Appeal No. 3.

Appeal of *Fitch Gilbert, John S. Owen,* the personal rep-resentatives of R. E. Rust, and those of D. R. Moon. This involves the question of whether appellants are liable for $2,642.24 expended in completing an assigned contract, and $187.90 for expenses incurred in endeavors to collect the same and an unincumbered claim against the debtor. The view taken of the matter by the trial court will be found in :subdivisions 157 to 173 as to facts, and 11 as to law in the

statement. In short, the undisputed material facts are these:. At the time the receivership commenced the electric company was in default on a contract to install an electrical plant for· the Bucyrus Steam Shovel & Dredge Company, which it agreed to complete by December 15, 1892, and was under· bond, with sureties, to do so or suffer a penalty of $50 per· day, the sureties being R. E. Rust, *George T. Thompson,* and C. A. Daigh. The direct primary benefits to flow to the electric company were held by *George T. Thompson, John S.. Owen, Fitch Gilbert,* and D. R. Moon, to secure them against loss by reason of their having indorsed a note of the electric· company to the National Exchange Bank of Milwaukee for $12,000. The amount of the contract was about $4,750, and. there had been expended thereon at the time the receivership commenced nearly $1,000 in excess thereof. Independently of such contract the Bucyrus Company owned the electric company $1,195.34. So far as appears, during the period covered by the expenditure in question, the contract claim. and the other claim mentioned were collectible contingent upon the. completion of such contract. The material for such completion, largely in a manufactured state, designed by the· electric company for use in that regard, was on hand with the receiver. Substantially the only thing required, as was supposed, was a generator rated at $2,500. Mr. Rust, after his appointment, was importuned to complete the contract, by the holders of the collateral claim, they offering to become· responsible for any expenditure in that regard for which they would be justly liable. The situation in regard to the contract was thereupon presented to the court by the receiver for· advice, the value of the generator being placed at $1,500 and no statement being made that he was interested by reason of· his position as surety for the completion of the contract. The· result was that he was advised to ship the generator, to collect what was due upon the contract for the benefit of the· holders of the collateral, except $1,500, and to retain that sub--

ject to the further order of the court. The generator was thereupon shipped, and thereafter, in efforts to satisfy the Bucyrus Company in respect to the plant, so that it would be willing to pay the amount due upon the contract, prior to November 16, 1893, other expenses were incurred, which, with the value of the generator, aggregated $2,642.24.

There came to the receiver from the insolvent a number of unfinished contracts and partly constructed electrical appliances, and some manufacturer's stock. He was ordered to continue the manufacturing business for a time for the purpose of enabling him to convert the partly manufactured electrical appliances and the manufacturer's stock on hand into money to the best advantage, and, impliedly, to finish outstanding contracts where the interests of the trust required it.

Prior to February 7, 1894, the Bucyrus contract was completed. There was then due from such company all that was collectible out of an expenditure of $5,710.09 made by the electric company, and $2,646.24 made by the receiver, and an indebtedness otherwise of $1,195.34, all of which it refused to pay, rendering judicial proceedings necessary to collect the same. This situation was brought to the attention of the court and authority asked for the receiver to proceed to collect the entire indebtedness, the claim of the holders of the collateral to be transferred therefrom to the proceeds thereof, they consenting. Authority was so granted. Appropriate proceedings were then taken by the receiver through his attorney, to collect all of said indebtedness, a lien being filed in that regard. Such proceedings were, with due discretion, so far as appears, pursued with effect so far as possible, and at the expense of the trust; but the claim proved entirely uncollectible.

When the generator was used, as aforesaid, it was charged to *Thompson, Owen,* and Moon, and was one of the matters charged off to loss and gain account pursuant to the order of June 2, 1897, aforesaid. The court, in the petition upon

which the order was granted, was truthfully informed of the facts as to the charge, showing that it did not constitute a legal or equitable liability against the apparent debors.

We are unable to discover in this history anything to warrant an inference of fraud or wrongdoing of any kind, when correct rules of law are applied thereto. The court found that all parties knew that nothing could be realized out of the Bucyrus indebtedness for general creditors when the expenditures were made to complete the contract and to make the collection. That seems highly inconsistent with the undisputed facts, that a large proportion of the indebtedness at the start belonged absolutely to the trust property, and that in the end about one half of all that could be collected under any circumstances so belonged, and that there was no evidence that the debtor would not or could not pay because of insolvency.

The court found, in effect, that the proceedings whereby the receiver took upon himself the burden of collecting all of the Bucyrus indebtedness in one proceeding was a scheme to which *Gilbert, Thompson, Owen,* and Moon were parties, in order to make the expense of collecting the collateral claim a burden upon the trust fund. The evidence seems plain that the course adopted was the only one to avoid two suits; one on the collateral, in which the trust was indirectly interested to a large amount and indirectly interested otherwise, and one on the claim for $1,195.34. The only orderly way was the one resorted to. The court would doubtless have directed proceedings to be so taken upon being fully advised, even against the protest of the owners of the collateral, so long as their rights were preserved.

The trial court viewed the situation as if any expenditure by the receiver to collect the collateral was necessarily fraudulent, both as to the receiver and the other parties interested in and consenting thereto. That was error, as we have seen.

The court further assumed that the expenditure of any

sum in the completion of the contract, in excess of that in-
volved in the generator, was unwarranted, and under the cir-
cumstances fraudulent as to all concerned.   That was clearly
a misconception.   The general order under which the receiver
operated must have contemplated that he was to complete
unfinished contracts where, in his judgment, the interests
of the trust would best be subserved thereby.    That sug-
gested reasonably, in some cases, a moderate outlay without
expectation of any direct addition thereby to the trust fund.
In other cases it reasonably suggested the propriety of an ex-
penditure to complete a contract, the outlay being treated as
a proper claim upon the proceeds to be collected.   Both of
these situations were presented to the receiver for action, and
his decision is not to be condemned merely because in the end
the outlay led to a loss, especially when his action was ap-
proved by his judicial director and was as directed.   We must
test it by what might have been deemed reasonable at the time
the expenditure was made, resolving fair doubts in favor of
the receiver rather than against him.   He was called upon
to deal with many perplexing business propositions in getting
something like order out of the confusion of things that came
to his hands, and to determine whether there was any real
substance therein for general creditors.

A receiver in the position occupied by Mr. Rust is by no
means expected to abandon as a matter of course unfinished
contracts.   While he is not bound to finish them, or warranted
in doing so where property of the trust fund would not be
otherwise jeopardized, he is bound to investigate them, to
pass judgment upon what is for the best interests of his trust
under all the circumstances, or to act upon such judgment
and take the chances of judicial approval, or take the advice
of his principal in advance in respect thereto, and follow it.
Wait, Insolv. Corp. § 214; Gluck & Becker, Receivers, 316;
Smith, Receiverships, § 35; Beach, Receivers, § 378; *Flor-
ence G. E. L. & P. Co. v. Hanby,* 101 Ala. 15, 13 South. 343;

*Blake Crusher Co. v. New Haven,* 46 Conn. 473; *Cooke v. Orange,* 48 Conn. 409; *Sager Mfg. Co. v. Smith,* 60 N. Y. Supp. 849. Ordinarily a receiver would take serious risks in completing a contract of the insolvent at the expense of the trust where no property was to be saved thereby, because the court, as will be seen by the authorities, in such cases is not bound to approve even if it appears that such completion was for the best interests of the trust. But in case of a manufacturing industry like the one in question, where a general order is made for its temporary continuance for the very purpose, among other things, of finishing uncompleted contracts, where the interests of the trust seem to require it, it is expected that the details of executing the order will be passed upon by the receiver, other than in exceptional cases. Mere mistakes of judgment as to such details will not work to his loss, much less subject him to the charge of fraud, and his attorneys and all parties concerned with him as well.

Here there was not only an implied direction to complete unfinished contracts where it seemed for the interests of the trust to do so, which would have authorized finishing a contract under some circumstances where no property was to be saved thereby, but it particularly applied to cases where property belonging to the trust was incumbered, as in the case in hand, and the completion of the contract was necessary to save such property. In such cases a receiver might be guilty of a serious breach of trust by failing to give attention to the matter, especially in a situation where, as in this case, there was a special order to expend money to the amount of $1,500, which, of course, would necessarily be lost unless further expenditures were made so far as necessary to complete the contract and render the $1,500 collectible. In this Bucyrus matter, in 1893, when the expenditure was made, the receiver had a right to believe that the whole amount was collectible and that at the closing of his trust there would be a considerable dividend for creditors, and that the entire indebtedness

secured by the collateral might be represented in the distribution regardless of the value of the security, and the loss of the collateral be wholly attributable to him. He knew, if he was correctly advised as to this, and it seems that he was, that the holders of the collateral were not compelled to look to it primarily for their pay, or to do anything in regard thereto, except not to allow the same to be lost through their negligence.

We see no indication of fraud or negligence in the completion of the contract. Putting the generator in at $1,500 that had been rated at $2,500 has no significance. We speak of that particularly because counsel refer to it as a strong indication of fraud, and probably the trial court so viewed the matter. It is quite easy to understand how an electric generator, with the usual guaranty that goes with one, when put out by a going concern might be rated at $2,500 and be worth that, and the same machine, in the bankrupt stock of a concern not expected to resume operations,—an article of a sort that no other manufacturer would care to supply extras for or keep in repair, or would otherwise be interested in except to condemn it,—might not be worth $1,500. It is more than probable that the machine in question was not salable at that sum for cash when the petition was made upon which the order was entered, authorizing it to be used in completing the Bucyrus contract. Many other circumstances pointed to as indicating fraud might be referred to with like effect. Suffice it to say that there are none which we can discover, when properly analyzed and correct principles of law applied thereto, that change the situation above indicated.

### Appeal No. 4.

Appeal of *Fitch Gilbert, James T. Barber,* and the personal representatives of R. E. Rust. For the trial court's history of this matter, in the main, we refer to subdivisions 187, 198, and 199 as to the facts and 16 as to the law, in our

statement. The further circumstances found by the court or appearing in evidence are contained in the following summary:

February 13, 1893, *Gilbert, Barber,* and Rust indorsed a note of $2,800 for the electric company, taking as security the liability of the St. Louis Light, Heat & Power Company for $3,000 upon a contract for the installation of some electrical machinery. Such liability matured only upon the full completion of the contract by the machinery being put in successful operation. The indorsers were compelled to pay the note. When the receiver was appointed the expense of installing the machinery, as was supposed, had all been incurred, except that of putting the same in successful operation. At the request of the purchaser the receiver sent an electrician to demonstrate the competency of the machinery to satisfy the terms of the contract. Before his efforts in that regard were completed the armature of the electrical machine burned out. The purchaser was a responsible party, and the collection of the $3,000 claim only awaited upon a satisfactory operation of the machinery. The receiver, about August 3, 1893, furnished a new armature, rated at $800, and incurred expense in regard thereto of $53.80 for freight. After the new armature was in place the machinery was not made to operate satisfactorily to the purchaser, the result being that, without fault on the part of the receiver, the entire original expenditure, and that for the new armature and freight were lost. The price of the new armature and the freight bill in regard to the same were charged by the receiver to the holders of the collateral. *Barber* and *Gilbert* did not authorize the same or the expense. In the petition upon which the order of June 2, 1897, referred to in previous appeals, was granted, the whole matter in respect to the $853.40 was explained to the court so far as it was material to do so, and an order was entered authorizing the account to be charged to loss and gain account.

The court found that when the expenditure was made Rust,

*Gilbert,* and *Barber* were all parties to it; that it was for their sole benefit; that they knew at that time that nothing could be realized for general creditors, and were guilty of a fraudulent appropriation of trust property. Those conclusions seem to be clearly against the law, as we have heretofore declared the same, and against the evidence. Why the positive evidence of *Mr. Barber* and *Mr. Gilbert* that they had nothing to do with the expenditure in question, unimpeached by any circumstance to the contrary, should have been ignored, is not perceived. It is equally difficult to perceive how the conclusion could have been reached that the purpose of the expenditure was for the sole benefit of the holders of the collateral, when the collateral in fact exceeded the principal debt, its collectibility, as it appeared at the time the expenditure was made, was dependent only upon the completion of the contract, the whole of the principal debt was provable in the receivership proceedings regardless of the security, and the expenditure was made in the early history of the receivership when it was reasonable to expect a substantial sum for distribution among creditors. It is equally difficult to understand how the conclusion could have been reached, that when the expenditure was made it was not expected that any benefit would grow out of the transaction for general creditors, when, from the standpoint of the receiver when the expense was incurred, both direct and indirect benefits to general creditors were apparent. It seems that a wrong conclusion was arrived at by overlooking or ignoring material credible evidence, the drawing of unwarranted inferences from undisputed facts, and a misconception of legal principles which we have heretofore discussed. There is no need to say more in respect to this matter.

### *Appeal No. 5.*

Appeal of *Fitch Gilbert, George T. Thompson,* and the personal representatives of R. E. Rust. This involves six dis-

tinct matters, which will be treated under the heads of a, b, c, d, ·e, and f.

a. The idea of the trial court as to this, in the main, will be found in subdivisions 129 to 133 as to facts, and 6 as to law, in the statement. The following appear to be the undisputed facts: May 16, 1892, *Gilbert, Thompson,* and Rust indorsed a note of $8,000 for the electric company to the National Exchange Bank of Milwaukee, which was renewed with the same indorsers January 1, 1893, such indorsers taking as security an instrument whereby an attempt was made by the electric company to pledge to them as security an electric plant at Brookville, Indiana, said plant consisting of land and buildings and machinery therein, so circumstanced that all was real estate. The instrument was so executed as to show clearly the purpose thereof, but not so as to legally convey an interest in the property under the laws of Indiana or so as to be entitled to record under such laws. It was not recorded. May 18, 1893, the insolvent, without any new consideration, and upon the eve of its suspension to the knowledge of all parties concerned, made a mortgage in due form in place of the defective instrument, such mortgage being thereafter duly recorded. The mortgagees were compelled to pay the indorsed note about May 24, 1893, $8,164 being required for that purpose.

July 12th after the receiver was appointed, the history of the matter above referred to was brought to the attention of the court by petition, with information that the mortgage was about to be foreclosed; that the property was nonproductive and noninsurable; and that it was for the interest of the trust that it should be sold. That was accompanied by proof that the holders of the mortgage concurred in the judgment of the receiver, and consented to the sale as prayed for by him. An order of sale was thereupon entered, the receiver being directed to dispose of the property at public vendue in manner specified, unless at private sale the full amount of the mort-

gage indebtedness could be obtained. That was equal to the full value of the property. Subsequently a private sale was made in accordance with the order, ostensibly to *George T. Thompson,* for $8,287.30 in the form of a release of the indebtedness. A deed was made accordingly, and thereafter the sale was duly reported to the circuit court and confirmed. *Thompson* in fact bought the property in the interests of all the mortgagees, taking the title with the understanding that it was to be conveyed to a corporation to be formed, the stock to be distributed between the mortgagees according to their respective interests. That was subsequently done.

Upon such facts and others not necessary to be detailed, the court held that the attempted mortgaging or pledging of the property January 18, 1893, was *wholly* ineffective; that the instrument then executed was *wholly* invalid; that the one of May 18, 1893, was *wholly* without consideration, was made when all the property of the mortgagor was impressed with a trust for its creditors, and for the purpose of giving, and received for the purpose of obtaining, an unlawful preference over the general creditors of the mortgagor; that the subsequent proceedings were in furtherance of this fraud and a general fraudulent purpose as to the creditors of the electric company, and that by reason of the facts the persons so obtaining possession of the property became liable to such creditors for the full value thereof.

Many questions suggested as to this matter need not be discussed. It is not contended by appellants' counsel but that the secret interest of Mr. Rust in the purchase of the property was sufficient to invalidate it at the election of creditors; but it is contended by them that it was not permissible to treat the sale as valid and recover more of the receiver, or of him and those participating with him, than the actual damages which the creditors sustained, if any. That is elementary. The undisputed evidence is that they did not suffer any damage if the mortgage was a valid security, since the mort-

gage indebtedness was equal to the full value of the property. The result is this. If the mortgage was valid, then the judgment on this matter is wholly wrong.

The trial court's conclusion as to the validity of the mortgage rests on the finding that it was without consideration and taken for the purpose of obtaining an unlawful preference; and that rests on the finding that the attempted mortgaging of the property January 18, 1893, was *wholly* ineffective, and that the character of the second transaction was to be determined *wholly* by the circumstances existing at its date. In that serious error was committed.

The instrument of January 18th was made upon a sufficient consideration, and when it was perfectly competent for the electric company to mortgage the property as it attempted to do. That is not questioned. It was not a mortgage good at law, but was clearly an attempt to make such a mortgage, or to pledge the property as security. That is clear beyond reasonable controversy. It contained no unexplainable ambiguity as to the property intended to be mortgaged, or the debt or liability intended to be secured, or the parties. That made a good mortgage in equity. It could have been foreclosed as such, or perhaps regarded as a good contract to make a mortgage valid at law, and specific performance enforced. It was, then, a good consideration and justification for the mortgage of May 18, 1893. The latter act is no more than a court of equity would have compelled, if necessary, to protect the rights of the mortgagees. The instrument of May 18th related back to that of January 18th, taking effect in equity as of the earlier date. The fact that the first paper was not recorded when the receiver was appointed or the suspension of the electric company occurred, has no significance, since, of course, neither the creditors nor the receiver for them could take any better right to the property involved than the electric company had. The receiver did not stand in the position of a *bona fide* purchaser. An equitable mortgage is

as good as any as regards the mortgagor and every person dealing with him with notice of the facts, or any person claiming under him having no superior equities.

It follows that the rights of Rust, *Thompson*, and *Gilbert* are not referred, necessarily, to the instrument of May 18th, but to the attempt to make a mortgage January 18th prior thereto. It was on the latter as well as the former that the sale was ordered by the court, and it might as well have been ordered if the instrument of the later date had been entirely omitted from the proceedings. Thus it is seen that the foundation upon which the learned trial court rested the judgment as to the wrongful appropriation of the Brookville property is wholly wanting. The learned judge failed to appreciate that an attempt to make a mortgage, both parties intending to accomplish that result, sufficient being done in that regard, upon a valuable consideration, to enable a court of equity to discover with certainty the purpose of the parties, the terms of their contract, and the property involved, so as to deal with the matter, is a good mortgage in equity,—is just as good as any mortgage, so long as there are no superior intervening equities.

The law on this subject is well settled, as the following authorities will show: *Mowry v. Wood,* 12 Wis. 413; *Jarvis v. Dutcher,* 16 Wis. 307; *Dreutzer v. Lawrence,* 58 Wis. 594, 17 N. W. 423; *Dreutzer v. Baker,* 60 Wis. 179, 18 N. W. 776; *Flagg v. Mann,* 2 Sumn. 486; *Talieferro v. Barnett,* 37 Ark. 511; *Waddell v. Carlock,* 41 Ark. 523; *Bell v. Pelt,* 51 Ark. 433, 11 S. W. 684; *Peers v. McLaughlin,* 88 Cal. 294, 26 Pac. 119; *Daggett v. Rankin,* 31 Cal. 321; *Love v. Sierra Nevada, L. W. & M. Co.* 32 Cal. 639; *Remington v. Higgins,* 54 Cal. 620; *Higgins v. Manson,* 126 Cal. 467, 58 Pac. 907; *Gardner v. McClure,* 6 Minn. 250; *Howard v. Iron & L. Co.* 62 Minn. 298, 64 N. W. 896; *Payne v. Wilson,* 74 N. Y. 348; *Hale v. Omaha Nat. Bank,* 64 N. Y. 550; *Perry v. Board of Missions,* 102 N. Y. 99, 6 N. E. 116; *Sprague v.*

*Cochran,* 144 N. Y. 104, 38 N. E. 1000; *Hamilton T. Co. v. Clemes,* 163 N. Y. 423, 57 N. E. 614; *In re Howe,* 1 Paige, 125; *Knott v. Mfg. Co.* 30 W. Va. 790, 5 S. E. 266; *White Water Valley C. Co. v. Vallette,* 21 How. 414; *Watkins v. Vrooman,* 51 Hun, 175, 5 N. Y. Supp. 172; *Burdick v. Jackson,* 7 Hun, 488; *Price v. Cutts,* 29 Ga. 142; *Courtney v. Scott,* Litt. Sel. Cas. 457; Pingrey, Mortgages, 278; Jones, Mortgages, §§ 163–168; 3 Pomeroy, Eq. Jur. § 1237; Miller's Eq. Mortgages (45 Law Library) 1, 2, 216; Jones, Corporate Bonds & Mortgages (2d ed.) §§ 33–38.

We quote verbatim or in effect from the above authorities, showing how plainly the law as here declared governs the facts of this case:

"If a transaction resolve itself into a security, whatever may be its form, and whatever name the parties may choose to give it, it is in equity a mortgage." Judge STORY, in *Flagg v. Mann, supra.*

The recital in a promissory note given for land, "This note is to stand as a lien on said land until fully paid," held to create a mortgage. *Waddell v. Carlock, supra.*

"An attempt to create a security in legal form having failed, equity will give effect to the intention of the parties and enforce the lien as an equitable mortgage. Any agreement that shows an intention to create a lien is in equity a mortgage." *Bell v. Pelt,* 51 Ark. 438, 11 S. W. 685.

"An imperfect attempt to create a mortgage upon specific property for the purpose of securing a debt, will create a specific lien upon the property so intended to be mortgaged." *Peers v. McLaughlin,* 88 Cal. 297, 26 Pac. 119.

"Every express agreement in writing, whereby the party clearly indicates an intention to make some particular property therein described a security for a debt, creates an equitable lien upon the property, which is enforcible. The form of the writing is not important, provided it sufficiently appears it was thereby intended to create a security. If that intention appears, it will create a mortgage in equity, or a specific lien on the property so intended to be mortgaged." *Howard v. Iron & L. Co., supra.*

"An agreement based upon a valuable consideration to give a mortgage, will be treated in equity as a mortgage."

So an agreement or transaction good as an equitable mortgage, the transaction between the parties occurring when, as regards the rights of creditors of the mortgagor, a mortgage good at law might be given, is a sufficient support for the giving of a mortgage good in law within the time when disability would otherwise exist in regard thereto under the bankrupt act. The second transaction will take effect by relation as of the date of the equitable mortgage. The assignee in bankruptcy will take the property subject to the incumbrance. *Burdick v. Jackson, supra.*

The principle "is of frequent application under the bankrupt laws, where it operates to make valid a mortgage given to a creditor shortly before the filing of a petition in bankruptcy by the mortgagor, when this is done in pursuance of an agreement made at a time when the giving of the mortgage would not have been a fraudulent preference." 1 Jones, Mortgages, § 163.

"An equitable mortgage may be constituted by any writing from which the intention so to do may be gathered, and an attempt to make a legal mortgage, which fails for the want of some solemnity, is valid in equity; and . . . an agreement for a mortgage is, in equity, a specific lien upon the land; and an equitable mortgage thus created is entitled to a preference over subsequent judgment creditors." Judge Folger, in *Payne v. Wilson,* 74 N. Y. 348.

The law as thus indicated prevails without exception in this country and England. Equity holds parties to their mutual intentions, when supported by a valuable consideration and sufficient definiteness that such intentions may be understood and the matter dealt with by equity jurisdiction. Therefore, an imperfect attempt to give a mortgage, which creates a good mortgage in equity, if perfected by the acts of the parties at a time when, by reason of the rights of the creditors, a good mortgage could not be made, will constitute a

mortgage good at law; and if not perfected till such time, equity will nevertheless regard the rights of the intended. mortgagee as superior to those of creditors. So the learned. court's decision that the paper made to R. E. Rust and his associates January 18, 1893, was not a valid mortgage in law, should not have led to the holding that it was of no force whatever and rendered all proceedings in regard to the mortgage given in lieu thereof May 18, 1893, fraudulent, and the result a fraudulent appropriation of property.

As before indicated, the participation by the receiver, as a purchaser at his own sale, however innocent it may have been—and we are constrained to believe that no wrong was in fact intended—rendered the sale voidable, and it might have been decreed void in this litigation, and such proceedings taken as seemed best to protect the rights of the respondents. But such rights only· extended to the value of the property involved over and above the amount of the mortgage indebtedness, which, as it seems, was not worth seeking after. True, the rule cannot be stated too broadly or enforced too firmly, that a trustee can at best obtain but a voidable title by purchasing the subject of his trust at his own sale. Such a proceeding is voidable, as before indicated, at the election of the *cestuis que trustent* if they move seasonably, and that is so whether the sale was really injurious to them or not. The rule is established on those broad lines for the purpose of rendering inquiry into the real motives of the purchaser, or whether there was any real injury to the *cestuis que trustent* or not, unnecessary. It is one of absolute disability at the election of the adverse parties if they move seasonably. Gluck & Becker, Receivers, 284; *Heyl v. Goelz,* 97 Wis. 327, 72 N. W. 626; Perry, Trusts, 195. In this case the court might have treated the sale of the property as void and restored the former situation, or caused the property to be sold free from the incumbrance, using the proceeds to pay off the same and turning the surplus, if any, over to the trust fund, or treated

the holders of the title as trustees for the creditors and caused the property to be redeemed, or taken other courses that might be suggested, to protect the legal and equitable interests of the respondents.  But, as whatever course that might have been chosen would have resulted, or that might now be chosen would result, in expense to both sides for the mere satisfaction of going through the form of compelling appellants to realize on their security legitimately, without adding anything to the trust fund, the better way, it seems, is to let the matter rest where the trial court found it.

b.  For the trial court's idea of this, see 136 to 148 inclusive of the facts, and 8 as to the law, in our statement.  It bears such close relation to the subject last treated that many of the facts in regard to it do not need to be restated.  This is a fair summary, as the court viewed the matter:

At the time of the sale of the Brookville plant to *Thompson,* representing himself, Rust, and *Gilbert,* there stood, when corrected, charged on the books of the electric company in the receiver's hands against Charles B. Searrin, who had managed the property from the start for the electric company, $1,160.30.  At the time of the sale Rust and *Gilbert* were familiar with this account, and had reason to believe that it represented a considerable sum of money belonging to the trust fund, that was obtainable.  After the sale to *Thompson,* Searrin continued to operate the plant for the new owners, treating the old accounts as belonging to his new employer. He collected $862.37 out of such accounts, $305.87 of which was used for attorney's fees chargeable to the receiver, and the balance was knowingly appropriated by Rust, *Thompson,* and *Gilbert* to their own use in meeting the expenses of the Brookville business.  The account on the receiver's books was included in the sale to Thomas, made under the order of June 2d, heretofore referred to, the entire account being lost to the trust fund.

We are unable to find any definite evidence showing with

any reasonable degree of satisfaction the facts thus found. The evidence shows that the account of $1,160.30 was constructed mainly before the receiver was appointed, by charging Searrin with his reports of earnings made by the plant and crediting him with his pay rolls for salaries and other disbursements, so that the balance indicated money on hand and uncollected bills. What amount was money and what amount was uncollected bills, and what part of the latter was of any value, did not appear. It further satisfactorily.appears that Mr. Rust and his associates understood, so far as they knew anything about the matter, that substantially all the money represented by the account at the time of the sale was $520.38. in bank, under attachment. That is included in the $862.37 said to have been collected by Searrin, upon which credit is given of $305.87 paid as attorney's fees, which the evidence shows without dispute was not so paid, but was disbursed, $299.87 to pay attaching creditors, and $6 for expenses, which, with salary accounts chargeable to the bank fund, exhausted the same except $74.51. That amount, it is claimed, was at some time diverted by Searrin to the accounts of the new proprietor. We do not deem it important to state or discuss the details of the evidence in regard to it. Suffice it to say, if it were so converted, we find nothing bringing the matter distinctly to the attention of the parties charged until the trial of this action, and then nothing except the unsworn statements of Searrin. The report, however, made in respect to the matter in September, 1893, simply showed that after paying the attaching creditors, and expenses, and the salary bills chargeable to the fund, there was left in the bank account the sum named. There was nothing in the communication in respect to the matter indicating that the money was to be used for the new proprietors. It was not at any time transferred to the accounts of the new proprietors in an item of $74.51. It is claimed that at some time $30.60 of it was used to pay a freight bill, and the residue, $43.91, in June, 1894, was de–

posited as money of *Thompson* and his associates, this infor-
mation being contained in Searrin's statements. The balance
of the $1,160.30 account, over and above the bank balance as
aforesaid, consisted of a sum of money assumed to be in Sear-
rin's hands, determined in the manner hereinafter stated, and
included bills to the amount of $478.78, of all sorts, $283.89
admitted to be worthless, and $140.50 in serious dispute at
the time of the sale, and, if collected at all, not collected till
some five months thereafter, leaving $54.39 unaccounted for.
So, assuming that the $54.39 was collected by Searrin, and
the $140.50 as well, and that the same was used for the ben-
efit of *Mr. Thompson* and his associates, and that the $74.51
was likewise used—all of which is at best supported only by
the unsworn statements of Searrin—we have but $269.40 that
can be ciphered out as having been obtained out of the Sear-
rin account of $1,160.30 and used for the benefit of *Thomp-
son* and his associates. From this it is quite clear that such
account was never supposed to be more than merely repre-
sentative of what Searrin should account for by uncollected
matters, expense bills, or cash; that it did not indicate an in-
debtedness to the amount of $1,160.30, or any other sum in
particular, and was so involved at the time of the sale that it
was probably regarded as of such trifling significance as not
to be worthy of attention. Of the whole $1,160.30 there was
only $54.39, in the old bills, which under the circumstances
might have been considered doubtful, the $140.50 due from
the municipality, which was in dispute, and the assumed
amount of money in hand as aforesaid, or whatever there
might be in fact, of such money, that there could have been
any reasonable expectation, by Mr. Rust, that anything would
come out of. This being the nature of the account, doubtless
reliance was placed in Searrin to report and pay over any
money coming out of the same which belonged to the receiver,
such amount being considered in any event so small as to be
of little significance.

Notwithstanding the character of the Searrin account was such that we discover no evidence of fraud in the fact that Mr. Rust treated the same as not worthy of his attention, we cannot acquit him entirely of negligence in not investigating it and securing from Searrin the benefits to the trust fund, whatever they were, which belonged to it. Any loss that occurred from such negligence should be charged to his legal representatives, which can be determined with any reasonable degree of definiteness from the evidence, the order of the circuit court of December 30, 1897, passing upon his account, not being regarded as any protection to him in that regard, since it appears that such matter was not brought understandingly to the court's attention.

We shall not take time to review at length the evidence in respect to all the details of this account. It seems to us undisputed that no knowledge came to Rust, *Thompson,* or *Gilbert,* until the trial of this action, at least, that any money had been realized out of the account and used in their business. They did not visit Brookville, and knew nothing about the business there, except what they gathered from Searrin's reports. None of such reports showed, definitely, that any of the receivership money was used in such business; and if they did, they were but the unsworn statements of Searrin as to his doing what he had no authority from his employer to do. Such reports failed to prove that any money belonging to the receiver came to the use of *Mr. Thompson* and his associates. No action could have been maintained against them on such proof as was made in this case. *Mr. Thompson* and *Mr. Gilbert* demonstrated by their own and other testimony that they did not obtain or use any of the receivership money, or have any information that any such money was used, except what they obtained from Searrin during the trial of the action; and we see nothing in the record to impeach their evidence.

The subject was brought into the action by amendment granted on the trial, the understanding being that a continu-

ance would be granted, if needed by appellants. Thereafter, it seems, an investigation was made by correspondence with Mr. Searrin, resulting in a statement by him that $74.51 was used in their business, and that $140.50 due for municipal lighting, included in the $478.78 of uncollected accounts, was collected in December, 1893, and was so used. Whether Searrin's unsworn statements are true or false does not appear. Standing alone, they do not show that any money belonging to the receiver was used at all for *Thompson* and his associates, much less do they show, against the sworn testimony, that any such money was used fraudulently.

The learned counsel for respondents does not appear to claim that the finding, as to $556.50 being collected of the Searrin account of $1,160.30 and misappropriated, is according to the evidence, but the amount is made up this wise: The $74.51, $140.50, and $54.39 before mentioned are assumed to be established in the manner before indicated, as having been misappropriated. Seventeen days' earnings of the plant in July, 1893, not included in the $1,160.30, computed at $157.34, less seventeen days' wages of Mr. Searrin and his assistant, $60.32, was assumed to belong to the receiver. In this it was thought there were no expenses for the period named other than for labor, that all of the service accounts should be counted as money, and that such accounts— not ordinarily deemed as earned till the end of the month— were apportionable and did not go with the plant by the sale. An estimate was made—from freight bills as to coal purchased, from statements made by Searrin respecting the average consumption of coal per day, and from coal bills showing the price paid for coal per ton,—that the value of coal on hand at the time of the foreclosure was $98.58. From that was deducted $71.66, which Searrin's communications indicated was owing for this coal at the time of the sale, leaving a balance of $26.92. From a general statement of Searrin's cash account from May 10 to August 11, 1893, items of cash

collections for May and June were taken, against which were credited expense vouchers for money paid from June 1st to July 10, 1893, leaving a balance of $161.14, and it was assumed that such balance represented money in Searrin's hands, without any bills outstanding to be paid out of the same. Lastly, $2 appearing by Searrin's statement to have been paid for recording the Brookville mortgage, was charged as part of the misappropriations. In this the following assumptions were made which it seems are not warranted: First, that the unsworn statements of Mr. Searrin prove what appears upon their face as to matters wholly unwarranted. We say "unwarranted" because we do not interpret the instructions from *Thompson,* to treat all the property as his as of a certain date, to include any money at that time in hand, or uncollected bills. Second, that the balance between May and June collections of $420.88, and vouchers paid from June 1 to July 10 of $200.34, leaving a balance of $161.14, should be regarded as free cash on hand, when it appears that the account was thus made up wholly by taking the items from Mr. Searrin's cash account before mentioned, wherein it appears that bills were paid so near to July 17, 1893, the date of the sale, that indebtedness must have existed prior thereto sufficient to exhaust the entire $161.14 except the sum of $5.36. The total debit in the cash account up to the time of the sale was $1,124.49. The credits up to and inclusive of July 22, 1893, were $598.75, leaving a balance of $525.74. Against that balance must be charged the $520.38 in bank under attachment, leaving the balance indicated, $5.36. It must be assumed in view of the way business is ordinarily conducted, and in the absence of any evidence to the contrary, that bills paid for supplies up to July 22, 1893, probably represented debts contracted considerably earlier than that date. Third, that the $54.39 of old bills were collected and used in the business of *Thompson* and his associates. Fourth, that there was $26.92 in coal on hand at

the time of the sale. Fifth, that the small amount of coal on hand for immediate use in operating the plant was not an incident thereof and did not pass therewith at the sale. Sixth, that the July service bills were apportionable and that there were no claims justly chargeable thereto except salary accounts. The items discovered by respondents' counsel make up the $556.50 found by the court to have been fraudulently appropriated, as thus appears:

| | |
|---|---:|
| Estimated coal, less freight charges. | $ 26 92 |
| Cash in hand. | 161 14 |
| Municipal bill, collected. | 140 50 |
| Uncollected bills treated as cash. | 54 39 |
| Amount out of attached bank balance. | 74 51 |
| Seventeen days' July earnings. | 157 34 |
| Recording mortgage. | 2 00 |
| | $616 80 |
| July salaries, part. | 60 30 |
| | $556 50 |

The following statement of the matter will exhibit definitely, and in proper form, we think, the manner in which the balance above indicated is arrived at. The above statement is in the form presented by respondents' counsel.

| | | |
|---|---:|---:|
| To part July earnings, 1893. | $154 34 | |
| Book accounts, old bills. | 478 78 | |
| Bank account, attached. | 520 38 | |
| Cash determined as aforesaid. | 161 14 | |
| Coal on hand, at date of sale. | 98 60 | |
| Recording Brookville mortgage. | 2 00 | |
| | | $1,418 24 |
| By conceded worthless accounts. | $283 89 | |
| Coal bill. | 71 66 | |
| Settlement of lien on bank account. | 306 87 | |
| Back salaries. | 140 00 | |
| Part July salaries, 1893. | 60 32 | |
| | | 861 74 |
| Balance. | | $ 556 50 |

It seems we should not pass this matter without demonstrating that the Searrin cash account from which respondents' counsel determined that Mr. Searrin had on hand at the time of the sale of the Brookville plant, $161.14, will not legitimately bear the treatment resorted to by them in sup-

port of the court's finding.    Here is the account, balanced
July 22, 1893:

1893

| | | | | |
|---|---|---|---|---|
| May 10. | Balance in bank......................... | $ 4 64 | | |
| May 24. | By freight, F. Geis, Agt................. | | $ 33 60 | |
| May 25. | Acct. Winefrede Coal Co................. | | 139 90 | |
| May 27. | " wages, John Cleaver............... | | 5 50 | |
| May 27. | By miscellaneous acct. A. Bossert, Jr..... | | 3 63 | |
| June 1. | Express, M. P. Hippard, Agt............. | | 1 50 | |
| " 10. | Wages, F. Hermansdorfer.......... ..... | | 40 00 | |
| " 10. | Miscellaneous, Recorded Franklin Co..... | | 2 00 | |
| " 10. | Miscellaneous, H. E. Balsley, Mgr. N. W. Tel. Office.............................. | | 1 63 | |
| " 10. | Freight, John Deitz, drayman............ | | 2 81 | |
| " 10. | Freight, F. Geis, Agt.................... | | 32 40 | |
| " 14. | Wages, Chas. B. Searrin................. | | 70 00 | |
| May 23. | To Consumers' Ledg. Acct. for St. lights from Dec. 1 to May first, '93............ | 693 37 | | |
| June 10. | To Consumers' Ledg. Acct. Month of May | 153 11 | | |
| July 10. | By wages, Chas. Searrin................. | | 70 00 | |
| " 10. | Wages, Frank Hermansdorfer............ | | 40 00 | |
| " 10. | To Consumers' Ledg. Acct. for Month of June.................................... | 127 87 | | |
| " 10. | To Consumers' Ledg. Acct. St. Lights, month of May................................. | 140 50 | | |
| " 18. | By fuel Acct. Winefrede Coal Co.......... | | 71 66 | |
| " 18. | Oil and Waste, Standard Oil Co.......... | | 28 12 | |
| " 19. | Carbon Acct. Standard Carbon Co........ | | 50 00 | |
| " 22. | Supplies, Eureka Tempered Copper Co... | | 6 00 | |

Attached Bank account............................    $ 520 38
    Balance.........................................    5 36

$1,124 49 $1,124 49

While the balance of cash in hand, less outstanding claims,
was not to exceed $5.36 at the time the plant was sold—it
was probably less—it is more than likely that there were
numerous small liabilities, in addition to those paid up to
the date we close the account, which properly should have
been paid out of any money available for that purpose.    How
just it is to include in the liabilities those paid within five
days after the sale seems to be confessed by respondents' coun-
sel in that one paid July 18, 1893, is treated by them as a
proper charge in that regard in their treatment of the coal
matter.    It is no legitimate answer to this to say that late bills
represent supplies on hand, because the moderate supplies for
immediate use in the operation of the plant were as much a

part thereof as the tools and many other things that might be mentioned, not strictly speaking a part of the real estate.

The court, we must assume from the way the matter is presented here, obtained the item of $161.14 by taking from the above cash account three items on the debit side and nine items on the credit side, thus:

| 1893 | | | |
|---|---|---|---|
| June 10. | To Consumers' Acct., May ................ | $153 11 | |
| " 10. | " " " June ................ | 127 87 | |
| " 10. | " Street lights, May ..................... | 140 50 | |
| " 10. | By Express ............................. | | $ 1 50 |
| " 10. | " Wages ............................. | | 40 00 |
| " 10. | " Recording........................... | | 2 00 |
| " 10. | " Mgr. N. W. Tel..................... | | 1 63 |
| " 10. | " Freight ............................ | | 2 81 |
| " 10. | " Freight ............................ | | 32 40 |
| " 14. | " Wages ............................. | | 70 00 |
| July 10. | " Wages ............................. | | 70 00 |
| " 10. | " Wages ............................. | | 40 00 |
| | Balance ............................ | | 161 14 |
| | | $421 48 | $421 48 |

That not only makes a misleading statement to the extent indicated, but is quite likely further erroneous in that the $54.39 of back bills, in whole or in part, are liable to be included therein, though still uncollected.

The foregoing lengthy analysis of the manner in which the court's finding as to the $556.50 must be supported, if at all, shows, it would seem, that at many points the finding is not supported by evidence at all, and that at others the evidence is altogether too vague to establish a legal liability, much less one of a fraudulent character. That seems too clear to warrant further discussion of the matter. We have studied the record in regard thereto endeavoring to look at all of the evidence legitimately bearing thereon, stating and restating the account to such an extent that it would not do to spread the evidence of all our labor upon the printed pages. The finding as to $556.50 having been collected out of the Searrin account of $1,160.30 may have been based upon a different theory than the one advanced by the learned counsel in sup-

port of it.   We have been unable to discover what that theory was from the record.

It seems from the proceedings on the application for a new trial upon newly discovered evidence, that when the evidence was substantially all in as to this matter, the trial judge announced from the bench an opinion to the effect that, while there might be evidence of some receivership money having been used in the Brookville business after the July sale, there was no evidence that it was known to the purchasers, and that from such statement appellants' counsel supposed, as well they might, that no finding would be made against their clients of a fraudulent appropriation of money, and none made against them at all in respect to the matter for more than $74.51; and that, relying thereon, they did not ask for a continuance under the terms imposed upon respondents when leave was granted to bring in by amendment the new matter; that upon the finding being made as it was, they were taken by suprise, which seems most natural; that as soon as practicable a full investigation of Mr. Searrin's administration at Brookville was made, when it was discovered that his reports of uncollected bills, which largely led to the finding in question, were false; that the indications upon which the trial court largely relied, tending to show that receivership money was appropriated by Searrin to the use of *Thompson* and his associates, merely showed defalcations on Searrin's part prior to May 18, 1893; that instead of there being the large amount of uncollected matters supposed to exist July 17, 1893, there was only a very small amount; that instead of $1,160.30 of such matters at that date to be accounted for, there was only $322.60, excluding the worthless account of $283.87, of which $278.74 was for lighting service during the preceding month, leaving only about $50 of past-due bills and the worthless account of $283.87 which could legitimately have appeared in the account of $1,160.30; that Mr. Searrin acknowledged his defalcations and settled the same

to the amount of $1,733.26 by giving his note with security; and that the books kept by him showed the statements used upon the trial to be false. The facts of the situation so found to exist were set out in great detail, accompanied by Mr. Searrin's books, and by statements, making a strong case, and were presented to the court on the motion. If the facts were as stated in the motion papers, and competent proof thereof upon a retrial of the matter were produced, upon no possibility, it would seem, could the conclusion be reached that the parties charged, fraudulently or otherwise, appropriated any of the receivership money. Counsel for the respondents reply to this, relying, as on the trial, upon the unsworn statements of Mr. Searrin, which were the very matters which the new evidence was claimed would show to be false. Counsel's argument does not seem to meet the situation. Upon just what ground the learned trial court denied the rehearing as to this matter does not appear. With the strong presentation made, and the undisputed fact that the continuance was not asked for to enable appellants to make the investigation at Brookville before the trial closed, because the court gave assurance that the evidence was insufficient to establish any fraudulent appropriation of money, it seems that nothing but laches after the findings were filed could have justified denying the motion. It was addressed to the sound discretion of the court, it is true, and it takes a strong case to warrant this court in holding that judicial discretion has been abused. However, with the elements of assurance to counsel from the bench, their relying thereon, and reasonably, too, and a finding entirely inconsistent therewith, it would be a very grave question whether we could allow the order denying the motion to stand if it were material to the rights of the parties. Though it is not, and for that reason the matter will not be passed upon further, the situation is such that we feel called upon to say the foregoing in respect to it, and to suggest as a rule, that in the trial of an action, the evidence being closed as to

Harrigan v. Gilchrist, 121 Wis. 127.

a material matter brought in by amendment on the trial, under circumstances rendering the adverse party, upon hearing the evidence in support of it, entitled to a continuance if desired, if the trial court gives an opinion that such new matter is wholly or in a material part unproved, and such adverse party relies thereon, submitting his defense without obtaining time to make investigation and bring before the court evidence which he otherwise would, and thereafter a conclusion is reached entirely contrary to such opinion, the case should be reopened as to such matter upon seasonable application being made therefor, with a reasonable showing that evidence successfully defending against such new matter can be produced upon a rehearing.

c. The substance of the findings as to this will be found in subdivisions 149 to 156, inclusive, of the statement. The facts, as we understand the evidence, are these:

May 15, 1893, Rust, *Thompson,* and *Gilbert* indorsed a note of $3,500 for the electric company, taking as security accounts receivable, matured or to mature, aggregating $3,900, one being against the Consolidated Engineering Company of St. Louis, Missouri, for $1,550. Soon after the receivership commenced the Knapp Electrical Company at St. Louis garnished this account. The receiver, acting by his attorney Mr. Frawley, caused the holders of the collateral to enter an appearance, because Mr. Rust, as a foreign receiver, could not well obtain recognition in the Missouri court. Such holders did not move in the matter except as requested by the receiver, as stated, and only to the extent of signing the necessary intervention papers. The whole matter was attended to by the receiver's attorney at his request. The garnishee proceedings were conducted in Missouri under the direction of R. G. Dun & Co. for the receiver, and were successful. At the termination of the garnishee suit, either directly or through Mr. Frawley, R. G. Dun & Co. caused an action to be brought against the engineering company to recover upon

the account in the names of the holders thereof as collateral. $944.76 was collected, which was remitted to the receiver less $77.80 charges, and the amount was later, upon the order of the court, paid to the owners of the collateral according to their respective interests, the petition therefor not containing information upon its face of the fact that the receiver had incurred expense to the amount of $155.75 in making the collection, $10.25 having been paid early in 1893 for the services of an electrician, $20 to Joseph Singleton as attorney's fees, and $125 to R. G. Dun & Co., which expenses were charged by the receiver to such holders. By authority of the court, under the order of June 2, 1897, heretofore several times referred to, the apparent asset was charged off to expense or loss and gain account.

On these facts the appeal is ruled in favor of appellants upon principles already sufficiently discussed. The trial court's decision, so far as not against the evidence, went upon the mistaken idea that it is not only improper but fraudulent for a receiver to take upon himself the burden of enforcing accounts belonging to the trust, subject to the right of collateral holders, if he has no good reason to believe that the collateral will yield a surplus over the principal debt. The disbursements were ordinary receivership expenses which the receiver might, under the circumstances of the case, safely have incurred without previous authority of the court. Certainly, he should not be charged with fraud in the matter.

Some of the findings seem so radically wrong that they should not be passed without special attention. The finding should not, it seems, have been made, carrying the impression that the collateral to the $3,500 note was $1,550 instead of $3,900. We do not perceive why it was found, in effect, that Mr. Frawley acted in the matter as the employed attorney of *Thompson* and *Gilbert,* since the evidence is undisputed to the contrary by both of them, and by Mr. Frawley. The mere fact that they were the interveners, in view of the

reasonable explanation made by Mr. Frawley, and we should say even without explanation, did not warrant regarding as false the fair and positive testimony of three witnesses. Neither do we understand why the finding was made that Mr. Frawley charged $430 for his services in the matter, and was paid out of the general assets in the hands of the receiver, when the evidence is undisputed that while he made such charges he never presented the same to the court, nor intended to, nor was paid by the receiver any specific sum on account of services in such matter, but that his compensation for his entire services for the receiver, upon his application to the court therefor, was settled without regard to any specific charges and on a *per diem* basis, proof being made of the number of days occupied in all the services rendered and the reasonable value per day of such services. There are other findings of this kind in what we have passed over, which have not been mentioned. We will say now that they seem to be unsupported.

d. The substance of the finding as to this is at No. 190 in the statement. The evidence is to the effect that, Rust, *Thompson,* and *Gilbert* being the holders of $3,900 of collateral, consisting of contract liabilities, assigned to them by the electric company as regards the $3,500 note before mentioned,—one of such liabilities being the Cassadaga Free Association contract for $1,200,—Rust, as receiver, expended a sum of money completing the contract so as to render the $1,200 collectible, prior to July 1, 1893. The finding is to the effect that the amount so expended was $51.20. Counsel for appellants claim the amount was $30.10. Which is right is immaterial. It was ordinary receivership expense, governed by the principles before stated. However, we will say in passing that we must agree with appellants' counsel that, since the expenditure was made a few days after the receiver was appointed, and the total of the collateral was more than the principal debt; and, as appears, none of the collateral

matters had yet been contested, nor was there any question as to the responsibility of the parties, the finding cannot be approved. Nor does any warrant appear for the decision that when the expenditure was made the receiver, *Thompson,* and *Gilbert* knew that nothing would come out of the collateral for the trust fund. Nor do we agree with the court that *Thompson* and *Gilbert* were in any way parties to the expenditure.

e. What we discover in the court's findings, upon which a fraudulent appropriation of $127.30 is based, is sufficiently indicated in No. 174 of our statement. Upon the evidence the matter involved seems to be very simple. The parties charged with liability were indorsers on notes of the electric company to the amount of $3,169.73. They held collateral duly assigned to them by such company to the amount of $3,642.50. In the early part of the receivership the receiver incurred indebtedness which he paid to the amount stated, to a collection agency and foreign attorneys for services in attempting to collect such collateral, with partial success. There is no claim but that, if it be proper under any circumstances for a receiver to use trust funds not expecting the collateral will more than pay the principal debt, it was proper in this case. The first court that passed upon the matter viewed the law rightly, and doubtless understandingly, as what has heretofore been said indicates. We might pass this matter without saying more, but it seems best as we proceed to make a brief detail reference to the more significant of the findings excepted to.

We find the conclusion that the money was corruptly expended, coupled with a decision that the evidence showed two badges of fraud: first, that it was known that nothing would be added to the trust fund from the collateral; second, that the receiver's attorney acted in the matter for the holders of the collateral, charging the receiver $214.90 and obtaining pay thereof from the trust fund. There may be some evi-

dence that there were indications that the collateral would not more than pay out the principal debt when the expenditures were made, but not that it was so poor as to indicate that the receiver acted wrongfully, much less fraudulently. On the other point we find no evidence to support the finding, but conclusive evidence the other way. The evidence is positive and satisfactory that whatever Mr. Frawley did in looking after the collateral was done under his employment for the receiver, and that he made no specific charge therefor which was presented to the court, or on the basis of which he received or expected to receive pay. What was said in the previous matter of the kind applies to this.

f. For the facts as found by the court on this we refer to Nos. 193 and 194 of our statement. The court's findings appear to be fatally misleading. The receiver is charged therein with having fraudulently expended $369.72 for the purpose of collecting collateral in the hands of *Thompson,* Rust, and *Gilbert,* knowing that nothing would come therefrom for the trust fund, and that *Thompson* and *Gilbert* were guilty participants because they consented thereto. The truth of the matter seems to be this: Prior to the receivership the electric company had large dealings with Caspari, Whittaker & Co. in disposing of its manufactured products. Business relations with such company were continued by the receiver in aid of disposing of trust property and collecting money due on previous transactions, the liability therefor having been assigned as collateral. When the receiver was appointed this situation existed: The Caspari Company was indebted to the electric company on account for $1,550. Part, as indicated before, with other matters aggregating $3,642.50, was hypothecated to *Thompson,* Rust, and *Gilbert* to secure their indorsements upon the electric company's notes to the amount of $3,169.73. There was a considerable amount of machinery in the possession of the Caspari Company on consignment, some of which was shipped shortly before the appoint-

ment of the receiver and formed the consideration for the liability assigned as aforesaid. When such machinery came to the Caspari Company in the regular course of business, it paid the freight and drew back therefor, the same amounting to $437.87. The receiver treated that as a matter which should come out of receipts for the machinery, and made his charges accordingly. The freight was a lien upon the machinery, which belonged to the receiver subject to the rights of the consignee and of the holders of the collateral. When the receiver paid the freight bill he expected the same to be refunded out of the sales of the machinery. That occurred, except $36.92, which was allowed as a refund by Mr. Rust on a claim made by the Caspari Company, and in the regular course of the exercise of business judgment. In the foreign jurisdiction the machinery in the possession of the Caspari Company, owned by the receiver, and the indebtedness of the Caspari Company, were attached in an action for the collection of a claim against the electric company. In the due exercise of judgment on the part of the receiver, to obtain a release of the attached property, $200.75 was expended. There were storage and insurance charges by the Caspari Company on the property of the electric company, which were a lien thereon, to the amount of $123, which the receiver paid. Other small matters were paid by the receiver, making the total expenditures the $369.67 in question. None of the payments were made by the passing of money from the receiver's hands to the Caspari Company. The various matters were paid by the Caspari Company's retaining the same out of the money due the receiver or upon their indebtedness held as collateral. The collateral account does not seem to have been more than incidentally involved. We find nothing in the evidence connecting *Mr. Thompson* and *Mr. Gilbert* with the matter except that the indebtedness assigned to them was created in the manner aforesaid, and was involved with other matters which the Caspari Company

treated as inseparable. We can discover nothing in any of the transactions which legitimately subjects any of the parties concerned to criticism.

## Appeal No. 6.

Appeal of *Fitch Gilbert.* This relates to a subject not mentioned in the summary of the findings of fact in our statement. The finding on the subject is to the effect that *Mr. Gilbert,* having in his hands, obtained out of collateral duly turned out to him by the electric company, a surplus over the debt secured by such collateral, of $84.50, applied the same upon a $710 note indorsed by him for the electric company and which he was obliged to pay, when he should have turned the same over to the receiver, the collateral not having been given to him to secure his liability upon such note. The only question involved on the evidence is whether *Mr. Gilbert* held the collateral to secure him against loss as to the $710 note as well as the indebtedness upon which the rest of the proceeds of the collateral were applied. There was no evidence on the question except that of *Mr. Gilbert.* He gave a detailed statement of all the transactions as to a long, involved matter, not very difficult to understand, however, upon a careful study thereof, the transaction in question being a part of it. The controversy was whether, when he indorsed the $710 note, he obtained as collateral in consideration thereof whatever surplus might come out of a Baker & Co. note of $1,500 which he held as collateral in respect to other matters. In answer to the interrogatory, "Now, you may state what security was given you at the time you indorsed this $710 note," he said: "Practically all the account of the National Electric & Development Company of San Francisco and a small balance of the C. H. Baker & Co. note of $1,500."

*Gilbert's* right to apply the money as he did was sub-

mitted to the court, as were most of the matters which have passed in review, and was approved. December 6, 1893, Mr. Rust filed his petition respecting this matter, stating that Mr. *Gilbert's* indorsement upon the $710 note was procured by the electric company upon the promise of the Baker note as security; that it was turned out to him accordingly; that the proceeds of such note, after satisfying primary liens thereon, the balance being $84.50, was, with the approval of the receiver, applied upon the $710 note, and the sanction of the court thereof was requested. Thereupon, by an order dated December 2, 1893, judicial approval was given. There is nothing in the record to impeach this showing. It follows, necessarily, that the finding and conclusion of the trial court in respect to the matter cannot stand.

## *Appeal No. 7.*

Appeal of *John S. Owen.* The court's finding of fact as to this matter does not appear in our statement. It involves $129.52 excess on collateral turned out by the electric company to *Mr. Owen* over and above money sufficient to pay the indebtedness to secure which it was primarily assigned, and sufficient to pay some other matters, all of which are found to have been properly paid. This surplus, the court found, was free from any claim on the part of *Mr. Owen,* and should have been paid by him to the receiver, but instead of so doing he misappropriated it by applying the same on his unsecured claim against the electric company.

The details of the evidence on this subject need not be stated. Suffice it to say that the sole controversy was whether at the time *Mr. Owen* used the money there was an existing valid agreement entitling him to do so. No question of law was involved. The question was one of fact, and could not be resolved otherwise than in *Mr. Owen's* favor except upon the theory that his testimony in respect to the subject was

·entirely unworthy of belief. We see nothing unreasonable in his evidence. It was positive, clear, and concise throughout. Holding the collateral, and being a large creditor, as he was, that he should have demanded as security the surplus of the note if any should come out of it, was most natural. It was what any business man of reasonable intelligence and prudence would have done under the circumstances. It was what any debtor, under the circumstances, if asked, would be expected to consent to.· It seems that in setting aside *Mr. Owen's* evidence as false, the court overlooked the familiar rule that the undisputed reasonable evidence of one witness, though a party interested, should be given controlling weight in determining a question of fact. *Burnham v. Norton,* 100 Wis. 8, 75 N. W. 304.

The record shows that when *Mr. Owen* claimed a right to the money the receiver did not consent thereto. The situation was such that he was called upon to choose one of three courses of action: first, submit to *Mr. Owen's* position and take the chances of subsequent judicial sanction; second, try conclusions with *Mr. Owen* in an action and take such chances; or third, submit the matter to the court for advice in advance, with or without an expression of judgment in the matter, and follow whatever direction might be given. The latter and more prudent course was adopted. The petition fairly stated the facts as to *Owen's* claim, without any opinion as to the real right of the matter. It closed with this language: "Your petitioner doubts the propriety of litigating or contesting the claim of said *Owen* to said $129.55, and asks the court for directions as to the course that he shall pursue in the premises." An order was entered on such petition, in effect, that the money as applied by *Mr. Owen* should be deemed properly used. It must be obvious that in the face of that situation the conclusion made by the trial court that the money was wrongfully applied could not stand upon any other theory than that the whole administration of the trust

was so steeped in fraud that, regardless of direct testimony, however fair upon its face and however undisputed, and regardless of judicial sanction in the matter, everything done should be deemed wrong until clearly shown to be otherwise. We have not, up to this time, found anything in this case that will warrant a serious thought that there was any such corruption in the administration of justice, involving all concerned in it, from the head down, as that would indicate. We are constrained to say that, since the findings, passing in review, cannot be sustained consistently with the belief that even the judicial director of the receiver was not guilty of negligence in the highest degree.

Frequent reference is made on behalf of respondents to the fact that the advisory orders to which we have referred, and others of the same character, were granted *ex parte*. Of course, that has no significance upon any other theory than that the whole administration was so faulty that every act should be deemed bad not shown clearly to the contrary, where creditors were not given special opportunity to be present and protect their interests,—since the usual course in such matters is to make advisory orders in just the way those in question were made. No one familiar with such matters would, under ordinary conditions, expect that a receiver would obtain in advance judicial advice as to every detail of the business under his charge, or that proceedings to obtain advice should ordinarily be upon notice to creditors. A matter of this kind must necessarily proceed, so far as practicable, the same as any other business matter would be conducted. It involves in the main executive functions of a purely discretionary character, circumscribed, of course, to some extent, by rules, but allowing considerable freedom of action to the receiver without advice, and absolute immunity from liability when acting under judicial direction so within the realms of reason as to entitle him to protection if the judicial head would be so protected if competent to act in the

physical capacity. The receiver is the court, as near as it is practicable for the court to physically have a business matter in charge. He is a mere agent. In handling a large, complicated matter, he must ordinarily keep quite close to his principal, shaping his course in that regard as near as practicable after the manner of any other business agent. He commonly counsels with the court in respect to matters as a business agent would counsel with his principal, keeping such principal reasonably familiar with the affairs, and taking his suggestions in advance of action in many situations not deemed necessary to be made matters of record, but very necessary, in order to do justice, that the court should be able to call to mind upon the conduct of his receiver thereafter being called in question in respect thereto, and also to have in mind when called to deal with his receiver in respect to any matter dependent thereon in whole or in part. All that is necessary to an orderly, safe administration of a receivership trust like the one in question.

Everything depends upon the combined business judgment, legal knowledge, and judicial acumen of the judicial head in such matters. The element of business judgment is of the greatest importance, since there is little or no opportunity for redress in case of error in that field. The judge must necessarily depend to a great degree upon the ability of his receiver; but in the end every act is the act of the court. In this is seen what vast responsibilities, in receivership matters of which this is a type, rest upon the judicial administrator. If he excels as a business man, or has one for his agent who so excels, the results will ordinarily be of the best. If his business judgment is but limited and is not helped out by that of his receiver, however honestly everything may be administered, the end is likely to be disastrous. But whether it be of the best or the worst, within the uttermost limits of business discretion under all the circumstances, the conclusiveness is the same. It is the only way yet de-

vised by human wisdom for doing such things. Though re-
sults up to the high standard of the better class of privately
managed business enterprises cannot be expected, the in-
firmity in that regard cannot be helped.    It can best be
guarded against by great care in the selection of receivers,
and the judge keeping in close touch with them.    But when
the judicial director gives the use of the talents he possesses
to the situation, his duty is fully performed regardless of
consequences.    Parties so circumstanced as to require judi-
cial assistance of that character must take the agent provided
in the due course of law.    There is no way, as in private en-
terprises, of replacing such agent by another if the one first
selected is not found satisfactory.    In this may well be ap-
preciated how careful the court sitting in review should be
in condemning the judicial administrator or his agent as
being inexcusably negligent or something worse.    They often
occupy very trying situations.    They have at times to deal
with a multitude of creditors so smarting under the sting of
pecuniary loss as to bias them greatly in judging the actions
of others.    It is not to be wondered at that sometimes, after
a receiver and his director have done the best they can with
a wreck for which they were in no wise responsible—one that
has so little of real substance in it, as demonstrated by the
end—interested parties cannot comprehend how such a thing
could be and will not excuse it, and the receiver and all con-
cerned suffer in reputation, if not otherwise, for what they
could not help.    All this should admonish courts of review
to step with caution in reviewing such administrations;
should admonish judicial administrators to exert themselves
to the very best of their ability to fully meet their great re-
sponsibilities, and, in case of inexcusable conduct, should
hold them and their agents morally responsible where the
law furnishes no remedy, and otherwise responsible to the
extent of legal obligations.    These generalizations are not
intended as a criticism of the administrator of the trust in

question further than the points decided go. So far as we have gone, justice requires us to say it compares fairly with the general run of such administrations, considering all the circumstances, which have come under our notice. It is well to keep in mind in original jurisdictions, as we endeavor to do, that the policy of the law is toward holding judicial administrators and receivers to a more rigid rule of responsibility in these matters than formerly, as is well evidenced by the statutory removal of exemption from liability incident to the judicial office under some circumstances, as in sec. 2583, Stats. 1898. *Lefferts v. Calumet Co.* 21 Wis. 688. Further indication of that is found in *Speiser v. Merchants' Exch. Bank,* 110 Wis. 506, 86 N. W. 243, where the court, speaking by Mr. Justice DODGE, to the end that a higher standard might be set, said:

"Only in the wise discretion and firmness of the courts can there be found prevention or remedy for the abuse and disgrace of judicial conservation of estates from their enemies, only to permit their destruction by their salvors. If such abuses continue, the beneficent power of a court of equity to take to its sheltering arms a litigated estate while rights to it are being established will become a mockery, worse than the avoided perils as it is more effective."

The great truth, so forcibly and tersely uttered, might well be posted in every judicial presence in the land.

### Appeal No. 8.

We have now arrived at a point in this great case where we are in view of the last act of the drama which was found by the trial court to have had its inception before the commencement of the *Barber* action, to have been born in iniquity, and to have progressed through all its stages of growth to the final consummation without any diversion from the original wrongful purpose. We have come to the point where the actors are to take their places for the final performance.

As we have progressed through over four years of history, seeking diligently for tangible evidence of fraud, from which, if at all, the alleged original fraudulent purpose was to be inferred, we have not found it. If we had started by looking through the mental coloring of an impression of wrong-doing caused by the history of things done prior to May 18, 1893, and journeyed in pursuit of evidence to dispel it, may-be things would have appeared differently. As we now take our bearings for the final view that is to end our investigation, we need not "refer to the point from which we started to determine where we now are," because we have not drifted from a direct course. The point of starting we have endeavored, with effect, it would seem, all the time to keep in sight. Only the ending was in obscurity. That is now so in evidence that it seems clear that it cannot be tied back to the alleged and found original fraudulent purpose. We have endeavored to consider carefully everything of importance upon which counsel rely and which we must presume greatly influenced the trial court in the conscientious disposition of this case,—we have no reason to doubt for an instant but that there was such disposition of it—and yet no substantial evidence of fraud has been seen. We may well refer to some of the more significant of such things which have not heretofore been specifically mentioned, lest it be thought something has been overlooked.

Probably the most significant of them is the circumstance that Mr. Hayden, prior to the commencement of the Barber action, had been for a long time the attorney and an officer of the insolvent, and that he severed his relations as such attorney just before the action was commenced and was then instrumental in placing the insolvent's business in the hands of a receiver, he being at the same time a creditor and acting for and interested with others who were likewise circumstanced, some of whom had from time to time obtained security for their claims, and many of whom were Mr. Hay-

den's business associates. Without some tangible evidence of fraud those situations have a perfectly innocent aspect under the circumstances. If Mr. Hayden was to commence the receivership action, it was, of course, proper that he should first sever his relations as attorney for the insolvent. Probably it were better had he retained such relations and let some other attorney commence the action; but there is little or nothing in that when we see that in the very nature of things no adversary element existed in a sense that the interests of the insolvent called for any opposition whatever to the receivership proceeding. There was no great impropriety, if any, in Mr. Hayden representing the plaintiff, expecting that the insolvent would admit the facts alleged which were relied upon to secure the sequestration, so long as there was no ulterior motive; though, as before indicated, it were better if some one else had performed the service. There was no question but that the electric company was an eminently proper subject for a receivership action. It was hopelessly insolvent, as all agree. The interests of all creditors and stockholders, and of others legitimately interested in the corporate assets, demanded judicial treatment of the kind administered. No time was required to diagnose the case to solve doubtful questions on that point. The voices of all, could they have been heard speaking legitimately, would have been in harmony for the creation of the trust. That the proceedings were speedy was most natural. They are usually so under similar circumstances, in order that an equitable levy may be accomplished before individual adverse efforts for preference, or efforts to institute sequestration proceedings in different jurisdictions, have unduly complicated the situation. Proceedings somewhat unseemly in such cases from one aspect, are not so from circumstances that often exist in view of the infirmity of judicial remedies to always secure without needless expense a single judicial control of the property of an insolvent corporation for the

benefit of its creditors. Mr. Hayden testified distinctly, and he is corroborated by all the circumstances, that he was active in commencing the *Barber* action for the sole purpose of putting the assets of the electric company in possession of the court before opportunity were given for the institution of numerous embarrassing actions, liable to be detrimental to the general interests of creditors.

Considerable significance is given to the fact that Mr. Hayden not only commenced the litigation, but that after charging *Mr. Barber*, his employer, the sum of $200 for services, the charge was, in September thereafter, transferred upon Mr. Hayden's books to the account of R. E. Rust, receiver. That circumstance is urged upon our attention with great force by the learned counsel for the respondent, and we must assume that it was urged with like force upon the learned trial court, from the fact that, although it has no significance whatever when the case is viewed in its proper aspect, it found a prominent place in the court's findings. Mr. Hayden testified, in effect, that he transferred the charge of $200 from being against *Barber* to an account against the receiver, because of his judgment in regard to the propriety of such charge being made a receivership expense. That the reasonable expense incurred by the attorney in the commencement of a receivership action, such action being commenced in good faith in the interests of all the creditors, is a proper charge upon the trust fund, there can be no doubt. It is commonly presented as such and is allowed or disallowed according to the circumstances, the former being the general rule where the circumstances indicate clearly that the proceedings were judiciously commenced, with no ulterior purpose in view. On this subject, in one of our late text-book authorities it is said:

"In the control of the trust property a court of equity will recognize every substantial equity, and when one party, for the benefit of himself and all other parties interested in the

property of a corporation, begins an action or proceeding for the preservation or administration of the property, and for that purpose a receiver is appointed, equity would require that such party should be reimbursed from the trust property for counsel fees and expenses incurred in procuring the appointment of such receiver." Gluck & Becker, Receivers, 354.

Such text, for support, refers to *Central R. & B. Co. v. Pettus,* 113 U. S. 116, 5 Sup. Ct. 387, and *Davis v. Bay State League,* 158 Mass. 434, 33 N. E. 591. True, as the author indicates, the authorities are not all one way on this question. But, having the support of the federal supreme court, the presentation of such a charge for allowance in a receivership proceeding could hardly be deemed wrongful, much less an indication of fraud. In the federal case cited, Mr. Justice HARLAN at great length discussed the subject, in the course of which he said:

"When creditors filed their claims they had notice, by the bill, that the suit was brought, not exclusively for the benefit of the complainants therein, but equally for those of the same class who should come in and contribute to the expense of the litigation. Those expenses necessarily included reasonable counsel fees, which, upon every ground of justice, should be estimated with reference as well to the claims of the complainants who undertook to protect the rights of all the unsecured creditors, as of the claims of those who accepted the fruits of the labors of complainants and their solicitors. We are of opinion that the appellees are entitled to reasonable compensation for their professional services in establishing a lien in behalf of the unsecured creditors."

Though the circumstances of that case are different from those of this one, the principle involved there is identical with the one here. We have not been able to discover any ulterior purpose in the commencement of the *Barber* action, or in any of the proceedings therein. The fact that there were secured creditors, and that many of them were clients of Mr. Hayden, and some of them his business associates, is not significant, since it appears that the rights of general

creditors were not trespassed upon by the holders of such securities, and that the secured creditors had equal rights with others in the trust to be created. It may be easily seen that the commencement of the action was more beneficial to the unsecured than the secured creditors. The chief interests requiring protection were those of the general creditors, to the end that their rights to equal liens upon the corporate assets might be judicially determined and enforced. Mr. Hayden's position as to one class was, in that light, in no wise hostile to the other. The fact that an officer of the corporation and a creditor was appointed receiver does not indicate a wrongful purpose. The fact that one is a creditor of an insolvent corporation rather tends to suggest the propriety of preference being given him in the selection of the receiver than otherwise. *State ex rel. Fourth Nat. Bank v. Johnson,* 105 Wis. 164, 183, 83 N. W. 320; *Frink v. Buss,* 45 N. H. 325; Burrill, Assignments, § 57, and cases cited.

The fact that the receiver and a much-interested creditor, *Mr. Owen,* were brothers-in-law and business associates, having desks side by side in the same office, which is urged upon our attention as important, is hardly worthy of attention in view of all the circumstances and the law applicable thereto heretofore discussed. It would be exceedingly embarrassing to do business if a person of good standing, because of having ordinary business relations with a class to which some of his wife's relations belong, must be regarded as so liable to unduly favor them in performing a duty where they and others are concerned, that his actions in the matter should be considered as tainted with fraud till rebutted by satisfactory evidence.

Many other circumstances are disclosed by the record and forcibly presented by respondents' counsel, which we may well presume from the whole record, in connection with counsel's attitude, materially influenced the court, but which do not, when mentioned either by themselves or in connection

with anything else appearing, have any material bearing.
Perhaps we should not pass from this field without mention-
ing, in connection with what has been said, the circumstance
referred to by counsel, and which was given a place in the
findings of the court not only as indicating fraud but also
professional impropriety,—that the attorney or counsel for
the receiver performed the professional service of assisting
in making the formal proof for some of the secured credit-
ors, to be filed in the receivership proceeding. There being
no contest as to the claim, merely assisting the creditor by
preparing his written proof for him would seem to have no
significance. Of course, the assumption indulged in, in em-
bodying such circumstances in the finding, that the position
of the secured creditors was necessarily hostile to that of the
unsecured creditors and therefore that it was improper from
a professional standpoint for the attorney for the receiver to
act for the secured creditor in such a matter to the extent
indicated, is entirely unwarranted.

Since it seems that nothing hereafter to be reviewed can
change the aspect of the case as to the major fraudulent
agreement, alleged and found to have been made, and to have
from before the *Barber* action to the end of the receivership
proceeding ruled it, it is thought best now to decide that we
find no such original fraud, and that the finding of the court
in that respect, in No. 113 of our statement, cannot be sus-
tained.

We will now take up the merits of this appeal. The trial
court's view, in the main, will be found in our statement,
113 to 128 inclusive, 176 to 178 inclusive, and 195 to 239
inclusive of the facts, and 19 to 22 inclusive of the law.
But in order to thoroughly appreciate such view, one should,
perhaps, examine the entire findings as contained in the
main in our statement. The material matters to which this
opinion must relate will be deemed sufficiently set forth here
by our reference to such statement, except as we may inci-

dentally restate them. Much that is covered by the findings, a great part of which was omitted from such statement because not necessary to be considered, and much already considered, leads up to the conclusion that the determination in the court's finding No. 113, must now be rejected. That includes most of the circumstances leading to the court's conclusion that Mr. Frawley, soon after the *Barber* action was commenced, became a party to the alleged original wrongful agreement. That element in the trial court's decision, necessarily, is eliminated from the case with our disapproval of the findings upon which it is based.

A second fraudulent agreement is found to have been made. In finding 201 it is held that early in the receivership it was agreed between the receiver, Mr. Frawley, and Mr. Hayden, to so manage the trust that nothing would be left for general creditors, and it is said that the services of Mr. Frawley were rendered with that end in view, and that in consummation thereof, at the close, such proceedings were taken as to allowances to be made to the receiver for himself, his attorney, and counsel, that all the trust fund was divided between the three parties, such fund amounting to somewhat less than $13,184.11, and that, there not being enough to go around and satisfy all their demands, the deficiency was prorated according to the amounts of the judicial allowances. This indictment is quite as severe as the one we have disposed of, and it is in great part dependent upon the misapprehensions of law and fact upon which the original finding of fraud was predicated. If the learned trial court had viewed the case from the standpoint we have reached, it is very probable that this other supposed fraudulent agreement would not have appeared to the judicial mind. There is no direct evidence of it. In determining whether there is any circumstantial evidence thereof, it seems best to treat the matter by the inductive rather than the deductive process of reasoning.

It is true, as found, that near the close of the term of office of the judge who supervised the receivership proceeding for over four years, he passed the receiver's account and allowed him for his services and expenses for attorney and counsel a sum exceeding the total amount of the trust fund in hand, leaving nothing for general creditors, and that the deficiency of money to pay the allowances was prorated. But the right or wrong of that is determinable only by passing upon assignments of error as to facts found regarding occurrences which took place, if at all, before the proceedings for the allowance of the receiver's final account. What is left to be considered appertains particularly to what occurred during the period commencing with the preparation for the accounting, but must be viewed largely in the light of what occurred theretofore.

The findings touching this subject are considered in appeals Nos. 1 and 2 as to the Asheville matter, in appeal No. 3 as to the Bucyrus matter, and in appeal No. 5 at "a" and "f" as to the Brookville matter. We need not refer to them now more than incidentally. Since the unfavorable inferences based thereon must fall, with them must go one that the receiver managed his trust for the sole benefit of himself, his attorney, his counsel, and certain business associates. Finding 202, to the effect that that much of Mr. Frawley's services was for the special benefit of the holders of hypothecations, though he charged the receiver therefor and was paid out of the general assets, and that he charged upon his books exorbitantly and dishonestly for services rendered the receiver and holders of hypothecations, obtaining his pay from the trust fund,—we have not been able to find any evidence to sustain. If we read the evidence aright the truth of the matter has been before stated; but it is so very important to this appeal that it will bear restatement.

It seems to us that the evidence is undisputed that Mr. Frawley's services, from first to last, were for the receiver;

that the book charges mentioned in the finding refer solely
to services rendered for the receiver; that they were made as
memoranda of the transactions, not as representing the com-
pensation to be demanded for the particular services men-
tioned; that it was not designed to ask for compensation upon
the basis of such charges, nor was that done.   The evidence
is without dispute that none of such charges were presented
to the court which made the allowance on account of Mr.
Frawley's services, nor were known of by it.   The error as
to this is connected with another in that the court found that
Mr. Frawley's book charges aggregated $8,818.31 and that
he was paid a lump sum in addition thereto of $3,092.42.   It
is difficult to see how a finding could have been wider of the
mark than that and yet have some shadow of connection with
the facts.   We feel constrained to say this that nothing may
be left of so erroneous a record.   Probably the extraordinary
finding comes of the court's having adopted, without careful
study, a finding suggested by counsel, conscientiously pre-
pared, doubtless.   The practice which sanctions that, when
the court, especially in a complicated case, does not make
careful study of the suggested findings in all their bearings
before making them official, is quite liable to lead to bad re-
sults.   It is a practice which, in the judgment of the writer
of this opinion, it would be well to discontinue by judicial
action if that can be done, and if not, by legislative aid.   The
profession and the judiciary, and the parties litigant as well,
would be greatly benefited by such a reform.   Experience
shows that counsel, the most able, honorable, and conscien-
tious—and to the learned counsel for respondents we may
well give a place in that class—after the close of a hotly con-
tested case, are not in the frame of mind, ordinarily, best
suited to drafting the findings which must express the judg-
ment of the court.   That is no criticism.   It is only an ac-
knowledgment of the natural infirmities of the most perfect
of us.   All are affected, regardless of ability or purity; the

difference is in degree. The making of the findings is purely
a judicial function. Sec. 2863, Stats. 1898. Aside from
the custom which sanctions it, it would seem to be just as
proper for the judges of this court to receive from con-
tending counsel suggestive samples of the opinion and judg-
ment to be rendered, with the expectation that one will
be chosen, either as written or with changes to correspond to
the views of the judge, and then placed on file as voicing the
judgment of this court, as for a like practice to obtain at the
circuit court. It is hoped that nothing said here will be re-
garded as a criticism upon court or counsel. Both are dis-
tinguished, able, and honest. It is the practice that is criti-
cised,—a practice for which no one connected with this case
is responsible. To that practice, it seems, many of the mis-
takes in the findings before us are attributable. Things look
far different to counsel than to court, as is evidenced by the
fact that sometimes counsel will conscientiously claim here
that the evidence is all one way in support of their position,
when from the judicial standpoint it is largely or wholly op-
posed thereto.

True, the court allowed to the receiver a sum for expenses
on account of Mr. Frawley's services, $3,092.42 in excess of
the charges which by the evidence upon this trial were found
upon Mr. Frawley's books. But, as was said in another part
of this opinion, the allowance was made on the basis of one
entire charge for all the time devoted by Mr. Frawley to the
receivership business, from May 23, 1893, till the close, De-
cember 30, 1897, the rate being $50 per day for time actually
spent. There was really no arbitrary allowance of a lump
sum of $3,092.42 or any other lump sum. However, if the
court had seen fit to make an allowance without regard to
specific charges or a *per diem* basis, it would have accorded
with the practice usually adopted in such matters, as the cases
cited by counsel for appellants, and others referred to, and
more that might be referred to, sufficiently show. *Greeley v.*

*Provident S. Bank,* 103 Mo. 212, 15 S. W. 429; *Bound v. S. C. R. Co.* 43 Fed. 404; *Boston S. D. & T. Co. v. Chamberlain,* 66 Fed. 847; *Maxwell v. Wilmington Dental Mfg. Co.* 82 Fed. 214; *Stuart v. Boulware,* 133 U. S. 78, 10 Sup. Ct. 242; *Harrison v. Perea,* 168 U. S. 311, 18 Sup. Ct. 129; *Richardson v. Tyson,* 110 Wis. 572, 86 N. W. 250; *Remington v. E. R. Co.* 109 Wis. 154, 84 N. W. 898, 85 N. W. 321.

From evidence that it had been customary for Mr. Hayden during his professional life to enter from day to day charges for legal services performed by him, and that as regards the receiver he had charged items amounting to $479.74, including $50 for expenses and the $200 originally charged against *Mr. Barber* as aforesaid, the court found that he rendered no services for the receiver other than the specific matters so charged, and, we assume, less the $200. We confess inability to find the evidence in support of that conclusion. Counsel for respondents do not satisfactorily point to any. It seems based, in the main if not wholly, on an inference that since it was Mr. Hayden's custom to make charges for specific professional labor, the reasonable probabilities were that he did so in every instance. That is, as we understand it, a custom being established as regards one's private business, it must be presumed to be universal. We do not understand there is any such rule of evidence. A custom in regard to a particular matter is controlling in the absence of evidence to the contrary (Jones, Ev. § 54), and in doubtful cases. But why should that be applied to the matter under consideration? Is the truth in respect to the matter doubtful? The learned trial court no doubt so thought. Starting with the finding of a general fraudulent purpose and finding later a specific fraudulent agreement,—of course every question was necessarily doubtful that depended upon oral evidence of the guilty parties. It is more than probable—it is pretty certain—that the finding in question would not have been made, with the elements out of the case which we must regard, from

what has been said, to be absent. But the great difficulty with the conclusion of the court is that the supposed principal fact from which it was inferred is not established by the evidence. In this instance it seems best to quote the finding and the most salient parts of the evidence supposed to have warranted it. This is the finding:

"The defendant H. H. Hayden has been in the continuous practice of the law in the city of Eau Claire since the year 1872. From the time of the commencement of said receivership and for many years prior to May 23, 1893, it was the custom and rule of said Hayden in the conduct of his business to keep an accurate set of books of account, in which he entered in detail an itemized statement of all charges made by him or by any one in his employ for legal services as they were rendered from day to day or within a short time after the rendition of such services."

The evidence, in the main, was this: Mr. Hayden's books were offered in evidence. They showed specific charges in the receivership matter as follows:

| | | |
|---|---|---:|
| May 31, 1893. | Day's services................................. | $50 00 |
| June 26. | Examination of Mulland Co. matter ................. | 5 00 |
| June 23. | Advice Ft. Worth contracts ......................... | 5 00 |
| June 30. | To service on Bucyrus contract ...................... | 5 00 |
| July 26. | To services on Winnipeg, etc., matters............... | 25 00 |
| Aug. 18. | To proof of claim before U. S. court commissioner .... | 5 00 |
| Aug. 28. | To expenses at Milwaukee on reappointing receiver... | 15 00 |
| Sept. 4. | To services on order to continue time of sale.......... | 50 00 |
| Sept. 19. | To appointing Rust receiver in second action ......... | 200 00 |
| Sept. 22. | Drawing papers for settlement with Commercial Electric Co................................... | 15 00 |
| Oct. 19. | Services at Detroit, etc............................ | 49 80 |
| May 24. | Services by Walmsley, etc.......................... | 10 00 |

These, with some other charges for expenses, aggregating $50, are all that appeared. There was an interim of about two years, being from May 3, 1893, to May 24, 1895, in which there were no charges at all. No charges of any moment appeared for services such as would ordinarily be rendered by a general counsel. Mr. Hayden testified as follows:

"I have been in the habit for many years of keeping accounts in my business. In most cases I put down charges for each day, but not as matters occur,—sometimes days

afterwards. That is not true as to all matters. I tried to have that practice followed in my office, but being unable to do so abandoned it. I tried to get all on the books done by my clerks, because they were interested in the matters. Charges went on my books as to most clients, but not all. I have been attorney or counsel in other receivership cases. In the insurance company receivership I hardly made a charge. In most matters of accounts I have endeavored to charge on my books for services shortly after the same were rendered. The reason why in this case I did not charge on my books for services rendered is that I expected my compensation would be fixed by the court at the end of the receivership. Nearly all the charges in this matter on my books are for services rendered by Mr. Miner. I think I made no entry whatever in this matter from beginning to end in regard to any of my consultations with Mr. Frawley, the attorney for the receiver, either alone or with the receiver. I think I made a few entries where the receiver himself personally called upon me to do some particular piece of work which belonged to the attorney, and also an entry or two where other persons were interested in the particular work which I did. I did not think, because I was looking forward to the settlement of my compensation by the court, that it would be proper to keep an accurate account to aid him. I thought the court well informed as to my services and their value. I did not think an itemized account from the beginning to the end would be required. I think the manner of dealing with such matters is different than with an ordinary client; that the court usually allows an annual compensation, or averages it that way. That has been my experience. I have been familiar with cases where that was the practice. I do not recall to mind instances. I did not have, when my charges were passed upon, and never had, any memorandum from which to determine the time spent by me, except the charges upon my books. Never had any such memorandum. Generally my matters are charged. I did not itemize my account for the receiver of the insurance company, nor for Mr. Smith, the receiver of a crockery company. I expect in such matters an allowance will be made by the court regardless of charges, the consultations are so common and so petty. I did in this matter about all of the work of counselling and

advising. I did the work of counsel and Mr. Frawley that of attorney. I did some little work on the hypothecations at the request of the receiver, and was paid therefor. I did a large amount for the holders of the hypothecations, and they paid me therefor. I was employed as counsel for the receiver immediately upon his appointment. I continued in his employ in that capacity till the end of the administration. My services were mostly of an advisory character for the receiver and the attorney. When I did work for the holders of hypothecations there was no question as to their rights as regards general creditors. I have had a good and large practice since 1872. My usual charge per day for services is $50. The reasons why I did not charge in this matter for all services, are, first, the nature of the employment being exclusively matters of advice, rendering it difficult to make specific charges; second, my system of keeping my accounts was somewhat unsettled because my partner died about when the service commenced, and they drifted along without charges, except now and then a charge at the commencement of the business. My services for the receiver occupied 100 days. There were many matters attended to of an embarrassing nature. There were a great many complications. The business was scattered all over the United States. I have performed no services for the holders of hypothecations where their interests conflicted with the receiver's. I have not made any attempt to itemize my services for the receiver. I could not so present my claim. I did not bring suits, but all matters during the receivership where there was litigation were brought to me for advice. The reasonable value of my services is $50 per day, and $5,000 in the entirety."

There was much more evidence, but none to change the effect of the foregoing. Mr. Hayden's books showed that in many instances he did keep, as testified, carefully itemized accounts. His evidence was fully corroborated by Mr. Frawley's and other evidence, as to his having in fact acted as counsel in the receivership matter through the whole administration. Comment thereon seems unnecessary. It does not appear to us to bear out the finding. On the contrary, the finding seems to be clearly against the preponderance thereof,

not only when we look at the evidence by itself, but in connection with all the other facts and circumstances in the case. On the whole the evidence shows that Mr. Hayden did not have any custom as to keeping accounts upon his books in an itemized form where his services were of long duration and strictly of an advisory character. In his professional experience in receivership matters, it seems he had not attempted to make specific charges. His judgment was that it was hardly possible to keep an account that way for services rendered as general counsel, and that it was not required. That is reasonable. It is according, we should say, to common experience among professional men where the service extends over a large period of time. We are safe in saying that a general counsel in a large business matter rarely makes charges for advice as rendered from day to day, at least in a receivership matter where the compensation is, as a rule, to be allowed by the court to the receiver, not to the counsel, at the closing-up of the trust, and is to be fixed, not with regard to charges, but with regard to services actually performed, the reasonable necessity therefor, and the value thereof to the trust and other considerations. It looks as if the learned trial court made the finding as to this matter upon an entirely wrong basis. It seems to have been supposed that a general counsel for a receiver should keep an itemized account of every instance where he acts,—something out of reason and experience. We find no evidence in the books that any such practice was ever supposed to be necessary, and we find no instance even where it was followed. The finding as to Mr. Hayden's services and the value thereof cannot be regarded as even an aid to the determination of what was right. The same is true of the finding in regard to the value of the services rendered by Mr. Frawley. There is no need of prolonging this opinion to go further into matters of detail in respect to this subject. The findings as to Mr. Frawley's services are based on the false assumption

that what he did in aid of collecting hypothecated matters was done for the holders of the hypothecations under the cloak of his position as attorney for the receiver, and that was based on the false assumption that the receiver had no interest whatever in such hypothecations which even the order of his court would protect him in conserving, and on the false assumption that the holders of the collateral were necessarily in a capacity hostile to general creditors; and on other false assumptions of fact and of law to which we have referred, and others which we will not review, since it would add nothing in effect to what has been said; and further by entirely ignoring the undisputed oral evidence in the case that all the services rendered in regard to matters which had been hypothecated were rendered at the request of the receiver. The court found that under ordinary conditions the services rendered by Mr. Hayden would have been worth the amount charged on his books, those of the receiver $4,000, and those of Mr. Frawley $3,000; but that they were not entitled to anything on account of their having been guilty of dishonest conduct to the great prejudice of the general creditors, for which they should be compelled to restore all paid them, aggregating $23,523.86, with interest. If the underlying conclusions as to that were warranted, the ultimate conclusions would be just; but they were found by such misconceptions of the law and the evidence that they are not only wrong, but so radically wrong as not to aid us in determining what is right.

We must now consider the transaction of settling the receiver's account and the steps leading thereto. That includes the filing of the account in early June, 1897, and the proceedings thereon till the final order was entered. To understand aright what occurred during the last few days of the receivership, acts must be viewed in the light of the situation in which all the characters concerned were placed. We are now able to do that, having discovered that the findings

which would otherwise interfere therewith are unsupported
by the evidence and were made otherwise through miscon-
ceptions of the law. We must assume, until it otherwise ap-
pears by some tangible evidence, that there were concerned,
in settling the account, an upright referee, receiver, attorney,
counsel, and court. We must take judicial notice that im-
mediately after the April election of 1897 it was known that
the receivership would have to be closed by the end of the
year, or the matter of settling the long, complicated account
would necessarily go before a judge entirely unfamiliar
therewith. We must place ourselves in the position of the
parties charged at this time, as near as we can, and look for-
ward. To do otherwise would be unjust. It is entirely con-
sistent with an honest administration of the trust that all
should have deemed themselves bound to close the matter up
before the time arrived for the judge who was familiar with
it to pass out of office. He had been the real administrator.
Others had been merely his agents. Everything was ready
for the closing except a few minor matters. The laborious
task was yet to be performed of passing upon the vast ac-
count and adjusting the compensation of the officers of the
court for the time spent by them during a period of four
years and a half. The relations, from a business standpoint,
between the judicial agents and the presiding judge, were
much the same as between a private principal and his agents,
with this significant feature added: there was an army of
parties to the litigation very likely to assume an attitude of
hostility to the court's instrumentalities, upon facing the sit-
uation then apparent, that there would be so little for them
in any event that it would hardly pay the expenses of dis-
tribution. No one could ever be expected to devote the labor
to the matter necessary to become equally fitted to deal justly
in respect thereto, with the judge who had been in touch with
it from the beginning. The interests of the creditors were
as much at stake as those of the receiver and his attorney

and counselor. The labor of the latter to be compensated for was large, and likely, under the circumstances, to require a most thorough investigation. While claims of the former were in the aggregate large, the amount obtainable by each was so trifling that except in case of a *prima facie* showing, a pretty strong one, of wrongdoing, confidence in the court and its officers would ordinarily deter dissatisfied creditors from making complaint. The administration had been kept from the start exceptionally under the eye of the judge. The period covered, as indicated, was over four years. During that time no report had been filed in the court, and none had been required. In passing upon the account, necessarily, the entire administration, from the beginning, was to be to some extent investigated. Nothing approaching the proceeding in magnitude and complications, probably, had ever before occurred in that jurisdiction or anywhere else, where the parties chiefly concerned had carried the responsibility. Nearly $500,000 in nominal value of assets had been conserved; about $100,000 in money had been obtained therefrom aside from that which legitimately went to preferred creditors. Nearly 250 administrative orders had been granted on as many presentations by petition or otherwise to the court. The amount of the claims filed and considered represented an indebtedness in the aggregate of hundreds of thousands of dollars. The number of creditors was very large. The consideration and adjustment of the claims involved innumerable disputes, many of which imperfectly or not at all appeared upon the record. There had been many actions tried in home and foreign jurisdictions, the latter embarrassed by the difficulties commonly experienced when a receiver goes out of his state. No reason whatever existed for this vast subject to go before a judicial officer unacquainted therewith, for final adjustment. The attorney and counsel for the receiver owed it to him, themselves, and the court, to use their best efforts not to allow the term of office of the presid-

ing judge to end without his leaving upon the records of the court the judgment of the law in respect to such matter. The receiver, as regards the court, his legal assistants, and the army of creditors whose interests he had, as the court's agent, in personal charge, and as regards himself, had a like duty. Above all the sitting judge, by every consideration of official duty, owed it to his receiver and the creditors to open the doors of his court as wide as due process of law would permit rather than to let this mass of things be unsettled when he should doff his robes of office at noon on the first Monday of January, 1898. Failure of the attorney and counsel to use the greatest diligence practicable to bring this matter to a termination before that time, would render them unworthy of that trust and confidence which is to the professional man his greatest support. Failure on the part of the presiding officer of the court would be a judicial outrage. He would carry into private life a burden of duty unperformed which no right-thinking man would assume. We feel confident that this is not an overdrawn picture. More likely it is incomplete. The actors in the matter in the spring of 1897 could see it well perspectively. We that have now to deal with it can see the same better, perhaps, retrospectively, since, notwithstanding the trust was settled in a most orderly manner until the closing scene was reached, dissatisfaction by the army of disappointed creditors, honestly thinking, no doubt, they had been greatly wronged, their complaints being necessarily dealt with by judicial agencies without the aid of personal touch with the matters as they occurred, resulted, in the due performance of judicial duty, so far as seen from the light in hand, in the whole subject matter of the administration being opened up; and, after some two years of investigation, at great expense, and by the aid of eminent counsel—every detail of such administration being gone into, without the aid, however, of the chief instrument in the matter, the receiver, who in the meantime had gone to render

his account in another jurisdiction,—it was found that, upon all grounds claimed, aside from those involved in the compensation of the receiver and his assistants, accountability existed for $15,221.54, and also for all sums paid to the receiver, his attorney, and counsel, upon grounds rendering them infamous if true; and now, after four years more of labor, including months of study here before dealing with the matter finally, we have not been able to escape the conclusion that the receivership was honestly conducted and that at the most there is liability for $524.26 on the ground of negligence, and an excessive allowance as compensation for the personal services of the receiver, and for expense incurred for the services of an attorney and counsel, involving no moral turpitude.

Standing as near as we may, as before indicated, where the parties whose conduct in question stood in the spring of 1897, some things that would otherwise be difficult to understand are reasonably plain. We must assume, in the absence of clear evidence to the contrary, that, from the first act looking to a final settlement to the end, every one concerned in it expected that the presiding judge would judicially close the matter before his term of office expired; that no act was done on the part of the receiver, his attorney, or counsel, or the presiding judge, that was supposed would prevent that consummation. We must also assume that those that came in time to act adversely, and their attorney, understood the situation, and that in all the proceedings leading up to the final conclusion they expected that the last act would take place before the expiration of the presiding judge's term of office.

The receiver, his attorney, and counsel prepared the final account, as appears, in March, 1897. Unusual attention was given, in doing so, to details. It was exceptionally complete. The only thing which seems to have been omitted therefrom, which some accounts often contain and which, by the policy

of our laws as to assignees, it should have contained (sec. 1701, Stats. 1898), was a statement of the amount claimed in the whole as compensation for the services of the receiver and his expenses for legal assistance. That is not very significant, inasmuch as such matters are often submitted to the court for adjustment regardless of any claim made for any specific sum. The report contained many schedules so constructed as to be easily understood by the presiding judge with the aid of his knowledge of the matter. There was one of a large amount of accounts receivable that came from the insolvent supposed to be of little value, with appropriate explanations, where that was thought necessary, these being accounts in the main subsequently sold to Mr. Thomas as detailed in appeal No. 1. It also contained a list of accounts created by charging to holders of collaterals money spent in endeavors to collect the same, the $524.26 passed upon in appeal No. 2 being one of them. Each of these accounts was accompanied by a reasonably appropriate explanation. The report contained other schedules, in the whole presenting the entire situation with exceptional completeness. As stated therein, as to all important transactions an advisory order was on file authorizing or sanctioning it. It is hard to do full justice to this report in a brief summary. Suffice it further to say that it suggests that the services of an expert bookkeeper, under the guidance of a skilled lawyer, were rendered in its preparation. It was verified May 18, 1897. With reasonable promptness it was presented to the judge with a lengthy petition referring to those parts ordinarily expected to be carefully examined, with reference to past and future action, and requesting a time and place to be set for settling the same and determining the compensation to be allowed the receiver for his services and the services of his legal assistants, and his discharge. The report was not immediately placed on file, but the evidence is to the effect that the judge took it into his possession for examination and

·examined it. An order was promptly entered upon this report, authorizing the disposition of the stale accounts, and the few remaining articles of personal property, in the way in which such matters are usually conducted. The order was duly executed and the proceedings in that regard promptly and fully reported to the court and approved. The details as to this report sufficiently appear in appeals Nos. 1 and 2. This left nothing to be done but to pass finally upon the account. Preparatory to that a supplemental report was ordered June 24, 1897. That was filed June 30, 1897, the day set for the hearing of the account. It showed $14,242.68 to be dealt with in paying the final expenses yet to be adjusted, and creditors, in case of a residue. It showed upon its face that all payments which had theretofore been made to the receiver, his attorney, or counsel, for services and expenses, were paid upon account and as per the order of the court, suggesting that the final compensation, it was supposed, would be fixed at the end of the administration as is usual in such matters. This was the situation early in July, open to inspection by any one interested. As indicated, the report, upon its face, was an example of order and complete submission to judicial direction and observance thereof. The order prayed for upon the presentation of the report was signed June 3, 1897, and was on that day entered, the time fixed for the hearing being June 30, 1897, at the courthouse in Eau Claire, Wisconsin, at the opening of court on that day or as soon thereafter as counsel could be heard. Notice thereof was ordered to be given to all creditors in the usual way, that is, by publication of the notice and by mailing a copy thereof to every creditor having a valid claim, and to each of the stockholders, officers, and directors of the insolvent. Notice was given accordingly, and proof thereof was duly filed. No objection was made to the account till six days after the time set for the hearing, but the matter was yet open for that purpose. On July 6, 1897, one of the

creditors filed objections to the general character of the re-
port as to definiteness, and vouchers, but not objecting, how-
ever, to the propriety of any matter when explained as was
suggested the same ought to be, except as to $8,802.38 there-
tofore paid the attorneys, $524.26 involved in the Asheville
matter, treated in appeal No. 2, $675.71 in the Bucyrus mat-
ter, treated in appeal No. 3, $161.71 paid for completing
the Armour & Co. plant, treated in appeal No. 2, and $877.28
stated to have been expended in completing a contract, which
does not seem to be involved in this litigation. These objec-
tions, it now seems plain, were based on the same erroneous
ideas of the law that in the end ruled the trial of the case.
A further and more definite account was prayed for, with a
statement of the amount asked as compensation for services
as receiver, the same to include the amount claimed by him
for his counsel, the total to be in one sum or in two items at
the pleasure of the receiver. An order was asked for, refer-
ring the account to a suitable attorney of the court to take
the evidence respecting the same as to all matters objected to
by the petitioning or interested persons, and to speedily re-
port the same to the court. Thereafter, and July 16th, as
appears by the record, not June 30th, as stated in the court's
findings, an order was made referring the matters objected
to, and many others. The language of the order now neces-
sary to have before us is as follows:

"Take the evidence and report the amount kept and re-
tained by said receiver for compensation for his services,
and the amount of expenses and disbursements by him made,
not included in the items hereinbefore enumerated, and spe-
cify the amount of such compensation for such receiver here-
tofore specially authorized by the court herein.

"Take evidence and report the amount and value of legal
services rendered by counsel to said receiver herein, includ-
ing such as may be necessary to finally close up said receiver-
ship.

"Take evidence and report the amount and value of the

services rendered by the receiver, as such, in the discharge of his trust, including such as may be necessary to finally close up said receivership.

"And it is further ordered that the official stenographer of this court attend the hearing of said matter before said referee and take all the evidence offered thereon the same as though said matter were heard by and before this court.

"And it is further ordered that said referee give due notice of the time and place of such hearing to R. E. Rust, receiver, and his attorneys as such, and to Peter Truax and his attorney, of the time and place of said hearing."

Pursuant thereto, with reasonable promptness, a hearing before the referee was commenced. So much time was consumed in the investigations, and so much time was lost by adjournments, that the hearings were prolonged so late into December as to render it apparent that the greatest diligence would be required for the rest of the time available in order to have the matter closed up before the termination of the term of office of the presiding judge. The length of time occupied in the hearings is indicated by the fact that $431.81 was ordered paid for referee's and stenographer's fees. The record shows that evidence was taken as late as December 28th, before the referee, long after it could have been expected that time would remain for the court to pass upon the matter if the practice were to prevail in regard to trials before referees as regards notice of the filing of the referee's report, time for exceptions, and a motion to affirm, modify, or set aside the report. The taking of evidence did not cease with that given before the referee. Other evidence was taken, as will hereafter be indicated, which no one expected the referee would consider, yet which all expected would be given its appropriate weight in the final decision to be rendered. From what has been said, we cannot believe but that it was understood by the attorney for the objecting creditor, as well as every one concerned in the matter, that the presiding judge would take up the report of the referee for consid-

-eration and close the whole matter at the end of the year, and that all necessity for any notice of motion, other than possibly a short one, by means of an order to show cause, had been waived by the occurrences detailed, if not expressly. After December 1, 1897, events happened in rapid succession, all in harmony with the idea that time, though limited, was to be so utilized as to accomplish the purpose all had in view from the time of the presentation of the report early in June, 1897.

Though suspicion appears to be cast upon what occurred at the last, by the circumstance found that the order of reference, in form to take evidence and report the same with conclusions, instead of to take evidence and report the same, was made upon the insistence of Mr. Frawley and Mr. Hayden, we are unable to discover the evidence of such insistence. The finding seems to be based largely upon mere unwarranted inference, like many others to which we have referred. It is very definite, as if there were evidence in the record, definite and clear, showing the fact. Therein occurs this language, after that indicating that there was a contest in court between Mr. Frawley and the attorney for Mr. Truax in respect to the form of the order, the former contending for an order to hear, try, and determine and the latter to merely take and report the evidence: "Said Frawley prevailed." Our failure to find evidence in the record to support that has given us much trouble. So definite a finding, one would think, could not have found a place in the record without some tangible evidence to base it on, or some clear mistake of a serious nature. It is our judgment, after a thorough research, that the evidence preserved in the record not only does not support the finding, but is clearly to the contrary. True, there is an affidavit on file, sent here by supplemental return, which counsel stipulated might be used as a part of the record, and which was used at the time the proceedings occurred to vacate the order of December 30,

1897. That may have been the basis for the finding which was in the mind of the person who drafted it. If such affidavit was introduced as evidence, we can find no indication of it. Mr. Miner, who made it, does not appear to have testified upon the trial. The order of reference is a fair response to the petition. There is nothing on the face of the record indicating that there was any contention as to the form of the reference. We must conclude that the finding was inadvertently made, through circumstances heretofore alluded to. However, if it were true that Mr. Frawley preferred a reference to hear, try, and determine, and in the end findings by the referee were rendered unnecessary, we cannot perceive how such circumstance is material. They probably would not have been deemed material by the trial court or the learned counsel for respondents except for mistake of law.

The court found, in effect, that December 21, 1897, Mr. Frawley obtained, *ex parte,* a peremptory order closing the proceedings before the referee by December 27th, and ordering him to file his report by that time, and December 24th thereafter obtained a second such order to close the taking of testimony by December 29th and file the report December 30th. Orders to that effect were entered. The attorney for the contestant must have known of them. There is nothing to indicate that he objected thereto, and much to suggest that he consented to the same in advance, or submitted later. The natural inference is that he consented, fully understanding that the whole matter in controversy was to be finally closed up before the end of the presiding judge's term of office, and that such orders were judicial directions to that end, on the motion, largely, of the presiding judge himself. Such attorney had long known, we must assume, that all were working with such end in view, each actor expecting that no objection would be made to its being accomplished. That he shaped his course in harmony therewith is indicated by a paper he.

signed, which appears in the record and will be presently referred to at length, showing that the additional time granted to take evidence, by the second order, was for his accommodation. It seems that, in the face of the undisputed evidence in the record that the order was drawn in accordance with the wish of the judge and the natural inference that all expected a speedy closing-up of the matter, the finding cannot be approved that the orders were obtained with bad intent. If the learned judge, waiting in his chambers for the report, expedited its coming, he but performed a clear judicial duty. If the attorneys who are said to have procured the order did so without judicial suggestion, their action indicates but a performance of professional duty. It was competent at this time, under all the circumstances, for the circuit judge to summarily order all of the proceedings before the referee to cease, though unfinished, to order a report to be made to him forthwith, and to conclude the matter himself in a summary way, save as time remaining enabled him to give the objecting parties opportunity to be heard.

Here, as well as anywhere, it would be well to observe that the theory that the statute, sec. 2871, Stats. 1898, and sec. 6, Circuit Court Rule XXII, as to trials of actions before referees and proceedings thereon, apply to a mere special proceeding like the one in question, resorted to by the presiding judge in order to obtain assistance in passing upon his receiver's account, is erroneous. The referee, when those orders were entered, was as much under the control of the court as a master in chancery under the old practice in proceedings to state an account for the information of the court. The hands of the court were by no means tied by any statute or rule, neither could they be tied by the attitude of any attorney in the litigation upon either side. The judge had power to make his own rules, to make them one day and unmake them the next, with or without notice, not transcending judicial discretion. Within that field he had absolute control

of the accounting by his receiver, answerable to no earthly tribunal but that of his own conscience. The broad judicial authority existing in such matters is probably sufficiently treated in the early part of this opinion, incidental to the jurisdictional question. That the learned judge, from his large experience at the bar and on the bench, so understood the matter, is evident from what he did. That, better than any oral testimony in the case, explains his treatment of the order of reference on December 30th—better than the idea that he regarded such order, as originally drawn, merely one to take testimony and report the same. We cannot agree with counsel for respondents that it will bear any such interpretation. The meaning of the language, "To take evidence and report the amount and value," etc., is unmistakable. However, it is quite evident that all parties in the last days of December, 1897, entirely lost sight of or disregarded such feature, or, what is more probable, regarded it as having been eliminated from the order, by the general course of all concerned, and particularly by subsequent orders. The one of December 24, 1897, requiring the taking of testimony to be closed by December 29, 1897, and the report to be made December 30th thereafter, of course could not have contemplated a careful consideration of the evidence by the referee and the filing of findings, in view of the record. Such order contained a recital that no further evidence upon any question was desired, except as to the compensation to be allowed to the receiver for his personal services, and for the expenses incurred by the employment of an attorney and a counselor, and that the attorney for the receiver purposed accomodating the attorney for the contestant by going with him, without notice, any reasonable distance, to take such evidence on that question as he might desire. Such recitals were in accordance with the facts as conclusively appears by what thereafter occurred. The order of December 21st bears on its face evidence that it was the presiding judge at this

time that was most active. It corroborates very clearly the evidence that he directed it to be drawn; not that it was procured, strictly speaking, by the attorney, Mr. Frawley, as the finding seems to indicate. It is in the form of an order by the judge, on his own motion, to his referee. "Let a copy of this order be served on T. F. Frawley, attorney for the receiver, and on F. M. Miner, Esq., attorney for Peter Truax herein, and this order to be filed with said J. C. Gores, referee," is the language used therein.

The concluding acts between the attorneys for the respective parties leave little ground, if any, for belief but that there was a mutual understanding that the original order was to be regarded as modified by the subsequent orders, in that they contemplated an immediate filing by the referee of his report upon closing the testimony December 29, 1897, any additional testimony to be presented to the court for its consideration. They are particularly significant in that they involved a favor to the contestant's attorney, which he improved. He was given time to go to a distant part of the state to take testimony which could not be obtained without the extra time given, and then not without the attorney for the receiver waived all requirements as to notice, which he did, that fact being recited in the order. Four days after the order was signed a stipulation was entered into between Mr. Frawley, as attorney for the receiver, and Mr. Miner, as attorney for the objecting creditor, which is so significant that it should have a place *in extenso* in this opinion. Omitting the formal parts it is as follows:

"It is stipulated by and between the above-named plaintiffs, by T. F. Frawley, his attorney, and Peter Truax, contestant, by F. M. Miner, his attorney, that the testimony of A. L. Sanborn, G. W. Bird and H. M. Lewis may be taken in the above-entitled action in shorthand by Mary E. Smith, a notary public in and for Dane county, Wisconsin, and by her extended in typewritten form, and that the signatures of the said witnesses to the same be and are hereby waived;

and that said testimony, after being so taken, may be trans-
mitted by the said Mary E. Smith to the clerk of the circuit
court at Eau Claire, Wisconsin, and that the same shall be
by him attached to the testimony. taken before J. C. Gores,
as referee in said action, and shall be treated and considered
a part of the testimony taken before said referee in all re-
spects the same as though said testimony had in fact been
taken before said referee.

"Dated December 28, 1897.

"T. F. FRAWLEY,

"Attorney for Plaintiff.

"F. M. MINER,

"Attorney for Peter Truax."

There is the plainest proof that all parties were co-operat-
ing to get the matter in hand finally disposed of by the then
presiding judge.    Prior to the making of that stipulation,
the idea must have been abandoned that the referee was to
do more than report the testimony as to the receiver's com-
pensation and expenses.    That seems evident.    It had before
this time been agreed, as the record conclusively shows, that
the objections made by Mr. Truax had been sufficiently met.
He made no objections to the mere amount of compensation
to be allowed for legal services, but he prayed that the ref-
eree might be required to state what was claimed in that re-
gard, and for receiver's compensation, either in a lump sum
or in two items, one covering expenses for legal services, and
one covering receiver's compensation.    The indications are
unmistakable that the parties to that stipulation had an un-
derstanding that the evidence to be taken was to be presented
to the court for consideration without any formal notice by
the attorney on one side to the attorney on the other.    Depo-
sitions were taken under that stipulation and filed as con-
templated therein.    Thereafter Mr. Frawley, at the request
of the receiver, drew his report.    It appears by the findings.
and by the argument of the learned counsel for the respond-
ents that such circumstance, in the conclusion of this case,

was regarded as significant. There is no finding and no claim, as we understand it, but that the report as drawn was in accordance with the facts, and fairly prepared, considering, as we must, that the parties understood that the matter of compensation for the receiver's services and expenses for legal services was to be settled by the court. It substantially responded to the original order of reference except as to the particular matters objected to by Mr. Truax, which the evidence shows had been satisfactorily explained before the referee, and that part with reference to reporting the amount and value of the services of the receiver, his attorney, and counsel; which latter feature was not a matter asked for by Mr. Truax in his petition. It only asked, as before indicated, a report to be placed on file which should show the amount claimed by the receiver and his attorneys in one or two amounts at his pleasure. Of course, in this we consider the general objection to the charges for attorneys' fees paid, to have been based, either on the erroneous idea afterwards urged with success that under the circumstances no such expenses were allowable, or the idea that the objection was limited to the feature which the prayer distinctly asked to have supplied. It was on the court's own motion that the reference was ordered, to take proof and report conclusions as to the amount and value. If that had not been waived by the parties and abrogated by the court, before the report of the referee was made, it was competent for the court to abrogate it at any time.

In view of what has been said, the circumstance that the referee's report was drafted by Mr. Frawley seems to be of little significance. The fact that there were some 600 pages of evidence, is also of no great moment, as regards the particular matter under consideration, since none that bore on any contested question, except the amount and value of the services rendered by the receiver and his legal assistants, was required to be examined. The report had to come into court

on December 30th anyway. There was no time for a studied judicial determination by the referee, and he was not expected to make any. That seems evident. The circumstance of Mr. Frawley's drawing the report merely shows conformance to the practice criticised in this opinion. Maybe it would have been better for the referee to have drawn his own report. We think it would. But it is as well for a referee to permit the labor which in legal contemplation devolves upon him as regards preparing his report, to be performed by the attorney for one of the contesting parties, as for the presiding judge to do the same thing as regards his findings of fact and conclusions of law. However, if it is entirely nonprejudicial in any case, it is where there is no contested question, as in this instance, which the referee is expected to pass upon.

On the morning of December 30, 1897, the report of the referee was placed on file. The final act in which the attorney for the objecting creditor was concerned leaves little room to doubt that he expected it might be taken up for consideration on that day. He was personally notified that the court was ready to proceed in the matter, as the findings state. It is found that he refused to be present, relying on the statute and the rule to which we have referred. That is not consistent with what had occurred. Mr. Miner was as much bound morally to appear, if necessary to give the court jurisdiction to act, as if he had entered into a written stipulation to do so. To his credit, so far as it goes, we are unable to find definite evidence sustaining the finding. He was not sworn. The messenger sent to notify Miner testified that he said to him, he was requested to say that the court was waiting for him in order to take up the settlement of the receivership matter, to which Mr. Miner replied: "There is no matter coming up at the courthouse in which I am interested, in which any notice or motion or order to show cause has been served upon me, and I do not propose to go over there. I

have had no notice of any motion in any matter in which I am interested, and do not propose to go to court." We have not Mr. Miner's version of this interview, except as it appears in the supplemental return to which we have heretofore referred. Since the affidavit thus sought to be made evidence does not appear to have been used as such upon the trial, it hardly seems proper to consider it now. If Mr. Miner had been sworn upon the trial and subjected to cross-examination, an entirely different situation might have appeared from what appeared in his affidavit. It is not the practice to allow evidence to be introduced in this court which was not introduced upon the trial below, in order that a judgment may be sustained or impeached, even when counsel agree that it may be done. However, if the affidavit were considered as evidence, probably it would not change the situation. Certainly, the appearances as regards the person involved, who is not a party to the litigation, are better with it out of the record than with it in. It may be that he supposed some time would be given him to make his appearance, such time to be fixed by an order to show cause. That would not be unreasonable in view of all the facts we have detailed. There was time to have given such notice. We will refer to that later. The evidence in the record goes no further than to show that Mr. Miner declined to aid the taking up of the receivership matter by his presence, without any formal notice, preferring to stand upon any rights which he had in that regard, in case proceedings were taken in his absence resulting in a conclusion not satisfactory to his client. He had a legal right to do that; whether he had a moral right to do so under the circumstances is another question. As we have had occasion heretofore to say, courts must leave parties and witnesses as well, on strictly moral questions, to be dealt with by other than judicial tribunals.

Now we have this situation: The court in session in the closing days of the presiding judge's term of office, with this

great matter undisposed of. Everything was before him for action. The matter in controversy as to everything contained in the adverse creditor's objections was in effect out of the way, except what the judge saw fit to substitute in place of a claim in writing by the receiver as to the amount of compensation for his services and his expenses for legal assistance. All the evidence both parties wanted to submit before the referee or the court was on file. There was a written stipulation, which the court had a right to regard, in connection with what had been done, as a recognition by the objecting creditor that the matter was to be fully settled on the 30th of December, or at least before the termination of the judge's term of office. Everything is consistent with that. It appears so certain as to leave no reasonable doubt on the question. The receiver was present with his attorney and counsel. At the last moment, if we are to believe the findings, the court and the attorney and counsel, rightly believing that it was in the power of Mr. Miner by his absence to disable the court from settling its receiver's accounts, were led to and did resort to unprofessional proceedings, and obtain participation therein of the receiver and the presiding judge, to the end that the referee's report might not, because of its form, preclude the court from acting in the matter of closing up the receivership as was contemplated. Whether Mr. Miner at this time considered that the power of the court to exercise its functions was dependent upon his attitude, we will not disturb the finding or say more in regard thereto. So far as the findings are to the effect that Mr. Miner could by his conduct prevent the court from settling the receiver's account, they are erroneous.

That part of the finding now most important is quite lengthy. To review the same in detail and show the reasons why it cannot be supported, would only lead to a repetition of much that has been said. We will take up, briefly, the leading features.

First, it is said the report was fraudulently withdrawn from the files. That is based on an inference, which could not have been drawn except for a misconception of the law, as before stated, as to the right of the court to proceed regardless of the statute and the rule on the subject of trials before referees, in the treatment of their reports. It does not seem to be supported by the evidence, because that seems undisputed to the effect that what was done was in execution of the mandate of the judge delivered from the bench. It is found that the referee signed a new report upon the statement being made to him privately that the court had so ordered. He testified, and there appears to be nothing impeaching the same, as follows:

I made no objection to signing the new report because I heard the court make a ruling that all I was required to do in this matter was to sign a certificate reporting the evidence. That order was made before such discussion [discussion about some rule affecting the matter]. It was made immediately after I came into the courtroom. When I was coming in I heard the judge make such verbal ruling.

This evidence seems to have been overlooked in making the findings, or else it was deemed to be rendered false by legitimate inferences from what was done. The finding is to the effect that Mr. Frawley, with bad intent, procured the omission from the first report of all mention of the subject of compensation to the receiver, his counsel, and attorney. That is evidently found by inference from the supposed general fraudulent intent, of which we have been unable to find evidence. There was no definite evidence as to why the omission was made, but the circumstances we have heretofore referred to all indicate that it was supposed the court had concluded to adjust the matter without any aid from the referee's opinion, that all parties so understood it, and no one better than Mr. Miner. There is evidence tending to show that the court, Mr. Hayden, and Mr. Frawley, considered

Mr. Miner's attitude, and deemed it inconsistent with the general understanding with which the matter had been handled, especially the stipulation signed by him. The other facts found by the court in respect to this matter are detailed in Nos. 226 and 227 of our statement. All elements of bad intent or wrongful conduct mentioned in the findings, it seems, are unsupported.

It is probably true, as found, that the possibility of Mr. Miner's endeavoring before the incoming judge to make some point on his not having had a notice of motion, in due form, of the hearing, was discussed. Rules were, it seems, spoken of. What rules, is left to conjecture. It may be that the statutory and other practice as regards trials before referees was a subject of discussion, and to obviate any difficulty in that regard it may be that it was concluded not to have on file, if it could be avoided, any report after the manner of a finding by a referee appointed to hear, try, and determine an action. If so, the record appears to us clear that it was the trial judge who was responsible for the change in the report. It would have been more orderly, probably, not to have made such change. There was no need for it in order to enable the court to settle his receiver's account. It was, it seems, a matter of overcaution, done to satisfy the fears of counsel. The evidence is to the effect that there was discussion by counsel in the courtroom; that then the order was made from the bench; that later there was the discussion, which is mentioned in the finding in a way to indicate that it was initiatory to what followed instead of following the direction from the bench.

Enough has been said on this subject. The conclusion is that the finding of bad intent as to the filing of a mere certificate reporting the evidence taken by the referee is not supported; that the whole matter was done under the direction of the presiding judge in the exercise of his undoubted jurisdiction, and that he acted summarily under the circum-

stances, either because he deemed the order of July 16, 1897, in effect modified by the subsequent order, or that the feature in question had been waived by the parties, or that by their conduct they were estopped from insisting upon it, or that it was his duty, if necessary, to take the subject of settling the matter in hand to himself, summarily vacating that feature of the order, if necessary to enable him to proceed to the final settlement of the trust. On the last proposition we apprehend the presiding judge had no doubt as to his authority in the matter, so long as he kept within the boundaries of discreet action.

The next thing that occurred after the new report was placed on file was the entry of the final order, which occurred without much delay, the indications being that it was signed soon after the noon hour. The findings are to the effect that many of the recitals in such order are untrue, specifications being given. To warrant such a finding pretty clear and satisfactory evidence should be produced. If the order will admit of a reasonable interpretation, under all the circumstances, relieving court and counsel from such a charge, it should be favored. If such a construction cannot be discovered, and the false statements can yet reasonably, under all the circumstances, be attributable to mere mistake, that theory should be favored. If neither truth nor innocent mistake can be reasonably discovered, but the wrong of the matter under all the circumstances can reasonably be attributed to negligence, we should incline to that view before finding facts creating liability even in a civil action, where it necessarily means that the parties charged were guilty of criminal conduct. Without the considerations to which we have referred, great injustice is liable to occur in such matters. The maxim that it is better that many guilty men should escape than that one innocent man should be convicted has some application in the circumstances suggested. This court at an early day held that an alleged civil liability grounded

on criminal responsibility should fail unless established beyond reasonable doubt. *Freeman v. Freeman,* 31 Wis. 235. That later was abandoned, and of course is not the law. *Poertner v. Poertner,* 66 Wis. 644, 29 N. W. 386. But the rule still is so far adhered to that the proof in such cases is required to be clear and satisfactory; though a preponderance of the evidence, if it meets that test, is sufficient. The danger of reading criminal conduct, by construction, out of a paper that may be viewed from an aspect consistent with innocence may be appreciated when we observe that a mandate of this court, framed with all the care that could reasonably be devoted to it, and approved by all the members of the court after a careful examination thereof to the end that court and counsel subsequently to execute it might have no reasonable doubt as to what course to pursue, may become a subject of controversy in that regard, resulting, after expensive litigation, in a judgment necessarily coming here for review, largely respecting the meaning of that mandate.

We confess that there are some recitals in the order under discussion as to occurrences leading up to and characterizing its presentation for the court's signature, not easy to be understood, and that might well have the meaning attributed thereto by the trial court if the aspect in which it was there viewed is proper; but it is not. We cannot escape the conclusion that if the bad intent found actually existed, the circuit judge himself, and his referee, must have been parties thereto, either actually or constructively. It seems that had the erroneous idea that fraud permeated the whole of this matter from start to finish not been discovered as supposed, the severe indictment of wrongdoing contained in the finding in regard to this order would not have been embodied therein. Things look far different when viewed inductively, conclusions entirely waiting upon a discovery of the particulars, from when viewed deductively, assumptions being indulged in, supposed to be warranted, and particulars searched for

harmonizing therewith. True, in any view, there are some recitals in the order not easy to understand. One of them is this, speaking of the order of reference:

"Required and directed by said court, to wit: to report the evidence taken upon such hearing to the court, and such being the construction placed upon such order of reference by the parties and by the court, to wit, being an order of reference to take and report the evidence."

But when the whole situation is reviewed as it existed at the time the order was signed, it seems reasonable to conclude that such language referred to the meaning to be attributed to the order in the light of subsequent orders entered by the court, the conduct of the parties generally, the practical construction apparent, particularly by the circumstance of the stipulation of December 28, 1897, and the action of the parties thereon in the taking of testimony and the filing of the same in the office of the clerk of the circuit court instead of with the referee.

There is a sufficient explanation that can be given to all recitals in the order of December 30, 1897, to preclude holding, reasonably, that it was drafted with bad intent, when we leave out of view the many elements to which we have referred, that were erroneously given weight in the case. When we look backward over all the facts that have been considered, appreciating that, in the candid oral evidence of Mr. Frawley that, though his professional conduct in the administration of the trust might have been wrong as regards legal principles, he believed it to be right when the acts criticised were performed, and still believed so, he not only spoke truthfully, but was right; and appreciating that, at the last scene in that courtroom on December 30, 1897, the presiding judge, as was testified, not only proceeded according to his views of the law respecting his right to act summarily, if necessary, not transcending judicial discretion, to close up the receivership, but with a correct understanding of his

duty: the scene, so vividly pictured in the court's findings, of three lawyers of high standing at the bar, among whom were those who had passed into the evening twilight of life and of a long and distinguished career, wickedly colluding in a side room off the temple of justice, under the forms of law to consummate grand larceny, so to speak, of the funds in their keeping as the instruments of the law, in trust for many persons who had no. representative at hand,—and accomplishing their infamous purpose with a referee and a presiding judge as their stupid, negligent, or willing tools,— disappears; and in its place we see the picture of court, attorney, and counsel endeavoring, in the last days of the presiding judge's official life, to do what, if possible within the rules of law and reason, could be done to fully perform the duties resting upon them respectively, and accomplishing it without fault, unless it be found in indiscretion. The determination covered by the order the judge, as the court, had a right to make when and in the manner he did, if he gave that consideration to the matter necessary to enable him to pronounce a reasonably just judgment as to the right of the receiver to compensation and expenses. The control of the judge over such matters we have heretofore sufficiently referred to.

From the conclusions already reached it seems plain that the theory upon which the learned trial court held that the receiver and his assistants did not render faithful service in administering the trust and hence that they were not entitled to anything for their services and should restore all sums paid to them therefor, is all wrong. If there is any error in respect to the mere procedure of December 30, 1897, it consists in indiscretion. Counsel for appellants contend that if the element of fraud discovered by the trial court is held not to exist, the whole cause of action as to them must fail. That we have already shown to be erroneous, as this is not a cause of action for damages on the ground of fraud, but one for

:an accounting for money received by the persons charged, to which they are not entitled, and for which their legal representatives, as successor possessors of their property, should account, and is a mere part of a greater cause of action, as has been before indicated.

There is no difficulty in reviewing the matter because of a change in the judicial head of the court. The December term of the circuit court for Eau Claire county survived the change as to its presiding judge, and included the time when, as ruled over by his successor, the order in question was vacated. So the rule precluding an order or judgment at one term being vacated at another, except pursuant to sec. 2832, Stats. 1898, does not apply.

It may be that excusable negligence on the part of the attorney for the creditor, Mr. Truax, was shown, which would have justified action under sec. 2832, Id. We are inclined to the opinion that it would. The judge of the court at the time the order of December 30th was vacated, had the same authority to take such action as his predecessor would have had, if the latter's term of office had continued to the time thereof. So we really do not need to consider whether there was abuse of discretion in granting the order of December 30, 1897, so much as we do whether there was such abuse in vacating it. True, though a judge who comes into power, as here, possesses authority, in a sense, to review decisions of his predecessor, as under the circumstances of this case, such authority should be exercised with great care. The doctrine that one judge of co-ordinate jurisdiction with another should not sit in review upon that other's judicial acts other than under some extraordinary circumstances rendering it clearly necessary to prevent a miscarriage of justice, is well understood. In England, as regards chancellors, it is prohibited by statute. In this country it is quite as effectually prohibited by judicial policy. *Coon v. Seymour,* 71 Wis. :340, 37 N. W. 243; *Fenske v. Kluender,* 61 Wis. 602, 21

N. W. 796; *Cardinal v. Eau Claire L. Co.* 75 Wis. 404,. 44 N. W. 761; *Crowns v. Forest L. Co.* 102 Wis. 97, 101, 78 N. W. 433.    Authorities here in respect thereto are mainly confined to instances where one circuit court attempted to pass upon or interfere with the execution of some order or judgment of another such court; but the same principle applies where one circuit judge is called upon to review the judicial acts of his predecessor in the same case.    The highest court in New York, in *Matter of Livingston,* 34 N. Y. 555, made this emphatic declaration on the subject:

"Although we have no statute which expressly prohibits one judge from rehearing a matter decided by another judge, the rule is so well established and is so important for the protection of parties from unjust vexation, that if it has not already been, it is full time it should be incorporated into the equity law of this state."

Chancellor WALWORTH, in *Winship v. Pitts,* 3 Paige, 260,. speaking on the same subject, said:

"After a decree has been made by the chancellor, it is not competent for any vice-chancellor to make an order or decree which would, directly or indirectly, discharge, alter or modify the same."

To the same effect are *Greenwich Bank v. Loomis,* 2 Sandf. Ch. 70; *Astor v. Ward,* 3 Ed. Ch. 371.    In the last case cited a vice-chancellor refused to rehear a matter passed upon by his predecessor.

From what has been said it will be seen that a successor judge should never assume the function of reviewing mere matters of judgment of his predecessor.    To do so is such a flagrant violation of established practice as to constitute reversible error of a jurisdictional nature.    One of the familiar rules in equity matters is that a plain prejudicial violation of established rules of practice constitutes reversible error. *Woerz v. Schumacher,* 161 N. Y. 530, 56 N. E. 72.

Notwithstanding the foregoing, doubtless when a case is

presented to a circuit court, showing clearly to the presiding judge that an order in a case yet pending was granted by his predecessor corruptly or through negligence, or by reason of fraud perpetrated by the applicant therefor, or without the opposite party's being heard, through excusable mistake or neglect on his part or his attorney's,—such fault that the judge who granted the order, were he in a position to do so, could properly, and probably would, relieve him therefrom,—the successor may properly act in the matter, opening the way for a rehearing, if to him it seems that justice cannot otherwise be obtained. So while we fully recognize the rule contended for by appellants' counsel, it is not one creating an absolute disability of a judge to set aside an order made by his predecessor, where the latter, if in office, might do it.

The foregoing suggests that the action of the court in granting the order of December 30, 1897, should be considered in the light of everything characterizing it. The circumstance that the judge, of his own motion, on July 16, 1897, made the reference to take evidence and report the same with an advisory suggestion as to the amount and value of the services of the receiver, his attorney, and counsel, shows, as the fact is, that the subject involved, even from the standpoint of the judge who had been familiar with it all the way through, considerable difficulty. It must have been appreciated from that time on that the matter involved would come before the court for final determination, as we have several times indicated, before the expiration of the judge's term of office, and that even with the advisory opinion of the referee, some time at least would need to be devoted to a review of the evidence taken. The failure of the referee to finish his labor and file his report was taken notice of, as the record shows. The oral testimony is to the effect that the judge made inquiries in respect to the matter. It was in his power, at any time, as we have seen, to discharge the referee

and take the whole matter to himself, and, giving parties such opportunity to be heard as seemed reasonable under all the circumstances, take up the matter and consider and dispose of it. So, in a measure, there was judicial fault in not compelling an earlier report by the referee. That, it seems, the judge appreciated, when he made the order of December 21, 1897, in effect informing all concerned that the matter must be closed up and the report filed December 27, 1897. It must have occurred to him before that the condition of the proceeding before the referee was greatly weakening the court's ability to deal with the matter for want of time, as in the closing days of his term of office there would necessarily be many things requiring attention. His action December 21, 1897, he might well have taken earlier. In such a matter the judge need not wait to be put in motion by the attitude of counsel. The order of December 24, 1897, is excusable so far as parties represented were concerned, which included the only active objecting creditor and the receiver and his legal assistants; but the great mass of creditors, as appears, were relying wholly upon the court. The receiver stood for creditors, generally speaking, but in this proceeding, in a sense, he was in an adversary capacity as to them. The last order, it seems, was a mistake, when it is considered that the court was determined, and properly so, to close the trust before going out of office on Monday, January 1, 1898. When the report of the referee was before the court with its mass of evidence, conflicting in character, as to the matter to be decided, it should have been appreciated that deliberate treatment thereof was necessary. There was no fault in the act of relieving the referee from the duty of making a finding in respect to such matter, but it increased the amount of diligence which the judge should have devoted to it. It seems, as before indicated, that the whole of the forenoon of December 30th was taken up with the general business of the court, and with the preliminaries to taking up the report

for consideration. While the judge probably appreciated that Mr. Miner was making a mistake in supposing that by his mere absence he could paralyze the arm of the court to settle with its receiver, he should also have appreciated that the penalty, if any were to be suffered, would fall upon Mr. Miner's clients and on the army of unrepresented creditors. So the attitude of Mr. Miner, though wrong, should have been regarded as increasing the degree of care to be devoted to the matter in hand rather than rendering action *pro forma* permissible or proper. True, the referee, his attorney, and counsel, were in court, demanding judicial settlement of the matter. There was no wrong in that unless it were error of judgment in unduly pressing the matter when there was yet time. They may have called the court's attention to the amount and value of their services as shown by the evidence taken. It is more than probable that they did. We must assume that the court was informed in some way as to the trend of the evidence on the part of the receiver, before finally adjudicating the matter. If so, and it was by way of a statement by counsel as to what the evidence tended to prove, there is nothing wrong in that. The counsel were supported by evidence of eminent members of the profession, and other expert evidence, and their own honest judgment as to the amount and value of their services. It was for the court, of course, to determine how much they were entitled to in view of all the considerations legitimately bearing on the question, which included his personal knowledge as the most important factor in the circumstances of this case. *Taylor v. C., M. & St. P. R. Co.* 83 Wis. 645, 53 N. W. 855; *Richardson v. Tyson,* 110 Wis. 572, 86 N. W. 250. However, the time had come when the interests of the receiver were on one side and those of the creditors on the other. The former was represented before the court, the latter were not. The creditors were entitled to all the protection which such an examination of the evidence and such

attention to the matter as time would reasonably permit would afford, the diligence in that regard to be measured somewhat by the delay in taking the matter up. Now as we understand the record, pretty soon after the noon hour,—the indications are, promptly thereafter,—without any study of the evidence, without any opportunity to know what was in the report except by general statements of the interested parties as to its general effect, which if made at all were no doubt honestly and fairly made,—the blanks in the order previously prepared were by direction from the bench filled in, specifying the allowances to be made, and it was then signed, and the matter thus ended. We do not doubt but that the learned judge was very much pressed for time. We see nothing to impeach the good faith of any one concerned, yet it seems that the diligence which discreet conduct would have brought to the matter was hardly given thereto. It is more than probable that it was thought, and not without good grounds, that in any event the surplus of funds on hand over and above the necessary amount to pay expenses was so little as to not be worth the trouble and expense of making a distribution, and that such idea led to the belief that the creditors were really not interested. That is indicated from the wording of the order, showing that it was anticipated there might not be enough in the hands of the receiver to pay the allowances made. It hardly affords a satisfactory excuse for a *pro forma* granting of an order turning over to the receiver and his legal assistants whatever there was for a division between them on a basis fixed by the court. The limited amount of time available does not satisfactorily explain the haste in settling the matter which characterized it. The judge's term of office did not, as we have heretofore indicated, expire on the 30th day of December, 1897. He had until noon on Monday, the 1st day of January, 1898, the day when his successor's term of office was to commence, to close up the business in hand. *State ex rel.*

*Emberson v. Byrne,* 98 Wis. 16, 73 N. W. 320. That may not have been appreciated. It gave him one day and a half after December 30th, if we count Sunday, which, though not a day for business, ordinarily, need not in a case of necessity be wholly ignored. There was time for a pretty thorough investigation of the evidence filed by the referee, time to have had other witnesses called than those who had testified, if thought necessary, time to have examined the parties interested in open court, even time to have relieved Mr. Miner's client of all danger of being prejudiced through his attorney's mistake as to the law by removing the latter's scruples to making an appearance in court except in response to an ordinary notice of motion or an order to show cause. To take up the matter and dispose of it summarily, even under the press of circumstances, which to a great extent legitimately existed, it seems, was an indiscretion. That does not cast any serious reflection on the learned circuit judge or other parties concerned. If presiding judges were to be condemned merely for indiscretion, and members of the bar likewise condemned for making presentations to the court leading thereto, there would be few who would escape. If the learned judge in this instance had possessed the opportunity, upon reflection, to vacate his order of December 30, 1897, and to give the matter deliberate consideration, it is quite probable that he would have done so. It follows from this, that there was no reversible error in vacating the order as was done in any aspect of the matter in which it can reasonably be viewed.

Whether the determination made by the order was really prejudicial or not is the next question. In considering that, notwithstanding what has been said, some weight must be given to the determination at first made. It at least represents the judgment of one who was better prepared than any one else could well be to make the proper allowance, if correct rules were observed.

There is no *per diem,* percentage, or salary rule that governs in fixing the compensation to be paid to a receiver for his services, yet there are some rules to go by. He is entitled to compensation for services of the kind required of a business agent having regard to the nature of the matter administered, the amount involved, the complications attending it, the time spent, the degree of success attained under all the circumstances, the fidelity to details, the appreciation evidenced as to the responsibilities of the position, the character of such responsibilities, the expedition with which the trust has been administered in view of results reached, the method, character, and promptness of the accounting, and many other things that could be suggested, having regard, of course, to what is commonly paid for somewhat similar services in the performance of official duties, not the standard in private business transactions. *Union Nat. Bank v. Mills,* 103 Wis. 39, 79 N. W. 20; *Speiser v. Merchants' Exch. Bank,* 110 Wis. 506, 86 N. W. 243; *Stuart v. Boulware,* 133 U. S. 78, 10 Sup. Ct. 242; Gluck & Becker, Receivers, 535; High, Receivers, § 782; Beach, Receivers, sec. 761; Wait, Insolv. Corp. § 223. Precedents do not help much, as it is impossible to find any two cases alike in their facts. In *Karn v. Rorer I. Co.* 86 Va. 754, 11 S. E. 431, the term of office was twenty-two months. The gross receipts in money handled were $35,000, and the receiver was allowed $3,375. In *Schwartz v. Keystone O. Co.* 153 Pa. St. 283, 25 Atl. 1018, the amount handled was $96,000, the work in the main was done in six months, largely by employees under the supervision of the receiver, and he was allowed $4,000. In *Union Bank Case,* 37 N. J. Eq. 420, a receivership of a bank lasting six years, about $200,000 being collected and distributed, the allowance was $22,000. In *Stuart v. Boulware, supra,* a receivership lasting some five years, the receiver giving a bond for $50,000, caring for property from which was collected rents to the amount of $100,000, which was disbursed,

and which property was sold under the supervision of the court for $380,700, the receiver was allowed $6,500 for his services and legal expenses. These citations are sufficient to indicate that such matters, in the decided cases, are not governed by any definite rule. The range of compensation in many instances seems quite low as compared with what was allowed in this case, and in other instances the indications are to the contrary. This court in *Speiser v. Merchants' Exch. Bank,* laid down a rule, which we are disposed to adhere to, that in such matters the standard should be that of public, not of private, service, and that doubts shall be resolved in favor of the trust.

Courts should strive to make trusts for the benefit of creditors all which the name signifies, not trusts for the benefit of the trustee and his employees, which is too often the case, tending to scandalize the administration of justice. If there is any repository where property for the benefit of creditors can be located, which is safe, and will ultimately render to them everything that can be made available by economical, judicious, honest management, and which should excel all others, it is the circuit courts having jurisdiction of such matters. Much significance should be given to the policy established here for the judicial administration in this state; that is, that the standard of compensation of receivers is the amount paid for somewhat similar services in official work. In most jurisdictions the standard is far different. Generally it is that ordinarily paid for the performance of somewhat similar services in ordinary business pursuits; while in some cases it has been said that the responsibilities and accountabilities and duties of a receiver are so peculiar that he should be allowed a greater amount to compensate him for his services than would be obtainable by the head of a similar institution, if managed privately. Gluck & Becker, Receivers, 101.

Applying the principles stated, to the case in hand, in

view of the fact that the receiver employed two eminent law-
yers, accustomed to charge for their services $50 per day
each, and the time necessarily occupied in administering
the trust, the allowance of $7,500 is much too large. The
trial court found that one year and a half was time enough in
which to have entirely closed up the receivership. That can-
not be taken as quite correct, because many things were re-
garded by the trial court as outside of the receiver's duties,
which we hold were not. But it seems that two full years
for the whole matter, aside from time occupied in settling
the account, were enough, and that upon the standard es-
tablished for measuring the compensation, in view of all the
circumstances, $5,000 would be quite a liberal allowance,
that to cover the time required in settling the account up to
and inclusive of December 30, 1897. The salaries of state
appointive officers who have charge of interests very much
larger than were involved in this case, and who are required
to devote their whole time to the duties of their positions,
are but $2,000 per year. We hold that the allowance to Mr.
Rust, for his services up to and inclusive of the settlement
of his account, over $5,000, was excessive.

The considerations above mentioned, as regards the re-
ceiver's compensation, in many respects govern in determin-
ing the amount allowable to him on account of the services
of his attorney and counsel. Such services are not to be com-
pensated for as has been supposed, as a matter of course. A
receiver is not permitted to employ an attorney at the ex-
pense of the creditors unless the services of one are reason-
ably necessary, and then only to the extent reasonably re-
quired, and of course is not permitted, except in extraor-
dinary cases, to employ one person as attorney and another
as counsel, and to draw the salary of a trained business man
himself, who, ordinarily, does not require the aid of an attor-
ney in conducting his business. The tendency of adminis-
trative courts is to be too lax in such matters. They must

aim to a higher standard,—aim to deal with receiverships as important public trusts, making the element of private gain, as regards their business agents and their legal assistants, a secondary consideration, so far as that can reasonably be done, which can probably best be attained by applying, pretty strictly, as the standard for compensation, the amount ordinarily paid for similar services in official life. Precedents will not better help in this matter than in determining the amount which should be paid for the services of a receiver,—probably not so much.

The reasonable necessities of this case did not require the permanent employment of two distinguished lawyers, one as attorney and one as counsel. Either one of the learned gentlemen, as appears from the evidence, was eminently capable of filling the position, both of attorney and counsel, as is usually done, especially in public matters. True, a very large amount of work was done, and in a most methodical way. But much of it was of the kind commonly performed by law clerks, as we must assume it was in this case. The compensation allowable, it must be understood, is not the value of the work actually done by the attorney to be computed from the time spent and the amount which an attorney customarily charges his clients, but it is what may appear to be proper for the work that was reasonably necessary to the due administration of the trust by the standard heretofore indicated. *Richardson v. Tyson,* 110 Wis. 572, 86 N. W. 250. The time actually spent and work actually done are important elements, but the controlling feature is the work reasonably required. There must also be considered, of course, the character of the work, the manner in which it was done, and the beneficial results to the trust. Where the work is of a character commonly performed satisfactorily by an attorney who would not be reasonably expected to charge in private transactions at a greater rate than the average standard for professional services, a receiver would not

be justified in employing an attorney accustomed to be compensated by a much higher standard on account of his experience, expecting to make compensation for such services on such extravagant basis an equitable lien upon the trust fund.

It is our judgment that if the learned judge who made the allowance of December 30, 1897, had applied the law, as we must deem it to have been established for the courts of this state, the allowance to the receiver on account of his legal assistants would not have exceeded $10,000. That we fix without much regard to the fact that two attorneys instead of one were employed. If only one had been employed, in our judgment the sum named would not be very much less than the amount above indicated. The allowance is to the receiver, not directly to his attorney. Beach, Receivers, sec. 308; Gluck & Becker, Receivers, 354, 360; *Richardson v. Tyson, supra; Stuart v. Boulware,* 133 U. S. 78, 10 Sup. Ct. 242. Whether that be divided, part being paid to the attorney and part to the counsel, is not material to the court or the creditors. However, since the receiver submitted to the court the question of how much should be allowed for services of the character rendered by Mr. Hayden, and what should be allowed for services of the character rendered by Mr. Frawley, separately, and Mr. Hayden and Mr. Frawley joined therein, it was proper to accord to the parties a decision of the matter, and we will do the same. In our judgment the proper allowance on account of the services rendered by Mr. Frawley should be fixed at $7,500, and the proper allowance on account of the services rendered by Mr. Hayden should be fixed at $2,500. We have determined those amounts from a careful study of the subject in all its bearings, and believe the same to be the limit of what correct principles will clearly justify.

The claim is made that the excessive allowances for legal services cannot be recovered of the receiver, since he paid

the same over on the order of the court, and there was no appeal with a stay of proceedings, the rule announced in *Maxwell v. Bank of New Richmond,* 101 Wis. 286, 291, 77 N. W. 149, *Florida Central R. Co. v. Bisbee,* 18 Fla. 60, and Gluck & Becker, Receivers, 356, being cited. *Maxwell v. Bank of New Richmond* clearly does not apply. There an equitable lien on property acquired by garnishee process was discharged by a judgment in favor of the garnishee. There was an appeal from such judgment without any proceedings being taken to continue the lien till the termination of such appeal. The garnishee in that situation, *bona fide* parted with the property of the principal debtor. In those circumstances it was held that the reversal of the judgment did not revive the lien; that the garnishee was a mere stakeholder and was entitled to be protected on equitable principles. It is entirely unlike a case where one pays money to another under a judicial order, which is afterwards set aside. The other authorities cited by counsel are to the same effect as the one reviewed. Money in the hands of a receiver sequestered for the benefit of the plaintiffs, having been on the order of the court paid to the plaintiffs' attorney, he having an equitable lien thereon as regards plaintiffs' rights, and thereafter the judgment upon which the sequestration was based being reversed, it was held that no right of action thereby accrued in favor of the defendant against such attorney to recover back the money. It was said, however, that the right of the defendant whose money had been thus diverted, to recover the same of the plaintiffs for whose benefit it was used, was undoubted. Of course, in such circumstances, by the enforcement of the liability against the plaintiff, no cause of action would accrue over against the attorney who received the money, because it was paid to him merely to satisfy the valid indebtedness of the plaintiff. The general principle that when a judgment has been enforced, and is subsequently reversed, a right of action is thereby created

in favor of the prevailing party against his adversary to recover the money back, is not in conflict with *Florida Cent. R. Co. v. Bisbee, supra.* On the contrary it is there most distinctly recognized, the following on the subject being quoted from *Bank of U. S. v. Bank of Washington,* 6 Pet. 8:

"The reversal of the judgment gives a new right or cause of action against the parties to the judgment, and creates a legal obligation on their part to restore what the other party has lost by reason of the erroneous judgment; and as between the parties to the judgment, there is all the privity necessary to sustain and enforce such right."

In *Clark v. Pinney,* 6 Cow. 297, the law on the subject is stated thus, where the money was paid on a judgment of a court of common pleas, which was afterwards reversed on error, the court holding that it might be recovered back in an action of *indebitatus assumpsit,* for money had and received. That is a leading case. It will be found cited with great frequency. The principle there announced has been applied in many instances of money paid pursuant to a judicial determination, sometimes upon judgments and sometimes upon orders, the particular form of the judicial determination not being important. *Scholey v. Halsey,* 72 N. Y. 578; *Haebler v. Meyers,* 132 N. Y. 363, 30 N. E. 963. In the last case the money was paid relying upon an order of the court which, so long as it stood, justified the same. The doctrine is of common-law origin, and will be found incorporated into the statutes of many of the states. In such instances it has been held that the statute is merely cumulative. *Haebler v. Meyers, supra.* The philosophy of the rule is that, where a person receives money pursuant to a judicial determination which is subject to review, there is an implied promise to restore it in case such determination be set aside, no superior equities intervening. That principle enables us to determine the just rights of all the parties concerned in this litigation, unless there is some matter not yet considered

which should prevent the excessive judgments from being reversed, and we know of none.

Counsel for appellants urge, with much earnestness, the rule that a person cannot be permitted to sue upon one cause of action and recover upon another; and that since the respondents sought to recover on the ground of fraud they must succeed on that ground or fail altogether. On that *Kruschke v. Stefan,* 83 Wis. 373, 53 N. W. 679, *Truesdell v. Bourke,* 145 N. Y. 612, 40 N. E. 83, *Eyre v. Potter,* 15 How. 42, and *Piper v. Hoard,* 107 N. Y. 67, 13 N. E. 632, are cited. The scope of those authorities, it seems, is misconceived by counsel. Their legitimate bearing was fully discussed here in *Gates v. Paul,* 117 Wis. 170, 94 N. W. 55, in declaring the law respecting the scope of the power of amendment. This is not an action the subject matter of which would be wholly departed from if a recovery were sustained, eliminating the element of fraud. If it were an action to recover back money paid upon a contract, voidable and avoided for fraud, and the fraud failing it was sought to recover in some manner upon the contract, or if it were an action to recover possession of goods sold, the sale being repudiated on the ground of fraud, and, the fraud failing, it were sought to recover the purchase price of the property, the rule invoked by counsel would apply. This, however, is an action for the administration of a trust fund, in which certain parties were joined as defendants because of a claim that they were in possession of some of such funds which in justice they ought to account for. The fact that it is alleged that they obtained such possession through fraud, while it turns out that they did not possess themselves thereof through that means, yet have possession of a part of the trust property in fact, and are not justly entitled thereto, leaves them no less liable to restore the same because the element of fraud charged was not established. Such a variance is clearly within the power of amendment under the Code. Moreover, such a situation

is clearly within the rule in equity that if the plaintiff's cause of action as alleged be not established, but a liability within its broad scope is established, the matters in respect thereto being fully litigated, the plaintiff will not be turned out of court and compelled to seek for relief by means of another action, but the pending suit will be retained and as full relief be granted to the plaintiff as equity jurisdiction has power to afford. *Hebard v. Ashland Co.* 55 Wis. 145, 12 N. W. 437; *Prescott v. Everts,* 4 Wis. 314; *Hamilton v. Fond du Lac,* 25 Wis. 490.

Applying what has been said to the case before us, the request by Mr. Rust to have the compensation for his services as receiver and his expenses for legal assistance adjusted and paid, was a special proceeding, the arrangement of the parties being in effect the receiver, his counsel, and attorney upon the one side, and the general creditors upon the other. The order in his favor was appealable on the part of the creditors as persons aggrieved. Had they appealed and the order been reversed, his duty to restore if in the meantime he had applied the trust fund to his private use, is clear. The fact that the order was set aside in the court where it was granted, and the action in that regard sustained, is obviously governed by the same principles. The attorney, Mr. Frawley, and the counsel, Mr. Hayden, do not stand in the same situation as regards creditors. Their relations were with Mr. Rust as receiver. They had no relations with the creditors except one of an equitable character. Mr. Rust was primarily liable to them to the amount, at least, fixed by the court as a reasonable allowance for services of the kind which they performed. There being no express contract between them, they and Mr. Rust having joined in submitting the matter of the amount that should be paid to them to the court, they bound themselves by implied contract to take what should be judicially determined was proper to be paid them out of the trust fund. If the compensation had not been sat-

isfactory and they had brought suit against Mr. Rust, after
what occurred, the order of the court would have been deemed
part of the contract with Mr. Rust, and would have pre-
cluded them from any further recovery. Their only re-
course, if they had any, in case of dissatisfaction with the
order, was by appeal as parties aggrieved, upon the theory
that they had an equitable lien upon the trust fund. *Walsh
v. Raymond,* 58 Conn. 256, 20 Atl. 464; Gluck & Becker,
Receivers, sec. 106. The contract between Mr. Hayden and
Mr. Frawley and the receiver was conditional in this: that
in case the allowance made by the supervising court should
be subsequently reduced they would abide by the change, not
holding Mr. Rust to a personal liability in case the money
should not theretofore have been paid by him, and not hold-
ing the money to his loss in case the same should have been
so paid. That, in principle, is very clearly laid down in the
opinion of HALL, J., in the case above cited. Upon the same
equitable principles that govern where a judgment has been
reversed after payment has been enforced, payment by a re-
ceiver to his attorney under the circumstances of this case is
presumed to be subject to the order not being disturbed by
due course of law. If it is so disturbed by a reduction in the
allowance, a cause of action accrues in favor of the receiver
for a restoration of the excessive payment. The implied
promise, upon equitable principles, dates from the time the
money was paid, and interest should be figured from that
date.

Applying the foregoing to the minor conclusions reached,
the receiver is liable in this action for $524.26 and interest
thereon at the rate of six per cent. per annum from the time
he received the same, which is fairly fixed in the findings at
July 30, 1895, this referring to the conclusion reached in
Appeal No. 2. In addition, he having received from the
trust fund $7,427.82 as compensation for his personal serv-
ices, $11,144.02 on account of the legal services of T. F.

Frawley, and $4,952.02 on account of the legal services of his counsel, H. H. Hayden, in all $23,523.86, while he was entitled to receive but $5,000 for his personal services and $10,000 for expenses incurred by employing legal assistance, in all $15,000, his legal representatives are liable in this action to restore to the trust fund, at the suit of the respondents, $8,523.86, with interest from December 30, 1897, the time the excess was paid, less such sum as should be allowed for expenses of settling his account since December 30, 1897.

No proceedings outside of this action need be resorted to for the enforcement of the equities between the personal representatives of Mr. Rust and those of Mr. Frawley, and those of Mr. Hayden. Upon general principles of equity, and the statute, sec. 2883, Stats. 1898, as well, they can be finally adjusted in the decree to be entered herein under the directions of this court. The statute provides that:

"Judgment may be given for or against one or more of several defendants and it may determine the ultimate rights of the parties on each side, as between themselves, . . . and may grant to the defendant any affirmative relief to which he may be entitled."

It follows that Mr. Hayden having received from Mr. Rust $4,952.02 while he was entitled to receive but $2,500, his representatives are liable to the latter's representatives for the excess of $2,452.02 and interest thereon at the rate of six per cent. per annum from December 30, 1897, the day the same was paid.

Mr. T. F. Frawley, having received from Mr. Rust as receiver $11,144.02 while he was entitled to but $7,500, the former's legal representatives are liable to the latter's for the excess of $3,644.02 and interest thereon from the date the same was paid, December 30, 1897.

Complete equity between all these parties demands that the judgment in favor of the respondents, representing all the creditors participating in this litigation, entitled to the bene-

fit of the recovery against the legal representatives of R. E. Rust, shall be adjudged a lien on the recovery as to the legal representatives of H. H. Hayden, and also the recovery as to. the legal representatives of T. F. Frawley, after applying on such recoveries the costs that may be allowed to such legal representatives respectively in the court below as hereafter directed.

Some additional compensation, under familiar principles, should be allowed to the receiver as expenses of passing his account; notwithstanding the manner adopted in doing so. While such manner placed the receiver in the position of a litigating defendant in the action, which, under the peculiar circumstances of this case, not liable to frequently occur we, should hope, we hold was permissible in one view of it and approvable in another, the rights of the receiver, as regards compensation for the expenses of passing his account, to be paid out of the trust fund, of course cannot be prejudiced. If the conclusion was that there was any great fault upon the part of Mr. Rust leading to this new litigation, it would be competent for the court to deny him the usual compensation for expenses in passing the account; but it does not. Yet on the contrary the unfounded charges made against the receiver and his attorney and counsel, which have led to years of litigation since December 30, 1897, renders it eminently proper that the creditors represented by respondents should bear a considerable share of the expenses that would otherwise fall on Mr. Rust's estate. The case as to the abstract question involved is substantially the same as would have been presented to the judge who originally settled the account if he had set aside his order at the request of the creditors and gone over the entire matter anew, putting the receiver to a considerable expense in that regard. In such circumstances there would not be any question but that the reasonable expense of the receiver for attorney's and counsel's fees and other costs would be allowable to him, payable out of

the trust fund.  Not only allowable, but it would be unjust
not to allow the same.  Now his rights in that regard are not
changed by reason of the peculiar method resorted to for the
accounting.    So it seems that some reasonable amount, in
view of all the circumstances, should be allowed, to be de-
ducted from the liability above mentioned, on account of the
additional expenses caused to the personal representatives of
Mr. Rust by reason of the renewed controversy over his ac-
count.    It further seems best that there should be no fur-
ther litigation or proceedings in order to determine the proper
amount.  The case is all before us.  It can be seen with rea-
sonable certainty, as well here as anywhere, what sum should
be allowed under all the circumstances.  Many things are to
be considered in fixing this new allowance,—many things
not necessary to inscribe in this opinion.  Of course, very
much of the expense of this litigation was necessarily borne
by other parties.  Such expenses cannot be considered.  The
expenses of those who represented the receiver are so inter-
woven with those of other defendants, that it would be ex-
tremely difficult, if not impossible, to separate them with any
degree of definiteness by any aid that could be given to this
court or to the trial court, by sworn testimony or otherwise.
The matter is of such a peculiar character that the best that
can be done is to make an estimate of what the allowance
should be, having regard to what was reasonably necessary
as to the one particular interest in view of its being united
with many others.    Probably this court is as competent
to do that after the investigation made here as any court
can be, and, having power to do so, it is thought best not to
leave anything open for further controversy.  We have con-
cluded to allow the personal representatives of Mr. Rust, as
reasonable expenses of settling the receivership account, in
proceedings that have taken place in respect thereto since
December 30, 1897, the sum of $500 and all costs that might
be taxable against them in this court and in the court below,

such sum to be deducted from the liability to the respondents hereinbefore mentioned.

The matter of costs in the court below should be settled by this decision so as to avoid any difficulty hereafter in that regard. Testing the record by sec. 2920, Stats. 1898, after eliminating the interest represented by the personal representatives of R. E. Rust, we have defendants united in interest in a general way, but substantially not so united, rendering it permissible, and under the circumstances proper, to allow separate bills of costs where separate answers were interposed, and directions will hereinafter be made in that regard. The rights of the defendants as to that may be restrained by the court to an amount below what might be taxed by the fee bill in the discretion of the court, or disallowed altogether if that should seem best in a case like this. Subd. 7, sec. 2918, Stats. 1898. We have concluded to name a sum which in our opinion will be equitable under all the circumstances as to each defendant or group of defendants entitled to a separate recovery for costs, putting the same at a figure which we have determined with certainty to be below the amount that might be taxed by the fee bill, thus doing away with the necessity for the taxation of costs in the court below, and at the same time awarding to each one of the defendants or group of defendants entitled to a separate bill of costs, an equitable amount.

On the principles above stated there will be awarded to the personal representatives of H. H. Hayden for costs in the court below, in the rendition of the final judgment, $250. To the personal representatives of D. R. Moon, and *Fitch Gilbert, George T. Thompson, John S. Owen,* and the *Chippewa Valley Bank,* as parties answering together, $250; and to the personal representatives of T. F. Frawley, who answered separately, $250. The supplemental and separate answer of the personal representatives of D. R. Moon is not deemed to have changed the situation of that interest as the

same became fixed by Mr. Moon's having joined with *Fitch Gilbert* and others in answering to the complaint during his lifetime.

We have next to consider the subject of costs to be awarded in this court. As heretofore suggested, no costs will be awarded here for or against the interests represented by the personal representatives of R. E. Rust. On the motion to dismiss the appeals, because of the peculiar wording of the notices by which they were taken, it seemed necessary to hold that the jurisdiction of this court to hear the matter as to each of the appealing defendants depended upon whether each had complied with sec. 3052, Stats. 1898, by giving an undertaking for $250; it being considered that, since all the appealing defendants having, as stated in the notices of appeal, "severally and separately" appealed, each, from the standpoint of sec. 3052, had pending in this court, so far as the notices of appeal could render it so, a separate appeal. But a different question arises as regards the number of prevailing parties, in determining whether there should be here separate bills of costs, and if so how many such bills. There may be, as it seems, several appeals under sec. 3052 in a case where several persons united in interest severally appeal, and yet such several appeals, when disposed of in this court, there being really but one interest represented by the several defendants so severally appealing, which interest prevails, have but one prevailing party under sec. 2949, which provides that, "Costs shall be allowed in the supreme court irrespective of any costs taxed in the case in the court below to the prevailing party," etc. The term "prevailing party" as used in that section evidently refers, not so much to the person as to the interest represented. The language of the statute is peculiar in this: it indicates that the costs are to go to the prevailing party, not to the prevailing person. The word "party" is used in a plural or singular sense according to the person or persons standing for the particular interest in-

volved. That is in harmony with the decision of this court in *Allis v. Meadow S. D. Co.* 67 Wis. 16, 29 N. W. 543, 30 N. W. 300.

Looking at the various groups of appealing defendants in the light of what we have said, it is considered that there must necessarily be, as regards the appellants, seven prevailing parties as follows:

1. *Chippewa Valley Bank* and *George T. Thompson.*

2. *Fitch Gilbert, John S. Owen,* and *S. G.* and *F. H. Moon* administrators with the will annexed of the estate of D. R. Moon, deceased.

3. *Fitch Gilbert* and *J. T. Barber.*

4. *Fitch Gilbert* and *George T. Thompson.*

5. *Fitch Gilbert.*

6. *John S. Owen.*

7. *Lydia A. Frawley,* executrix of the last will of T. F. Frawley, deceased, and *A. J. Marsh* and *Daniel McLeod,* executors of the last will of H. H. Hayden, deceased.

Directions must be given as regards the collection of these various bills of costs in this court as well as in the court below, to the end that all sums for costs which the respondents may be required to pay shall be reimbursed to them out of the trust fund created by the recovery against the personal representatives of R. E. Rust. This is deemed equitable because it seems that, notwithstanding the disastrous results to respondents, the proceedings for the reopening of the receivership account were instituted in good faith by the active creditors, and were subsequently carried on in good faith to the final result, and that all creditors not personally active in the matter allowed themselves to be represented by those who were. Such directions must be given in regard to this matter that the judgment in this court in favor of the appellants, and the judgments in the court below in their favor as well, will, until paid, constitute equitable liens upon the judgment that shall be rendered in favor of re-

spondents against the legal representatives of R. E. Rust, and that upon the payment of any such judgment by the former the same shall be regarded as kept alive in favor of the respondents paying the same, with the equitable lien aforesaid incident thereto, till fully discharged by the discharge of such equitable lien through the payment thereof to the respondents out of the trust fund. Such further directions must here be given as regards the recoveries for costs in the court below in favor of the legal representatives of H. H. Hayden and the legal representatives of T. F. Frawley respectively, that such recoveries shall be used, so far as the same will go, for that purpose, in reduction of the recoveries against them respectively in favor of the legal representatives of R. E. Rust.

Such further directions should be given as will, so far as practicable, render further controversy respecting any matter in this litigation, even as regards details of the closing according to our decision, unnecessary.

We might now rest from further labors upon writing the mandate of the court. It is believed that every question advanced by counsel upon either side, that could in any reasonable aspect of the case affect the final result, has been considered and our conclusion in respect thereto stated, with reasons therefor. Those that have not been treated directly, have been incidentally. Yet, because of the importance of the principles involved and the great length of this opinion, a brief recapitulation of the fundamental errors found may be helpful in understanding the decision, in future cases. However plain many of the principles found to have been violated may appear here, the fact that to the learned circuit judge and the eminent counsel for the respondents they seemed quite different, strongly suggests that nothing should be left undone which may reasonably be done that will fortify against a recurrence of such errors. The remediless consequences liable to flow from serious misconceptions of

legal principles are well illustrated here. It stimulates us to put up all the guards we reasonably can to avoid such happenings. This court can correct errors, and so far as human wisdom embodied in our laws has designed a standard for measuring, in money, injurious consequences of wrongs to person, character, or estate, can redress them or open the way therefor; but no vindication which this or any other human tribunal can afford can redress still other injuries which may weigh down men's souls in spite of any legal vindication. That situation is peculiarly impressive in this case when we note, as has been before indicated, that all the significant figures concerned, that were so condemned by the judgment appealed from, have passed from under the cloud only to cross the Dark River that is never recrossed, and must take such vindication as the court can afford at the hands of their legal representatives.

Here, as we view the matter, are the fundamental mistakes that were committed in this case:

1. In assuming that, because Mr. Hayden severed his connection with the insolvent corporation to be active in commencing the receivership action, an ulterior motive on his part was to be presumed, and that such conduct, in connection with other circumstances happening before such commencement, and others subsequent thereto not evidencing bad intent, warranted holding that prior to such commencement a fraudulent agreement was formed to misappropriate the assets of the insolvent, and viewing the transactions which thereafter occurred from that standpoint.

2. In finding, contrary to the undisputed evidence, that the receiver did not, prior to endeavor to save something out of the Ashville bonds by the use of his own means, obtain the court's refusal to allow him to use receivership money in the matter.

3. In finding, in effect, that the receiver realized a profit

from the Asheville matter, when the evidence was clear that he was a loser to a large amount.

4. In finding that the receiver fraudulently concealed the fact that $3,500 of Asheville bonds belonged to the trust fund, when the evidence is to the effect that there were but $2,500 of such bonds that he ever possessed or knew about, and is reasonably clear that the insolvent did not control the additional $1,000 of bonds after the day they were issued, if at all.

5. In assuming that, in a judicial administration of the property of an insolvent corporation for the benefit of its creditors, secured creditors have no standing as regards a distribution of the assets except upon a basis of their claims, less the value of their securities.

6. In assuming that a receiver, even with the approval of his court, cannot rightfully incur expense in the enforcement of contract liabilities in which he possesses only an equity, there being no reasonable ground to expect any money can be realized therefrom that will inure to the direct benefit of general creditors.

7. In assuming that, if a receiver incurs any expense in respect to any such equity without being so directed by his court, his action is necessarily wrongful and probably fraudulent.

8. In assuming that a receiver has no right, even with the approval of his court, to complete unfinished contracts of the insolvent where the amounts to be realized therefrom have been hypothecated, unless he has reasonable ground to expect something will be realized therefrom for the direct benefit of general creditors.

9. In assuming that legal services by the receiver's attorney, in collecting hypothecated accounts, must necessarily be deemed to have been rendered for the holders thereof.

10. In making such assumption notwithstanding the un-

disputed evidence that the services of the attorney were performed for the receiver.

11. In assuming that, in case of a receivership and the existence of hypothecations made by the insolvent before the commencement of the administration suit, the validity of which is not in dispute, the interests of the secured parties are adverse to those of general creditors, so that the attorney for the receiver, in performing any service for the former as to filing the proper proof in the receivership matter, of their claims against the insolvent, necessarily acts inconsistently with his employment by the receiver.

12. In assuming that an attorney for a receiver should keep an itemized account; not relying upon the court to make a proper allowance for his services at the close of the receivership.

13. In assuming, because the receiver's attorney made charges upon his books to his employer for some services rendered, they must represent the extent of his services; and that the compensation awarded him, so far as necessary to balance such charges, was necessarily fixed according thereto; and that all compensation awarded in excess of such charges, or of the reasonable value of such services, where the charges greatly exceeded it, was excessive and fraudulently obtained, though the undisputed evidence was that no attempt was made to keep a strict account of the services rendered, that the charges were not made with a view to obtaining compensation according thereto, and that they were never presented or intended to be presented to the court.

14. In assuming that a pledge of real property as security, not constituting a mortgage at law, is of no validity and cannot form a sufficient consideration for a valid mortgage carrying out the intention of the parties to the pledge, the property in the meantime having become impressed with a trust for general creditors.

15. In predicating findings against defendants upon un-

sworn statements of their agent respecting matters outside the scope of his agency.

16. In violating the rule that the fair testimony of an interested witness, not impaired by any other testimony or circumstance, should be deemed controlling.

17. In assuming that a reference of a receiver's account to take evidence in respect thereto and report the same with conclusions for the assistance of the presiding judge in settling such account, is governed by the statute and rules of court in respect to trials of actions before referees.

There are very many other errors which have been treated, but those specially mentioned caused the court below to view the conduct of the parties charged from a radically erroneous standpoint. Looking through such a veil of misconceptions, very many of the ordinary transactions that must necessarily occur in the judicial administration of a large property, of the character of the one in question, were supposed to be glaring evidences of fraud.

Now we will close this case, satisfied that justice will be done so far as it is given to us here to discover it. Satisfied, too, that no greater wrong appears anywhere in the record upon appellants' part than negligence at one or two points, and some indiscretion in the proceedings of December 30, 1897. We have been able to discover nothing that should reflect upon the professional, the business, or the official integrity of any one concerned in this litigation; nothing to indicate bad faith in the conduct of any one concerned with the receivership, nor to indicate but that the proceedings on the part of the creditors and those acting for them since December 30, 1897, have been characterized by the utmost good faith. The judgment pronounced will be shaped in harmony with that view. It is hoped that we may be able to so plainly direct the course to be taken in such proceedings as may be necessary to close up this matter, that neither party will need to make any further application to this court.

The deaths of Mr. Hayden, Mr. Frawley and Mr. W. A. Rust, the latter being one of the executors, as indicated, of the last will of Ralph E. Rust, having occurred since the cause was removed to this court, and due proceedings having been taken to continue the action notwithstanding, by the substitution, for Mr. Hayden, of *A. J. Marsh* and *Daniel McLeod* in their capacity as executors of his last will, the substitution, for Mr. Frawley, of *Lydia A. Frawley* in her capacity as executrix of his last will, and the substitution of *T. W. Gilchrist* as executor of the last will of Ralph E. Rust in place of W. A. Rust, deceased,—the judgments here and in the court below will be pronounced, using the names of the existing legal representatives of deceased parties.

*By the Court.*—Those parts of the judgment appealed from by the several appellants are reversed, that is to say:

1. That against *John S. Owen* for $182.94.

2. That against *Fitch Gilbert* for $119.58.

3. That against *Fitch Gilbert, George T. Thompson,* and William A. and *Aloney J. Rust* as executors of the last will of Ralph E. Rust, deceased, for $13,400.36.

4. That against *Fitch Gilbert, John S. Owen,* William A. and *Aloney J. Rust* as executors as aforesaid, and *Simon G.* and *Frank H. Moon* as administrators with the will annexed of the estate of D. R. Moon, deceased, for $3,536.02.

5. That against the *Chippewa Valley Bank, George T. Thompson,* and W. A. and *Aloney J. Rust* as executors aforesaid, for $891.50.

6. That against *Fitch Gilbert* and *James T. Barber,* and William A. and *Aloney J. Rust* as executors, as aforesaid, for $1,196.68.

7. That against the *Chippewa Valley Bank* and William A. and *Aloney J. Rust* as executors aforesaid, for $226.54.

8. That against William A. and *Aloney J. Rust* as executors aforesaid, for $1,395.67.

9. That against T. F. Frawley, H. H. Hayden and W. A. and *Aloney J. Rust* as executors aforesaid, for $29,071.91.

10. That against all the parties named for $798.91 costs.

11. That vacating the *ex parte* orders entered prior to December 31, 1897, except those of December 30, 1897, and the one authorizing the charging off of the account against the receiver and others, of $524.26.

12. That modifying the receiver's account as settled by the order of December 30, 1897, except as the account so originally settled is modified by this decision.

13. All other portions of the judgment inconsistent with those above specially mentioned.

The circuit court from which the cause was removed to this court is directed, immediately upon the return of the record to that court, and upon due application therefor, to enter an amended judgment containing that portion of the judgment as at first entered, not disturbed by this decision, and the following:

1. Awarding to the plaintiffs against *T. W. Gilchrist* and *A. J. Rust* as executors of the last will of Ralph E. Rust, deceased, judgment for $9,048.12 with interest at the rate of six per cent. per annum on $524.26 from July 30, 1895, and on $8,523.86 from December 30, 1897, to the date of this decision, April 19, 1904,—less the sum of $500, allowed in addition to costs that might be taxed as regards the receivership interest, for expenses incurred by that interest in the adjustment of the receivership account since December 30, 1897, and less the further sum of $500 applied to the payment of costs allowed to the legal representatives of H. H. Hayden and those of T. F. Frawley, and paid by deducting the same from the liabilities of said legal representatives to the legal representatives of Ralph E. Rust,—leaving the total sum to be recovered by the plaintiffs against the legal representatives of Ralph E. Rust, as of the 19th day of April, 1904, $11,634.32.

2. Awarding to *T. W. Gilchrist* and *Aloney J. Rust*, defendants, in their capacity as legal representatives aforesaid,. against *A. J. Marsh* and *Daniel McLeod*, in their capacity as executors of the last will of H. H. Hayden, deceased, judgment for $2,452.02, with interest thereon at the rate of six per cent, per annum from December 30, 1897, to the date of this decision aforesaid, less $250 allowed to the Hayden interest for costs against the plaintiffs, making the total sum of $3,153.82.

3. Awarding to *T. W. Gilchrist* and *Aloney J. Rust*, defendants, in their capacity as executors aforesaid, against *Lydia A. Frawley*, defendant, as executrix of the last will of T. F. Frawley, deceased, judgment for $3,644.02, with interest thereon from December 30, 1897, at the rate of six per cent. per annum, to the date of this decision, as aforesaid, less $250 allowed to the Frawley interest against the plaintiffs for costs, making $4,807.48.

4. Awarding to *Lydia A. Frawley*, defendant, in her capacity as executrix, aforesaid, against the plaintiffs, judgment for $250 as costs in the circuit court, the same to be deemed discharged as soon as entered, by the credit of $250 to such interest as between the legal representatives of T. F. Frawley and the legal representatives of Ralph E. Rust, and a like credit to the latter as between them and the plaintiffs, as heretofore indicated.

5. Awarding to *A. J. Marsh* and *Daniel McLeod*, defendants, in their capacity as executors aforesaid, a judgment for $250 costs in the circuit court against the plaintiffs, the same to be deemed canceled as soon as rendered, by the credit of $250 given to such executors as between themselves and the legal representatives of Ralph E. Rust, deceased, and a credit of a like amount to the latter as between them and the plaint-. iffs as before indicated.

6. Awarding to defendants *Fitch Gilbert, John S. Owen*,

and *Simon G.* and *Frank H. Moon* as administrators with the will annexed of the estate of D. R. Moon, deceased, *George T. Thompson,* and the *Chippewa Valley Bank,* against the plaintiffs, $250 as costs.

7. Providing that the judgment, in the whole, shall be deemed entered as of the date of this decision, April 19, 1904, aforesaid, to the end that interest on the recoveries shall run from that time.

8. Providing that the recovery for costs in favor of *Fitch Gilbert* and his associates in the circuit court, and all judgments for costs rendered against the respondents in this court, shall be liens on the judgment in their favor as plaintiffs in the circuit court, against the legal representatives of Ralph E. Rust, deceased, such liens to continue till such judgments for costs shall have been paid to the judgment creditors respectively, and, if paid by the plaintiffs, till they shall have been reimbursed for their outlay in that regard out of the proceeds of the encumbered judgment in their favor.

No costs are to be taxed against the legal representatives of Ralph E. Rust in the circuit court,—any sum which might be equitably, under ordinary conditions, taxable against them, to be deemed offset by legitimate claims for expenses of settling the receivership account in addition to the $500 awarded as aforesaid.

Separate judgments for costs are awarded in this court to the appellants against the respondents as follows:

1. *Chippewa Valley Bank* and *George T. Thompson;*

2. *Fitch Gilbert, John S. Owen,* and *Sumner G.* and *Frank H. Moon* as administrators with the will annexed of the estate of D. R. Moon, deceased;

3. *Fitch Gilbert* and *James T. Barber;*

4. *Fitch Gilbert* and *George T. Thompson;*

5. *Fitch Gilbert;*

6. *John S. Owen;*

7. *Lydia A. Frawley* as executrix of the last will of T. F.
Frawley, deceased, and *A. J. Marsh* and *Daniel McLeod,* as
executors of the last will of H. H. Hayden, deceased;—

Each of said several prevailing parties, seven in number,
to have taxed in his or their favor attorney's fees and one
eighth of a full bill of costs exclusive of fees taxable under
sec. 2949, Stats. 1898.

The respondents moved for a rehearing as to each of the
separate appeals. The following opinion was filed June 10,
1904:

MARSHALL, J. No new question is presented now for con-
sideration, or reason given why the result heretofore reached
is not right, that has not been thought of and disapproved.

We are urged to at least make such modification of the
mandate as to direct the trial court "to allow to the active
creditors reimbursement out of the proceeds of the judgment
rendered in their favor for all reasonable expenses which may
have been incurred in the prosecution of these proceedings
which have resulted in the obtaining of such judgment."
That is a subject not necessarily involved in the decision of
any question raised by the appeal. Just how a trust fund,
brought under the control of a trial court by the execution of
a judgment rendered pursuant to a mandate of this court,
shall be administered for the benefit of those entitled thereto,
is not ordinarily made a part of the decision here. Ordinar-
ily the mere execution of any judgment in the trial court ren-
dered pursuant to the mandate of this court is within the ad-
ministrative function of the former, subject to review here in
case of error; though it is proper to suggest, or in some cir-
cumstances to direct, what course shall be pursued. Prob-
ably a direction in the matter suggested by counsel for re-
spondents in addition to what is contained in the former
mandate, may expedite the speedy distribution of the trust

fund and final closing up of the whole matter, which is "a consummation devoutly to be wished." Such mandate may be considered amended so as to direct that the judgment to be rendered in respondents' favor shall provide that the recovery of the legal representatives of R. E. Rust shall be *into the hands of the clerk of the circuit court* for the benefit of all the creditors whose claims are established by the judgment, after the extinguishment of the liens for costs thereon and the payment of the counsel fees and other expenses of the active creditors in recovering and administering the fund, so far as the same are deemed reasonable, the amount for such counsel fees and expenses to be fixed and allowed at $1,000; that the residue left after the extinguishment of such lien and the payment of such $1,000 shall be under the direction of the court paid *pro rata* to all the creditors whose claims are established as aforesaid.

A mere review of the decision of December 30, 1897, as to the compensation and expenses of the receiver, could doubtless have been secured by a small outlay as compared with the large amount required to pay all the expense incurred by the necessity created by respondents of trying the multitude of issues presented to the court for adjudication which have been found, in the main, to be without merit as regards their contentions.

*By the Court.*—The former mandate is amended as above indicated, and the several motions for a rehearing are denied with $25 costs in favor of each prevailing appellant mentioned in the former opinion.